1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 SOFIE KARASEK, et al.,                    Case No. 15-cv-03717-WHO

Plaintiffs,

8                                          **ORDER ON MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

9       v.
Re: Dkt. No. 18

10 REGENTS OF THE UNIVERSITY OF
CALIFORNIA,

11                 Defendant.

12                          **INTRODUCTION**

13          Plaintiffs Sofie Karasek, Nicoletta Commins, and Aryle Butler were victims of sexual

14 assault while enrolled as undergraduate students at UC Berkeley (the "University"). They allege

15 that the University responded with deliberate indifference when they reported their assaults to

16 school officials and, in addition, that the University's deliberate indifference to the general

17 problem of sexual violence against its students subjected them to their assaults. They highlight

18 numerous deficiencies in the University's procedures and seek to hold it liable in money damages

19 under Title IX, 20 U.S.C. § 1681, as well as under several state law causes of action. The

20 University, citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), moves to dismiss for

21 failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed

22 below, Butler has stated a Title IX claim and the motion is DENIED as to that claim. In most

23 other respects, the University's motion is GRANTED. I will give plaintiffs 60 days leave to

24 amend.

25                          **BACKGROUND**

26 **I.     FACTUAL BACKGROUND**

27         **A.     Karasek**

28         Karasek participated in a weekend trip to San Diego with the Cal Berkeley Democrats

Club (the "Club") from February 10 to 12, 2012, during which she was sexually assaulted by a student referred to in the Seconded Amended Complaint ("SAC") as "TH." SAC ¶¶ 5-9 (Dkt. No. 14). On the night of February 10, 2012, she slept in the same bed with three other students, one of whom was TH, and awoke around 3:00 a.m. to find TH massaging her legs, back, and buttocks. *Id.* ¶ 9. Karasek states that she "froze in the moment, and TH continued to inappropriately rub her for approximately 30 minutes." *Id.*

In approximately April or May 2012, Karasek and three other female students who had been sexually assaulted by TH met with three University representatives (Cici Ambrosio, from the Gender Equity Resource Center; Denise Oldham, from the Title IX Office; and Hallie Hunt, from the Center for Student Conduct) and reported their assaults. *Id.* ¶ 10. Karasek was not told during the meeting that she would need to submit a written statement regarding her assault. *Id.* ¶ 11. After learning of this requirement, she submitted a formal, written complaint to Hunt on May 15, 2012.[1] *Id.* ¶ 12.

The University did not contact Karasek regarding her complaint for the next eight months. *Id.* ¶ 16. At some point during that period, the Club's president informed Karasek that the University was conducting "backdoor meetings" with TH and the Club's board. *Id.* ¶ 17. The Club's president also told Karasek that "the administration had advised against removing TH from the Club because [the administration was] concerned that if [TH] went to another student group, he [could] assault someone and there would not be the same support structure for a survivor in that group." *Id.* ¶ 14.

In November 2012, one of the Club's board members informed Karasek that TH was set to graduate one semester early, in December 2012. *Id.* ¶ 18. Upon learning of this information, Karasek emailed Ambrosio to request an update on her complaint. *Id.* ¶ 19. Ambrosio did not immediately respond, and after two weeks had passed, Karasek emailed Ambrosio a second time. *Id.* Ambrosio subsequently informed Karasek "that the University was preparing to respond to Karasek." *Id.*

---

[1] Karasek does not explain for what purpose she was required to submit a written statement. I assume that she means that it was required to initiate an investigation by the University.

On December 12, 2012, Karasek received her first communication from the University regarding her complaint since the initial meeting in approximately April or May 2012. *Id.* ¶ 20. The Title IX Office sent her a three sentence email stating that "th[e] matter had been explored and resolved using an early resolution process" and that the Title IX Office had "communicated the outcome of the early resolution process to the Center for Student Conduct." *Id.* The email did not reveal to Karasek what the outcome was. *Id.*

On December 17, 2012, three days after TH had graduated, a representative from the Center for Student Conduct sent Karasek an email stating that TH had been found to be in violation of the Campus Code of Student Conduct. *Id.* ¶ 22. However, the email did not explain what, if any, disciplinary action had been taken against TH. *Id.* Karasek filed a federal Clery Act complaint against the University in May 2013, and in September 2013, she contacted Hunt to inquire into whether any disciplinary action had been taken against TH. *Id.* ¶¶ 23-24. Hunt responded that TH had been placed on disciplinary probation and had "engaged in some counseling measures." *Id.* ¶ 25.

Karasek states that she was never informed that she could report her assault to law enforcement,[2] was never given an opportunity to present her claim at a disciplinary hearing, and was not informed of the outcome of the investigation until nearly a year after TH had graduated. *Id.* ¶ 27. While Karasek does not allege that she has suffered any further assaults by TH or has had any further contact with him since reporting the February 2012 incident to the University, she states that as a result of the University's conduct, she has suffered psychological and emotional damages and has experienced a loss of educational opportunities and/or benefits, including but not limited to: (1) "[b]eing forced to change her major from Economics to the less academically rigorous Political Economy;" (2) "[s]uffering a noticeable drop in her GPA;" (3) being "forced to drop at least one class;" (4) "miss[ing] assignments" and "ask[ing] for extensions on assignments;" and (5) "constantly operating with a heightened sense of fear, anxiety, and stress

---

[2] Plaintiffs allege that "as early as 1999, if a student reported that they had been sexually assaulted, the University's policy dictated that the student be notified of their rights under the law, as well as their ability to report their assault to law enforcement." SAC ¶ 74.

knowing that there are possible perpetrators in her classes that have not been removed by the University." *Id.*

### B. Commins

In January 2012, Commins was sexually assaulted in her off-campus apartment by a fellow University student identified in the SAC as "John Doe 2." SAC ¶ 48. She states that she invited John Doe 2 to her apartment, and that without her consent, he performed oral sex on her, attempted to physically coerce her to perform oral sex on him, and digitally penetrated her. *Id.* ¶¶ 50-51.

The next day, Commins reported the assault to the University's Tang Student Health Center (the "Health Center"). *Id.* ¶ 52. The Health Center performed a cursory exam but did not administer a rape kit. *Id.* ¶ 53. Commins subsequently reported the assault to the Berkeley Police Department and went to Highland Hospital, where a rape kit was administered. *Id.* ¶¶ 54-55. The rape kit revealed evidence of trauma.[3] *Id.* ¶ 55.

Although Commins never reported her assault to the University, the University learned of the assault (according to the SAC, likely from the Berkeley Police Department). *Id.* ¶ 56. At some point, Commins received a telephone call from either the Title IX Office or the Office of Student Conduct to discuss the assault. *Id.* ¶ 57. She was told that the University would perform an investigation but was made to believe that the University's investigation could not begin until the Berkeley Police Department's investigation was complete. *Id.* Commins specifically requested that the University begin its investigation immediately, but the University did not respond to this request. *Id.*

At some point thereafter, a representative from the Office of Student Conduct contacted Commins to ask if she still wanted to pursue an investigation. *Id.* ¶ 61. She responded that she would. *Id.* Commins states that she was not contacted again until March 2013, when the Office of

---

[3] Plaintiffs state in their opposition brief that John Doe 2 was convicted of felony assault under California Penal Code § 245(a)(4) for his assault on Commins. Opp. at 8 (Dkt. No. 19). They submit for judicial notice a Clerks Docket and Minutes dated October 5, 2012 from the Superior Court of California for the County of Alameda, which they describe as the record of John Doe 2's sentencing for the conviction. RJN EX. C (Dkt. No. 20-3).

4

Student Conduct sent her an email stating that John Doe 2 had been suspended until Fall 2014, the semester after Commins was set to graduate.  *Id.* ¶¶ 61-62.  However, the email was sent to an address that Commins infrequently checked and had not used to correspond with the administration, and she did not see the email.  *Id.* ¶ 62.  In July 2013, she contacted the Office of Student Conduct for an update and learned that John Doe 2 had been suspended, that he was required to complete a reflective writing assignment, that he had been prohibited from contacting her, and that he would be on disciplinary probation for the remainder of his time at the University.  *Id.* ¶ 63.  Commins was not informed of her right to appeal any of the decisions regarding the disciplinary actions taken against John Doe 2.  *Id.* ¶ 64.

Commins is now a graduate student at the University.  *Id.* ¶ 65.  She states that despite her protestations that she does not feel comfortable with John Doe 2 on campus, the University informed her that he would be returning in August 2015.[4]  *Id.* ¶ 67.  She does not allege that she has suffered any further assaults or has had any further contact with John Doe 2 since the University learned of the January 2012 incident.  However, she states that John Doe 2 was allowed to remain on campus, with no restrictions, "throughout this whole process," and that as a result of the University's conduct, she has suffered psychological and emotional damages and has experienced a loss of educational opportunities and/or benefits, including but not limited to: (1) "[b]eing forced to drop a class because it let out at night and she was fearful of encountering John Doe 2 on campus after dark;" (2) "[a]voiding enrollment in any classes that let out after dark;" (3) "[b]eing forced to take a reduced course load for the semester after her report, and having to stay in school for an extra summer to make up for her reduced course load;" (4) "[w]ithdrawing [from] the Tae Kwon Doe Club;" and (5) incurring "[s]ignificantly higher amounts of absences which negatively impacted her GPA."  *Id.* ¶¶ 60, 68.

### C.     Butler

In 2012, Butler signed a work contract with the University to serve as an assistant to Margot Higgins, a PhD candidate who was conducting research in Alaska that summer.  SAC ¶

---

[4] The SAC does not state whether John Doe 2 did in fact return to campus in August 2015.

28. Higgins was receiving funding from the University at the time, and the University authorized her to hire and supervise an undergraduate assistant while conducting her research. *Id.* ¶¶ 29-30.

While in Alaska, Butler lived at the Wrangell Mountains Center (the "Wrangell Center"). *Id.* ¶ 31. The Wrangell Center houses the Alaska Wildlands Studies Program ("Alaska Wildlands"). *Id.* The University advertises Alaska Wildlands to its students, who can receive academic credit for completing the program. *Id.* ¶ 32. A man identified as "John Doe" in the SAC is on the board of the Wrangell Center and is a guest lecturer for Alaska Wildlands. *Id.* ¶ 33. "[A]t all relevant times," John Doe was also a guest lecturer at the University and was involved in an environmental restoration project on the University campus, and was frequently on campus in these capacities while Butler was a student. *Id.* ¶ 34.

Toward the end of June 2012, Butler was in the dining hall at the Wrangell Center when John Doe approached her from behind, pressed her up against a table, and inserted his hands into her underwear and began massaging her genitals. *Id.* ¶ 36. The following day, Butler reported the incident to Higgins, without identifying her assailant. *Id.* ¶ 37. Unprompted, Higgins asked if the assailant had been John Doe. *Id.* Butler confirmed that it had been but asked Higgins not to say anything at that time. *Id.*

Shortly thereafter, Butler was in the library at the Wrangell Center when John Doe entered the room and maneuvered behind her chair. He moved her hair to one side and whispered into her ear, "It's so nice to have such a beautiful woman around." *Id.* ¶ 38. He then patted her shoulder and left the room. *Id.* At some point, Butler also reported this incident to Higgins. *Id.*

Later that summer, Butler was in the kitchen at the Wrangell Center when John Doe again approach her from behind, pressed her up against the kitchen counter, and rubbed her breasts underneath her clothing. *Id.* ¶ 39. He quickly retracted his hands after there was a noise outside the room. *Id.* He whispered, "You have such a beautiful voice," and left. *Id.* Butler immediately reported this incident to Higgins, who was away for a few days but advised Butler to pack her belongings and to go to Higgins's cabin, which was offsite from the Wrangell Center. *Id.* ¶ 40.

When Higgins returned, Butler asked her if she had reported John Doe to anyone, or spoken with him about the assaults. *Id.* ¶ 41. Higgins responded that she had not. *Id.* At the end

of Butler's term of employment, Higgins told her that she had spoken with John Doe and that she believed he "really gets it this time." *Id.* ¶ 42.

Upon returning to the University, Butler reported the assaults by John Doe to Ambrosio (from the Gender Equity Resource Center) who set up a meeting between Butler and Oldham (from the Title IX Office). *Id.* ¶ 43. During the meeting, Butler identified John Doe as her assailant. *Id.* ¶ 44. Oldham repeatedly asked Butler if she ever affirmatively rebuffed any of John Doe's advances, and also asked how John Doe was supposed to know his conduct was not welcome if she never affirmatively rebuffed him. *Id.* Oldham also admonished Butler regarding the consequences of falsely reporting sexual assaults. *Id.*

Butler states that there has been no investigation by the University into her assaults, and that no disciplinary action has been taken against John Doe. *Id.* ¶ 46. She does not allege that she has suffered any further assaults or has had any further contact with John Doe since the University learned of the summer 2012 incidents. However, she states that as a result of the University's conduct, she has suffered psychological and emotional damages and has experienced a loss of educational opportunities and/or benefits, including but not limited to: (1) "[b]eing forced to withdraw from an internship she had secured with the Gender Equity Resource Center because she was deemed 'too political' for speaking out against the way the University handles reports of sexual assault;" (2) "[b]eing forced to drop a class, required for her major, during finals week in the fall of 2013;" and (3) "[b]eing forced to avoid classes altogether for fear that she would encounter John Doe on campus." *Id.* ¶ 47.

### D. Dear Colleague Letter

Plaintiffs describe in the SAC and submit for judicial notice a Dear Colleague Letter ("DCL") on sexual harassment published by the Department of Education Office for Civil Rights ("OCR") on April 4, 2011.[5] SAC ¶ 72; RJN Ex. A (Dkt. No. 20-1).

---

[5] The DCL is a "significant guidance document" as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices. *See* DCL at 1 n.1; 72 Fed. Reg. 3432. It "does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations." DCL at 1 n.1.

The DCL discusses "Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence." DCL at 2. It states that "[i]f a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." *Id.* at 4. A footnote attached to this sentence explains, "This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief . . . The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999)." DCL at 4 n.12.

In their SAC and opposition brief, plaintiffs highlight several of the specific requirements and guidelines for responding to sexual assault reports set out in the DCL, including the following:

> • A school's grievance procedures must "provid[e] for the prompt and equitable resolution of sex discrimination complaints." DCL at 8.
>
> • Schools must "provide equitable grievance procedures. Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing." *Id.* at 10.
>
> • "Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment." *Id.* at 12.
>
> • "Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate." *Id.* at 7. In addition, "[a]ll persons involved in implementing a recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures." *Id.* at 12.

• "A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation." *Id.* at 10.

• "Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime." *Id.*

### E.    Other Allegations

In addition to the allegations regarding the University's response to the sexual assaults on Karasek, Commins, and Butler in particular, the SAC includes the following allegations regarding the University's response to the general problem of sexual violence against its students.

First, plaintiffs state that the University "underreported the amount of sexually violent incidents that occurred on campus during the years prior to plaintiffs' enrollment at the University." SAC ¶ 69.

Second, in June 2014, the California State Auditor published a report entitled "Sexual Harassment and Sexual Violence: California Universities Must Better Protect Students by Doing More to Prevent, Respond to, and Resolve Incidents" (the "Audit Report"). *Id.* ¶ 70; RJN Ex. B (Dkt. No. 20-2).[6]  The Audit Report concerns the handling of sexual violence incidents at four California universities: UC Berkeley, UCLA, California State University at Chico, and San Diego State University.  It concludes, among other things, that:

• "The universities do not ensure that all faculty and staff are sufficiently trained on responding to and reporting these incidents to appropriate officials."

• "[A]lthough the Title IX coordinators and staff involved in key roles of the incident reporting process receive adequate training, certain other university employees who are likely to be the first point of contact are not sufficiently trained on responding to and reporting these incidents. By not ensuring that all university

---

[6] Plaintiffs' request for judicial notice of the Clerks Docket and Minutes regarding John Doe 2's sentencing, the DCL, and the Audit Report is GRANTED to the extent that the request seeks judicial notice of the existence of these documents and the existence of their contents.  *See* Dkt. Nos 20-21; *see also* Dkt. No. 22.  To the extent that the request seeks judicial notice of the truth of the contents of the documents, it is DENIED.

employees are adequately and routinely trained on responding to and reporting incidents of sexual harassment and sexual violence, and by not providing practical information on how to identify incidents, universities risk having their employees mishandle student reports of the incidents."

• "The universities must do more to appropriately educate students on sexual harassment and sexual violence."

• "The universities did not always comply with requirements in state law for distribution of relevant policies."

• "The universities . . . need to better inform students who file a complaint of the status of the investigation and notify them of the eventual outcome."

• "Each university we reviewed has an adequate overall process for responding to incidents of sexual harassment and sexual violence. However, our review of 80 case files at the four universities revealed that the universities need to improve these processes in some key areas. Specifically, the universities should do more to demonstrate that a student who may have experienced sexual harassment or sexual violence is informed of his or her reporting options and what to expect regarding the university's subsequent actions. The universities then need to better inform students who file a complaint of the status of the investigation and to notify them of the eventual outcome."

Audit Report at 1-3 ("Results in Brief"); *see also* SAC ¶ 72.

Third, in 2014, 31 women filed an administrative Title IX claim with the Office of Civil Rights, alleging that "as far back as 1979, the University failed to adequately respond to their reports that they had been sexually assaulted." *Id.* ¶ 73.

## II. PROCEDURAL BACKGROUND

Plaintiffs initiated this action in the Superior Court of California for the County of Alameda on July 2, 2015. Dkt. No. 1-1. On July 17, 2015, they served the University with their first amended complaint, and on August 14, 2015, the University removed the case to federal court. Dkt. No. 1 ("Notice of Removal"). On September 10, 2015, after the University moved to dismiss the first amended complaint, plaintiffs filed the SAC. Dkt. Nos. 6, 14.

The SAC brings four causes of action against the University: (1) gender discrimination in violation of Title IX, 20 U.S.C. § 1681, SAC ¶¶ 77-79;[7] (2) negligent failure to warn, train, and/or

---

[7] The SAC refers to the Title IX cause of action as, "Discrimination on the Basis of Gender in Violation of 20 U.S.C. § 1681." SAC ¶ 77.

educate plaintiffs, SAC ¶¶ 80-82; (3) gender discrimination in violation of California Education Code § 220, SAC ¶¶ 83-85; and (4) fraud, SAC ¶¶ 86-92. The SAC seeks damages but does not include a request for injunctive or other equitable relief.

The University filed their motion to dismiss the SAC on September 24, 2015. Dkt. No. 18 ("Mot."). I heard argument from the parties on November 3, 2015. Dkt. No. 32.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076

(9th Cir. 2013).

## DISCUSSION

## I.    FIRST CAUSE OF ACTION: TITLE IX

Title IX states in relevant part that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The statute provides victims of sex discrimination with a private right of action against recipients of federal education funding. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). Under *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), however, a school may be held liable in money damages under Title IX "only for its own misconduct," i.e., only when it "subjects its students to harassment." *Id.* at 644-45 (internal quotation marks and alterations omitted). Under this standard, a plaintiff bringing a Title IX claim arising from student-on-student or faculty-on-student[8] sexual harassment must establish the following elements:

First, the school must have "exercise[d] substantial control over both the harasser and the context in which the . . . harassment occur[ed]." *Id.* at 645.

Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Third, the school must have had "actual knowledge of the harassment," meaning that a school official "who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf ha[d] actual knowledge of [the] discrimination." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (internal quotation marks omitted); *see also Davis*, 526 U.S. at 650.

Fourth, the school must have acted with "deliberate indifference" to the harassment, meaning that the school's "response to the harassment [was] clearly unreasonable in light of the

---

[8] *See Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) (applying the *Davis* "deliberate indifference" framework to a Title IX claim based on faculty-to-student sexual harassment); *Takla v. Regents of the Univ. of California*, No. 15-cv-04418, 2015 WL 6755190, at *3 (C.D. Cal. Nov. 2, 2015) (same).

United States District Court
Northern District of California

known circumstances." *Davis*, 526 U.S. at 643, 648. This is an "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (internal quotation marks omitted), that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless," *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Rather, a plaintiff must plead facts that support a plausible inference that the school made what amounts to "an official decision . . . not to remedy" the discrimination. *Id.* (internal quotation marks omitted). Deliberate indifference is a fact intensive inquiry that often must be resolved by the trier of fact. *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860-MEJ, 2011 WL 2976805, at *5 (N.D. Cal. July 22, 2011). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Fifth, the school's deliberate indifference must have "subject[ed] [the plaintiff] to harassment," i.e., "cause[d] [the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it." *Id.* at 645 (internal quotation marks omitted).

The University contends that none of plaintiffs' Title IX claims satisfy these requirements. I begin by addressing three common issues: (1) plaintiffs' contention that they have stated a Title IX claim based on their allegations regarding the University's response to the general problem of sexual violence against its students; (2) the University's argument that plaintiffs have not stated a Title IX claim because they do not allege that they suffered "further harassment" after reporting their assailants to the University; and (3) plaintiffs' reliance on the DCL to establish deliberate indifference. I then address the allegations specific to each plaintiff.

### A.     Common Issues

#### 1.     The University's Response to the General Problem of Sexual Violence

In addition to their Title IX claims based on the University's alleged *post-assault* conduct, plaintiffs contend that they have established Title IX liability against the University based on its *pre-assault* response to the general problem of sexual violence against its students. Opp. at 11-13. I agree with plaintiffs that in certain circumstances "[a] school's generally inadequate response to a known institutional problem of sexual violence" can support a student-on-student harassment

13

claim under Title IX, *id.* at 11, and I also agree that plaintiffs have alleged problems that, if true, should be corrected. I disagree, however, that the pre-assault-conduct allegations in the SAC are sufficient to support a claim under Title IX.

Plaintiffs cite only one case in support of their pre-assault-conduct theory, *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), but that case is plainly distinguishable, as it involved a school's prior knowledge of a "serious risk of sexual harassment and assault" within a specific context (football recruiting efforts) by a particular group of persons (football players and recruits). *Id.* at 1173, 1184. The school in that case not only failed to properly supervise the recruiting efforts, it supported and funded them, despite knowing that, without proper control, they would "encourage" sexual harassment and assault. *Id.* at 1177. Another case that approved of Title IX liability based on pre-assault conduct, *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282 (11th Cir. 2007), likewise involved a situation where, prior to the assault, the school knew specific facts about the perpetrator and the environment in which the assault occurred, facts that "substantially increased the risk" that such an incident would occur. *Id.* at 1296.

In support of their pre-assault-conduct theory, plaintiffs do not allege that the University had any specific knowledge of a heightened risk of sexual assault either by their particular assailants or in the particular contexts in which their assaults occurred. They rely instead on their general allegations regarding the University's alleged underreporting of sexually violent incidents, the Audit Report, and the Title IX administrative complaint alleging that the University has for many years failed to adequately respond to certain reports of sexual violence. *See* Opp. at 11-13. They also contend that their allegations indicate that the University has routinely "failed to comply with [its] own policy of informing victims of their rights under the law and their ability to report their assaults to law enforcement." *Id.* at 12-13.

These allegations clearly support the inference that, before plaintiffs were assaulted, the University was aware of the general problem of sexual violence against its students, and that its efforts to address that problem were lacking in certain respects. But plaintiffs cite no authority indicating that this level of awareness or deficiency of response with respect to the general

14

problem of sexual violence is enough to establish either actual knowledge or deliberate indifference for the purposes of a Title IX claim. *Cf. Lopez*, 5 F. Supp. 3d at 1122 ("The actual notice requirement under Title IX is satisfied where an appropriate official possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.") (internal quotation marks omitted). The Supreme Court in *Davis* specifically emphasized that its "conclusion here – that [federal education funding] recipients may be liable for their deliberate indifference to known acts of peer sexual harassment – does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment." 526 U.S. at 648. Plaintiffs' pre-assault theory comes too close to asking that the University be held liable for its failure to "purg[e] [its] schoo[l] of actionable peer harassment" to pass master under *Davis*. To the extent that plaintiffs' Title IX claims are based on this theory, they are DISMISSED WITH LEAVE TO AMEND.

### 2. "Further Harassment"

A significant portion of the University's briefing is dedicated to the argument that plaintiffs have not made the requisite showing of causation – i.e., that the University's deliberate indifference "cause[d] [them] to undergo harassment or ma[d]e them liable or vulnerable to it," *Davis*, 526 U.S. at 645 – because they have not alleged that they suffered "further harassment" after reporting their assaults to an appropriate school official. The University contends that such a "failure to allege subsequent harassment is fatal to a Title IX claim . . . [T]o sustain a damages claim a plaintiff must allege that additional harassment occurred after the institution had actual knowledge of the harassment." Mot. at 14-15. According to the University, there are "two avenues of causation" available to a sex discrimination victim under *Davis*: "A student can allege either that the institution's conduct directly caused the harassment or that the institution indirectly caused the harassment by creating a vulnerability that allowed the harassment to take place. But a student may not prevail on a claim if there is no allegation that any harassment occurred after the institution received notice of the student's complaint, as is the case here." Reply at 8 (Dkt. No. 23). By "further" or "additional" harassment, I take the University to mean an affirmative act of harassment by the original perpetrator or a similarly situated individual.

15

As the University points out, there are a number of Title IX decisions that appear to endorse this view of a "further harassment" requirement. *See, e.g., Yoona Ha v. Nw. Univ.*, No. 14-cv-00895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (on appeal) (plaintiff's allegations that she had "an occasional glimpse" of her assailant at her school and that "knowledge of [his] presence on the campus caused her considerable grief" were not sufficient to support a Title IX claim; "[t]he complaint does not allege any subsequent acts of harassment on [the assailant's] part so there was no further action required to be taken by [the school] to avoid Title IX liability"); *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 613-14 (E.D. Pa. 2014) (dismissing Title IX claim where plaintiff's only allegations of subsequent harassment were that her harasser "followed her, sat outside her dormitory, and . . . stood directly beside her [in the cafeteria] and stared at her while she was having a conversation with a fellow student"); *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 827 (M.D. Tenn. 2014) ("[B]ecause plaintiff did not continue to experience sexual harassment once he put defendant on notice of [his harasser's] conduct, there is no basis to find defendant's response to plaintiff's sexual harassment report amounted to deliberate indifference.").[9]  I do not agree with the reasoning in those cases.

---

[9] The University contends that the Ninth Circuit applied the same "further harassment" approach in *Reese v. Jefferson Sch. Dist. No. 14J.*  Reply at 8.  I disagree.  The relevant portion of *Reese* states as follows:

> We hold that [the school district] is not liable for the alleged antecedent harassment of female students by male students.  The school district was "not deliberately indifferent to sexual harassment of which [it had] actual knowledge" in such a way as to "cause the plaintiffs to undergo harassment or make them liable or vulnerable to it."

> The plaintiffs concede that they did not report their harassment to anyone in authority until May 28, 1997 – after the plaintiffs were themselves threatened with disciplinary action.  By that time, the school year had ended.  There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations.  Thus, under *Davis*, the school district cannot be deemed to have "subjected" the plaintiffs to the harassment. *Cf. Burtner v. Hiram College*, 9 F.Supp.2d 852, 857 (N.D. Ohio 1998) (holding that school was not deliberately indifferent by failing to act on report of harassment filed two days before graduation).

United States District Court
Northern District of California

A number of other decisions have sustained Title IX claims even in the absence of allegations or evidence of further affirmative acts of sexual harassment or assault. In *Kelly v. Yale Univ.*, No. 01-cv-01591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003), the plaintiff alleged that she was sexually assaulted by another student and claimed that the school was liable under Title IX for its failure to respond to her repeated requests for residential and academic accommodations following the assault. *Id.* at *4. The plaintiff had communicated to administrators "the discomfort and fear that she would feel if she encountered [her assailant]" (who lived in her same dormitory) as well as her "concern about her course of study and her desire to continue her education without delay." *Id.* When the school did not respond to the plaintiff's requests, she left her dormitory because she no longer felt safe living there and eventually withdrew from all classes in which she was enrolled. *Id.* at *2.

The court denied the school's summary judgment motion, reasoning that "[a]lthough [plaintiff] was not subjected to further harassment by [her assailant], it was her departure from her classes and her dormitory, not any immediate action taken by Yale, that assured that outcome . . . [A] reasonable jury could find that Yale's response, or lack thereof, rendered [plaintiff] 'liable or vulnerable' to [the assailant's] harassment." *Id.* Elsewhere in the opinion, the court acknowledged that the school could not be held liable for the assault itself because, under *Davis*, a school "cannot be held liable for harassment of which it had no notice." *Id.* at *3. The court nevertheless found that there was a triable issue on the severity of the known harassment suffered by the plaintiff on the ground that "a reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." *Id.*

Relying in part on *Kelly*, the court in *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp.

---

*Reese*, 208 F.3d at 740 (some internal citations omitted). I do not read this as a holding that a student must have suffered a further affirmative act of sexual harassment or assault to establish a Title IX claim under *Davis*. Rather, I read it as a holding that, in light of the timing of the plaintiffs' reporting of their alleged sexual harassment, the school district's response was not deliberately indifferent and could have subjected the plaintiffs to "sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive [them] of access to the educational opportunities or benefits provided by the school." *Davis*, 529 U.S. at 650; *see also Takla*, 2015 WL 6755190, at *5 n.3 (distinguishing *Reese* on similar grounds).

2d 438 (D. Conn. 2006), denied a school board's summary judgment motion upon finding that the plaintiff, a middle school student who had been sexually assaulted by a high school student during summer break, had experienced sufficiently severe harassment following the assault to support her Title IX claim against the school board. *Id.* at 444-445. The court explained that while the school could not be liable for the assault itself,

> it could still be liable for deliberate indifference to known post-assault harassment "in a context subject to the school district's control," if the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive [plaintiff] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 645, 650; *Kelly*, 2003 WL 1563424, at *3.
>
> [ . . . ]
>
> [Plaintiff] was constantly exposed to a potential encounter with her assailant because [the middle and high school] were housed in the same building such that students from each could readily come in contact with each other. In fact, [plaintiff's] affidavit states that she saw [her assailant] many times during the school year and that the experience of seeing him "was very upsetting" and made the "school year very hard." Thus, even absent actual post-assault harassment by [the assailant], the fact that he and plaintiff attended school together could be found to constitute severe, pervasive, and objectively offensive harassment.

*Id.* at 444 (citations in original).[10] The court also found a triable issue on whether this harassment had effectively "deprive[d] [the plaintiff] of access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 650, based on the plaintiff's claim that "as a result of the potential for seeing and/or interacting with [her assailant], she transferred out of the . . . school system after eighth grade." *Id.* at 445. The court held that a jury could reasonably credit the plaintiff's claim "that an interaction with [her assailant] would be sufficiently distressing or threatening such that the fact of their continued mutual presence in the same building and concomitant possibility of potential interaction impacted her decision to transfer." *Id.*

---

[10] There was also evidence that after the assault the plaintiff had been harassed by the assailant's friends, who "would allegedly drive by [plaintiff] in a blue truck and call her a 'slut.'" *Derby*, 451 F. Supp. 2d at 444-45. The court considered this evidence in its analysis but noted that the friends' harassment was not actionable on its own "because *Davis* mandates that [the school board] cannot be liable for any deliberate indifference to harassment in a context over which [it] does not have control." *Id.*

Most recently, in *Takla v. Regents of the Univ. of California*, the court rejected essentially the same "further harassment" argument the University makes here. The plaintiff in that case was a graduate student at UCLA who alleged that she had been sexually harassed by a professor. While the plaintiff did not claim that there had been any further affirmative acts of harassment after she reported the professor to school authorities, she alleged that her "[f]ear of running into [him] and being subjected to additional sexual harassment ha[d] prevented [her] from going to . . . campus." 2015 WL 6755190, at *2. She stated that the school "became a sexually hostile environment for [her] after she made her report because [the professor] was still teaching in the History Department and every time [she] saw [him], she was fearful that he would harass her again." *Id.* at *4. She also stated that, after she filed her report, the professor on one occasion had "stared at her with an angry look on his face and looked her up and down," and on another occasion had "closely follow[ed] her and a friend as they walked through campus." *Id.* at *4 (internal quotation marks omitted).

The school argued that these allegations failed to support the plaintiff's Title IX claim "because occasional sightings of an alleged harasser or allegations that the harasser 'followed' or 'stared at' the plaintiff is insufficient to constitute further harassment for purposes of imposing Title IX liability on an educational institution." *Id.* The court disagreed. It reasoned that the school's position failed to appreciate that a student is "subjected to harassment" within the meaning of *Davis* not only when it "cause[s] [students] to undergo harassment," but also when it "make[s] [them] liable or vulnerable" to harassment. The court stated:

> Based on UCLA's interpretation of *Davis*, . . . a Title IX claim cannot be brought based merely on alleged vulnerability without an allegation that any further harassment actually occurred. The Court disagrees. Given that the phrase, "cause [students] to undergo" harassment already contains an element of causation and that the phrase, "make liable and vulnerable" would be redundant if construed to require further harassment, the Court is not persuaded that UCLA's interpretation is correct.
>
> [ . . . ]
>
> The Court agrees with plaintiffs that placing undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending

> environment in which she may again encounter the harasser . . . That [plaintiff] took it upon herself to avoid her alleged harasser by not setting foot on the UCLA campus should not absolve UCLA of its responsibility to take reasonable measures to end the harassment.

2015 WL 6755190, at *4-5. The court also found that the plaintiff had adequately alleged deliberate indifference and denied the school's motion to dismiss. *Id.* at *5-7.

While *Kelly*, *Derby*, and *Takla* differ slightly in how they address the issue, they all recognize that it is possible for a plaintiff to bring a Title IX claim against an educational institution even in the absence of any further affirmative acts of harassment by the alleged harasser or other students or faculty. The Eleventh Circuit has reached the same conclusion. *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1297 (11th Cir. 2007) (reversing the dismissal of a Title IX claim where, although the plaintiff withdrew from the school the day after the assault, her allegations indicated that the school's "deliberate indifference was followed by further discrimination, this time in the form of effectively denying [the plaintiff] an opportunity to continue to attend [the school]" by "fail[ing] to take any precautions that would prevent future attacks from [her assailants] or like-minded hooligans should [she] have decided to return"). I agree with this approach and will follow it here. The alternative offered by the University – i.e., that a student must be harassed or assaulted a second time before the school's clearly unreasonable response to the initial incident becomes actionable, irrespective of the deficiency of the school's response, the impact on the student, and the other circumstances of the case – runs counter to the goals of Title IX and is not convincing.

To the extent that the University's motion to dismiss is based on the argument that plaintiffs have not plausibly established causation because they have not alleged that they suffered any further affirmative acts of harassment after reporting their respective assaults, the motion is DENIED.

### 3.     The DCL

In arguing that they have adequately alleged deliberate indifference, plaintiffs rely heavily on the requirements and guidelines for responding to sexual assault reports set out in the DCL. *See* Opp. at 4-7. The DCL, however, specifically provides that the grievance procedure requirements it describes concern "the standard for administrative enforcement of Title IX and in

20

court cases where plaintiffs are seeking injunctive relief," not "[t]he standard in private lawsuits for monetary damages." DCL at 4 n.12. The standard in such lawsuits, the DCL specifically explains, "is actual knowledge and deliberate indifference." *Id.* (citing *Davis*, 526 U.S. at 643, 648).

Further, the guidance provided by the DCL is obviously broader than the scope of liability for private causes of action for money damages under Title IX. The DCL advises that "[i]f a school knows *or reasonably should know* about student-on-student harassment that *creates a hostile environment*, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." *Id.* at 4 (emphasis added). Under *Davis*, however, a school may only be liable in damages under Title IX for student-to-student or faculty-to-student sexual harassment where the school has "actual knowledge" of the harassment, and the harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive [the student] of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650; *see also Doe v. Bibb Cnty. Sch. Dist.*, No. 12-cv-00468, 2015 WL 5063746, at *8 n.13 (M.D. Ga. Aug. 27, 2015) (on appeal) (pointing out these same discrepancies between the DCL and *Davis* in rejecting the argument that the school's noncompliance with the DCL amounted to deliberate indifference). Plaintiffs do not cite, and I have not found, any case in which a plaintiff has successfully relied on the DCL to establish deliberate indifference under Title IX. At least one district court has specifically rejected a plaintiff's attempt to do so. *See Bibb*, 2015 WL 5063746, at *8 ("What funding recipients' responsibilities are under Title IX and what they can be held liable for in a private cause of action for damages, however, are not one and the same.").

Moreover, in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), the Supreme Court rejected the petitioners' attempt to establish deliberate indifference under Title IX by pointing to the school district's failure to comply with Department of Education regulations requiring funding recipients to "adopt and publish grievance procedures providing for prompt and equitable resolution" of discrimination complaints, and to provide notice that they "d[o] not discriminate on the basis of sex in the educational programs or activities [they] operat[e]." *Id.* at 291. The Court explained:

> [The school district's] alleged failure to comply with the regulations
> . . . does not establish the requisite actual notice and deliberate
> indifference . . . Of course, the Department of Education could
> enforce the requirement[s] administratively: Agencies generally
> have authority to promulgate and enforce requirements that
> effectuate the statute's nondiscrimination mandate, even if those
> requirements do not purport to represent a definition of
> discrimination under the statute. We have never held, however, that
> the implied private right of action under Title IX allows recovery in
> damages for violation of those sorts of administrative requirements.

*Id.* at 291-92; *accord Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014); *King v. San Francisco Cmty. Coll. Dist.*, No. 10-cv-01979-RS, 2011 WL 5358131, at *1-2 (N.D. Cal. Nov. 7, 2011). Although the University squarely raises this point in its opening brief, plaintiffs do not address *Gebser* in their opposition.

There are undoubtedly situations in which a school's conduct in violation of the DCL also amounts to a clearly unreasonable response under *Davis*. But I agree with the University that the DCL does not define what amounts to deliberate indifference for the purposes of this case. In determining whether plaintiffs have adequately alleged deliberate indifference, I will look to *Davis* and its progeny, not the DCL.

### B. Plaintiffs' Individual Claims

#### 1. Karasek

The University argues that Karasek's Title IX claim must be dismissed because her allegations do not plausibly establish either deliberate indifference or causation. I agree that Karasek has not adequately alleged causation. As discussed above, Karasek is not required to plead that she suffered additional affirmative acts of sexual harassment or assault after reporting the February 2012 incident to the Univeristy. But this does not mean that her allegations automatically establish that the school "cause[d] [her] to undergo harassment" or "ma[d]e [her] liable or vulnerable to it." *Davis*, 526 U.S. at 644. Even under *Kelly*, *Derby*, *Takla*, and *Williams*, a plaintiff must plead *something* regarding what happened after the school was put on notice of the discrimination. The plaintiffs in those cases, for example, were forced to take drastic measures to avoid their assailants in the face of their respective schools' deliberate indifference. In *Kelly*, when the school did not respond to the plaintiff's repeated requests for residential and academic accommodations, the plaintiff left her dormitory out of fear for her safety and eventually withdrew

from all classes in which she was enrolled. 2003 WL 1563424, at *2. The plaintiff in *Derby* stated that she transferred to a different school system to avoid the possibility of interacting with her assailant. 451 F. Supp. 2d at 445. The plaintiff in *Williams* permanently withdrew from school the day after she was assaulted. 477 F.3d at 1297. And the plaintiff in *Takla* alleged that "[f]ear of running into [her assailant] and being subjected to additional sexual harassment ha[d] prevented [her] from going to . . . campus." 2015 WL 6755190, at *2.

Further, in *Kelly*, *Derby*, and *Takla*, the plaintiffs made specific allegations regarding the discomfort, anxiety, and fear they felt as a result of the "constan[t] expos[ure] to a potential encounter with [their] assailant[s]." *Derby*, 451 F. Supp. 2d at 444; *see also Takla*, 2015 WL 6755190, at *4 (plaintiff alleged that her school "became a sexually hostile environment for [her] after she made her report because [the professor] was still teaching in the History Department and every time [she] saw [him], she was fearful that he would harass her again"); *Kelly*, 2003 WL 1563424, *4 (plaintiff had communicated to administrators "the discomfort and fear that she would feel if she encountered [her assailant]"). In addition, in both *Derby* and *Takla*, the plaintiffs had encountered their assailants on campus after reporting their assaults. *See Derby*, 451 F. Supp. 2d at 444; *Takla*, 2015 WL 6755190, at *4.

Karasek alleges no similar facts in the SAC. There is no indication that she has had any further contact with TH since reporting the February 2012 incident to the University. Although she alleges that she has suffered psychological and emotional damages, she does not link those damages to TH's presence on campus or to discomfort or fear over encountering him there. Even her allegation that she is "constantly operating with a heightened sense of fear, anxiety, and stress knowing that there are possible perpetrators in her classes that have not been removed by the University" is completely divorced from TH and makes no reference to any specific individual. *See* SAC ¶ 27. Nor does Karasek allege that has taken steps to avoid TH as a result of the University's deliberate indifference. She does state that she was forced to change her major and to drop at least one class, but she does not explain why she did so. *See id.*

In their opposition brief, plaintiffs argue that Karasek was subjected to sex discrimination as a result of the University's deliberate indifference because TH was "allowed to remain on

campus, unrestricted." Opp. at 17. This theory is not enough to show that she has suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [her] of access to the educational opportunities or benefits provided by the school" since reporting her assault in the absence of any allegations connecting her post-assault behavior or psychological distress to TH's presence on campus. *See Davis*, 526 U.S. at 650. Accordingly, Karasek's Title IX claim is DISMISSED WITH LEAVE TO AMEND.[11]

### 2. Commins

The University moves to dismiss Commins's Title IX claim on the same grounds as Karasek's, i.e., because her allegations do not plausibly establish either deliberate indifference or causation. Mot. at 10-11. I am satisfied that Commins has adequately pleaded causation. But her Title IX claim must be dismissed because she has not alleged, even in general terms, the amount of time that passed between when she received the telephone call from the University regarding her assault, SAC ¶ 57, and when the University initiated and/or completed its investigation. This is a significant gap in her allegations because her Title IX claim is largely predicated on the University's delay in commencing its investigation of John Doe 2 despite her request that it do so immediately. *See id.*

In *Oden v. Northern Marianas College*, the Ninth Circuit held that a school's nine-month delay in convening a hearing on the Title IX plaintiff's sexual harassment allegations was insufficient to create a triable issue of fact on deliberate indifference, despite the undisputed evidence that the the delay was contrary to school policy, where the record neither "demonstrate[d] that the delay was more than negligent, lazy, or careless," nor "permit[ted] an inference that the delay was a deliberate attempt to sabotage plaintiff's complaint or its orderly resolution." 440 F.3d at 1089. The Ninth Circuit made clear that it was not deciding that a delay can never rise to the level of deliberate indifference. *Id.* In addition, there are factual and procedural distinctions between *Oden* and this case, including that *Oden* was decided on summary judgment. Nevertheless, without any indication of the amount of time that passed between when

---

[11] Because I dismiss Karasek's Title IX claim on this ground, I do not address the University's argument that she has not adequately alleged deliberate indifference.

the University first contacted Commins about the assault and when it initiated and/or completed its investigation, I cannot determine whether her allegations give rise to a plausible inference of deliberate indifference.

Plaintiffs also accuse the University of failing to provide Commins with updates regarding its investigation, to allow her an opportunity to present evidence at a hearing, or to inform her of her right to appeal its disciplinary decisions. *See, e.g.,* Opp. at 8. But without more information regarding the University's delay in commencing and completing its investigation, a deliberate indifference finding based on these alleged deficiencies would amount to either imposing Title IX liability for conduct was that was merely "negligent, lazy, or careless," *Oden*, 440 F.3d at 1089, or "second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648. Similarly, plaintiffs contentions that the University acted with deliberate indifference by allowing John Doe 2 to remain on campus unrestricted for some period of time during the course of its investigation, and that the discipline it ultimately imposed was not sufficiently severe, run counter to the basic Title IX precept that "victims of peer harassment [do not] have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648; *see also Oden*, 440 F.3d at 1089 ("An aggrieved party is not entitled to the precise remedy that he or she would prefer."). I do not doubt that in certain circumstances a school's disciplinary decision, standing alone, may be so clearly unreasonable in light of known circumstances as to support a deliberate indifference finding. But plaintiffs cite no authority indicating that this is such a case.

Commins's Title IX claim is DISMISSED WITH LEAVE TO AMEND.

### 3. Butler

Butler's allegations state a claim for sex discrimination under Title IX, and the motion to dismiss her Title IX cause of action is DENIED.

The University does not raise any arguments targeting Butler's showing of deliberate indifference.[12] *See* Mot. at 9-10; Reply at 4-5. Instead, it contends that Butler's allegations are

---

[12] Although the University states in a subheading that Butler "has not pleaded sufficient facts to show deliberate indifference," Mot. at 9, the arguments it actually makes are better characterized as targeting the actual knowledge, substantial control, and causation elements, not deliberate indifference. *See* Mot. at 9-10; Reply at 4-5.

deficient because they do not establish actual knowledge, in that there is no indication that Higgins, a PhD candidate, "ha[d] authority to address the alleged discrimination and to institute corrective measures on the [University's] behalf." *Reese*, 208 F.3d at 739. Whether or not this argument has merit, it fails to justify dismissal because it ignores the allegations that, upon returning to the University, Butler reported her assaults to Ambrosio (from the Gender Equity Resource Center) and Oldham (from the Title IX Office). *See* SAC ¶¶ 43-44.

The University argues that even these allegations fail to establish actual knowledge because the SAC is "notably vague about what facts Butler reported to [the University]." Mot. at 12. This argument is not persuasive at this juncture. Butler plainly states that she "reported her assaults" to Ambrosio and "identified John Doe as her assailant" to Oldham. SAC ¶¶ 43-44. The preceding allegations in the SAC provide more than sufficient detail regarding the assaults that Butler suffered. *See id.* ¶¶ 36-39. She was not required to restate those facts in alleging her communications with Ambrosio and Oldham to plausibly establish actual knowledge. At least by the time Butler reported her assaults to Amrosio and Oldham, the University had actual knowledge of those incidents.[13]

The University next contends that Butler's allegations fail to show that the University "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[ed]." *Davis*, 526 U.S. at 645. According to the University, without an allegation that John Doe was a faculty member, employee, or student of the University, Butler cannot show "substantial control over [her] harasser." Mot. at 12. The University cites no authority for this bright line rule, however, and I am not aware of any. To the contrary, courts considering this aspect of the substantial control element have looked instead to whether the "harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646; *see also Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1025 (E.D. Cal. 2009).

Butler alleges that John Doe (1) is a guest lecturer for Alaska Wildlands, a program which the University advertises to its students and through which its students receive academic credit;

---

[13] The University does not dispute that both Ambrosio and Oldham plausibly qualify as University officials with positions sufficient to satisfy the actual knowledge requirement.

(2) is on the board of the Wrangell Center, which houses Alaska Wildlands; (3) was "at all relevant times" a guest lecturer at the University; (4) was "at all relevant times" involved in an environmental restoration project on the University campus; and (5) while Butler was a student, was frequently on the University campus in his capacity as guest lecturer and through his involvement in the environmental restoration project. SAC ¶¶ 31-34. Viewed holistically, and in the light most favorable to Butler, these allegations make a sufficient showing of substantial control over John Doe to withstand a motion to dismiss.[14]

The University also argues that Butler's allegations fail to show "substantial control over . . . the context in which the known harassment occur[ed]," *Davis*, 526 U.S. at 645, which the University identifies as the Wrangell Center. Mot at 12-13. The principal case the University relies on for this argument, *Ostrander v. Duggan*, 341 F.3d 745 (8th Cir. 2003), was decided on summary judgment, such that "the record [was] clear [that the University] did not own, possess, or control" the fraternity house where the alleged sexual abuse occurred.[15] *Id.* at 750-51.

The University's focus on the Wrangell Center as the context in which the known harassment occurred misses the mark. As exemplified by *Kelly* and *Derby*, discussed above, the known harassment at issue here is that which occurred after Butler returned to the University and was "forced to avoid classes altogether for fear that she would encounter John Doe on campus." SAC ¶ 47; *see also* Opp. at 10 (describing the harassment suffered by Butler as "the likely and

---

[14] In arguing that it lacked substantial control over John Doe, the University warns of the "unpredictable levels of liability" that would ensue if "an institution could be said to exercise control over the off-campus behavior of every person who visits its campus." Reply at 5. That is an unfair characterization of Butler's claims, which, as alleged, arise from the misconduct of a University guest lecturer who is significantly involved in a program through which University students receive academic credit, who the University knows has been accused of repeatedly sexually assaulting one of its students, and who continued to frequent the University campus in a professional capacity while she remained enrolled there.

[15] In the other case cited by the University, *Clifford v. Regents of Univ. of California*, No. 11-cv-02935, 2012 WL 1565702 (E.D. Cal. Apr. 30, 2012), the plaintiff alleged that he was repeatedly bullied and sexually harassed by members of the fraternity he was pledging. *Id.* at *1-2. The alleged discrimination occurred during a fraternity retreat in Lake Tahoe, at the fraternity house, and at the house of a fraternity alumnus. *Id.* After finding that the plaintiffs' Title IX claims were barred by the statute of limitations, the court concluded, without further analysis, that "there are no facts alleged showing [that] the University . . . had substantial control over the alleged harassers and the context in which the events occurred." *Id.* at *7.

pervasive possibility that [she] would encounter her assailant on campus").[16]  At this early

juncture, that theory is sufficient to support Butler's Title IX cause of action against the

University.  *Cf. Kelly*, 2003 WL 1563424, at *3 ("[A] reasonable jury could conclude that further

encounters, of any sort, between a rape victim and her attacker could create an environment

sufficiently hostile to deprive the victim of access to educational opportunities provided by a

university.").

## II.        THIRD CAUSE OF ACTION: CALIFORNIA EDUCATION CODE § 220

California Education Code § 220 prohibits discrimination on the basis of a number of

protected characteristics, including gender, in any "program or activity conducted by an

educational institution that receives, or benefits from, state financial assistance or enrolls pupils

who receive state student financial aid."  Cal. Educ. Code § 220.  The parties agree that the legal

standards that govern plaintiffs' Title IX claims apply equally to plaintiffs' claims under section

220, and that the claims rise and fall together.  *See, e.g.,* Opp. at 17; Reply at 10; *see also Donovan

v. Poway Unified Sch. Dist.*, 167 Cal. App. 4th 567, 589-81 (2008).  The University moves to

dismiss plaintiffs' section 220 claims (1) for the same reasons discussed above with respect to

their Title IX claims, and (2) because section 220 does not apply to postsecondary institutions

such as the University.  *See* Mot. at 16-17; Reply at 10.

In support of its second argument, the University points out that section 220 applies only to

"educational institution[s]," Cal. Educ. Code § 220, and that California Education Code § 210.3

defines "educational institution" as "a public or private preschool, elementary, or secondary school

or institution; the governing board of a school district; or any combination of school districts or

counties recognized as the administrative agency for public elementary or secondary schools."

Cal. Educ. Code § 210.3.  The University contends that because it is a "postsecondary" school or

institution, not a "secondary" one, section 220 does not apply to it.

Plaintiffs respond that "one type of educational institution defined in Cal. Educ. Code §

---

[16] To be clear, plaintiffs also argue that the incidents in Alaska, standing alone, provide a viable basis for Butler's Title IX cause of action.  Because her Title IX cause of action does not depend on that theory and is adequately supported for the reasons stated in this Order, I do not address that theory now.

210.3 is a public institution," and that the University falls within this definition. Opp. at 17. In the alternative, plaintiffs seek leave to amend to add a new cause of action under California Education Code § 66270, which provides substantially identical protections as section 220 but applies to "any program or activity conducted by any *postsecondary educational institution* that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid." Cal. Educ. Code § 66270 (emphasis added). California Education Code § 66261.5 defines "postsecondary educational institution" as "a public or private institution of vocational, professional, or postsecondary education; the governing board of a community college district; the Regents of the University of California; or the Trustees of the California State University." Cal. Educ. Code § 66261.5.

Neither party cites any authority addressing this issue, and I am not aware of any. In the absence of any authority to the contrary, I am persuaded that section 220 does not apply to a postsecondary institution such as the University. Plaintiffs' argument – i.e., that section 220 applies to the University because the definition of "educational institution" set out in section 210.3 includes all "public institution[s]" – is meritless. The definition set out in section 210.3 includes all "public or private preschool, elementary, or secondary *school[s] or institution[s]*," not all "public institution[s]." *See* Cal. Educ. Code § 210.3 (emphasis added). Plaintiffs' reading of the statute would result in "educational institution" applying to all "public or private . . . institution[s]" regardless of their content or purpose. That is not a reasonable reading of the statute.

Any ambiguity in the meaning of "secondary institution or school" is eliminated by section 66261.5 and other provisions in that chapter of the California Education Code, which make clear the distinction between "secondary" and "postsecondary" as used in the Code. As one treatise explains in summarizing the California Education Code sections prohibiting discrimination,

> [t]he provisions pertaining to grade schools are set forth in [California Education Code] §§ 200 to 283. Many of those provisions are duplicated, with little or no change in language, in [California Education Code] §§ 66250 to 66292.4, which apply to postsecondary schools. Each of these two groups of code sections constitutes a single chapter in the Education Code.

Cal. Civ. Prac. Civil Rights Litigation § 10:28 (2015).

This leaves the question of whether plaintiffs should be granted leave to amend to add a new cause of action under section 66270. The University argues that such amendment would be futile. Reply at 10. Because the University made this argument in its reply brief, and plaintiffs have not had an opportunity to respond in writing, I do not address it now. If plaintiffs allege a section 66270 claim in their third amended complaint, the University may raise the argument again.

The motion to dismiss the third cause of action for violation of section 220 is GRANTED. Because further amendment would be futile, the third cause of action is DISMISSED WITHOUT LEAVE TO AMEND. Plaintiffs' request for leave to amend to add a new cause of action under section 66270 is GRANTED, without prejudice to the University moving to dismiss the cause of action in a subsequent motion.

## III. SECOND CAUSE OF ACTION: NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE

Plaintiffs allege that the University breached its "duty to take reasonable protective measures to protect plaintiffs and other similarly situated students from the risk of sexual abuse and/or sexual assault" by failing to properly warn, train, or educate them about how to avoid such a risk. SAC ¶ 81.

The parties agree on the basic statutory framework, set out in the California Government Code, for common law liability against a public entity under California law. The California Supreme Court has explained the framework as follows:

> Section 815 establishes that public entity tort liability is exclusively statutory: "Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."

> Section 815.2, in turn, provides . . . : "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. (b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

> Finally, section 820 delineates the liability of public employees themselves: "(a) Except as otherwise provided by statute . . . , a public employee is liable for injury caused by his act or omission to the same extent as a private person. (b) The liability of a public employee . . . is subject to any defenses that would be available to the public employee if he were a private person."
>
> In other words, the general rule is that an employee of a public entity is liable for his torts to the same extent as a private person (§ 820, subd. (a)) and the public entity is vicariously liable for any injury which its employee causes (§ 815.2, subd. (a)) to the same extent as a private employer (§ 815, subd. (b)).

*C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal.4th 861, 868 (2012) (some internal quotation marks and alterations omitted; paragraphing added). Among other arguments, the University contends that plaintiffs' negligence cause of action must be dismissed because plaintiffs have not alleged facts plausibly establishing that any employee of the University had a duty to warn plaintiffs of wrongful acts by third parties. I agree.

The general rule in California is that "one who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another from the acts of a third party." *Melton v. Boustred*, 183 Cal. App. 4th 521, 531 (2010) (internal quotation marks omitted). In other words, "absent misfeasance, as a general matter, there is no duty to act to protect others from the conduct of third parties." *Id.* (internal quotation marks omitted).

There are exceptions to this general rule, such as where the defendant has a "special relationship" with the plaintiff. *Id.* at 532. But California courts have repeatedly held that a university does not have a special relationship with its students such that it may be held liable for failing to protect them from the wrongful acts of third parties. *See, e.g., Regents of the Univ. of California v. Superior Court of Los Angeles Cnty.*, 240 Cal. App. 4th 1296, 1311-1316 (2015) (rejecting argument that student's "status as a matriculated student created a special relationship with [UCLA] that required the school and its employees to protect her from foreseeable third party criminal conduct."); *Ochoa v. California State Univ.*, 72 Cal. App. 4th 1300, 1305 (1999) ("[S]ince college administrators have abandoned in loco parentis supervision of adult students and have recognized the students' rights to control and regulate their own lives, colleges and universities may no longer be charged with a general duty of care to supervise student activities.");

*Tanja H. v. Regents of Univ. of California*, 228 Cal. App. 3d 434, 437-38 (1991) ("College administrators have a moral duty to help educate students [with] respect to [sexual violence], but they do not have a legal duty to respond in damages for student crimes."); *Crow v. State of California*, 222 Cal. App. 3d 192, 208-09 (1990) (rejecting plaintiff's argument that his "affiliation with the university as a student created . . . a special relationship" giving rise to "an affirmative duty to protect him" from the criminal acts of a third party; distinguishing the plaintiff's claim from cases involving elementary or high school students on the ground that the plaintiff's claim "does not implicate the duty to supervise the activities of students who are too immature to exercise judgment for their personal safety") (internal quotation marks omitted).

Plaintiffs attempt to get around the general absence of a duty to protect under California law in two ways. First, they argue that by establishing a Title IX office and coordinator, the University "task[ed] [that] employee with the obligation of carrying out Title IX's mandate to educate students about sexual harassment," thereby "endow[ing] that employee with a duty to warn, train, or educate." Opp. at 19. Plaintiffs appear to mean to invoke the "negligent undertaking doctrine," according to which a volunteer who undertakes to provide protective services to another may be held liable for failing to do so with due care where either (1) the volunteer's "failure to exercise such care increases the risk of harm to the other person," or (2) "the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." *Delgado v. Trax Bar & Grill*, 36 Cal.4th 224, 248-49 (2005); *see also Regents*, 240 Cal. App. 4th at 1319. But plaintiffs do not allege facts plausibly indicating that the University increased their risk of harm by designating and maintaining Title IX staff. *See Regents*, 240 Cal. App. 4th at 1319-1320 ("The 'increased risk' element of the negligent undertaking doctrine . . . is not satisfied where the defendant merely failed to eliminate a preexisting risk . . . A failure to alleviate a risk cannot be regarded as tantamount to increasing that risk.") (internal quotation marks and alterations omitted). Nor do plaintiffs allege facts plausibly indicating that they "relie[d] upon [the University's] undertaking and suffer[ed] injury as a result." *Delgado*, 36 Cal.4th at 248-49.

Second, plaintiffs cite to *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377 (2000), a case involving a former Boy Scout who sued the Boy Scouts of America after being repeatedly sexually molested by his Scoutmaster, alleging that the organization had breached its duty to take reasonable measures to protect him from sexual assault. *Id.* at 385. The plaintiff "theorize[d] that if the adult leaders in his troop had received training on how to prevent and detect sexual abuse, and if he had been warned and educated about how to handle such a situation, the sexual molestations would have been prevented." *Id.* at 397.

In reversing the trial court's grant of summary judgment for the defendants, the court of appeal applied the multi-factor, public-policy-driven analysis set out in *Rowland v. Christian*, 69 Cal.2d 108 (1968). It concluded that "consideration of the *Rowland* factors supports the imposition of a duty of care on the Scouts to have taken reasonable protective measures to protect [plaintiff] from the risk of sexual abuse by adult volunteers involved in scouting programs, such as warning, training or educating him . . . about how to avoid such a risk." *Juarez*, 81 Cal. App. 4th at 409-10. The court of appeal noted in the alternative that in light of the "greater degree of care . . . owed to children because of their lack of capacity to appreciate risks and avoid danger," it would also hold "that a special relationship existed between the Scouts and [plaintiff] giving rise to a duty to protect him from harm caused by the criminal conduct of third parties." *Id.* at 411.

I agree with the University that the facts of *Juarez* are too distinct from those of this case to save plaintiffs' negligence cause of action. The court of appeal in *Juarez* repeatedly emphasized the special status and vulnerability of children. *See, e.g., id.* at 404, 407, 410. It also made "special note" that "the reach of this opinion is only intended to extend as far as the record before us today," observing that even other children's programs might not carry a similar duty. *Id.* at 409. Subsequent cases relying on *Juarez* in recognizing a duty to protect have largely involved closely supervised children or groups of children roughly analogous to the Boy Scouts. *See, e.g., Conti v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 235 Cal. App. 4th 1214, 1232-35 (2015) (relying on *Juarez* in holding that a religious organization "had a legal duty to exercise due care to prevent [plaintiff] from being molested during her church-sponsored field service," which occurred when she was between nine and eleven years old); *Doe 1 v. City of Murrieta*, 102 Cal.

App. 4th 899, 915-16 (2002) (relying on *Juarez* in finding that a police department program for encouraging juveniles to consider careers in law enforcement, operated pursuant to a charter agreement with the Boy Scouts, owed a "duty to protect its [members] by not fostering an environment which would encourage sexual exploitation and by taking reasonable protective measures to prevent its [members] from becoming victims of sexual exploitation by the [police department's] own officers").

Given the emphasis that California courts have repeatedly placed on the differences in the duties of protection owed to university versus elementary and secondary students, and the long line of cases rejecting attempts to impose on universities a duty to protect their students from the wrongful acts of third parties, *Juarez* is not persuasive authority here. The third cause of action for negligent failure to train, warn, or educate is DISMISSED WITH LEAVE TO AMEND.

## IV.     FOURTH CAUSE OF ACTION: FRAUD

Plaintiffs allege that unnamed "officers and authorized managing agents" of the University made "false representations" to plaintiffs regarding "the safety of [its] facilities," and that "[i]n order to induce plaintiffs to enroll at the University and pay tuition, and to induce plaintiffs to continue their enrollment, attendance at and payment of tuition to the University, [the University] made statements and omissions that communicated to plaintiffs that the University was safe and that students only experienced a minimal amount of sexual violence." SAC ¶¶ 87-88. Plaintiffs add that "the University significantly underreported the amount of sexually violent incidents that were reported in violation of the federal Clery Act which requires all universities to report crime statistics, including incidents of sexual violence, for public consumption." *Id.* ¶ 89; *see also id.* ¶ 69 ("[T]he University underreported the amount of sexually violent incidents that occurred on campus during the years prior to plaintiffs' enrollment at the University.").

This cause of action must be dismissed because it does not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that claims sounding in fraud or mistake "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "manner in

34

which the representations at issue were false and misleading." *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (internal quotation marks and alterations omitted). "In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Siegel v. Lyons*, No. 95-cv-03588-DLJ, 1996 WL 438793, at *3 (N.D. Cal. Apr. 26, 1996) (internal quotation marks omitted). The allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

The allegations in the SAC fall short of this standard. Plaintiffs merely allege that unnamed "officers and authorized managing agents" of the University made unidentified "false representations" regarding "the safety of [its] facilities," and that the University made unidentified "statements and omissions that communicated to plaintiffs that the University was safe and that students only experienced a minimal amount of sexual violence." SAC ¶ 88. Plaintiffs do not identify any specific statement or omission that fits within these vague descriptions; nor do they allege when or where such a statement or omission was made or provide a specific explanation as to why it was misleading at the time. The closest plaintiffs come to doing so is their contention that the University underreported the amount of sexually violent incidents that either "occurred on campus" or "were reported," *id.* ¶¶ 69, 89, but, again, plaintiffs fail to specify when or where such misrepresentations were made, or why they were misleading. Such generalized allegations of fraud are not sufficient under Rule 9(b).[17] *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106-07 (9th Cir. 2003) (finding allegations insufficient under Rule 9(b) where they "d[id] not identify any specific misrepresentations or specify when and where they occurred").

---

[17] Moreover, to the extent that plaintiffs' fraud cause of action is predicated on the University's alleged failure to comply with the Clery Act, codified at 20 U.S.C. § 1092(f), it runs into 28 U.S.C. § 1092(f)(14)(B), which provides that "evidence regarding compliance or noncompliance with this subsection shall not be admissible as evidence in any proceeding of any court, agency, board, or other entity, except with respect to an action to enforce this subsection." 20 U.S.C. § 1092(f)(14)(B). There is no private right of action under the Clery Act. *See* 20 U.S.C. § 1092(f)(14)(A) ("Nothing in this subsection may be construed to (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care.").

1         Accordingly, the fourth cause of action for fraud is DISMISSED WITH LEAVE TO

2  AMEND.  Because I dismiss the fourth cause of action on this ground, I do not address the

3  University's argument that under California Government Code § 818.8 it is entitled to absolute

4  immunity against liability for all misrepresentations.  *See* Mot. at 18; Reply at 13-14.

5                    **CONCLUSION**

6         For the foregoing reasons, the University's motion to dismiss is GRANTED IN PART and

7  DENIED IN PART.  Plaintiffs shall file their third amended complaint within 60 days of the date

8  of this Order.

9         **IT IS SO ORDERED**.

10  Dated: December 11, 2015



WILLIAM H. ORRICK
United States District Judge