**Pages 1 - 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
SOFIE KARASEK, ET AL.,            )
                                  )
            Plaintiffs,           )
                                  )
  VS.                             )      NO. CV 15-03717-WHO
                                  )
THE REGENTS OF THE UNIVERSITY     )
OF CALIFORNIA,                    )
                                  )
            Defendant.            )
_____ )
```

San Francisco, California
Wednesday, June 22, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

      THE ZALKIN LAW FIRM, P.C.
      12555 High Bluff Drive - Suite 301
      San Diego, CA  92130
    **BY:  IRWIN M. ZALKIN, ESQUIRE**


For Defendant:

      MUNGER, TOLLES & OLSON, LLP
      560 Mission Street - 27th Floor
      San Francisco, CA  94105
    **BY:  JESLYN A. EVERITT, ESQUIRE**

      MUNGER, TOLLES & OLSON, LLP
      355 S. Grand Avenue - 35th Floor
      Los Angeles, CA  90071
    **BY:  BRADLEY S. PHILLIPS, ESQUIRE**


Reported By:      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

<u>**Wednesday - June 22, 2016**</u>                                    **2:08 p.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling CV 15-3717, Karasek, et al., vs. Regents of the University of California, et al.

Counsel, please come forward and state your appearance.

**MR. ZALKIN:**  Good afternoon, Your Honor.  Irwin Zalkin for the plaintiffs.

**THE COURT:**  Mr. Zalkin.

**MS. EVERITT:**  Good afternoon, Your Honor.  Jeslyn Everitt for the Regents of the University of California.

**MR. PHILLIPS:**  Good afternoon, Your Honor.  Brad Phillips, also on behalf of the Regents.

**THE COURT:**  Good afternoon.  All right.

So whoever -- why don't you come back up here.  I think, Ms. Everitt, if you're going to be arguing and Mr. Zalkin.

Let me tell you my reaction to where we are at the moment. I allowed discovery so that Ms. Karasek and Ms. Commins could find out what UC did in response to the sexual assaults that they suffered while at school, and that I needed to do that I think points to a deficiency in the way that UC responded to their internal complaint, and a failure to communicate with students when they're at their most vulnerable is a problem.  I consider it a serious failing in UC's response, but by itself, it's not deliberate indifference.

1    So the issue that I'm interested in in this argument is

2    whether that and the other allegations in the Third Amended

3    Complaint, if established, plausibly show deliberate

4    indifference.  That's an exacting standard, Mr. Zalkin.  I

5    don't think Ms. Karasek and Ms. Commins have met that burden.

6    The facts, as I understand it, with respect to Ms. Karasek

7    are that once the complaint was brought to their attention,

8    they spoke with TH, they investigated this and other assaults,

9    found ultimately that he violated school policy, and UC imposed

10   discipline.

11   The fact that it was an informal as opposed to a formal

12   process doesn't establish deliberate indifference.  The fact

13   that it took six months over the summertime doesn't establish

14   deliberate indifference.  And the result was not so off the

15   mark that it might have been a different -- you could have come

16   to a number of different results, but that result was not so

17   off the mark that it establishes deliberate indifference, all

18   of those things being put together, and he did not re-offend.

19   With respect to Ms. Commins, UC suspended John Doe 2 in

20   some form, acted before Ms. Commins' complaint, and then

21   imposed the two-year suspension.  The delay of 13 months

22   occurred as a result of the criminal proceedings that were

23   going on.  I think you put those things together, that doesn't

24   make deliberate indifference.

25   You can't rely on the *Dear Colleague* letter to establish

1   deliberate indifference.  The letter applies first only with

2   respect to injunctive relief.  It lists a number of things

3   which matter a lot with respect to a policy, but actual

4   knowledge and deliberate indifference are what's required.

5        And so you look at -- I think this is a case that's very

6   different than the *Takla* case where UCLA violated its own

7   policy by using the early resolution program, discouraging the

8   filing of a request for a more formal investigation, failing to

9   document the process, making no findings.  And it's much more

10  like *Oden* and *Ha*, and there is nothing here to plausibly allege

11  that UC deliberately attempted to sabotage the complaint or its

12  orderly resolution.

13       So those are my problems with and my inclinations with

14  respect to deliberate indifference.  I don't think causation is

15  an argument that I'm interested in, but I do think deliberate

16  indifference is the one that you need to focus on.

17       **MR. ZALKIN:**  Thank you, Your Honor.

18       Let me just start by indicating that in measuring the

19  level of indifference, we have to look at what is the

20  overarching policy of Title IX, and that is for the University,

21  when it receives a report of sexual assault, to engage in a

22  prompt and equitable process of investigation and resolution.

23       And we've looked at some of the measures of what that is.

24  The *Davis* Supreme Court said that they have to act -- you have

25  deliberate indifference if they act clearly unreasonably under

all of the known circumstances.  And then you have the *Oden*
standard which says that their conduct has to be something more
than just negligent.  It has to, in effect, be a deliberate
interference with the process.

And in this case, you have, I think, both.  I think you
have -- certainly an inequitable treatment of the victims as
compared to the attention that was given to the well-being of
the assailants in both instances, and you have a focus in both
instances on something other than the investigation of the
allegations that were made by both of these women.

So, for example, in the Karasek circumstance, the focus
initially was on the California Democrats Club and whether the
California Democrats Club could expel her assailant from the
club.  So we have -- and I'm going to take you through the
timeline.  I think when you do that, you really see how this
unfolds and how it is a deliberate decision not to address what
they needed to address timely and responsibly and equitably.

So we have a new record, and I've got to apologize
because -- and I did tell counsel, in preparing for this
argument, we came across a record in the mounds of records that
were given to us that were not in any particular order, a
document that is dated February 14th, 2012, and it's an
intake -- it's intake notes from the Office of Gender Equity
Resource Center, and it's from Christine Ambrosio, who is a
member or administrator of that agency.

1    And so as of December 14th, 2012, the University had

2   actual knowledge of the sexual assault on Ms. Karasek.  The

3   document spells out what happened to her.  It has her name in

4   here as one of the persons who had been assaulted by this man,

5   by this student.  They identify it as sexual assault, and they

6   give notice or she gives notice, Ms. Ambrosio, to the Title IX

7   office, among other offices, that this has occurred, and she's

8   also advised that there were other women, at least two other

9   women, who reported similar conduct by this assailant.

10   What is her response?  Her response is not at all to reach

11   out to the victim, Ms. Karasek.  Her response is to send an

12   email to various administrators saying, *The president of the*

13   *Democrats Club,* which is a student, *wants to expel this*

14   *assailant, this perpetrator.  I'm not sure we can do that.  I*

15   *think we might have to engage in some other form of resolution*

16   *like this Transformative Justice Model or using something like*

17   *that.*

18   And there's this discussion that goes on about what to do

19   with this guy.  And the Title IX officer, Denise Oldham,

20   responds in an email of February 15th saying, *Hold on.  The*

21   *guidelines, the DOE guidelines, the most recent ones, which*

22   *must be the DCL, state you can't engage in this kind of*

23   *informal process when it comes to sexual assault cases.  We*

24   *can't do that.*

25   Ms. Oldham doesn't reach out to this victim, to

1    Ms. Karasek.   There is no communication with Ms. Karasek until

2    she and three, now, other victims -- because there was a

3    subsequent assault even after this report -- until these

4    victims reach out to the Gender Equity Office and they want to

5    have a meeting to talk about this.   And a meeting is held on

6    April 20th with Ms. Karasek -- where Ms. Karasek attends that

7    and three of the other victims attend that.   That's with

8    Ms. Oldham and that's with Hallie Hunt, the Director of the

9    Center for Student Conduct.

10        Now, at this meeting, Ms. Karasek is not told about what

11   her Title IX rights are.   She's not told that in fact in order

12   to initiate a Title IX investigation, she needs to submit a

13   written statement.   She's not told any of that.

14        In fact, what occurs are more conversations and

15   communications with the president, who is a student of the

16   Democrats Club, now concerned about the summer program that's

17   going -- that they're going to have where they do an internship

18   called Cal at the Capital, and this guy might be part of that

19   and how do they deal with that.   That's what they're talking

20   about.

21        In the meantime, Ms. Karasek is out here.   Nothing is

22   happening for her.   No accommodations are given to her.   Yes,

23   they did tell the student president, you know, you can tell her

24   or tell these victims they can go to the Student Health or some

25   other Rape Center or something and get some assistance.   But

1  they do nothing that would be consistent with what Title IX

2  requires for that period of time, from February to April 20th,

3  from February 14th, at the minimum, to April 20th.  That's two

4  months.  Nothing's happening.

5       Then what does happen?  So on May 15th, Ms. Karasek does

6  submit a written statement.  It so happens that on May 14th,

7  Dr. Glenn DeGuzman, who is the Assistant Director of the Center

8  for Student Conduct, meets with the assailant.

9       Now, he's not meeting with him, according to his own

10  records, for the purpose of investigating.  In fact, he says

11  that he is not going to investigate.  He wants to work on

12  rehabilitation and counseling of this victim.

13       So they're not addressing in an investigatory sense what

14  happened to Ms. Karasek, what they should do about what

15  happened to Ms. Karasek, what Ms. Karasek's needs might be.

16  They're worried -- they want to get this guy rehabilitated, and

17  they're going to focus in on that, and that's what they focus

18  in on for months -- for months.  And he's communicating to the

19  Title IX officer, DeGuzman is.  She is communicating to the

20  students -- the student president of the Democrats Club, which,

21  in my mind, might even violate FERPA.  I'm not even sure how

22  she has the right to be giving information to this other

23  student.

24       My client is out in the cold, is being ignored, is not

25  being addressed, a sex assault victim who's been traumatized.

This is not -- I mean, if this were a case of a student who had assaulted with -- say, a white student assaulted a black student with a knife and this was this kind of an assault, you bet there would be workup.  There would be investigation up the gazoo.

But this is a sexual violence case against a woman.  No big deal, which is the history.  If you look at our Complaint, we've alleged that there were -- in 2013, there were 14 sex assault claims and reports made that were dealt with in this informal way.  No formal hearings, no formal processes, no opportunity to put on any kind of evidence, make statements, be heard for what happened to her, at least be heard.  None of that.

This is a pattern and practice.  The Karasek case and the Commins case are just two more of the same.

So it's not until October 24th -- or actually -- it's actually on October 1st, 2012 -- all right.  This is somewhat eight months later -- that the Title IX officer determines on her own that there will be no informal proceeding, no formal investigation, and instructs Dr. DeGuzman to prepare an administrative disposition letter.  And he negotiates that letter.  He actually engages in a negotiation with the perpetrator over what should be included in that disposition.

And in that disposition, he was -- it's a slap on the wrist.  He gets one consultation with a licensed mental health

practitioner of his choice; one appointment with an alcohol and other drug counselor in Social Services at the Tang Center; and another drug counselor in Social Services at the Tang Center; and a requirement initially -- initially Dr. DeGuzman wanted a requirement that he at least talk to this Allan Creighton health educator to, quote, *check in regarding gender issues and sexual misconduct,* close quote.

The perpetrator negotiates that last requirement away, so ultimately the ultimate determination or ultimate disposition letter excludes the very problem that this guy was in trouble for, excludes that from the disposition.

I don't know how you can look at that, Your Honor, and say that this wasn't a deliberate indifference to this woman, to this victim.  Everything they did was deliberate, not accident, not carelessness, not negligence, not laziness, as the *Oden* court would indicate, but deliberate.

And in the meantime, when my client does try to find out what happened, they're not giving her the full story.  They share and they give the perpetrator the final disposition, but they don't even bother to give it to the victim.

This is absolutely incredible, to ignore a sexual assault victim who's been traumatized, who is scared, who is fearful, who is scared to be -- that she's going to run into this guy in school, sees him in school and has to take a different route. That's not indifference?  I don't know what indifference is,

1   Your Honor, if that's not indifference.

2       The complete inequitable treatment where you're spending

3   time in favoring and finding counseling and helping this poor

4   assailant who now sees the error of his ways -- there were four

5   women.  This is not a guy who just abused one woman.  This is a

6   guy who abused four women, and he's not even going to get any

7   sex education out of it.  That's indifference.

8       Let me talk about Nicoletta Commins.  So Ms. Commins was

9   sexually assaulted in January 2012, and it was a vicious

10  assault by a vicious guy.  Her perpetrator had beat up two

11  other students, fraternity students, one of whom ended up going

12  to the hospital.

13      Police were called in.  She made a report immediately.  A

14  rape kit was taken.  The school was on notice at least as of

15  January 31st.  The assault occurred on the 20th.  They were

16  probably on notice sooner than that because I assume the

17  Berkeley police would have advised the University.  But even if

18  they didn't, at least on January 31st we know they were on

19  notice because they issued this Notice of Interim Suspension as

20  a result of what he did at the fraternity and what he did to

21  Ms. Commins.

22      And at that point, they kicked -- they said he was

23  restricted from coming to campus at all.  At all.  That was --

24  I would have agreed with that, but then he lawyers-up.  They

25  have a hearing on February 3rd, and now he's no longer

1    restricted from coming on campus.  He now can come to campus

2    and he can go to classes and he's got this so-called

3    five-minute window to get there, to get back.  Nobody's

4    monitoring that.  Who knows if this -- nobody tells her --

5    nobody tells her that he might be on campus.  Nobody tells her,

6    you know, these are the routes he might be taking.  Nobody lets

7    her know.  They don't issue a no-contact order of any kind to

8    him.

9         Interestingly enough, on August 25th, 2015, Exhibit No. E

10   to the reply, they -- No. D, I'm sorry.  Letter D -- no.  It is

11   E.  In E, they lay out a no-contact order when they're

12   thinking about bringing -- when they want to bring him back.

13   In Exhibit E, they lay out a no-contact order that is

14   extensive.  They say in that one, "You may not contact or

15   communicate with Ms. Commins through any means or media,

16   including, but not limited to contact in person via phone,

17   messaging, social media, or through other people, including

18   counsel."  Including counsel.

19        They didn't do that while he was still in school, while he

20   was taking classes, while he got to finish his semester and

21   she's at school at the same time.  She doesn't know where he

22   is, she doesn't know what route he's taking, she doesn't know

23   when he's on campus, none of that.  She's exposed to further

24   harassment under the *Davis* standard.  She's vulnerable to it.

25        And, in fact --

1          **THE COURT:**  Mr. Zalkin, I appreciate this chronology,

2     which I've read in the papers.  My problem is that I think the

3     cases don't support the finding of deliberate indifference.

4          So I'm interested in your argument on the cases, and

5     particularly what you've been arguing attacks the conclusions

6     that the University came to.  The cases that have found

7     Title IX violations were basically ones where the school didn't

8     act, didn't investigate, didn't do anything.  So I'm interested

9     in what case you would point me to.

10          I told you at the beginning, I'm not -- I am unhappy that

11     the University wasn't communicating with your clients, and I

12     think I consider it a deficiency in UC's policy, but I didn't

13     see any cases that said failure to communicate reaches the

14     deliberate indifference standard.  So if you could focus on

15     that, that would be helpful.

16          **MR. ZALKIN:**  I can't tell you of a particular case

17     where there was a failure to communicate with the victim that I

18     can think of off the top of my head.  I mean, that's clearly

19     within the DCL, and as we have repeatedly said, the DCL is a

20     point of reference.  It doesn't carry with it the force of law,

21     but it is an important point of reference because these schools

22     are held to those standards for their funding purposes.  So why

23     should it be really any different as a measure of what would be

24     responsible conduct on the part of the school.

25          **THE COURT:**  I understand what your argument is --

1   **MR. ZALKIN:**  I can't tell you of a case specifically

2   where there is a failure to communicate, but, for example, one

3   of the arguments the defendant makes is that they delayed in

4   their investigation --

5   **THE COURT:**  Before you get there, could you answer my

6   question?

7   **MR. ZALKIN:**  I will give you the case authority.

8   **THE COURT:**  Give me the case or cases that I should be

9   paying most attention to.

10   **MR. ZALKIN:**  I'm going to give you a list of cases --

11   **THE COURT:**  Don't give me a list.  Give me something

12   that really -- you're strongest case, because I've read all of

13   the cases.

14   **MR. ZALKIN:**  I think one case that is very strong is

15   *Williams vs. the Board of Regents of the University System of*

16   *Georgia.*

17   So one of the arguments like, for example, in the Commins

18   case that the defendant is making is that they -- and they

19   pressured her to allow them to delay doing any investigation

20   until the resolution of the criminal proceeding against the

21   plaintiff -- the assailant in that case.  All right.  That took

22   up almost a year or close to it.  That was delayed.

23   And in *Williams vs. the Board of Regents,* the defendants

24   in that case, the University, that was a case of gang rape.

25   Three guys --

1    **THE COURT:**  It was a horrific, horrific fact

2    situation.

3        **MR. ZALKIN:**  Horrible case.

4        But they made the same argument for the reason -- the

5    reason for the delay in the University's investigation was

6    premised on the fact that they wanted to defer and felt they

7    should defer to the criminal proceedings, and the Court in

8    *Williams* said that the pending criminal charges did not affect

9    UGA's ability to institute its own procedure.

10        Criminal charges were an ineffectual means to prevent

11   future attacks at UGA while the charges were pending, and the

12   disciplinary proceedings were not instituted for another four

13   months after Brandon Williams' acquittal and the dismissal of

14   charges against Cole and Thomas.

15        That's very similar to what happened in Ms. Commins case.

16   They withheld their investigation until October 5th when the

17   criminal proceedings -- when he had finally been convicted or

18   took a charge, took a plea, and then they waited four months to

19   do their -- if you call it an investigation, an investigation

20   of any sort, and issue one of these disciplinary --

21   administrative disciplinary orders.

22        So that's an example of where a court has found that a

23   delay based on the very argument that defendants are making in

24   this case, in the Commins circumstance, was in some way

25   reasonable because of the pending criminal thing.

1      **THE COURT:**  Now give me your best case for

2  Ms. Karasek.

3      **MR. ZALKIN:**  Okay.  So with Ms. Karasek, you have

4  several, sort of, cases -- well, I think to some extent, you

5  have the -- there's a case called *Doe vs. School Administration*

6  *District No. 19* -- it's 66 F.Supp.2d 57 -- where they find

7  deliberate indifference for engaging in this informal

8  investigative process.  This is where a teacher is told to go

9  talk to the students who are accusing her, I believe, of

10 engaging in some kind of --

11     **THE COURT:**  Is this the teacher-on-student case?

12     **MR. ZALKIN:**  Yes.

13     **THE COURT:**  I thought none of those -- the high school

14 cases that you cited, all the different Doe cases were remotely

15 close to this situation.  And that one certainly wasn't.  So --

16     **MR. ZALKIN:**  Well, I mean, I don't know -- those are

17 the cases that exist that we could find.

18     **THE COURT:**  Okay.

19     **MR. ZALKIN:**  That's part of the problem, Your Honor,

20 in why it's important to look to the DCL because you have

21 this -- you have these ad hoc opinions all over the place in

22 these Title IX cases that aren't -- there's not a lot of

23 consistency because, you know, courts are just looking at it

24 and saying *well, this is what I think, this is what I think*.

25 And there's not -- there's not this kind of uniformity.

1    But that's why I keep harping back to saying let's look at

2    something that, number one, the U.S. Supreme Court has looked

3    at for guidance, the OCRs, the predecessor of the DCL, the

4    OCR's document on sexual harassment, guidance document on

5    sexual harassment.

6    There are cases where the courts have in fact -- let me

7    give you those cases -- looked to the DCL.  For example, in

8    *Lopez vs. The Regents of the University of California,* the

9    Court actually considered the DCL's reference to sexual assault

10   and rape, whether that could include domestic violence --

11   whether that would include domestic violence.  And so it turned

12   to the DCL for guidance.

13   In *Mansourian vs. The Regents of the University*

14   *California,* at 602 F.3d 957 and the particular areas you want

15   to look at is at page 965, it's a 2010 case, where the Court

16   looked to the OCR's 1979 policy interpretation guidance

17   document.  In fact, that was deemed a significant guidance

18   document, just like the DCL in its analysis of whether the

19   exclusion of women from the wrestling team violated Title IX.

20   So it looked to that for the guidance.

21   So I don't have for you a case exactly on point to

22   Ms. Karasek's case, but I can cite you to the DCL where it

23   violated almost everything that the Office of Civil Rights or

24   the Department of Education -- whose very purpose is to

25   interpret and enforce that Title IX, at least on the

1    administrative level.

2         So it is not -- doesn't carry the force of law, but it is

3    a significant reference that does create some sense of

4    uniformity when we look at these cases and we look at the

5    conduct of these universities and how they should respond to

6    sexual assault cases.

7         So I can't tell you specifically, but I just think the --

8    on the facts, a reasonable jury listening to those facts,

9    listening to the arguments on those facts and what it means,

10   could very well find that this was deliberate indifference.  I

11   don't think you can say that as a matter of law, reasonable

12   minds can't differ.  And I think that's what you're saying, and

13   I hope you change your mind.

14        **THE COURT:**  Okay.  Thank you.

15        Ms. Everitt.

16        **MS. EVERITT:**  Thank you, Your Honor.

17        To start with the failure to communicate point, as

18   Your Honor noted, we have looked at the case law.  We have

19   failed to identify a single case that has found deliberate

20   indifference based on a failure to inform or a failure to

21   communicate theory.

22        With respect to *Doe vs. School Administration District 19*,

23   that was a case where the school never confronted the assailant

24   about the investigation and never conducted an investigation,

25   including speaking with any student, so the facts there are far

from the facts here where the school did conduct an
investigation and promptly notified the assailant about the
claims of sexual assault and it did discipline the assailant.

   One reason why we might not see deliberate indifference
met for failure to inform is that Title IX is about stopping
harassment that deprives students of educational benefits, not
necessarily about telling students what's happening.  And
schools, as we note in our opening brief, are also restricted
in what information they can provide to students, both by
FERPA, which protects the students.  In this case, both
students -- both assailants, in the case of Ms. Karasek and in
the case of Ms. Commins, were students, and so they're FERPA
concerns and also due process concerns for the due process
rights of those assailants.

   Secondly, neither Ms. Karasek nor Ms. Commins requested
any information, so it's important to look not just at the
allegations in the Complaint but what the Complaint does not
allege, and here had Ms. Karasek or Ms. Commins come forward
and requested specific information and the University failed to
respond, perhaps we would be in a different factual setting,
but there is no allegations that this information was at all
requested or that the University ignored requests by
plaintiffs.

   THE COURT:  Maybe you can help me here.  I find it
very troubling that the University at the time that these women

1   were at the height of their vulnerability after those

2   assaults -- that the University didn't take care, that they

3   didn't communicate in any real way what was going on.

4        Now, I may have missed it; maybe they did.  And it's a

5   separate question, I think, from deliberate indifference,

6   although it does play a piece in my analysis.

7        So what's your response?

8        **MS. EVERITT:**  Two responses, Your Honor.

9        First of all, as a factual matter, the University did

10  correspond with the plaintiffs to a certain degree.  So, for

11  example, with Ms. Commins, the UC administrator spoke with

12  Ms. Commins in February and April of 2012.  February 2012, I

13  believe, was just a week after she filed her Complaint.

14       And then they took into account her recommendation for

15  sanctions that included excluding her assailant from campus

16  until she was no longer on campus and notified her when this --

17  of the sanctions when the case concluded.  I believe that was

18  in October/November time frame.

19       And there was one, I guess, email in the March time frame

20  that Ms. Commins says she didn't receive because it was sent to

21  an alternate email account.  Even there, as soon as Ms. Commins

22  followed up and requested additional information from the

23  University, the University responded the next day.

24       For Ms. Karasek, the Complaint alleges that UC

25  administrators were, quote, *continually in contact with the Cal*

*Democrats Club.*  Now, that makes sense because, as Your Honor
is aware, there is four students that all came forward
together, part of the Cal Dems Club, to report assault by this
particular individual, and so the primary point of contact, at
least early on, was these leaders of the Cal Dems club.  And
Ms. Karasek alleges that she then received information from the
Cal Dems club.

So if there had been additional information that
Ms. Karasek had sought, she could have gone to the University
and personally requested that information, but we can infer
from the information that she was being provided or from the
fact that she did not follow up and request additional
information that she was satisfied with the University's
correspondence.

In addition, Ms. Karasek was informed of the final outcome
of the sanctions, and, again, the Third Amended Complaint said
that Ms. Karasek did not request an update from the University
until November 5th, 2012, and she received a response the next
day.

So as a factual matter, even assuming all the facts in the
Complaint are true and construed in favor of plaintiffs, there
was information being provided to these students.  The students
never requested additional information, and if they had, we
would have every reason to believe that the University would
have promptly responded.

1          **THE COURT:**  So just my footnote on this.  The

2     University could have done much better by these women.

3          Go ahead with your argument.

4          **MS. EVERITT:**  Noted, Your Honor.

5          And I think that the second point I was going to make with

6     respect to this is just the high standard for deliberate

7     indifference, and so that it requires more than mere

8     carelessness or laziness, and the Supreme Court is clear that

9     we -- through the deliberate indifference standard, is not

10    looking to penalize individual employees for their inaction.

11    It's looking for an official decision not to remedy the

12    situation.

13         And so here there's no facts that support the school as a

14    whole taking an official decision to not inform the plaintiffs

15    or to remedy the situation.  Far to the contrary, the school

16    took immediate corrective measures and in fact did remedy the

17    situation.  Thus, as Your Honor noted, neither of the

18    assailants re-offended after the school took action.

19         So with respect to -- I wanted to comment briefly on the

20    document that Mr. Zalkin said that he discovered that changed

21    his analysis showing -- with respect to February 2012 being the

22    date of notice.  I have a copy if Your Honor is interested.

23    Again, it does not change the calculation.

24         **THE COURT:**  I think I read the -- I know that I read

25    the follow-on email that Mr. Zalkin referred to.  It was

1   attached to somebody's pleadings, so --

2           MS. EVERITT:  And it's the same language that appears.

3   It's Exhibit A to our Request for Judicial Notice, and what it

4   shows is to the extent that the University was aware of

5   anything in February of 2012, it was unclear what specifics

6   were provided about whether they even had the assailant's name

7   at that time and if they even knew any of the allegations apart

8   from the secondhand account, and it wasn't until April 2012

9   that Ms. Karasek came forward and formally lodged a complaint,

10  and the University immediately took corrective action at that

11  time.

12          And even with respect to the 2000 -- the February 2012

13  date, as Exhibit A makes clear, the University followed up

14  immediately.  Ms. Ambrosio at the Center for Gender Equity

15  e-mailed administrators at Title IX and at the Center for

16  Student Conduct about what she had met with the student about,

17  and both of those administrators offered to follow up with the

18  student, so then it was on the Cal Dems to convey that

19  information to the victim here, Ms. Karasek, and so that would

20  be the reason for any delay during that time period.

21          So Mr. Zalkin as well discussed the remedy being

22  insufficient, and I just wanted to touch briefly on that.  Here

23  the remedy -- there is no allegation that the discipline failed

24  to remedy the situation, and as Your Honor is aware, courts are

25  not entitled to second guess decisions made by the University.

1    And so here the University did take prompt corrective action.

2    It found that both assailants violated the University policy

3    and it did impose discipline on both assailants.

4        And as the Supreme Court has held, Title IX does not

5    require recipients to purge their schools of actual peer

6    harassment or to engage in a particular disciplinary action.

7        I guess to conclude, just to go quickly through the

8    timeline, yeah, as Your Honor is aware, in all cases here, the

9    University took prompt corrective action and met immediately

10   with the assailant and investigated the complaints, and it

11   found the assailant had violated school policy.  On these

12   facts, there is no case that has found deliberate indifference

13   under these circumstances, and so we ask Your Honor to dismiss.

14       **THE COURT:**  Thank you, Ms. Everitt.

15       Mr. Zalkin, briefly.

16       **MR. ZALKIN:**  Briefly.

17       The question really, Your Honor, is what is -- what does

18   it mean to be indifferent?  Indifferent to who, to what?  The

19   indifference is to the victim.  And what I've heard here is

20   that there is a burden-shifting, that it's really incumbent on

21   the victim to proactively proceed, this person who, as you

22   acknowledge, is in a state of trauma, is in a state of

23   vulnerability.  It's up to them to push and get information and

24   to see what's happening.

25       That is indifference, to do that and to put that burden on

1   the victims.  And I think -- you know, you take the position

2   that there's something separate from a lack of communication to

3   being -- acting unreasonably, and I think it's a part of the

4   unreasonable conduct.

5        **THE COURT:**  I don't disagree that if you could piece

6   together a number of actions, including ones that are listed in

7   the *Dear Colleague* letter, that rise to the level of deliberate

8   indifference plausibly, then you could go forward on those

9   claims.  So that's the thing I will be looking for.

10       And I do understand all of the arguments that you've made,

11  so if you've got a new one, go ahead, but otherwise, you should

12  just wrap up.

13       **MR. ZALKIN:**  I'm going to give you the pieces real

14  quickly, if you don't mind, at least on Ms. Karasek.

15       **THE COURT:**  Okay.

16       **MR. ZALKIN:**  The designated Title IX officer never

17  advised the victim of a requirement to file a formal complaint,

18  never conducted a formal investigation.  She knew that an

19  informal investigation was not the appropriate way to go in

20  these types of cases, but she didn't -- she deliberately made

21  the decision not to.

22       No administrator communicated with the victim for two

23  months after receiving actual notice --

24       **THE COURT:**  You've gone through this before,

25  Mr. Zalkin.

1    **MR. ZALKIN:**  All right.  I don't think there is much

2    more I can say, Your Honor.

3    **THE COURT:**  Okay.  I appreciate your argument.  I will

4    go back and think about it one more time.  I think we need to

5    have a case management conference to set the schedule for the

6    rest of the way, and so I'd like to do that on July 5th.

7    **MR. ZALKIN:**  July 5th?

8    **THE COURT:**  Are you available then?

9    **MR. ZALKIN:**  Yes.

10    **MS. EVERITT:**  That's fine here.

11    Two points of clarification.

12    **THE COURT:**  Okay.  Let me just tell you that I want to

13    have your CMC statement by June 30th.  And what I want is a

14    schedule for your proposed schedule for the remainder of the

15    case.

16    **MR. ZALKIN:**  July 5th at what time?

17    **THE COURT:**  July 5th at 2:00.

18    **MR. ZALKIN:**  Do you accept telephone appearance?

19    **THE COURT:**  We can -- you're down in San Diego; right?

20    **MR. ZALKIN:**  Yes.

21    **THE COURT:**  Yes.  You can appear by phone on this.

22    **MR. ZALKIN:**  Thank you, Your Honor.

23    **MS. EVERITT:**  Just two points of clarification for the

24    record.

25    Mr. Zalkin mentioned that the deliberate indifference

1  standard is deliberate indifference with respect to the victim,

2  not with respect to the assault, but that's incorrect if you

3  look at *Davis*.  It's whether the school is deliberately

4  indifferent to the complaint.

5        **THE COURT:**  I understand.

6        **MS. EVERITT:**  The second point is with respect to

7  whether you look at the totality of the circumstances in terms

8  of determining whether there's been deliberate indifference,

9  and the Ninth Circuit and the Supreme Court has not held that

10  you can look at the totality of the circumstances or that you

11  look at sort of multiple things leading to a systemic showing

12  of deliberate indifference.  But even if that were considered,

13  as Your Honor notes, here it does not rise to the level of

14  deliberate indifference.

15        **THE COURT:**  Well, I don't know how else you look at

16  deliberate indifference besides looking at the entire conduct

17  and making a determination that way.  But I appreciate your

18  argument.  Thank you very much.

19

20        (Proceedings adjourned at 2:54 p.m.)

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, July 1, 2016

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25