1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable William H. Orrick, Judge

4

5  SOFIE KARASEK, et al.,           )
                                    )
6            Plaintiffs,            )
                                    )
7  vs.                             )    No. C 15-03717-WHO
                                    )
8  THE REGENTS OF THE UNIVERSITY )
   OF CALIFORNIA, et al.,           )
9                                   )
             Defendants.            )
10 _____)

11                              San Francisco, California
                                Tuesday, November 3, 2015
12
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 4:36 - 5:26 = 50 MINUTES

14 APPEARANCES:

15 For Plaintiffs:
                                The Zalkin Law Firm, PC
16                              12555 High Bluff Drive
                                Suite 301
17                              San Diego, California 92130
                                (858) 259-3011
18                      BY:  IRWIN M. ZALKIN, ESQ.
                                ALEXANDER S. ZALKIN, ESQ.
19
   For Defendants:
20                              Munger, Tolles & Olson, LLP
                                355 South Grand Avenue
21                              35th Floor
                                Los Angeles, California 90071
22                      BY:  BRADLEY S. PHILLIPS, ESQ.

23

24         (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

```
 1                              Munger Tolles & Olson
                                560 Mission Street
 2                              27th Floor
                                San Francisco, California
 3                               94105
                                (415) 512-4073
 4                        BY:   NATHAN M. REHN, ESQ.

 5
         Transcribed by:        Echo Reporting, Inc.
 6                              Contracted Court Reporter/
                                Transcriber
 7                              echoreporting@yahoo.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

                          P-R-O-C-E-E-D-I-N-G-S

                              --oOo--

            THE CLERK:  Calling civil matter 15-03717,
Karasek, et al., versus Regents of the University of
California.

       Counsel, please come forward and state your appearance.

            MR. PHILLIPS:  Good afternoon, your Honor.  Brad
Phillips and Thane Rehn of Munger, Tolles and Olson on
behalf of the Regents of the University of California.

            THE COURT:  Good afternoon.

            MR. ZALKIN:  Good afternoon, your Honor.  Irwin
Zalkin on behalf of plaintiffs.  And Alex Zalkin is here as
well.

            MR. A. ZALKIN:  Good afternoon, your Honor.

            THE COURT:  Sorry you had to sit through --

            UNIDENTIFIED SPEAKER:  An interesting afternoon,
your Honor.

            UNIDENTIFIED SPEAKER:  It's been quite a long
afternoon.

            THE COURT:  Yes.  And so here you are.

       So let me tell you sort of where I see this -- the
complaint, because I think there are some easy issues and I
think there is a hard issue.

       And the easy ones, it seems to me is Education Code

4

1 section 220 doesn't apply to the Regents.

2      I don't think fraud is plausibly pled in this

3 complaint.

4      And the negligent failure to warn, train or educate, I

5 don't think I'm able to substitute my view on policy for the

6 University's.  I don't think there's a duty and I think the

7 <u>Juarez</u> case is just different.  Boy Scouts are different

8 than university students.

9      So those claims I don't see proceeding, although if you

10 tell me that you want to amend, I'll give you that

11 opportunity, Mr. Phillips.

12      The hard question to me and the one that I'm most

13 interesting in argument on is deliberate indifference on the

14 Title IX claim.

15      And here, I focus on the Regents' response after

16 learning of the assaults.  And a common concern is that the

17 plaintiffs weren't regularly informed or weren't informed of

18 what the Regents were doing.  And it seems to me that the

19 plaintiffs are entitled to know, entitled to discovery to

20 know so that the complaint -- either because the complaint

21 adequately states a claim so that we can determine whether

22 it's to think that it will.

23      It seems to me that it's close about whether you can

24 infer from the allegations regarding Ms. -- Karasek, is that

25 how to pronounce it?

5

1          MR. I. ZALKIN:   Karasek.

2          THE COURT:  -- Karasek and Ms. Commins, the

3    defendant, was late to respond, froze them out of the

4    process and reached an inadequate remedy.  I mean it's

5    obviously also plausible that the Regents' interpretation of

6    the facts such as they are, are right and that it acted

7    within its procedures reasonably and promptly.

8       The separate issue with Ms. Butler is the one of

9    control.  And there, I think it's plausible that the Regents

10   had sufficient control over John Doe, given that it

11   advertises the Alaska Wildlands program, he's a guest

12   lecturer at U.C., and the other allegations that are in

13   there.

14      And then the question on causation, which is another

15   interesting issue I think.  But I don't agree with the

16   Regents' argument on causation.  If the University's conduct

17   causes further discrimination, Title IX violation is still

18   viable.  And it seems to me that there are a lot of

19   different ways to allege further discrimination.  It's not

20   just another bad act of harassment.

21      So I'm inclined either to dismiss with leave to amend

22   and to give the plaintiff 90 days to do some discovery and

23   figure out what the University knew and when it knew it and

24   what it did or to deny the motion to dismiss on that issue

25   and look at it again on summary judgment.

6

1      But, Mr. Zalkin, why don't you start off.

2          MR. I. ZALKIN:  Sure, your Honor.  I'm going to

3  throw you a bit of a curve ball if I can.

4      We have two paths to liability in this case under Title

5  IX.  We've focused very much in the briefing on the path of

6  how the University responded to the particular claims of the

7  three plaintiffs in this case.

8      But we have another path, and I want to just address

9  that first, if you don't mind, take a few minutes.  And then

10  I will certainly answer your concerns or attempt to address

11  your concerns as you've stated them.

12      With respect to the first path, I'll call it -- it's

13  the policy path.  And what we've alleged in our complaint --

14  specifically I think it's paragraph 69 through 78 of the

15  complaint -- are allegations that the University --

16  essentially the manner in which it has historically and

17  continues to respond to claims of sexual violence and gender

18  discrimination associated with sexual harassment and sexual

19  violence has been one of a policy of indifference.

20      And when you have a circumstance where you have this

21  overall policy of indifference to a known harassment, known

22  sexual violence on their campus in their community and they

23  have failed to respond to that, you can just sort of skip

24  past the need to have to have actual notice to a particular

25  individual with the authority to remedy the situation.  You

7

1  go straight to court.

2       And there are two cases principally that I want to

3  address that stand for that proposition.

4       One is a Ninth Circuit case.  And the Ninth Circuit

5  case we didn't cite in our brief, and I'm sorry that we

6  didn't.  Often when you're preparing for these arguments,

7  you come across something that you should have included.  So

8  it is hidden in there among other cases, but it wasn't

9  brought to the forefront.

10      That's the case of <u>Mansourian</u> -- M-A-N-S-O-U-R-I-A-N --

11 <u>v. Regents of the University of California</u>, 602 Fed.3d 957,

12 Ninth Circuit case.

13      And in that case, the Ninth Circuit held that where the

14 official policy of the recipient educational institution is

15 one of the deliberate indifference to a known overall risk

16 of sexual harassment, notice of a particular harassment

17 situation and an opportunity to cure it are not predicates

18 for liability.  That's page 967 of the opinion.

19      Now, that was a case where the concern, the problem,

20 the issue was the University of California at Davis had shut

21 down a women's wrestling program.  It was a program that was

22 part actually of the men's program and they allowed women to

23 wrestle and then they shut it down.

24      They were called on it by the OCR.  They reinstated it,

25 but they made it so impossible for women to compete that

8

1  ultimately it faded.  That was the issue in the case, the

2  particular issue.  But the question that was raised in that

3  case was:  Does there have to be actual knowledge to a

4  particular individual that has the authority to remedy the

5  situation and does there have to be this sort of continuing

6  subject to harassment to follow the lack of a remedy.

7      And the court said no.  It looked to <u>Davis</u> and it

8  looked to <u>Gebser</u>, which was an earlier Supreme Court case.

9  So I'm going to just quote that page for you in -- because I

10 think it helps in what I'm trying to suggest.

11             "Proof of actual notice is required

12         only when the alleged Title IX violation

13         consists of an institution's deliberate

14         indifference to acts that, 'do not

15         involve official policy of the recipient

16         entity.'  In sexual harassment cases, it

17         is the deliberate failure to curtail

18         known harassment rather than the

19         harassment itself that constitutes the

20         intentional Title IX violation."

21 And it cites <u>Davis</u> and it cites <u>Gebser</u>.

22    But then it goes on to say:

23             "The Tenth Circuit has held that a

24         corollary of this principle is that

25         where the official policy is one of

9

1              deliberate indifference to a known

2              overall risk of sexual harassment,

3              notice of particular harassment

4              situation and an opportunity to cure it

5              are not predicates for liability."

6      And it cites Simpson v. The University of Colorado,

7  Boulder.  And that's the case, if you recall, where football

8  team at the University of Colorado had been harassing young

9  women, both recruits and players --

10             THE COURT:  No.  It seemed to me that the line of

11  cases that you are discussing did have pretty extraordinary

12  and egregious facts.

13             MR. I. ZALKIN:  Right, they do.  What they are

14  saying is when they have this overall policy of

15  indifference -- and we have alleged in this complaint that

16  the University has been audited, that as a result of a state

17  audit that deficiencies have been raised with the manner in

18  which it has either responded to complaints or prevented

19  discrimination.

20      We've alleged that there are 31 women who have filed

21  these Title IX administrative complaints.  We've alleged

22  that they have policies and procedures that they have not

23  implemented correctly, that they have not followed.

24      It's not before the Court today, but just yesterday in

25  the Berkeley newspaper there was an article about a graduate

1  student who has filed a complaint with the OCR alleging that

2  the University hasn't taught graduate students their sexual

3  harassment policies and how to protect themselves from

4  sexual harassment.

5      So we are on the one -- the one path, path number one,

6  we are alleging we have this policy of deliberate

7  indifference.

8            THE COURT:  Right.  No, I understand that path.

9            MR. I. ZALKIN:  Okay.  And that as a result --

10           THE COURT:  Let's go to the other path.

11           MR. I. ZALKIN:  Okay.  And as a result of that,

12 these three plaintiffs suffered --

13           THE COURT:  I understand.

14           MR. I. ZALKIN:  So to the individual cases with

15 respect to Ms. Karasek, what you have is first of all, she

16 was assaulted by a fellow student who was part of the

17 Democratic -- the club of the University, at a University

18 activity.  They were in San Diego attending the Democratic

19 Party Convention.  And as such, they were actually taking --

20 they were part --

21           THE COURT:  I've read the complaint a bunch.

22           MR. I. ZALKIN:  Okay.

23           THE COURT:  And I've read the briefs a bunch.  So

24 I don't need you to tell me what the facts are with respect

25 to these women.

11

1        MR. I. ZALKIN:  Okay.

2        THE COURT:  I'm interested though in the -- so I'm

3   zeroing in on the response of the Regents to the notice from

4   these three women.  And to me that seems like your best

5   argument.

6        MR. I. ZALKIN:  And I think it is.  I mean they

7   clearly, in the cases that we've cited to the Court and in

8   the DCL, the Dear Colleague Letter -- which by the way, if I

9   can take a minute to address that, that's a significant

10  guidance document.

11      The defendants would like to suggest that that's just

12  mere suggestions, it's not controlling.  And we're not

13  arguing that it per se raises legal liability in a civil

14  lawsuit for damages.  But what we're saying is it is very

15  persuasive of the standard of care because it's a document

16  that is issued -- and these guidance documents are

17  periodically issued -- by the federal agency that is

18  responsible for the implementation of Title IX, for the

19  interpretation of Title IX, and for compliance, enforcing

20  compliance with Title IX.

21      They can take away the funding of this University if

22  there's a violation of those guidance standards.  So these

23  are not de minimis.  These are significant indicia of the

24  type of conduct that is expected of the University in

25  response to these complaints.

1    So they didn't follow any of those.  In the case of Ms.

2 Karasek, first she was never even advised that she had a

3 right to file a formal complaint.  She learned of that on

4 her own.  That's not -- they are required to advise students

5 of the process and how to initiate a formal complaint.

6         THE COURT:  What do you know of what the

7 University actually did at the moment?  Have you done any

8 discovery -- do you have their documents?

9         MR. I. ZALKIN:  We only know what our clients have

10 told us, your Honor.  We haven't had an opportunity to find

11 out more informally at this stage.

12    So based on what we know now at the pleadings stage, we

13 know that they didn't advise Ms. Karasek of her opportunity

14 and her right to file a formal complaint.  When she did file

15 a formal complaint, there was no response.  Instead, they

16 engaged in a back-door deal with her perpetrator, which

17 clearly violates the DCL.

18    Page eight of the DCL lays out that there should never

19 engage in an informal process once a formal complaint has

20 been lodged.  They can attempt pre a formal complaint to

21 mediate, and only if the victim is willing to do that.

22    If the victim decides they want to pull out of any

23 informal process and go to a formal complaint, that informal

24 process ends, according to what the OCR requires.  They

25 didn't do that.  They went into a back room, they cut a deal

13

1  with this guy.  She has no idea what the outcome is.  She's

2  supposed to be advised of the outcome.

3      There's no effort -- as far as she knows, there's

4  nothing they've done to stop him from -- issuing a stop

5  order or a stay-away order.

6          THE COURT:  Let me stop you for a sec, because

7  you're ahead on points on this particular thing.  I'm

8  interested most specifically now on any other arguments you

9  want to make with the causes of action.

10     Once Mr. Phillips argues on this, I'll give you a

11  chance to go back.

12     But I agree that the -- it is what the University did

13  or didn't do that you're entitled to know so that the claim

14  can go forward or not.  That to me is what's important.

15         MR. I. ZALKIN:  You don't want -- need me to talk

16  about Butler or comments --

17         THE COURT:  I really don't.

18         MR. I. ZALKIN:  All right.  So what I'm dealing

19  with --

20         THE COURT:  After Mr. Phillips, I'm sure you'll

21  have a few pointed things to say.

22         MR. I. ZALKIN:  So after -- so what you're

23  struggling with is our state common law negligence claim and

24  why -- and <u>Juarez</u> essentially.

25         THE COURT:  Yeah, not struggling much but --

14

1           MR. I. ZALKIN:  Well, what I can tell you on that

2   is this is case where the University has been mandated under

3   Title IX to assume the responsibility, has the duty, the

4   statutory duty to protect their students from sexual or

5   gender discrimination including sexual violence and sexual

6   harassment.

7       They are required as part of that, under 34 CFR 106 --

8   I can give it to you but --

9           THE COURT:  That's fine.

10           MR. I. ZALKIN:  I can give it to you specifically.

11   I think it's 106(8)(b).  They are required to educate their

12   students on how to protect themselves.  So this is the

13   Juarez claim.  This is the circumstance where you have known

14   sexual harassment and violence within the institution, as in

15   the Boy Scouts.

16       You have in this case a statutory obligation, not a

17   common law duty but a statutory duty to educate, to warn, to

18   train students on how to protect themselves.  And they have

19   a failure on their part, or an allegation on our part that

20   they have failed to do that.  And as a result of that, our

21   clients have been damaged.

22       So I think we have the elements of a state common law

23   negligence claim a la Juarez.  It's a little bit different.

24           THE COURT:  All right.

25           MR. I. ZALKIN:  Broad -- you know, we cite the

1  <u>Michael J.</u> case.  I think that distinguishes why Government

2  Code section 818.8 doesn't apply in this context.

3      It usually applies in the context where some lesser

4  lower-level employees are misrepresenting financial

5  conditions or something of that nature as opposed to

6  misrepresenting the safety of the university with respect to

7  how it handles and what it does to protect people from

8  sexual violence.

9      I think on the state claim I can see that we're done,

10  on the state Education Code claim.

11          THE COURT:  Okay.  Great.  Thank you.

12          MR. PHILLIPS:  Thank you, your Honor.

13      Just quickly before I forget, I just want to point out

14  that the <u>Mansourian</u> case, which I don't believe they cited

15  in the papers anywhere, is an instance of official

16  discrimination by the school alleged, not discrimination

17  based on failure to remedy teacher/student or student-on-

18  student harassment.  It's a completely different issue from

19  the issue that we have here, completely irrelevant.

20      Your Honor, let me start by addressing the legal

21  standards for deliberate indifference because I don't think

22  they're quite as, I'll use the technical term, "loosey-

23  goosey" as counsel would suggest.

24      The Supreme Court in <u>Davis</u> said that the response to

25  known harassment, actual notice of harassment, in order for

16

1  there to be Title IX liability, the response must be clearly

2  unreasonable in light of the known circumstances.  And the

3  courts have said that that's not just a reasonable standard.

4  It is stricter than that.  It is an exacting standard.

5      And indeed the Ninth Circuit, quoting the Supreme

6  Court's decision in <u>Gebser</u> and characterizing <u>Gebser</u> the

7  same way the <u>Davis</u> court characterized <u>Gebser</u>, is that the

8  plaintiff has to plead facts sufficient to support a finding

9  that the college made an official decision not to remedy the

10  violation.

11      The cases -- the Fifth Circuit has said that actions or

12  decisions that are, quote, "merely inept, erroneous,

13  ineffective or negligent do not amount to deliberate

14  indifference."  That's the <u>Dallas Independent School</u> case

15  that we cite.

16      And the <u>Benicia School District</u> case, the Eastern

17  District of California, said that even ineffective or

18  mistaken responses don't constitute deliberate indifference.

19      And the <u>Davis</u> court specifically said that the victims

20  of harassment are not entitled to make particular remedial

21  demands, and that, quote, "The courts should refrain from

22  second-guessing the disciplinary decisions made by school

23  administrators."

24      And in <u>Oden</u>, your Honor, there was a -- the Ninth

25  Circuit's case of <u>Oden</u>, there was a failure to follow the

17

1 university's -- the school's own policy with respect to

2 responding to complaints.

3    And the court said that that failure to follow their

4 own policy did not support the existence of a Title IX

5 violation.  It's not a violation of Title IX to fail to

6 follow your own policies.  It's only a violation of Title IX

7 if it satisfies the standards set out in <u>Davis</u> and the cases

8 that follow <u>Davis</u>.

9    The cases that principally they rely on with respect to

10 deliberate indifference, your Honor, the <u>Jennings</u>, the

11 <u>Vance</u>, the <u>Morrell</u> cases, those are situations where either

12 the school failed to take any action to remedy a violation

13 or where remedial action was deemed to constitute deliberate

14 indifference where the same perpetrator committed acts of

15 harassment after the school was on actual notice of his

16 prior acts.  Neither of those things are alleged here, your

17 Honor.

18    And, your Honor, with respect to the Department of

19 Education Dear Colleague Letter, the letter itself very

20 carefully said that it does not add requirements to

21 applicable law.

22    So what your Honor needs to look to is the applicable

23 law and court decisions and not whatever the Department of

24 Education's letter may say.  And that it sets forth the

25 standard for administrative enforcement of Title IX.  And in

1 court cases where plaintiffs are seeking injunctive

2 relief -- and that, quote, the standard in private lawsuits

3 for monetary damages is actual knowledge and deliberate

4 indifference, not what appears in the Department of

5 Education's Dear Colleague Letter.

6     And indeed, your Honor, in <u>Gebser</u>, the Supreme Court

7 held that failure to comply with the Department of

8 Education's regulations -- the Dear Colleague Letter is not

9 a regulation.  It's just guidance put out by the Civil

10 Rights Office -- that failure to comply with the regulations

11 does not give rise to a claim for deliberate indifference.

12     So certainly, your Honor, if that can't give rise to a

13 claim for deliberate indifference, failure to comply with

14 the DOE guidance letter can't give rise to a claim for

15 deliberate indifference.

16     Your Honor, with respect to -- they also -- they make

17 an argument, your Honor, with respect to a delay, allegedly

18 delaying in responding, and I'll come back to that.  But in

19 <u>Oden</u>, your Honor, the Ninth Circuit was very clear.

20     There had been a nine-month delay in doing anything in

21 <u>Oden</u>, and the court said -- and that was a violation of the

22 school's policy as well as being a nine-month delay.  And

23 the court said that that did not give rise to a Title IX

24 claim unless -- unless the plaintiff showed that, quote,

25 "The delay was a deliberate attempt to sabotage plaintiff's

1 complaint or its orderly resolution."  That's when delay can

2 constitute a violation of Title IX.

3      Now, with those standards in mind, your Honor, let me

4 turn to what's alleged in the complaint, which as we all

5 know we have to take as true what's alleged in the

6 complaint.

7      With respect to Ms. Karasek, she affirmatively alleges

8 that the University did conduct an investigation and did

9 discipline her alleged harasser.

10      Paragraph 19, she alleges the University was preparing

11 to respond to her.

12      Paragraph 20, she alleges the matter had been explored

13 and resolved and an outcome communicated to the Center for

14 Student Conduct.

15      Paragraph 22, she alleges that her harasser had been

16 charged with violating and found in violation of the campus

17 Code of Student Conduct.

18      And in paragraph 25, she alleges that he was placed on

19 disciplinary probation and engaged in counseling measures.

20      She alleges all of those things.  That is clearly

21 contrary to the notion that the University made a decision

22 not to remedy the situation, not to investigate, not to

23 discipline.

24      And to the extent the Court or anyone else may disagree

25 with a particular discipline that was imposed on her

20

1  harasser, that's not an issue for the Court.  The Supreme

2  Court is very clear about that, your Honor.  The Ninth

3  Circuit's been very clear about that.  The courts are not

4  supposed to second-guess what the university does if they do

5  something in terms of investigating and disciplining.

6      Ms. Commins affirmatively alleges, again, that there

7  was an investigation and discipline imposed, that she

8  received a phone call from the Title IX office.  She's not

9  sure whether it's the Title IX office or the Office of

10 Student Conduct.  And she was told that the University would

11 conduct an investigation after the police finished their

12 investigation.

13     Now, there seems to be a complaint to some extent about

14 the fact that the University didn't pursue its investigation

15 while the police were doing so.  I would just point out that

16 in fact the Dear Colleague Letter specifically says that

17 universities, schools should in fact defer to police

18 investigations for obviously good reasons, your Honor.

19     But then she alleges affirmatively, paragraph 62, that

20 her alleged harasser was suspended until after the fall of

21 2015 when she was scheduled to graduate, that he was

22 suspended, that he was required to complete a writing

23 assignment, that he was prohibited from contacting her and

24 placed on disciplinary probation for the rest of his studies

25 at U.C., your Honor.

1       Neither of those with respect to Ms. Karasek or Ms.

2   Commins are clearly unreasonable responses or a decision not

3   to remedy a violation.  Even if one thought that they were

4   ineffective, negligent, erroneous or whatever else, that

5   would not give rise to a Title IX claim.  The courts have

6   been clear about that.  The complaint establishes that U.C.

7   responded in a manner that eliminates any Title IX liability

8   here, your Honor.

9       And, your Honor, with respect to Ms. Butler,

10  respectfully -- and I emphasize that in light of the

11  afternoon session -- respectfully disagree with your Honor's

12  conclusion in that regard.

13      There is nothing in the complaint that in any way

14  suggests that the University of California exercises any

15  control whatsoever about the alleged harasser in this

16  instance.  He is not an employee of the University, he is

17  not an agent of the University.  The alleged harassment took

18  place in a context over which the University had no control.

19      She was a student at the University who was doing

20  research with a Ph.D. candidate at a center not owned,

21  controlled or otherwise managed by the University.

22           THE COURT:  But advertised by.

23           MR. PHILLIPS:  Your Honor, if the University is

24  responsible for what goes on at every place where it may say

25  students can go and receive clinical experience or --

1          THE COURT:  Well, Mr. Phillips, that would be one

2  thing but he's a guest lecturer -- he's alleged.

3          MR. PHILLIPS:  He is alleged to have perhaps been

4  a guest lecturer.

5      But, again, your Honor, if the University liable for

6  what every guest lecturer that they ever invite to the

7  University did somewhere else, outside of their control,

8  then I think that's going to substantially change the way in

9  which universities go about their business, because you then

10  have to do essentially a check on everything this person has

11  ever done before you invite them to be a guest lecturer at

12  your school.

13      There is nothing in the complaint whatsoever --

14          THE COURT:  This though, Mr. Phillips -- I don't

15  know.  I think you're --

16          MR. PHILLIPS:  There's no allegation that he was a

17  guest lecturer after they had notice that of the alleged

18  harassment, your Honor.  No such allegation.

19      Perhaps that would create a new issue, but there's no

20  such allegation that he was invited as a guest lecturer

21  after the allegations against him were made.

22      So I would submit, your Honor, that it's very clear.  I

23  would point your Honor to -- Oden says that damages are

24  available only if an official who at minimum has authority

25  to address the alleged discrimination and institute

1 corrective measures.

2      There is no allegation that the University had any
3 authority over her alleged harasser to suspend him, to
4 discipline him, to do anything with respect to him.  Perhaps
5 you could say that they had obligation not to invite him to
6 be a guest lecturer, but there was no allegation that he was
7 invited to be a guest lecturer.

8      There is nothing they could have done with respect to
9 that individual, your Honor.  In Ostrander, the Ninth
10 Circuit's decision in Ostrander, there was a judgment in
11 favor of the university on a Title IX claim arising from a
12 sexual assault in an off-campus building because the
13 university did not own, possess or control the building.
14 Similarly here, the University had no ownership, control or
15 possession of the center where this occurred.

16      In Clifford, your Honor -- in Clifford we had a Title
17 IX claim where there was a sexual assault during a
18 fraternity retreat at Lake Tahoe, a university fraternity
19 retreat.  And the claim was dismissed because the university
20 didn't have control over that context.

21      So, your Honor, I think it's clear that in fact with
22 respect to Ms. Butler, there's simply no showing of an
23 ability to control or an ability to discipline the harasser.
24 There is essentially nothing the University could have done.

25      So I think with respect to the particular circumstance

24

1   argument that we have, it's two prongs, the ones with

2   particular circumstances here.

3       The complaint itself -- they don't need discovery, your

4   Honor.  The complaint itself establishes that the University

5   did respond, that they disciplined the individuals in the

6   two instances and in the other instance, there's no control,

7   no authority to do anything and therefore no Title IX claim.

8       Your Honor, with respect to whether or not Ms. Karasek

9   and Ms. Commins were informed as quickly as they might have

10  liked about what was going on, there is no law that I'm

11  aware of that suggests the University has a duty under Title

12  IX to inform the accused about the progress of the

13  investigation.

14      No case that suggests that liability can be based upon

15  the fact that notwithstanding you did an investigation and

16  notwithstanding the fact that you in fact imposed

17  discipline, that because you didn't tell the person along

18  the way what you were doing, that somehow that gives rise to

19  liability, that somehow that constitutes deliberate

20  indifference.

21      The question isn't whether you were deliberately

22  indifferent somehow to the complainant.  The issue is

23  whether you were deliberate indifference to the allegations

24  of harassment.  And it's clear from the complaint here the

25  University of California was not deliberate indifference to

25

1 these allegations.

2    Turning to the -- excuse me, a little bit of a -- would

3 you mind if I got a little water?

4         THE COURT:  The hour is late.

5         MR. PHILLIPS:  Turning to the policy argument,

6 there is no authority whatsoever for the proposition that a

7 Title IX claim in these circumstances can be based upon some

8 general inadequacy of a university's training or dealing

9 with alleged -- allegations of sexual harassment.

10    Again, the Ostrander decision of the Ninth Circuit I

11 think in this area is very instructive, your Honor.

12    There, the court held that the plaintiff could not

13 satisfy Davis's actual knowledge requirement by showing that

14 there had been prior complaints of sexual abuse by members

15 of a particular fraternity, when those complaints were not

16 about the same fraternity member or the same location as the

17 abuse was subject of the Title IX claim.

18    So you have a claim there that the university had

19 failed to deal adequately with abuse by a different

20 fraternity member.  And the court said no, that's not

21 enough.  You have to have an allegation about the particular

22 person or context.

23    And, your Honor, with respect to the Simpson case.  I

24 mean the Simpson case is a pretty egregious set of facts, as

25 I think you may have suggested.

26

1          THE COURT:  You don't really need to argue this.

2          MR. PHILLIPS:  Okay.  Thank you.  That's a

3 completely different situation and has been limited to

4 situations where there's potentially a policy of encouraging

5 the activity that has resulted in sexual harassment.

6     There's no even remotely similar allegation here, your

7 Honor.

8     So with respect to the deliberate indifference point,

9 your Honor, I think under Davis, under the Oden case and

10 under all the other cases we cited, your Honor, it's clear

11 from the face of the complaint that there was deliberate

12 indifference to these allegations of harassment, your Honor.

13     Let me turn, if I could -- and, your Honor, with

14 respect to the policy argument, I would just -- I think it's

15 sort of patently --

16          THE COURT:  You don't actually need to argue the

17 policy argument.

18          MR. PHILLIPS:  Okay.  I was going to say that

19 opens a can of worms that seems rather obvious.

20     Your Honor, with respect to the causation issue, I

21 would like to address that, if I may.

22     Because the Ninth Circuit's held in Reeves that where

23 there was no evidence that any harassment occurred after the

24 school learned of the plaintiffs' allegations the school

25 cannot be deemed to have, quote, "subjected the plaintiffs

1   to harassment."  That's what the Ninth Circuit said in

2   <u>Reeves</u>.

3       And we have cited numerous other cases, your Honor,

4   where Title IX claims were dismissed because there was no

5   allegation of further harassment or deprivation of rights

6   after the institution was put on notice of the harassment.

7       We cited a number of those.  There is no such

8   allegation of further harassment after the University was

9   put on notice of the allegations except, your Honor --

10  except -- and I don't think this is an allegation of further

11  harassment.  But there is an allegation that I believe Ms.

12  Commins or Ms. Karasek, possibly both, basically felt

13  uncomfortable because they thought the person might still be

14  around.

15      Well, your Honor, the Yoona Ha case -- <u>Ha versus</u>

16  <u>Northwestern University</u>, in that case the court specifically

17  said, your Honor, that, quote, "If plaintiff claims that

18  knowledge of Ludlow's presence on the campus caused her

19  considerable grief, that is not actionable under Title IX."

20      And your Honor, there are other cases -- I'm not

21  sure -- I think two of these may or may not have been cited

22  in our papers -- where even the fact that the complainant

23  actually saw the alleged harasser on campus the complaint

24  had been made -- which is not alleged her.  There's no

25  allegation that there was ever any contact whatsoever after

28

1    the allegations were made.

2        But even in situations where there was, in <u>Frazier v.</u>

3    <u>Temple University</u>, which is 25 F.Supp.3d 598, at page 614,

4    Eastern District of Pennsylvania, your Honor, dismissed the

5    claim where the plaintiff alleges that her harasser, quote,

6    "followed her, sat outside her dormitory and stood directly

7    beside her in the cafeteria and stared at her" after the

8    allegations had been made.  And the court held that that did

9    not state a claim under Title IX.

10              THE COURT:  I might have found differently.

11              MR. PHILLIPS:  Hmm?

12              THE COURT:  I think I might have found differently

13   but --

14              MR. PHILLIPS:  I understand you might have, your

15   Honor.  But of course we don't have anything close to those

16   facts here either.

17       All I'm saying is in these cases, which go well beyond

18   anything that's alleged here after the allegations, even in

19   those cases, there was a finding that there wasn't Title IX

20   liability.

21       But in the <u>O'Hara</u> case which is 2002, U.S. District

22   Lexus 12153 at star 18 to 19, if I'm reading my own writing

23   correctly, your Honor -- I hope -- the plaintiff alleged her

24   harasser, quote, "could occasionally be found in the same

25   vicinity and that he would stare at her," closed quote.  And

29

1   again, it rejected Title IX liability based on that.

2       And here, your Honor, we have not even that.  We have

3   simply a thought that maybe this person was around here

4   somewhere, even though Ms. Commins that her alleged harasser

5   had been told not to have any contact with her.

6       Your Honor, the notion -- if a university can be liable

7   under Title IX for causing further harassment by virtue of

8   the fact that the alleged harasser may have remained on

9   campus after the allegations of harassment were made, the

10  only way to cure that for a university, your Honor, would

11  almost certainly be to violate the constitutional rights of

12  the alleged harasser and order him off of campus without any

13  due process, because you'd -- assume you'd have to do an

14  investigation and have a hearing and allow him to present

15  his side of the case, or her side of the case potentially of

16  course, before you do that.

17      So that if -- if allowing a Title IX claim to proceed

18  based on that alone has subsequent harassment, your Honor,

19  again creates an enormous can of worms that would put the

20  universities in the situation between arguably violating the

21  Title IX rights of the accuser and almost certainly

22  violating the constitutional rights of the alleged harasser.

23      And, your Honor, they've cited some cases, the <u>Williams</u>

24  case out of the 11th Circuit.  The <u>Williams</u> case, your

25  Honor, is the situation where prior to her harassment --

30

1  harassment of the plaintiff in that case -- the university

2  that actual knowledge that one of her harassers had had a

3  history of sexual misconduct and had failed to respond to

4  allegations about that particular person.

5      And contrary to what I think is suggested in their

6  papers, it's not our position -- I don't know if facts

7  like -- certainly I'm not aware of a situation like this

8  right now, but that it may well be that if a student

9  complains that student "X" has harassed, you know, students

10 and the university does not do anything about that and

11 student "X" then harasses or assaults another student,

12 that's a completely different situation.  That may fit

13 within <u>Williams</u>, your Honor, but that's certainly not the

14 situation here.

15     So there's no showing whatsoever of any cognizable

16 harassment after the University is put on notice of these

17 allegations.  There's not even any allegation that any of

18 the plaintiffs ever saw any of these people again.  Far less

19 that they were subjected to harassment as a result of

20 something that the University did or didn't do, your Honor.

21     So --

22          THE COURT:  All right.  Well, thank you, Mr.

23 Phillips.

24          MR. PHILLIPS:  I won't bother with the state

25 law --

31

1          THE COURT:  That would be good.

2          MR. PHILLIPS:  -- causes of action, if that's all

3 right.  Thank you very much.

4          MR. I. ZALKIN:  That was a lot.

5          THE COURT:  That was a lot and I'll give you no

6 more than 10 minutes, hopefully less, to respond to this,

7 Mr. Zalkin.

8          MR. I. ZALKIN:  All right.  I'm going to do my

9 best, your Honor.

10     I'll work backwards.  On this issue of causation,

11 counsel referenced there are principally two cases that they

12 rely on.  Reese.  In Reese, that was a circumstance where

13 some high school girls hid in the boys' bathroom on senior

14 ditch day and four days after, school was done, classes were

15 never --

16          THE COURT:  No, I remember the case.

17          MR. I. ZALKIN:  It has nothing -- there was no

18 potential for further harassment.

19     And the standard is not were they subsequently harassed

20 or harassed after a failure to respond to their deliberate

21 indifference.  The standard is was there subsequent

22 harassment or were they made vulnerable to subsequent

23 harassment.

24     And counsel seems to suggest that, well, it's not a big

25 deal for someone who has been violated sexually, physically

32

1  violated -- remember, the guy who abused Karasek abused

2  three other women.  There were four complaints.

3          THE COURT:  I remember the facts.

4          MR. I. ZALKIN:  So the --

5          THE COURT:  So the case that you're relying on for

6  causation by being made to feel vulnerable, which --

7          MR. I. ZALKIN:  That's Davis, under Davis.  That

8  is exactly the standard under Davis is that they are subject

9  to harassment or being made vulnerable to harassment.

10      And in this case -- so the other case they rely on is

11 this Lopez case.  And in Lopez, unfortunately that was a

12 case where there was domestic violence between two students.

13 One was a graduate student teacher, and she dies in a car

14 accident.  When he's drunk, he's driving, she dies in a car

15 accident.  And the parents claimed she lost -- that further

16 harassment in the sense that she lost her opportunity to

17 continue living in student housing.

18      And the court said well, that causation -- there's an

19 intervening cause and that's the car accident.  It wasn't

20 because of further harassment.

21      But on the other hand, we have cited to the Court cases

22 that are right on the money with respect to that issue.  In

23 Doe v. Derby, that's the case where there was a 17-year-old

24 high school kid who was abusing a 13-year-old middle school

25 kid.  The schools were merged, they were in the same

1 complex, the same building.  And he was allowed to remain on

2 the campus.

3     And the court said there, just the mere fact that you

4 have this guy who has sexually harassed this young girl

5 still on campus is enough to make her vulnerable to further

6 harassment.  That doesn't have to be that.

7     There was a misstatement on the facts.  There's no

8 evidence that Ms. Commins ever knew that at any time the

9 school had advised her harasser or her abuser to stay away

10 from her.  There's no such allegation.  She learns that that

11 was supposedly done almost a year later.  But until then

12 there's no communication.

13     In terms of this question of deliberate indifference

14 and what the importance of these regulations are, in 106 --

15 citation for that.  In 106.8(b), the school is required to

16 engage in prompt and equitable investigation and resolution

17 of a complaint.  Prompt and equitable.

18     And the guidelines, the DCL is very clear that that

19 should include a formal process where the complainant, the

20 victim, is included in the process where both sides can

21 present witnesses, both sides can present evidence, where

22 there's a right to appeal.  That is what is required.

23 That's what the guidelines actually require.

24     It is important -- counsel says well, it doesn't matter

25 what the victim knows.  The indifference is to the victim,

34

1   to be indifferent to this person that just was assaulted and
2   to leave them completely out of the process.  To enter into
3   back-door deals and not advise them of the process at all is
4   completely contrary to what is clearly reasonable or what is
5   reasonable and what the DCL required.
6       It requires that they be involved.  It requires that
7   they be on notice of the process and on notice of the
8   outcome and have the right to appeal if they so choose, as
9   does the accused.  That's due process.  That's clearly
10  reasonable.
11      The test for deliberate indifference is, on the facts
12  as we know them, was the person who had the ability to
13  remedy the situation reasonable in the way they responded or
14  not.  That is the <u>Davis</u> test for what is deliberate
15  indifference.  Were they reasonable or were they clearly
16  unreasonable.
17      And all we're saying is these are indicia of what is
18  reasonable.
19      Oden, the case that defendants rely on, Ninth Circuit
20  case.  What happened in <u>Oden</u>?  It was at Northern Marianas
21  College, a young woman is assaulted by her music teacher.
22  She reports it.  Immediately -- immediately the university
23  assigns her two counselors to help her psychology, to help
24  her prepare and submit a formal complaint.
25      They serve the college professor with the formal

1 complaint.  They serve him with a stay-away order.  And they

2 remove her from his class.

3      There was a delay to the point where they had the

4 ultimate nine-month delay for the hearing.  And they

5 believed her in the hearing and they disciplined him.  And

6 her beef was it took nine months to get there.

7      But the court -- on the facts, she moved from the

8 Marianas Islands halfway across the world to New Mexico

9 during that period of time, and she wanted a lawyer which

10 took time.

11      So in part, the delay was due to her situation. And the

12 court did say that this is not to say that delay alone

13 cannot rise to the level of clearly unreasonable -- or to

14 deliberate indifference.  That was the Ninth Circuit.

15      I'm taking more time I think than you want.  I mean

16 there's a lot more I could say.

17           THE COURT:  All right.  Well, I think you've said

18 it in a variety of ways.  And I think Mr. Phillips had a

19 good opportunity to present his argument, and I don't need

20 any more.

21      So thank you both.  I know that you each could go on

22 for quite a while and I would be enlightened by what you

23 have to say, but it's been a long afternoon.

24      I appreciate the argument that you have made.  And I'll

25 try and get an order out very soon.

36

1          MR. I. ZALKIN:  Appreciate your time, your Honor.

2  Thank you very much.

3          MR. PHILLIPS:  Thank you, your Honor.

4          THE COURT:  Thank you.

5       (Proceedings adjourned at 5:26 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

Echo Reporting, Inc., Transcriber

Monday, July 11, 2016