UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SOFIE KARASEK, et al.,

             Plaintiffs,

      v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE,

             Defendant.

Case No. 15-cv-03717-WHO

**ORDER ON MOTION TO DISMISS THIRD AMENDED COMPLAINT**

Re: Dkt. Nos. 57, 58, 62, 64

## INTRODUCTION

Plaintiffs Sofie Karasek, Nicoletta Commins, and Aryle Butler were victims of sexual assault while enrolled as undergraduate students at the University of California, Berkeley (the "University"). They allege that the University responded with deliberate indifference when they reported their assaults to school officials and seek to hold the University liable in money damages under Title IX, 20 U.S.C. § 1681. Previously, I denied the University's motion to dismiss plaintiffs' second amended complaint ("SAC") with respect to Butler's Title IX claim, but granted it with respect to Karasek and Commins's Title IX claims, and with respect to the various state law causes of action brought by plaintiffs. Dkt. No. 38 ("Prior Order"). Plaintiffs' third amended complaint ("TAC") abandons the state law causes of action and focuses exclusively on plaintiffs' claims under Title IX. The University again moves to dismiss Karasek and Commins, arguing that they have again failed to plausibly establish deliberate indifference and causation, as required to state a Title IX claim under *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629 (1999).

I agree with plaintiffs that the University bungled its responses to their assaults. The University's failure to communicate with plaintiffs in a meaningful way prior to making its disciplinary decisions is a glaring deficiency in the University's process. As this Order outlines, there are others. And one wonders what it takes to get expelled from the University if a conviction for felony assault of a fellow student is not enough. But all of that said, the deliberate indifference standard under *Davis* protects school administrations that do investigate and remedy complaints, and judges are not permitted to substitute their views for those of not clearly unreasonable

administrators.  Because I agree with the University that Karasek and Commins have not adequately alleged deliberate indifference, the motion is GRANTED WITH LEAVE TO AMEND.

**BACKGROUND**

## I.     FACTUAL BACKGROUND

### A.     Karasek

Karasek participated in a weekend trip to San Diego with the Cal Berkeley Democrats Club (the "Club") from February 10 to 12, 2012, during which she was sexually assaulted by a student referred to in the TAC as "TH."  TAC ¶¶ 15-19 (Dkt. No. 55).  On the night of February 10, 2012, she slept in the same bed with three other students, one of whom was TH, and awoke around 3:00 a.m. to find TH massaging her legs, back, and buttocks.  *Id.* ¶¶ 18-19.  Karasek states that she "froze in the moment, and TH continued to inappropriately rub her for approximately 30 minutes."  *Id.* ¶ 19.  TH resigned from his position in the Club at some point that month.  *Id.* ¶ 31.

On April 20, 2012, Karasek and three other female students who had been sexually assaulted by TH met with Denise Oldham and Hallie Hunt (from the University's Title IX Office and Center for Student Conduct, respectively) to report their assaults.  *Id.* ¶ 25.  Karasek was not told during the meeting that, in order to initiate a formal University investigation of TH, she would need to submit a written statement detailing her assault.  *Id.* ¶ 26.  "Just out of luck, one of TH's victims told Karasek that she had submitted a written statement to the University detailing her assault."  *Id.* ¶ 27.  Karasek thought that this was a good idea and submitted a formal, written complaint to Hunt on May 15, 2012, although Karasek still did not realize that a written complaint was required to initiate a formal University investigation.  *Id.*

The University did not contact Karasek regarding her complaint for the next eight months.  *Id.* ¶ 32.  At some point during that period, the Club president informed Karasek that "the administration had advised against removing TH from the Club because [the administration was] concerned that if [TH] went to another student group, he [could] assault someone and there would not be the same support structure for a survivor in that group."  *Id.* ¶ 29.  This appears to be a reference to Karasek's allegation that at some point "[i]n early February 2012" but apparently after

2

her assault, the Club president met with Marisa Boyce of the Gender Equity Resource Center and told Boyce "that two women had reported being sexually assaulted by TH."  TAC ¶ 20.  Karasek states that the Club president "told Boyce that she was thinking about removing TH from the Club altogether," but that "Boyce discouraged this approach and suggested that the Club use more informal, transformative justice models to deal with TH," at least in part because "pushing TH too far out of his social circle would not be ideal because he would not have any support around him if he engaged in this type of conduct again."  *Id.* ¶ 21.

Following this meeting between the Club president and Boyce,[1] Christine Ambrosio of the Gender Equity Resource Center "emailed several administrators to ask about informal models for dealing with sexual assault that she could present to the Club president."  *Id.* ¶ 24; *see also* Mot. at 5 n.2; Hunt Decl. ¶ 5 (Dkt. No. 57-3).[2]  Amrosio's email is dated February 14, 2012 and states,

> I just met with the president of one of the student organizations on campus. She shared with me that she heard (second hand) that one of the other officers in her org sexually assaulted one of their new members (frosh) at an off-campus event this past weekend. I asked her to encourage survivor to seek emotional support/check in if she needs a medical check-up. I also asked her to tell survivor about how I can explain about options (police, student conduct). I gave her my card and the 10 tips to Help a Friend + Resources sheet and Social Services brochure.
>
> The president does not know the details and she will be meeting with survivor later today. I spoke to her about Student Conduct as a way for survivor or her group to address the possible sexual harassment/sexual assault. I told her that I would check in with you all regarding her org's responsibilities around this. She is considering asking the accused to resign from their officer position and contact[ing] Social Services regarding the impact on their officer group.
>
> Lastly, she asked about transformative justice models. I only know about Philly Stand Up. Do you all know of others that I can share with her?

---

[1] The February 14, 2012 email from Ambrosio described below suggests that the Club president met with Ambrosio, not Boyce.  However, Karasek alleges that "the Club president denies that any such meeting between her and Ambrosio occurred."  TAC ¶ 22.

[2] The University's Request for Judicial Notice or for Application of the Incorporation by Reference Doctrine of exhibits A, B, C, D and E and Paragraph 5 of the Hunt Declaration is GRANTED.  In line with plaintiffs' objection, the grant of this request does not mean that I will "incorporate by reference [the University's] interpretation of [the] contents" of the documents.  Dkt. No. 62-8.  Plaintiffs' unopposed request for judicial notice, Dkt. No. 63, is also GRANTED.

United States District Court
Northern District of California

Hunt Decl. Ex. A at UC0002200 (Dkt. No. 58-7).  In response to Ambrosio's email, Oldham sent

an email dated February 15, 2012 that states,

> I'm sure there are models out there, but I'm very wary of the use of these models for any kind of sexual harassment, let alone and extreme form like sexual assault. Not only do all the university colleagues with whom I regularly work feel this way, recent federal guidelines are indicating that any kind of mediation is not appropriate for these kinds of cases at educational institutions. Without telling her not to explore this kind of approach, which would be overstepping, I'd feel better if we could at least simultaneously talk to this student about the risks involved with using these kinds of resolution strategies for sexual harassment/assault. To just give her transformative justice models might implicitly suggest that the campus condones that approach.
>
> I'm happy to join you in a discussion with this student, if it's helpful.

*Id.* at UC0002202; *see also* TAC ¶ 24.

On May 14, 2012, less than one month after Karasek and the three other students reported

their assaults to Oldham and Hunt, Glen DeGuzman of the Center for Student Conduct met with

TH.  *Id.* ¶ 34.  During the meeting, TH "admitted that he had problems" and had "acted foolishly,

especially when he had consumed alcohol."  *Id.*  He also "admitted to engaging in troublesome

conduct even after being removed from office with the Club."  *Id.*  Karasek states that DeGuzman

"admitted [in his notes from the meeting] that the nature of [the] meeting was not to investigate,

but rather was 'focused on getting help so TH could move forward.'"  *Id.* ¶ 35.  DeGuzman

subsequently "followed up several times with TH to check on TH's progress with dealing with his

admitted problems and to continue to offer his assistance to TH in that regard."  *Id.* ¶ 36.

On September 11, 2012, Oldham provided both the outgoing Club president and the

incoming Club president with an update regarding the investigation into Karasek's complaint.  *Id.*

¶ 37.  Shortly thereafter, on October 1, 2012, Oldham sent an email to another administrator

stating, "After examining the information submitted by the two women students and consulting

DeGuzman about his positive impressions of the developmental discussion [he] had with [TH], I

determined that this situation could be resolved without a formal investigation by my office."  *Id.*

¶ 39.  Karasek states that Oldham also "acknowledged [in the email] that from her perspective, she

considered the sexual harassment issue with TH to be resolved."  *Id.*

United States District Court
Northern District of California

On October 10, 2012, DeGuzman sent an Administrative Disposition Letter to TH informing him that he had been found to have violated the Student Code of Conduct for engaging in disorderly or lewd conduct. *Id.* ¶ 40. DeGuzman "offered TH a choice to either meet with DeGuzman to tell his side of the story and participate in the resolution of his case, or, to simply accept responsibility." *Id.* DeGuzman explained to TH that if he chose to simply accept responsibility, he would be subject to the following sanctions: (1) disciplinary probation until December 2012, when TH was set to graduate; (2) one consultation with a mental health practitioner of TH's choice; (3) one appointment with an Alcohol and Other Drugs Counselor; and (4) one meeting with Alan Creighton, a Health Educator, to discuss gender issues and sexual misconduct. *Id.* TH chose to meet with DeGuzman and did so on October 19, 2012. *Id.* ¶ 43. In addition, on October 18, 2012, TH sent an email to an Independent Hearing Officer, in which TH set out a timeline of events regarding the allegations against him and "asked the Officer to review the timeline to see if there were any procedural deficiencies with respect to how the University addressed [the allegations]." *Id.* ¶ 41.

On October 24, 2012, DeGuzman sent another Administrative Disposition Letter to TH, again giving TH the option of simply accepting responsibility, but removing from the disciplinary sanctions the required meeting with Health Educator Creighton. *Id.* ¶ 44.

At some point in November 2012, a Club board member informed Karasek that TH was set to graduate in December 2012. *Id.* ¶ 45. On November 6, 2012 – presumably after Karasek learned this information – Karasek went to Ambrosio's office and "expressed her frustration and concern that she was not being treated fairly, and that she had not heard from anyone at the University regarding her complaint." *Id.* ¶ 46. Karasek also "expressed frustration at the length of time that had passed, given that she knew that TH was graduating in December 2012." *Id.* On November 6, 2012, Ambrosio informed Karasek via email that she was waiting for the Center for Student Conduct to give her an update on the investigation. *Id.* ¶ 47. On November 15, 2012, Karasek emailed Ambrosio to follow up. *Id.* ¶ 48. Ambrosio did not respond, and on December 2, 2012, Karasek emailed Ambrosio a second time but again received no response. *Id.* ¶ 49.

Finally, on December 12, 2012, Karasek received her first communication from the

University regarding her assault since she reported it on April 20, 2012. *Id*. ¶ 50. The Title IX Office sent her a three sentence email stating that "th[e] matter had been explored and resolved using an early resolution process," and that the Title IX Office had "communicated the outcome of the early resolution process to the Center for Student Conduct." *Id*. The email did not reveal to Karasek what the outcome was. *Id*.

On December 17, 2012, three days after TH had graduated, a representative from the Center for Student Conduct sent Karasek an email stating that TH had been charged with violating, and had been found to be in violation of, the Campus Code of Student Conduct. *Id*. ¶ 53. However, the email did not explain what, if any, disciplinary action had been taken against TH. *Id*. Karasek filed a federal Clery Act complaint against the University in May 2013, and in September 2013, she contacted Hunt to inquire into whether any disciplinary action had been taken against TH. *Id*. ¶¶ 54-55. Hunt responded that TH had been placed on disciplinary probation and had "engaged in some counseling measures," but she did not provide "any specific detail as to what counseling measures had been taken." *Id*. ¶ 56.

Karasek states that she was not provided with updates regarding the University's investigation, was not informed that she could report her assault to law enforcement, was not given an opportunity to present her claim at a disciplinary hearing, was not given an opportunity to appeal the University's disciplinary decision, and was not informed of the outcome of the investigation until nine months after TH had graduated. *Id*. ¶¶ 57-58. She emphasizes that while TH was "allowed to participate in the resolution of [her] complaint against him, at no time during the entire pendency of the 'early resolution process' was [she] allowed to participate in any investigatory or disciplinary process." *Id.* ¶ 52. She also emphasizes that, during the entire pendency of the investigatory and disciplinary process, TH was "allowed to remain on campus, unrestricted, creating a sexually hostile environment for [her]." *Id.* ¶ 59.

While Karasek does not allege that she suffered any further assaults by TH or had any further contact with him, she states that as a result of the University's conduct, she has suffered psychological and emotional damages and has experienced a loss of educational opportunities and/or benefits, including but not limited to: (1) "[b]eing forced to change her major from

United States District Court
Northern District of California

Economics to the less academically rigorous Political Economy;" (2) "[s]uffering a noticeable drop in her GPA;" (3) "[b]eing forced to drop at least one class;" (4) "[b]eing forced to miss assignments and ask for extensions on assignments;" and (5) "constantly operating with a heightened sense of fear, anxiety, and stress knowing that her assailant remained unrestricted on campus, and that there were other possible perpetrators in her classes that had not been removed." *Id.* ¶ 60. She also states that "[o]n one occasion, [she] saw TH from afar as she was walking to class," and that, "[b]ecause the University had taken no steps to ensure that TH would not continue to harass, or otherwise harm Karasek, [she] took her safety and well-being into her own hands, and in an effort to avoid her assailant, she was forced to change her usual path to class and take a longer route." *Id.* ¶ 61.

**B.     Commins**

On or around January 20, 2012, Commins was sexually assaulted in her off-campus apartment by a University student identified in the TAC as "John Doe 2." TAC ¶ 83. She states that she invited John Doe 2 to her apartment, and that without her consent, he performed oral sex on her, attempted to physically coerce her to perform oral sex on him, and digitally penetrated her. *Id.* ¶¶ 85-86. The next day, Commins reported the assault to the University's Tang Student Health Center (the "Health Center"). *Id.* ¶ 87. The Health Center performed a cursory exam but did not administer a rape kit. *Id.* ¶ 88. On January 20, 2012, Commins reported her assault to the Berkeley Police Department and went to Highland Hospital, where a rape kit was administered, revealing evidence of trauma. *Id.* ¶¶ 89-90.

On January 16, 2012, four days prior to John Doe 2's assault on Commins, John Doe 2 physically assaulted two other students[3] at a party at a University fraternity house. *Id.* ¶ 91. The students reported the incident to the University, and on January 31, 2012, the University placed John Doe 2 on interim suspension for his sexual assault of Commins and his physical assault of the other two students. Hunt Decl. Ex. B at UC0000639-42 (Dkt. No. 58-7); *see also* TAC ¶ 92. The Notice of Interim Suspension informs John Doe 2 that he is "strictly prohibited from entering

---

[3] Commins alternates between describing the January 16, 2012 physical assault as involving two other students and one other student. *Compare* TAC ¶ 91 *and* TAC ¶ 117.

United States District Court
Northern District of California

upon any part of the Berkeley campus." Hunt Decl. Ex. B at UC0000641.  On February 3, 2012, the University held an Interim Suspension Hearing and modified the interim suspension to allow John Doe 2 to "attend his classes only" and to be on campus for five minutes before and after each class.  Hunt Decl. Ex. B at UC0000644; *see also* TAC ¶ 94.  Commins states that the University did not notify her of the Interim Suspension Hearing and did not inform her of either (1) the "arrangement made with John Doe 2 allowing him to remain on campus to continue his studies," or (2) her ability to request a no-contact order.  TAC ¶¶ 93-94.

On February 22, 2012, Commins submitted an Incident Report Form, officially reporting her assault, to the Center for Student Conduct.  *Id*. ¶ 95.  Shortly thereafter, either the Title IX Office or the Office of Student Conduct called Commins and "asked if she was comfortable with the University delaying its investigation until after the criminal proceedings had concluded."  *Id*. ¶ 96.  "Commins responded that she was not comfortable with any delay in the commencement of the University's investigation."  *Id*.  She states that "[m]eanwhile, University administrators were communicating with [John Doe 2's attorney]," who was asking that the University's investigation be stayed until the resolution of John Doe 2's criminal proceedings.  *Id*. ¶ 98.

On April 2, 2012, an investigator working for John Doe 2's attorney called Commins and "attempted to pressure her into consenting to allow John Doe 2 to continue his studies at the University."  *Id*. ¶ 100.  The investigator also asked Commins if she would be comfortable with the University staying its investigation until John Doe 2's criminal proceedings were completed.  *Id.* ¶ 101.  Commins alleges that "[t]his contact by John Doe 2's agent amounted to additional intimidation and harassment . . . subsequent to her report of sexual assault."  *Id.* ¶ 102.  Following the investigator's call, Commins sent an email to Julio Oyola, Student Conduct Specialist, informing Oyola of the call.  *Id.* ¶ 103.  Commins stated in the email that she was not comfortable with the University delaying its investigation until after John Doe 2's criminal proceedings had concluded, and that she was "not sure she was comfortable with John Doe 2 being allowed to remain on campus at all."  *Id.*

Commins alleges that, "despite [her] clear wishes that [the University's] investigation ensue, independent of John Doe 2's criminal proceedings, the University honored John Doe 2's

8

1    request and stayed [its] investigation."  *Id.* ¶ 104.

2         On May 11, 2012, the University again modified John Doe 2's interim suspension, this

3    time to strictly prohibit John Doe 2 from attending classes or entering campus until the sooner of

4    (1) February 11, 2013, or (2) "the date upon which a formal or informal resolution of the charges

5    against [him] has been reached."  Hunt Decl. Ex. C at UC0000964 (Dkt. No. 58-7); *see also* TAC

6    ¶ 105.  The Notice of Interim Suspension states that "[t]his interim suspension has been imposed

7    in part to accommodate your request to postpone the hearing upon your charges until such time as

8    criminal charges pending against you have been resolved."  *Id.*  Commins alleges that the

9    University delayed in modifying John Doe 2's interim suspension in this way in order to allow

10   him to complete his classes for the spring semester.  *Id.* ¶ 106.  She also states that the University

11   never notified her of the interim suspension, and that she instead learned of it "by the end of spring

12   2012" from the deputy district attorney who was prosecuting John Doe 2.  *Id.* ¶ 107.

13        On October 5, 2012, John Doe 2 was convicted of felony assault for his assault on

14   Commins and was sentenced to five years' probation and 1,000 hours of community service.  *Id.* ¶

15   108.  From October through November 2012, University administrators, including Hunt and

16   Oldham, exchanged several emails with John Doe 2's attorney, who offered to provide and

17   ultimately provided evidence to Hunt and Oldham to support John Doe 2's defense in the

18   University's investigation.  *Id.* ¶ 109.  In addition, John Doe 2 provided letters and

19   recommendations from several individuals to support his defense.  *Id.*  Commins was never

20   allowed to present any evidence in the University's investigation and was not allowed to view or

21   comment on John Doe 2's evidence.  *Id.* ¶ 110.

22        At some point in late fall or early winter 2012, a University administrator called Commins

23   and represented to her that she would have an opportunity to present evidence at a formal hearing.

24   *Id.* ¶ 111.  Commins states that the administrator did not inform her that the University was in fact

25   engaging in an "early resolution process" in which Commins would not be able to participate.  *Id.*

26   ¶¶ 111, 128.

27        On January 21, 2013, Oldham notified John Doe 2 that she had completed the investigation

28   of Commins's assault, that she had found that he had violated the University's Policy on Sexual

United States District Court
Northern District of California

9

United States District Court
Northern District of California

Harassment, and that this finding would be forwarded to the Center for Student Conduct for evaluation of whether he had also violated the Code of Student Conduct. *Id.* ¶ 112. Commins alleges that the University's investigation was limited to: (1) interviewing Commins; (2) reviewing the police report regarding Commins's assault; (3) reviewing Commins's hospital records from the night of the assault; and (4) reviewing transcripts of online chat conversations between Commins and John Doe 2. *Id.* ¶ 113. On January 30, 2013, John Doe 2 and his attorney were given a copy of the Title IX Investigation Report. *Id.* ¶ 114. Commins was not given a copy of the report. *Id.* ¶ 115.

On February 4, 2013, Hunt met with John Doe 2 and his attorney "to discuss his side of both the physical assault and [the] sexual assault he [had] committed." *Id.* ¶ 116. On February 7, 2013, Hunt contacted Commins to ask if Commins would be comfortable with John Doe 2 being suspended until Commins finished her studies. *Id.* ¶ 117. Commins responded that she "would be most comfortable with John Doe 2 being permanently expelled, but could live with a suspension until she was no longer on campus." *Id.* ¶ 118.

On February 27, 2013, Hunt sent John Doe 2 an Administrative Disposition Letter thanking him for meeting with her and informing him that he had been found to have violated the Code of Student Conduct based on his physical assault of the other students on January 16, 2012 and his sexual assault of Commins. *Id.* ¶ 117. The Administrative Disposition Letter set out the following sanctions for both the physical assault and the sexual assault: (1) suspension through August 31, 2015; (2) total exclusion from campus and University functions through August 31, 2015; (3) disciplinary probation for the remainder of John Doe 2's studies; (4) no contact with Commins; and (5) a reflective writing assignment. *Id.* ¶ 119. On March 5, 2013, John Doe 2 accepted the sanctions, and the University "officially resolved its grievance procedure against John Doe 2 using an early resolution process." *Id.* ¶ 120.

At some point in March 2013, Hunt sent an email to Commins informing her of the outcome of the early resolution process. *Id.* ¶ 121. However, because the email was sent to an address that Commins never checked, she did not learn of the outcome until she contacted the University in July 2013 to request an update. *Id.* ¶¶ 121-22. Commins states that, when she

10

United States District Court
Northern District of California

finally learned of the sanctions imposed on John Doe 2, she was not informed that the sanctions were imposed for both the physical assault on the other students and the sexual assault on her, and that she was led to believe that the sanctions were imposed only as a result of John Doe 2's conduct against her.  *Id.* ¶ 122.

In April 2014, Commins notified Hunt that she had been accepted to several graduate schools, including the University's School of Public Health, and that "although the University's program was her first choice, she was concerned that John Doe 2's suspension would be lifted," allowing him to return to campus in the fall 2015 semester.  *Id.* ¶ 123.  Hunt informed Commins that she believed that John Doe 2 intended to recommence his studies at the University following the termination of his suspension.  *Id.*  On April 17, 2014, Commins notified Hunt by email that she had decided to enroll at the University's School of Public Health.  *Id.* ¶ 124.  Commins wrote, "I have made the choice to pursue my graduate studies at Berkeley in spite of the fact that I feel it is a risk to my physical safety and emotional well-being, and so my excitement about starting the next chapter of my education is cheapened by feelings of anger, helplessness, and fear."  *Id.*  In addition, in September 2014, Commins's father wrote a letter to the Chancellor of the University requesting that John Doe 2 not be allowed to return to the University.  *Id.* ¶ 125.  Commins alleges that her father "received boilerplate responses from low-level University employees."  *Id.*

John Doe 2 was allowed to recommence his studies at the University in fall 2015.  *Id.* ¶ 126.  In a letter dated August 24, 2015, Hunt informed John Doe 2 that the Center for Student Conduct had imposed a "No Contact Directive" prohibiting him from any contact, "direc[t] or indirec[t]," with Commins.  Hunt Decl. Ex. E at UC0002149 (Dkt. No. 64-8).  The letter explains the specific terms of the No Contact Directive as follows:

> • Your presence on campus is restricted only to the areas of campus and the specific buildings in which the classes that you are currently registered for are being held . . . Your presence in these areas is further restricted to a maximum of 30 minutes before class starts and 30 minutes after it ends. Meetings with faculty should be scheduled immediately before or after class whenever possible. You may not go to any other area of campus, enter any other campus building, or attend any extracurricular campus events without first requesting and receiving permission to do so from the Center for Student Conduct. This permission must be requested five business days in advance by emailing the office . . . Requests sent less than five

11

business days in advance will not be considered.

• Regardless of any requests that you may initiate, you will not be granted permission to enter or be within 500 feet of the following buildings: the new MLK student center (including the bookstore, pub, and eateries), upper and lower Sproul Plaza, . . . the Rec Sports Facility (RSF), the RSF Fieldhouse, all campus pools, all other campus athletic facilities, Li Ka Shing, the Valley Life Sciences building, Dwinelle Hall, Haviland Hall, Evans Hall, Lewis Hall, University Hall, Sproul Hall, and the Golden Bear Cafe.

• You may not attend campus events, enter campus buildings, or frequent areas of campus that Ms. Commins might frequent. If you find yourself in an area in which she is also present, it will be your responsibility to leave the area immediately without causing a scene regardless of who got there first.

• You may not contact or communicate with Ms. Commins through any means or media including, but not limited to contact in-person, via phone, messaging, social media or through other people, including counsel.

• It is expected that you will have met all graduation requirements by the end of the fall 2015 semester. As such, you will not be permitted to enroll in classes for spring 2016. We will discuss your ability to participate in campus graduation ceremonies at a later date.

• This directive will remain in place until you are otherwise notified by the Center for Student Conduct. The Center for Student Conduct is the only campus entity authorized to lift or modify this directive. Failure to comply with this directive will constitute a violation of university policy and will be grounds for further disciplinary action, likely in the form of an interim suspension and a recommendation for dismissal from the entire University of California system.

*Id.* at UC0002149-50.

Commins accuses the University of improperly relying on an "informal, early resolution process" to resolve her complaint, despite its previous representation to her that she would be able to present evidence at a formal hearing. *Id.* ¶¶ 111, 128. She highlights that she was not allowed to present her own evidence or to see the evidence provided by John Doe 2, and that she was not given an opportunity to appeal the sanctions imposed on John Doe 2. *Id.* ¶ 127.

Commins does not allege that she has suffered any further assaults by John Doe 2 or had any further contact with him since her assault. However, she states that as a result of the University's conduct, she has suffered psychological and emotional damages and has experienced a loss of educational opportunities and/or benefits, including but not limited to: (1) "[b]eing forced to drop a class because it let out at night and she was fearful of encountering John Doe 2 on

campus after dark;" (2) "[a]voiding enrollment in any classes that let out after dark, unless she

knew someone in the class that could walk her home, because she was fearful she would encounter

John Doe 2 on campus;" (3) "[b]eing forced to take a reduced course load for the semester after

her report, and having to stay in school for an extra summer to make up for her reduced course

load;" (4) "[w]ithdrawing [from] the Tae Kwon Doe Club;" (5) incurring "[s]ignificantly higher

amounts of absences from classes;" and (6) experiencing "a significant reduction in the enjoyment

of her academic experience at the University.  *Id*. ¶ 129.[4]

C.     **Dear Colleague Letter**

As they did in conjunction with the SAC, plaintiffs describe in the TAC and submit for

judicial notice an April 4, 2011 Dear Colleague Letter ("DCL") on student-on-student sexual

harassment disseminated by the Department of Education Office for Civil Rights ("OCR").[5]  TAC

¶ 14; Plaintiffs' RJN Ex. A (Dkt. No. 63).

The DCL discusses "Title IX's requirements related to student-on-student sexual

harassment, including sexual violence, and explains schools' responsibility to take immediate and

effective steps to end sexual harassment and sexual violence."  DCL at 2.  It states that "[i]f a

school knows or reasonably should know about student-on-student harassment that creates a

hostile environment, Title IX requires the school to take immediate action to eliminate the

harassment, prevent its recurrence, and address its effects."  *Id.* at 4.  A footnote attached to this

sentence explains, "This is the standard for administrative enforcement of Title IX and in court

cases where plaintiffs are seeking injunctive relief . . . The standard in private lawsuits for

monetary damages is actual knowledge and deliberate indifference.  *See Davis v. Monroe Cnty.*

*Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999)."  DCL at 4 n.12.

In their TAC, plaintiffs highlight several of the requirements and guidelines set out in the

---

[4] Because I have already held that Butler's allegations state a claim under Title IX and the University does not move to dismiss her claim, I do not include her allegations here.

[5] The DCL is a "significant guidance document" as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices.  *See* DCL at 1 n.1; 72 Fed. Reg. 3432.  It "does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations."  DCL at 1 n.1.

DCL. TAC ¶ 14. The relevant provisions provide:

> • A school's grievance procedures must "provid[e] for the prompt and equitable resolution of sex discrimination complaints." DCL at 8.

> • Schools must "provide equitable grievance procedures. Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing." *Id.* at 10.

> • "Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment." *Id.* at 12.

> • "Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate." *Id.* at 7. In addition, "[a]ll persons involved in implementing a recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures." *Id.* at 12.

> • "A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation." *Id.* at 10.

> • "Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime." *Id.*

## II.   PROCEDURAL BACKGROUND

Plaintiffs initiated this action in the Superior Court of California for the County of Alameda on July 2, 2015. Dkt. No. 1-1. On July 17, 2015, they served the University with their first amended complaint, and on August 14, 2015, the University removed the case to federal

United States District Court
Northern District of California

1   court.  Dkt. No. 1 (Notice of Removal).  On September 10, 2015, after the University moved to

2   dismiss the first amended complaint, plaintiffs filed the SAC.  Dkt. Nos. 6, 14.

3       The SAC brought four causes of action against the University: (1) gender discrimination in

4   violation of Title IX, 20 U.S.C. § 1681, SAC ¶¶ 77-79;[6] (2) negligent failure to warn, train, and/or

5   educate plaintiffs, SAC ¶¶ 80-82; (3) gender discrimination in violation of California Education

6   Code section 220, SAC ¶¶ 83-85; and (4) fraud, SAC ¶¶ 86-92.  The SAC sought damages but did

7   not include a request for injunctive or other equitable relief.

8       On September 24, 2015, the University moved to dismiss the SAC.  Dkt. No. 18.  On

9   December 11, 2015, I issued the Prior Order, denying the motion with respect to Butler's Title IX

10   claim, but granting the motion with respect to Karasek and Commins's Title IX claims, and with

11   respect to plaintiffs' state law causes of action.  Prior Order at 22-36.  I gave plaintiffs leave to

12   amend, and allowed them to pursue discovery so that they could learn more about how the

13   University had handled their complaints, and evaluate whether their Title IX claims were

14   plausible.  *Id.* at 36; Dkt. No. 40.

15       Plaintiffs filed the TAC on April 13, 2016.  Dkt. No. 55.  The TAC brings a single cause of

16   action under Title IX.  TAC ¶¶ 130-32.  Like the SAC, it seeks damages but no injunctive or other

17   equitable relief.  *Id.*  The University filed its motion to dismiss the TAC on May 9, 2016.  Dkt. No.

18   57 ("Mot.").  I heard argument from the parties on June 22, 2016.  Dkt. No. 72.

19                                    **LEGAL STANDARD**

20       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain

21   statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in

22   order to "give the defendant fair notice of what the claim is and the grounds upon which it rests,"

23   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations

24   omitted).

25       A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure

26   12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

27

28   ---
[6] The SAC referred to the Title IX cause of action as, "Discrimination on the Basis of Gender in Violation of 20 U.S.C. § 1681."  SAC ¶ 77.

*United States District Court*
*Northern District of California*

2001).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted).  The court may "reject, as implausible, allegations that are too speculative to warrant further factual development."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

## DISCUSSION

Title IX states in relevant part that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."  20 U.S.C. § 1681(a).  The statute provides victims of sex discrimination with a private right of action against recipients of federal education funding.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979).  Under *Davis*, however, a school may be held liable in money damages under Title IX "only for its own misconduct," i.e., only when it "subjects its students to harassment."  526 U.S. at 640, 644 (internal quotation marks and alterations omitted).  Under this standard, a plaintiff bringing a Title IX claim arising from student-on-student sexual harassment must establish the following elements:

First, the school must have "exercise[d] substantial control over both the harasser and the context in which the . . . harassment occur[ed]."  *Id.* at 645.

Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and

objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Third, the school must have had "actual knowledge of the harassment," meaning that a school official "who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf ha[d] actual knowledge of [the] discrimination." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (internal quotation marks omitted); *see also Davis*, 526 U.S. at 650.

Fourth, the school must have acted with "deliberate indifference" to the harassment, meaning that the school's "response to the harassment [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648. This is an "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (internal quotation marks omitted), that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless," *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Rather, a plaintiff must plead facts that support a plausible inference that the school made what amounts to "an official decision not to remedy the violation." *Id.* (internal quotation marks and alterations omitted); *accord Doe v. Willits Unified Sch. Dist.*, 473 F. Appx. 775, 776 (9th Cir. 2012). Deliberate indifference is a fact intensive inquiry that often must be resolved by the trier of fact. *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860-MEJ, 2011 WL 2976805, at *5 (N.D. Cal. July 22, 2011). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Fifth, the school's deliberate indifference must have "subject[ed] [the plaintiff] to harassment," i.e., "cause[d] [the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it." *Id.* at 645 (internal quotation marks omitted). In the Prior Order, I held that plaintiffs in this case were not precluded from satisfying this requirement merely because they had not alleged that they suffered further affirmative acts of harassment by their assailants after reporting their assaults to the University, so long as they adequately alleged in some other way that the University's deliberate indifference had subjected them to harassment "'that is so severe,

United States District Court
Northern District of California

pervasive, and objectively offensive that it can be said to deprive [them] of access to the educational opportunities or benefits provided by the school.'"  Prior Order at 24 (quoting *Davis*, 526 U.S. at 650); *see also id.* at 15-20, 22-24, 27-28.

## I.     THE DCL

In the Prior Order, I held that "the DCL does not define what amounts to deliberate indifference for the purposes of this case."  Prior Order at 2.  Plaintiffs nevertheless again rely heavily on the DCL in arguing that they have adequately alleged deliberate indifference.  *See* Oppo. at 3-8 (Dkt. No. 62-5); *see also* TAC ¶ 131 ("Defendant . . . acted with deliberate indifference in deviating significantly from the standard of care outlined . . . in the [DCL].").  I see no reason to depart from my ruling on this issue in the Prior Order and continue to follow it here. Accordingly, "[i]n determining whether plaintiffs have adequately alleged deliberate indifference, I will look to *Davis* and its progeny, not the DCL."  Prior Order at 22; *see also Moore v. Regents of the Univ. of California*, No. 15-cv-05779-RS, 2016 WL 2961984, at *5 (N.D. Cal. May 23, 2016) (rejecting Title IX plaintiff's reliance on the DCL; explaining that "[t]here is no private right of action to recover damages under Title IX for violations of [the Department of Education's] administrative requirements, much less the provisions of the DCL"); Hunt Decl. Ex. E (Dkt. No. 64-7) (letter dated February 7, 2016 from the OCR to Senator James Lankford stating that the OCR "does not view [its] guidance to have the force and effect of law," and that it issues its guidance "to advise the public of its construction of the statutes and regulations it administers and enforces").  Failure to adhere to the DCL may be bad policy, but standing alone it does not constitute deliberate indifference.

## II.    KARASEK

In the Prior Order, I dismissed Karasek's Title IX claim on the ground that she had not adequately alleged causation.  Prior Order at 22-24.  I observed that in cases finding that the school's deliberate indifference had subjected the plaintiff to harassment based on roughly similar facts, the plaintiffs had included specific allegations regarding (1) how they "were forced to take drastic measures to avoid their assailants in the face of their respective schools' deliberate indifference;" (2) "the discomfort, anxiety, and fear they felt as a result of the constant exposure to

United States District Court
Northern District of California

1    a potential encounter with their assailants;" and/or (3) how they "had encountered their assailants

2    on campus after reporting their assaults." *Id.* at 22-23. I stated:

3    > Karasek alleges no similar facts in the SAC. There is no indication
     > that [Karasek] has had any further contact with TH since reporting
4    > the February 2012 incident to the University. Although she alleges
     > that she has suffered psychological and emotional damages, she
5    > does not link those damages to TH's presence on campus or to
     > discomfort or fear over encountering him there. Even her allegation
6    > that she is "constantly operating with a heightened sense of fear,
     > anxiety, and stress knowing that there are possible perpetrators in
7    > her classes that have not been removed by the University" is
     > completely divorced from TH and makes no reference to any
8    > specific individual. Nor does Karasek allege that has taken steps to
     > avoid TH as a result of the University's deliberate indifference. She
9    > does state that she was forced to change her major and to drop at
     > least one class, but she does not explain why she did so.

10   *Id.* at 23-24. I acknowledged Karasek's argument that she had been subjected to harassment as a

11   result of the University's deliberate indifference because TH was "allowed to remain on campus,

12   unrestricted," but I found that, in the absence of any allegations connecting Karasek's post-assault

13   behavior or psychological distress to TH's unrestricted presence on campus, this theory was not

14   enough to show that the University's deliberate indifference had subjected her to harassment "'that

15   is so severe, pervasive, and objectively offensive that it can be said to deprive [her] of access to

16   the educational opportunities or benefits provided by the school.'" *Id.* at 24 (quoting *Davis*, 526

17   U.S. at 650). Because I dismissed Karasek's Title IX claim on this ground, I did not address the

18   University's argument that Karasek had also failed to adequately allege deliberate indifference.

19   *Id.* at 24 n.11.

20         The University contends that Karasek again fails to adequately allege either causation or

21   deliberate indifference. Mot. at 12-15; Reply at 4-10 (Dkt. No. 64-3). In arguing that she has

22   made a sufficient showing of deliberate indifference, Karasek asserts that the University

23   (1) improperly used an informal resolution process to address her complaint; (2) unjustifiably

24   delayed in resolving her complaint; (3) failed to appropriately discipline TH, in particular given

25   that the University knew that TH had been accused of sexually assaulting not just Karasek, but

26   also three other students; (4) "fail[ed] to take any action to ensure that TH would not continue to

27   harass Karasek," in particular in that the University discouraged the Club president from removing

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  TH from the Club; and (5) unjustly favored TH, in that "throughout the entire informal resolution

2  process, the University only met and communicated with TH" – including by "*trying to help TH*

3  *deal with his admitted issues surrounding alcohol and sexual violence*" and by allowing TH to

4  negotiate for lesser sanctions – whereas Karasek was not contacted during the entire pendency of

5  the informal resolution process and was not given an opportunity either to present her claim at a

6  disciplinary hearing or to appeal the University's disciplinary decision.  Oppo. at 12-14 (emphasis

7  in original).  At oral argument, Karasek focused on this last point, in particular the University's

8  failure to communicate with her during the course of its investigative and disciplinary process.

9  *See, e.g.,* Hearing Tr. at 5-11 (Dkt. No. 71).

10        In this Order I focus on deliberate indifference, and I agree with the University that

11  Karasek has not made a plausible showing.  According to Karasek's allegations, the University

12  began investigating her assault within one month of when she reported it, found that TH had

13  violated the Student Code of Conduct, and imposed disciplinary measures against TH, placing him

14  on disciplinary probation for the remainder of his studies at the University and requiring him to

15  consult with a mental health practitioner and a drug and alcohol counselor.  The whole process

16  spanned an approximately six-month period that included the summer vacation, from April to

17  October 2012.  Karasek does not allege that she had any further contact with TH following her

18  report of the assault, apart from the one incident in which she saw TH from a distance as she

19  walked to class.  Nor does she allege that she requested any accommodations from the University

20  that were not granted, or that she sought additional information from the University that was not

21  given.  Karasek cites no decision that has found deliberate indifference based on similar facts, and

22  I am not aware of any.

23        The two cases finding deliberate indifference cited by the parties that come closest to

24  supporting Title IX liability here, *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860 MEJ, 2011

25  WL 2976805 (N.D. Cal. July 22, 2011), and *Takla v. Regents of the Univ. of California*, No. 15-

26  cv-04418, 2015 WL 6755190 (C.D. Cal. Nov. 2, 2015), are both substantially different from this

27  one.  In *Lilah*, the court denied a motion to dismiss a Title IX claim brought by a high school

28  student whose academic counselor had repeatedly sexually harassed her over the course of the

1   school year, including by "follow[ing] her on campus, "monitor[ing] her during the school day,"

2   and "unnecessarily remov[ing] her from classes to speak with her."  2011 WL 2976805, at *1, *5-

3   6.  The student alleged that as a result of the school's inadequate response to the harassment, she

4   had "encountered the counselor on campus and felt that he was glaring at her."  *Id.* at *6.  The

5   court found that the student had plausibly alleged that the school's response was "not reasonably

6   expected to remedy the violation."  *Id.*  In contrast with the plaintiff in *Lilah*, Karasek has not

7   identified any specific circumstances known to the University – such as her assailant's history of

8   following, monitoring, and accosting her around campus, *id.* at *1 – that would have indicated to

9   the University that its response to her complaint could not be reasonably expected to remedy the

10  violation.  Karasek's allegation that Boyce discouraged the Club president from removing TH

11  from the Club does not help her claim, given that she alleges that this conversation occurred in

12  February 2012, after her assault had occurred but two months *before* she reported it.[7]  According

13  to Karasek's allegations, by the time she reported her assault, TH had already resigned from his

14  position in the Club, TAC ¶ 31, and there is no indication that he continued to participate in the

15  Club in any capacity.  Karasek alleges that she still saw TH one day from a distance as she walked

16  to class, but she does not allege that she informed the University of this incident.  Nor does she

17  allege facts plausibly indicating that the University was aware of the need to take particular

18  additional steps, such as the issuance of a no-contact order or other restriction on TH's movement,

19  to prevent such an encounter from occurring, or to otherwise "ensure that TH would not continue

20  to harass Karasek."  Oppo. at 13; *see also Moore*, 2016 WL 2961984, at *7 (dismissing Title IX

21  claim based on the defendant university's failure to restrict the assailant's presence on campus,

22  where the plaintiff did not allege either that university "ignored or rebuffed her requests for

23

24  [7] Although Karasek alleges that the Club president told Boyce at the February 2012 meeting that
    "two women had reported being sexually assaulted by TH," FAC ¶ 20, Karasek does not allege
25  that the Club president informed Boyce of the identities of the women or any other details
    regarding their reports.  Karasek does not explain how the information conveyed to Boyce at the
26  February 2012 meeting was sufficient to give the University actual knowledge of her assault.  *Cf.*
    *Lopez*, 5 F. Supp. 3d at 1122 ("The actual notice requirement under Title IX is satisfied where an
27  appropriate official possessed enough knowledge of the harassment that it reasonably could have
    responded with remedial measures to address the kind of harassment upon which plaintiff's legal
28  claim is based.") (internal quotation marks omitted).

United States District Court
Northern District of California

accommodations that specifically would have helped ameliorate the hostile environment to which she had been exposed," or that she "informed university officials she feared for her safety on campus").

In *Takla*, the court denied a motion to dismiss a Title IX claim where the defendant university's allegedly deficient response included actively discouraging the plaintiff from filing a written request for a formal investigation, and then resolving the plaintiff's complaint through an "Early Resolution" process that was in violation of the university's own policies and resulted in no formal findings, no other documentation, and, as far as the plaintiff had been informed, no discipline. 2015 WL 6755190, at *1, *5-7. Here, in contrast, Karasek specifically alleges that the University charged TH with violating the Student Code of Conduct, found him to have violated it, and imposed disciplinary measures against him that were documented at least in an Administrative Disposition Letter. While the details of these disciplinary measures were not immediately communicated to Karasek, when she asked for this information in September 2013, Hunt gave it to her. TAC ¶ 56. Further, even assuming that a school's violation of its own sexual harassment policy is relevant to the deliberate indifference analysis, Karasek identifies no way in which the University's use of an early resolution process to address her complaint was in violation of University policy. Karasek seizes on Oldham's February 15, 2012 email, in which Oldham responds to Ambrosio's inquiry about "transformative justice models," and states that she is "wary of the use of these models for any kind of sexual harassment," and that "recent federal guidelines are indicating that any kind of mediation is not appropriate for these kinds of cases at educational institutions." Hunt Decl. Ex. A at UC0002202; *see also* Oppo. at 12. But nothing in Oldham's email or the TAC indicates that the early resolution process the University used to address Karasek's complaint is accurately characterized as one of the transformative justice models criticized by Oldham. Moreover, while Oldham criticizes the models, she does not state that they are prohibited by University policy.

I am sympathetic to Karasek's complaint that the University failed to communicate with her during the course of its investigative and disciplinary process. The University's failure to stay in more regular contact with Karasek following her report, at the very least to provide her with

1    updates on the status of its investigation and disciplinary decisionmaking, strikes me as a serious

2    deficiency in the University's response.  Nevertheless, given the allegations regarding the

3    University's efforts to address the reported harassment, and the absence of allegations that

4    Karasek sought additional information from the University until November 2012, I do not think

5    that this failure can be said to rise above the level of nonactionable negligence, laziness, or

6    carelessness.  *See Oden*, 440 F.3d at 1089; *see also Willits*, 473 F. Appx. at 776 ("Even a showing

7    of heightened negligence is insufficient to prove deliberate indifference.").

8           Similarly, while Karasek's other arguments regarding deliberate indifference point to

9    deficiencies in the University's response, I do not think that they plausibly establish deliberate

10   indifference under *Davis*.  The University's use of an early resolution process to address Karasek's

11   assault does not meaningfully contribute to her showing of deliberate indifference because Title

12   IX liability turns on the content of the school's response, not the label affixed to it.  Karasek's

13   unjustifiable delay argument is unpersuasive in light of *Oden v. Northern Marianas College*,

14   where the Ninth Circuit held that a school's nine-month delay in convening a hearing on the Title

15   IX plaintiff's sexual harassment allegations was insufficient to create a triable issue of fact on

16   deliberate indifference, despite the undisputed evidence that the delay was against school policy,

17   where the record neither "demonstrate[d] that the delay was more than negligent, lazy, or

18   careless," nor "permit[ted] an inference that the delay was a deliberate attempt to sabotage

19   plaintiff's complaint or its orderly resolution."  440 F.3d at 1089.  Karasek's inadequate discipline

20   argument runs into the basic Title IX precept that "victims of peer harassment [do not] have a Title

21   IX right to make particular remedial demands."  *Davis*, 526 U.S. at 648; *see also id.* ("[C]ourts

22   should refrain from second-guessing the disciplinary decisions made by school administrators.");

23   *Oden*, 440 F.3d at 1089 ("An aggrieved party is not entitled to the precise remedy that he or she

24   would prefer.").  As I stated in the Prior Order with respect to Commins's Title IX claim, "I do not

25   doubt that in certain circumstances a school's disciplinary decision . . . may be so clearly

26   unreasonable in light of known circumstances as to support a deliberate indifference finding."

27   Prior Order at 25.  But Karasek "cites no authority indicating that this is such a case."  *Id.*

28

United States District Court
Northern District of California

Finally, Karasek's argument that the school's response unjustly favored TH is focused on the University's failure to communicate with her, to involve her in the disciplinary decisionmaking process, or to provide her with an opportunity to appeal its disciplinary decision. *See* Oppo. at 14.  I have already discussed the University's failure to communicate with Karasek. Like that failure to communicate, the University's failure to involve Karasek in the disciplinary decisionmaking process or to provide her with an opportunity to appeal does not support Title IX liability in light of the University's overall response to the reported harassment.  In the circumstances of this case, "a deliberate indifference finding based on [those] alleged deficiencies would amount to either imposing Title IX liability for conduct was that was merely 'negligent, lazy, or careless,' *Oden*, 440 F.3d at 1089, or 'second-guessing the disciplinary decisions made by school administrators,' *Davis*, 526 U.S. at 648."  Prior Order at 25 (addressing deliberate indifference with respect to Commins).  To the extent that Karasek also means to argue that the University acted with deliberate indifference by taking an unduly rehabilitative approach with TH, I am not convinced that this is a viable theory of liability.  Title IX requires that schools respond to known sexual harassment in a way that is not clearly unreasonable; Karasek cites no authority indicating that this means that schools must respond in a way that is exclusively punitive.

Whether viewed in isolation or in the aggregate, the deficiencies identified by Karasek do not plausibly establish that the University responded with deliberate indifference to her assault. The University's motion to dismiss her Title IX claim is GRANTED WITH LEAVE TO AMEND.

**III.    COMMINS**

In the Prior Order, I found that Commins had not adequately alleged deliberate indifference because her Title IX claim was largely predicated on the University's delay in commencing its investigation of John Doe 2, yet she "ha[d] not alleged, even in general terms, the amount of time that passed between when [the University learned of her assault] and when the University initiated and/or completed its investigation."  Prior Order at 4.

Commins also accused the University of failing to provide her with updates regarding its investigation, to allow her an opportunity to present evidence at a hearing, or to inform her of her

United States District Court
Northern District of California

1   right to appeal its disciplinary decisions, but I found that "without more information regarding the

2   University's delay in commencing and completing its investigation, a deliberate indifference

3   finding based on these alleged deficiencies would amount to either imposing Title IX liability for

4   conduct was that was merely 'negligent, lazy, or careless,' *Oden*, 440 F.3d at 1089, or 'second-

5   guessing the disciplinary decisions made by school administrators,' *Davis*, 526 U.S. at 648." Prior

6   Order at 25. Similarly, I held that Commins's assertions "that the University acted with deliberate

7   indifference by allowing John Doe 2 to remain on campus unrestricted for some period of time

8   during the course of its investigation, and that the discipline it ultimately imposed was not

9   sufficiently severe, run counter to the basic Title IX precept that 'victims of peer harassment [do

10  not] have a Title IX right to make particular remedial demands.' *Davis*, 526 U.S. at 648." Prior

11  Order at 25.

12        The University contends that Commins's allegations still fail to plausibly establish

13  deliberate indifference. Commins's arguments on deliberate indifference are similar to Karasek's.

14  She asserts that the University: (1) improperly used an informal resolution process to address her

15  assault; (2) unjustifiably delayed in commencing and completing its investigation of her assault;

16  (3) failed to take reasonable measures to ensure that John Doe 2 would not continue to harass her –

17  for example, by failing to issue a no-contact order or informing her that she could request a no-

18  contact order; and (4) unjustly favored John Doe 2, in that the University "was in constant

19  communication with John Doe 2 via his attorney," "honored John Doe 2's request to stay its

20  investigation," "allowed [John Doe 2] to participate in the determination of his sanctions for both

21  his physical assault of two students and sexual of Commins," and gave John Doe 2 the Title IX

22  Investigation Report, whereas Commins received minimal updates regarding her complaint during

23  its pendency, was not given the opportunity to participate in any formal hearing or in the

24  determination of John Doe 2's sanctions, was not given the Title IX Investigation Report, was not

25  given an opportunity to appeal John Doe 2's sanctions, and was not provided any formal process

26  for challenging John Doe 2's readmission to the University after she completed her undergraduate

27  studies and his suspension ended. Oppo. at 18-21.

28        I agree with the University that these arguments do not support a plausible showing of

25

deliberate indifference in light of the University's overall response to Commins's assault. I previously held that without more information regarding the University's delay in commencing and completing its investigation, Commins's allegations regarding the University's various communicative, procedural, and disciplinary failures were not sufficient to plausibly establish deliberate indifference. Prior Order at 25. Commins now alleges more details regarding the timing and content of the University's response to her assault, but those details do not help her case. It is now undisputed that on January 31, 2012, within two weeks of Commins's assault and nearly a month before she reported the assault to the University, the University placed John Doe 2 on interim suspension "strictly prohibit[ing] [him] from entering upon any part of the Berkeley campus." Hunt Decl. Ex. B at UC0000641. John Doe 2 was continuously subject to some form of suspension and/or restricted movement for the next four years. On February 3, 2012, the University modified the interim suspension to allow John Doe 2 to "attend his classes only" and to be on campus for five minutes before and after each class. *Id.* at UC0000644; *see also* TAC ¶ 94. Then, on May 11, 2012, the University modified John Doe 2's interim suspension again, this time to completely prohibit John Doe 2 from attending classes or entering campus. Hunt Decl. Ex. C at UC0000964; *see also* TAC ¶ 105. On March 5, 2013, John Doe 2 accepted a number of sanctions, including total exclusion from campus and University functions through August 31, 2015 and no contact with Commins. TAC ¶¶ 119-20. Finally, when John Doe 2 recommenced his studies in fall 2015, he was under a No Contact Directive significantly restricting his movement on campus, completely prohibiting him from any contact with Commins, and requiring him to finish his studies by the end of the semester. Hunt Decl. Ex. E at UC0002149-50.

These new facts weigh heavily against the conclusion that the University's delay in commencing and completing its investigation amounted to an "an official decision not to remedy the violation." *Oden*, 440 F.3d at 1089. Commins attempts to liken this case to *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282 (11th Cir. 2007), but this case is not like that one. In *Williams*, the Eleventh Circuit found a plausible showing of deliberate indifference based on the defendant university's eleven-month delay in conducting a disciplinary hearing for the alleged assailants. *Id.* at 1296-97. The plaintiff had withdrawn from the university immediately following

26

her assault, and by the time the university conducted the disciplinary hearing, two of the alleged assailants no longer attended the university. *Id.* The court rejected the argument that the university's delay was justified by the criminal charges pending against the alleged assailants. *Id.* It reasoned that the charges "did not affect [the university's] ability to institute its own procedures" and "were an ineffectual means to prevent future attacks at [the university] while the charges were pending." *Id.* at 1297. Further, "the disciplinary proceedings were not instituted for another four months after [the charges were resolved]." *Id.* The court concluded that, "[v]iewing the evidence in the light most favorable to [the plaintiff], [the university] failed to take any precautions that would prevent future attacks from [the alleged assailants] or like-minded hooligans should [the plaintiff] have decided to return to [the university]." *Id.*

The crucial difference between this case and *Williams* is that the University here *did* "institute its own procedures" and "take . . . precautions" to "prevent future attacks" while John Doe 2's criminal charges were pending: the University immediately placed John Doe 2 on interim suspension and severely restricted his movement on campus throughout the pendency of the charges. Moreover, instead of delaying an additional four months after the resolution of John Doe 2's criminal proceedings, the University reinstituted its investigation shortly after John Doe 2's conviction and sentencing. TAC ¶¶ 108-09 (alleging that John Doe 2 was convicted and sentenced on October 5, 2012, and that "[i]n October through November 2012, [the University] engaged in several email communications with John Doe 2's attorney"). The University did not complete its investigation until January 2013 and did not finalize its sanctions against John Doe 2 until March 2013. *See* TAC ¶¶ 112, 120. But Commins alleges no facts from which to conclude that this delay was "more than negligent, lazy, or careless." *Oden*, 440 F.3d at 1089.

As with Karasek, I am sympathetic to Commins's complaint that the University did not communicate with her more regularly over the course of its investigative and disciplinary proceedings. I also understand Commins's dissatisfaction with the University's failure to immediately issue a no-contact order when it placed John Doe 2 on interim suspension, and with the University's ultimate decision to allow John Doe 2 to recommence his studies. That decision – to not expel John Doe 2 despite his felony conviction for his sexual assault of Commins – is

highly debatable to say the least.  Given the facts alleged, I certainly would have decided the issue differently.  But in light of the steps the University did take to remedy the violation, I am not allowed to substitute my opinion for that of the University.  Whether viewed in isolation or in the aggregate, the deficiencies identified by Commins fail to plausibly establish that the University responded with deliberate indifference to her assault.  The University's motion to dismiss her Title IX claim is GRANTED WITH LEAVE TO AMEND.

**CONCLUSION**

For the foregoing reasons, the University's motion to dismiss is GRANTED, and Karasek and Commins's Title IX claims are DISMISSED WITH LEAVE TO AMEND.  Plaintiffs shall file their fourth amended complaint, if any, within 20 days of the date of this Order.[8]

**IT IS SO ORDERED**.

Dated: July 28, 2016



_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

---

[8] The parties filed several sealing motions in connection with their briefing on the University's motion to dismiss.  All of the parties' sealing requests are based on the Family Educational Rights and Privacy Act ("FERPA"), which prohibits federal funding of an education institution that "has a policy or practice of releasing, or providing access to, any personally identifiable information in education records" without the written consent of the student, a lawfully issued subpoena, or a judicial order.  20 U.S.C. § 1232g(b)(2).  The term "personally identifiable information" means information such as names, birthdates, social security numbers, and "[o]ther information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty."  34 C.F.R. § 99.3.

The parties' sealing requests appear to be vastly overbroad, in that they seek to seal far more than just personally identifiable information.  Further, the parties have not cited any authority indicating that FERPA in and of itself establishes compelling reasons for sealing judicial records.  Accordingly, the parties' sealing motions are DENIED WITHOUT PREJUDICE.  If either side wants any materials filed in connection with the University's motion to dismiss to remain under seal, it shall file an administrative motion within seven days of the date of this Order narrowing its sealing requests and articulating compelling reasons in support of sealing.  In determining how to narrow their sealing requests, the parties should note that none of the information specifically referenced in this Order is sealable under the compelling reasons standard.