UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SOFIE KARASEK, et al.,

        Plaintiffs,

    v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE,

        Defendant.

Case No.  3:15-cv-03717-WHO

**ORDER ON DEFENDANT'S MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT**

Re: Dkt. No. 87

## INTRODUCTION

In a thoughtful article in the Yale Law Journal, Catharine A. MacKinnon argues that the deliberate indifference standard in sexual assault cases under Title IX, 20 U.S.C. § 1681, is inconsistent with Title IX's guarantee of equal educational outcomes on the basis of sex. Catharine A. MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 Yale L.J. 2038 (2016)).  She describes how reporting sexual harassment to school administrators frequently becomes a distinctively damaging part of the abuse experience. She proposes that the law should apply a "due diligence" standard that would hold schools accountable to survivors if they failed to adequately investigate, effectively respond to and transformatively remediate sexual violations on campus.  If the standard I applied to the Title IX claims filed by Sofie Karasek and Nicoletta Commins was "due diligence" rather than "deliberate indifference," their allegations would proceed past the pleading stage.

But the standard set by the United States Supreme Court in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), and applied by the Ninth Circuit in *Oden v. North. Marianas College*, 440 F.3d 1085 (9th Cir. 2006), is deliberate indifference.  In order to state a claim under Title IX, the school's response to the assaults has to be "clearly unreasonable," amounting to "an

1    official decision not to remedy the violation." *Oden*, 440 F.3d at 1089 (quoting *Davis*, 526 U.S. at

2    648, and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

3         This is the fifth time that these plaintiffs have tried to state plausible Title IX claims in this

4    case. Despite the policies that the University of California, Berkeley (the "University") is alleged

5    to have violated, including the alleged failure of the University to be in contact with the victims

6    during the investigations of their assaults, the University's conduct does not meet the exacting

7    deliberate indifference standard. Accepting plaintiffs' allegations as true, the University could

8    have treated them much better. But the deliberate indifference standard under *Davis* protects

9    school administrations that do investigate and remedy complaints, and judges are not permitted to

10    substitute their views for those of not clearly unreasonable administrators. I am bound by the law,

11    and I agree with the University that Karasek and Commins have not adequately alleged deliberate

12    indifference.[1] The University's motion to dismiss is GRANTED WITHOUT LEAVE TO

13    AMEND. The University shall answer the Fourth Amended Complaint ("FAC") with respect to

14    Butler within twenty days.

15                      **BACKGROUND**

16    **I.   FACTUAL BACKGROUND**

17      **A.  Dear Colleague Letter**

18        As they did in conjunction with the Second Amended Complaint ("SAC") and Third

19    Amended Complaint ("TAC"), plaintiffs describe in the FAC an April 4, 2011 Dear Colleague

20    Letter ("DCL") on student-on-student sexual harassment disseminated by the Department of

21    Education Office for Civil Rights ("OCR"). FAC ¶ 5 (Dkt. No. 83); Plaintiffs' RJN Ex. A (Dkt.

22

23

24

25

26

27        [1] Because of this conclusion, I do not address the adequacy of the pleading with respect to
causation in this Order.

28

United States District Court
Northern District of California

No. 63).[2]

The DCL discusses "Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence." DCL at 2. It states that "[i]f a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." *Id.* at 4. A footnote attached to this sentence explains, "This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. … The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999)." DCL at 4 n.12.

In the FAC, plaintiffs highlight several of the requirements and guidelines set out in the DCL:

> • All persons involved in a complaint resolution process must be trained in handling complaints of sexual harassment or sexual violence;
>
> • A school's grievance procedures must be prominently displayed on the school website, and widely distributed throughout campus in both print and electronic formats;
>
> • A school must take immediate action to address a complaint of sexual harassment/assault, prevent its reoccurrence and address its effects;
>
> • A school should notify the complainant of his or her options to avoid contact with the alleged perpetrator;
>
> • When taking steps to separate a complainant and alleged perpetrator, a school should minimize the burden on the complainant;

---

[2] Plaintiffs did not resubmit the DCL for judicial notice in support of their opposition to the University's motion to dismiss the FAC, but I assume that plaintiffs renew their request at Dkt. No. 63, and take judicial notice of the DCL for deciding this motion to dismiss. The DCL is a "significant guidance document" as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices. *See* DCL at 1 n.1; 72 Fed. Reg. 3432. It "does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations." DCL at 1 n.1.

United States District Court
Northern District of California

• A school must inform a complainant of their right to file a criminal report and not discourage the complainant from doing so;

• Although a school may need to delay the fact-finding portion of an investigation while the police are gathering evidence, the school must promptly resume and complete its fact-finding once the police department has completed its gathering of evidence, not after the ultimate outcome or the filing of any charges (usually three to ten calendar days);

• Grievance procedures may include involuntary informal mechanism. However, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. In cases involving allegations of sexual assault, mediation is not appropriate;

• A school must treat both parties equally throughout the investigative process;

• A school must give the parties to a complaint periodic status updates;

• Throughout the school's investigation the parties must have an equal opportunity to present relevant witnesses and other evidence;

• A resolution should be achieved no longer than 60 days after the complainant makes a report of sexual harassment/assault;

• A school must notify the parties in writing about the outcome of the complaint.

FAC ¶ 5.

**B. General Policies**

Plaintiffs cite four University policies allegedly in place at the time of their sexual assaults. FAC ¶ 6; *see also* Goldblatt Decl. ¶¶ 5–8 (Dkt. No. 88-1).[3] The University implemented the Interim Sexual Misconduct Policy in September 2013, although plaintiffs allege that the University "began employing the practices" after receiving the DCL in 2011, thereby explicitly adopted the guidelines within the DCL. FAC ¶ 7. Plaintiffs highlight the following provisions of the policy:

• Prior to agreeing to an informal resolution of a sexual misconduct complaint, the CSC shall consult with the complainant regarding any proposed informal resolution;

---

[3] The University's Request for Judicial Notice or for Application of the Incorporation by Reference Doctrine of exhibits A, B, C, D, E, and F (Dkt. No. 88) is GRANTED. In line with plaintiffs' objections (Dkt. No. 91), the grant of this request does not mean that I will "incorporate by reference [the University's] interpretation of [the] contents" of the documents.

• If the CSC decides to agree with the responding student to enter into an informal resolution, then the CSC shall provide the complainant with the resulting signed Administrative Deposition.

• Upon receipt of the signed Administrative Deposition, the complainant may appeal the CSC's decision to enter into the informal resolution;

• Notices or communications given to the responding student by the CSC or the Independent Hearing Officer concerning the following shall be provided to complainant on the same day[.]

*Id*. ¶ 8; *see also* Goldblatt Decl. Ex. A (Dkt. No. 88-1).

Next, plaintiffs cite the Code of Student Conduct, Rape and Sexual Assault.  FAC ¶ 9. The policy is dated January 2012, and includes provisions on the following: determining whether to proceed with a conduct process within 7 days of the receipt of a complaint, notifying the respondent, and resolving complaints informally.  *See* FAC ¶ 9; Goldblatt Decl. Ex. B (Dkt. No. 88-1).  The plaintiffs also reference two undated policies: the Sexual Harassment Policy and the Sexual Assault Policy.  *Id*. ¶¶ 10–11.  The former details options for resolution and procedures for an early resolution versus a formal investigation.  *See* Goldblatt Decl. Ex. C.  The latter dictates the University's policy in handling reports of sexual assault and rape, and points to the Code of Student Conduct as the applicable standard in resolving allegations of sexual assault.  *See id.* Ex. D.

### C.  General History

Plaintiffs also point to a general history of sexual misconduct at the University.  FAC ¶¶ 14–28.  They identify a June 2014 report by the California State Auditor entitled "Sexual Harassment and Sexual Violence: California Universities Must Better Protect Students by Doing More to Prevent, Respond to, and Resolve Incidents," ("the Audit") which concluded that "[t]he universities need to better inform students who file a complaint of the status of the investigation and notify them of the eventual outcome."  *Id*. ¶ 16 (at 8:14-21).  With respect to the University, the Audit found that the policy allowing the University to exercise discretion when deciding whether to initiate a formal investigation when requested to do so by the complainant did not align with instructions in the 2011 DCL.  *Id*. ¶ 17 (9:3-7).  Further, if a Title IX coordinator decides to use early resolution, the coordinator must communicate with a complainant or else risk

inconsistency with federal guidance. *Id.* (9:8-12). The Audit also found that between 2009 and 2013, 76 percent of Title IX complaints were resolved using an early resolution process. *Id.* (9: 13-15).

Lastly, plaintiffs claim that the University underreported the amount of sexually violent incidents during their enrollment. *Id.* ¶ 19. And, in 2013, 14 cases of student-on-student sexual misconduct were reported to the University's CSC—all resolved through informal resolution. *Id.* ¶ 20.

**D. Karasek**

Karasek participated in a weekend trip to San Diego with the Cal Berkeley Democrats Club (the "Club") from February 10 to 12, 2012, during which she was sexually assaulted by a student referred to in the FAC as "TH." *Id.* ¶¶ 32-35. On the night of February 10, 2012, she slept in the same bed with three other students, one of whom was TH, and awoke around 3:00 a.m. to find TH massaging her legs, back, and buttocks. *Id.* ¶¶ 34-35. Karasek states that she "froze in the moment, and TH continued to inappropriately rub her for approximately 30 minutes." *Id.* ¶ 35. After a private meeting with the Club president later that month, TH resigned from his board position, but continued to attend "non-social" club events. *Id.* ¶ 41-42. His participation with the Club ended in April, when the Club president asked him to leave after learning of an additional sexual assault. *Id.* ¶¶ 43 – 44.

On February 14, 2012, the Club president met with Marisa Boyce ("Boyce") from the Gender Equity Resource Center to report TH's sexual assault of Karasek and two other unidentified women.[4] *Id.* ¶ 36. Boyce allegedly discouraged the Club president from removing TH from the Club, and encouraged "more informal, transformative justice models." *Id.* ¶ 37. The February 14, 2012 document memorializing the meeting specifically identifies Sofie Karasek as

---

[4] Documents suggest that Christine Ambrosio ("Ambrosio"), director of Women's Resources at the Gender Equity Resource Center, attended the meeting, but Karasek insists that Boyce, not Ambrosio, conducted the meeting. FAC ¶ 38; *see* Hunt Decl. Ex. A, B(Dkt. No. 89). In response to the Court's unsealing order (Dkt. No. 77), the University refiled unsealed versions of the emails associated with this meeting. Dkt. No. 89.

the victim of the assault.[5]  *Id.* ¶ 38.  The document also states that the information was provided to other departments, including OPHD and CSC.  *Id.*

Following this meeting between the Club president and Boyce,[6] Christine Ambrosio of the Gender Equity Resource Center emailed several administrators, including Denise Oldham with the University's Title IX office and Hallie Hunt with the Center for Student Conduct, to ask about informal models for dealing with sexual assault that she could present to the Club president.  *Id.* ¶ 39; Hunt Decl. (Dkt. No. 89).  Ambrosio's email is dated February 14, 2012 and states,

> I just met with the president of one of the student organizations on campus. She shared with me that she heard (second hand) that one of the other officers in her org sexually assaulted one of their new members (frosh) at an off-campus event this past weekend. I asked her to encourage survivor to seek emotional support/check in if she needs a medical check-up. I also asked her to tell survivor about how I can explain about options (police, student conduct). I gave her my card and the 10 tips to Help a Friend + Resources sheet and Social Services brochure.
>
> The president does not know the details and she will be meeting with survivor later today. I spoke to her about Student Conduct as a way for survivor or her group to address the possible sexual harassment/sexual assault. I told her that I would check in with you all regarding her org's responsibilities around this. She is considering asking the accused to resign from their officer position and contact[ing] Social Services regarding the impact on their officer group.
>
> Lastly, she asked about transformative justice models. I only know about Philly Stand Up. Do you all know of others that I can share with her?

Hunt Decl. Ex. A (Dkt. No. 89).  In response to Ambrosio's email, Oldham sent an email dated February 15, 2012 that states,

> I'm sure there are models out there, but I'm very wary of the use of these models for any kind of sexual harassment, let alone and extreme form like sexual assault. Not only do all the university colleagues with whom I regularly work feel this way, recent federal guidelines are indicating that any kind of mediation is not appropriate for these kinds of cases at educational institutions.

---

[5] Karasek does not attach the referenced document, but it cannot be the email from Ambrosio to Oldham because that email does not name Karasek.  *See* Hunt Decl. Ex. A (Dkt. No. 89).

[6] As stated *supra* note 3, the February 14, 2012 email from Ambrosio described below suggests that the Club president met with Ambrosio, not Boyce.  However, Karasek insists that "the Club president denies that any such meeting between her and Ambrosio occurred."  FAC ¶ 22.

United States District Court
Northern District of California

> Without telling her not to explore this kind of approach, which would be overstepping, I'd feel better if we could at least simultaneously talk to this student about the risks involved with using these kinds of resolution strategies for sexual harassment/assault. To just give her transformative justice models might implicitly suggest that the campus condones that approach.
>
> I'm happy to join you in a discussion with this student, if it's helpful.

*Id.*; *see also* FAC ¶ 40.

On April 7, 2012, the Club president learned that TH had allegedly assaulted another club member the previous night. *Id*. ¶ 43. Two days later, the Club president contacted the University to follow-up on the previous report involving Karasek, and to inform the University of the additional complaint. *Id*. ¶ 44. The Club president then asked TH to leave the Club. *Id.* ¶ 45. Ambrosio sent an email to Oldham and Hunt on April 12, 2012, informing them that two additional victims had come forward. *Id*. ¶ 46.

On April 20, 2012, Karasek and three other female students who had been sexually assaulted by TH met with Oldham and Hunt to report their assaults. *Id*. ¶ 47. The women also expressed their concern over TH attending the Cal in the Capital program over the summer. *Id*. ¶ 48. Karasek was not informed of potential options for resolving the allegation, including procedures for early resolution or a formal investigation. *Id*. ¶ 49. The University did not inform Karasek that she would need to submit a written statement detailing her assault to initiate a formal investigation. *Id.* ¶ 51. "Just out of luck, one of TH's victims told Karasek that she had submitted a written statement to the University detailing her assault." *Id.* ¶ 52. Karasek thought that this was a good idea and submitted a formal, written complaint to Hunt on May 15, 2012, although Karasek still did not realize that a written complaint was required to initiate a formal University investigation. *Id*. In her written complaint, she again expressed concern over allowing TH to attend the Cal in the Capital program. *Id*. ¶ 53.

On May 14, 2012, Glen DeGuzman of the Center for Student Conduct met with TH. *Id.* ¶ 59. During the meeting, TH "admitted that he had problems" and had "acted foolishly, especially when he had consumed alcohol." *Id.* He also "admitted to engaging in troublesome conduct even after being removed from office with the Club." *Id.* Karasek states that DeGuzman "admitted [in

United States District Court
Northern District of California

his notes from the meeting] that the nature of [the] meeting was not to investigate, but rather was 'focused on getting help so TH could move forward.'" *Id.* ¶ 60.  DeGuzman subsequently "followed up several times with TH to check on TH's progress with dealing with his admitted problems and to continue to offer his assistance to TH in that regard." *Id.*

Despite the University's knowledge of TH's "problems," he was allowed to attend the Cal in the Capital program during the summer of 2012.  FAC ¶ 61.  Karasek alleges that "no restrictions [were] in place," and DeGuzman merely advised TH to "please stay away from alcohol." *Id.*

On September 11, 2012, Oldham provided both the outgoing Club president and the incoming Club president with an update regarding the investigation into Karasek's complaint. *Id.* ¶ 62.  On September 17, 2012, Oldham met with TH for the first time. *Id.* ¶ 64.  Shortly thereafter, on October 1, 2012, Oldham sent an email to another administrator stating that her office became aware of complaints concerning "unwelcome physical contact" in "late April 2012." *Id.* ¶ 65.  "After examining the information submitted by the two women students and consulting DeGuzman about his positive impressions of the developmental discussion [he] had with [TH], I determined that this situation could be resolved without a formal investigation by my office." *Id.*  Karasek states that Oldham also "acknowledged [in the email] that from her perspective, she considered the sexual harassment issue with TH to be resolved." *Id.*

On October 10, 2012, DeGuzman sent an Administrative Disposition Letter to TH informing him that he had been found to have violated the Student Code of Conduct for engaging in disorderly or lewd conduct. *Id.* ¶ 69.  DeGuzman "offered TH a choice to either meet with DeGuzman to tell his side of the story and participate in the resolution of his case, or, to simply accept responsibility." *Id.*  DeGuzman explained to TH that if he chose to simply accept responsibility, he would be subject to the following sanctions: (1) disciplinary probation until December 2012, when TH was set to graduate; (2) one consultation with a mental health practitioner of TH's choice; (3) one appointment with an Alcohol and Other Drugs Counselor; and (4) one meeting with Alan Creighton, a Health Educator, to discuss gender issues and sexual misconduct. *Id.*  TH chose to meet with DeGuzman and did so on October 19, 2012. *Id.* ¶ 43.  In

addition, on October 18, 2012, TH sent an email to an Independent Hearing Officer, in which TH set out a timeline of events regarding the allegations against him and "asked the Officer to review the timeline to see if there were any procedural deficiencies with respect to how the University addressed [the allegations]." *Id.* ¶ 72.

On October 24, 2012, DeGuzman sent another Administrative Disposition Letter to TH, again giving TH the option of simply accepting responsibility, but removing from the disciplinary sanctions the required meeting with Health Educator Creighton. *Id.* ¶ 74. Two days later, TH returned his signed Administrative Disposition Letter to Guzman. *Id.* 75.

For the next eight months, the University did not contact Karasek regarding her complaint, and she was never consulted as to whether an informal resolution process would suffice. *Id.* ¶ 57, 67. The University never provided Karasek with a copy of the Administrative Disposition, nor any of TH's evidence, and never informed her of her right to appeal CSC's decision to informally resolve her complaint. *Id.* ¶¶ 76-78, 91-94. The University did not contact Karasek at any point during the informal resolution process. *Id.* ¶ 85.

At some point in November 2012, a Club board member informed Karasek that TH was set to graduate in December 2012. *Id.* ¶ 79. On November 2, 2012—presumably after Karasek learned this information—Karasek went to Ambrosio's office and "expressed her frustration and concern that she was not being treated fairly, and that she had not heard from anyone at the University regarding her complaint." *Id.* ¶ 80. Karasek also "expressed frustration at the length of time that had passed, given that she knew that TH was graduating in December 2012." *Id.* On November 6, 2012, Ambrosio informed Karasek via email that she was waiting for the Center for Student Conduct to give her an update on the investigation. *Id.* ¶ 81. On November 15, 2012, Karasek emailed Ambrosio to follow up. *Id.* ¶ 82. Ambrosio did not respond, and on December 2, 2012, Karasek emailed Ambrosio a second time but again received no response. *Id.* ¶ 83.

Finally, on December 12, 2012, Karasek received her first communication from the University regarding her assault since she formally reported it on April 20, 2012. *Id.* ¶ 84. The Title IX Office sent her a three sentence email stating that "th[e] matter had been explored and resolved using an early resolution process," and that the Title IX Office had "communicated the

10

1   outcome of the early resolution process to the Center for Student Conduct." *Id*.  The email did not

2   reveal the outcome.  *Id*.

3         On December 17, 2012, three days after TH had graduated, a representative from the

4   Center for Student Conduct sent Karasek an email stating that TH had been charged with

5   violating, and had been found to be in violation of, the Campus Code of Student Conduct.  *Id*. ¶

6   86.  However, the email did not explain what, if any, disciplinary action had been taken against

7   TH.  *Id*.  Karasek filed a federal Clery Act complaint against the University in May 2013, and in

8   September 2013, she contacted Hunt to inquire whether any disciplinary action had been taken

9   against TH.  *Id*. ¶¶ 87-88.  Hunt responded that TH had been placed on disciplinary probation and

10   had "engaged in some counseling measures," but she did not provide "any specific detail as to

11   what counseling measures had been taken."  *Id*. ¶ 89.

12         Karasek states that she was not provided with updates regarding the University's

13   investigation, was not informed that she could report her assault to law enforcement, was not

14   given an opportunity to present her claim at a disciplinary hearing, was not given an opportunity to

15   appeal the University's disciplinary decision, and was not informed of the outcome of the

16   investigation until nine months after TH had graduated.  *Id*. ¶¶ 91-94.  She emphasizes that while

17   TH was allowed to participate in the resolution of her complaint against him, at no time during the

18   early resolution process was she allowed to participate in any investigatory or disciplinary process.

19   *Id*. ¶¶ 73, 85.  She also emphasizes that, during the entire pendency of the investigatory and

20   disciplinary process, TH was "allowed to remain on campus, unrestricted, creating a sexually

21   hostile environment for [her]."  *Id*. ¶ 95.

22         Karasek alleges, "on one occasion, [she] saw TH from afar as she was walking to class,"

23   and that, "[b]ecause the University had taken no steps to ensure that TH would not continue to

24   harass, or otherwise harm Karasek, [she] took her safety and well-being into her own hands, and in

25   an effort to avoid her assailant, she was forced to change her usual path to class and take a longer

26   route."  *Id*. ¶ 97.  Additionally, she encountered TH while participating in off-campus Club events.

27   *Id*. ¶ 98.  Karasek was "constantly operating with a heightened sense of fear, anxiety, and stress

28   knowing that her assailant remained unrestricted on campus, and that there were other possible

perpetrators in her classes that had not been removed." *Id*. ¶ 96. And also that she "has suffered psychological and emotional damages, and has experienced a loss of educational opportunities and/or benefits, including but not limited to: [b]eing forced to change her major from Economics to the less academically rigorous Political Economy; [s]uffering a noticeable drop in her GPA; [b]eing forced to drop at least one class; [b]eing forced to miss assignments and ask for extensions on assignments." *Id*. ¶ 99.

Karasek includes specific allegations that the University's response to her Complaint violated its own policies, including the Sexual Harassment Policy, the Interim Sexual Misconduct Policy, the Sexual Misconduct Policy, and the Code of Student Conduct. *Id*. ¶ 100. It violated the Sexual Harassment Policy by failing to inform Karasek about options for resolving her report and the range of possible outcomes, failing to engage Karasek in the decision to use early resolution, failing to encourage Karasek to file a formal, written report, and using the informal resolution process for a sexual assault allegation. *Id*. ¶ 102. It violated the Interim Sexual Misconduct Policy by failing to complete its investigation within 60 days, failing to inform Karasek about the status of the investigation, failing to consult with her, failing to provide her with TH's signed Administrative Disposition Letter, failing to provide her an opportunity to appeal the CSC's decision to informally resolve her complaint, and failing to provide her with the Disposition Letter and Final Decision to Impose Sanctions on the same day these documents were provided to TH. *Id*. ¶ 103. It violated the Sexual Assault Policy by failing to disclose the outcome of Karasek's complaint to Karasek in a reasonable time and failing to take any measures to ensure a safe environment for Karasek on campus. *Id*. ¶ 104. Lastly, the University violated the Code of Student Conduct by failing to determine within seven days of the complaint by Karasek and three others, whether sufficient information existed to proceed with a conduct process. *Id*. ¶ 105.

She also cites an incident at the Club retreat in 2008, when the then Club president sexually assaulted another member of the Club. FAC ¶ 30. When the member reported the assault to the University Police, she was told that the University could do nothing because the assault occurred off campus. *Id*.

12

**B.      Commins**

In January 2012, Commins was sexually assaulted in her off-campus apartment by a University student identified in the FAC as "John Doe 2." FAC ¶ 126. She states that she invited John Doe 2 to her apartment, and that without her consent, he performed oral sex on her, attempted to physically coerce her to perform oral sex on him, and digitally penetrated her. *Id*. ¶¶ 128–29. The next day, Commins reported the assault to the University's Tang Student Health Center (the "Health Center"). *Id*. ¶ 130. The Health Center performed a cursory exam but did not administer a rape kit. *Id*. ¶ 131. On January 20, 2012, Commins reported her assault to the University Police Department, who directed her to the Berkeley Police Department. *Id*. ¶ 132. She then went to Highland Hospital, where a rape kit was administered, revealing evidence of trauma. *Id*. ¶ 133.

On January 16, 2012, four days prior to John Doe 2's assault on Commins, John Doe 2 physically assaulted two other students at a party at a University fraternity house. *Id*. ¶ 134. The students reported the incident to the University, and on January 31, 2012, the University placed John Doe 2 on interim suspension for his sexual assault of Commins and his physical assault of the other two students. Hunt Decl. Ex. B (Dkt. No. 89); *see also* FAC ¶ 136. The Notice of Interim Suspension informs John Doe 2 that he is "strictly prohibited from entering upon any part of the Berkeley campus." Hunt Decl. Ex. B. The prohibition did not include a "no contact" order with Commins. *Id*. ¶ 137. On February 3, 2012, the University held an Interim Suspension Hearing and modified the interim suspension to allow John Doe 2 to "attend his classes only" and to be on campus for five minutes before and after each class. Hunt Decl. Ex. B; *see also* FAC ¶ 137. Commins states that the University did not notify her of the interim suspension prohibition nor the interim suspension hearing. FAC ¶ 137. The University never informed Commins that John Doe 2 was on any type of prohibition, or that he was allowed to be on campus to attend classes. *Id*. ¶ 139.

On February 22, 2012, Commins submitted an Incident Report Form, officially reporting her assault, to the Center for Student Conduct. *Id*. ¶ 141. On or about March 5, 2012, Commins spoke with Julio Oyola, student conduct specialist with the CSC, who informed her that the

13

University would perform an investigation, but that it could not commence until after the Berkeley Police Department finished their investigation. *Id.* ¶ 142. "Commins responded that she was not comfortable with any delay in the commencement of the University's investigation." *Id.*

On April 2, 2012, an investigator working for John Doe 2's attorney called Commins and "attempted to pressure her into consenting to allow John Doe 2 to continue his studies at the University." *Id.* ¶ 146. The investigator also asked Commins if she would be comfortable with the University staying its investigation until John Doe 2's criminal proceedings were completed. *Id.* Commins alleges that "[t]his contact by John Doe 2's agent amounted to additional intimidation and harassment . . . subsequent to her report of sexual assault." *Id.* ¶ 147. Following the investigator's call, Commins emailed Oyola to inform him of the call. *Id.* ¶ 148. Commins stated in the email that she was not comfortable with the University delaying its investigation until after John Doe 2's criminal proceedings had concluded, and that she was "not sure she was comfortable with John Doe 2 being allowed to remain on campus at all." *Id.*

Oyola met with John Doe 2 on April 4, and with John Doe 2 and his attorney on April 19, 2012, to discuss an informal resolution of the issues. *Id.* ¶ 150. John Does 2's attorney requested that any process be stayed pending the outcome of the criminal proceeding against John Doe 2. *Id.* ¶¶ 149, 152.

On April 30, 2012, Oldham met with Commins and asked her to describe what happened the night of the assault and requested that she gather some documents. *Id.* ¶ 152. Oldham did not inform Commins that an investigation would take place, nor did Oldham receive Commins's consent to an informal resolution process. *Id.*

In a May 4, 2012 letter, the University again modified John Doe 2's interim suspension effective May 11, 2012, this time to strictly prohibit John Doe 2 from attending classes or entering campus until the sooner of (1) February 11, 2013, or (2) "the date upon which a formal or informal resolution of the charges against [him] has been reached." Hunt Decl. Ex. C (Dkt. No. 89); *see also* FAC ¶ 154. The Notice of Interim Suspension states that "[t]his interim suspension has been imposed in part to accommodate your request to postpone the hearing upon your charges until such time as criminal charges pending against you have been resolved." *Id.* Commins alleges that

14

the University delayed in modifying John Doe 2's interim suspension in this way in order to allow him to complete his classes for the spring semester. *Id.* ¶ 157. She also states that the University never notified her of the interim suspension, and that she instead learned of it "by the end of spring 2012" from the deputy district attorney who was prosecuting John Doe 2. *Id.* ¶ 158.

On October 5, 2012, John Doe 2 was convicted of felony assault for his assault on Commins and was sentenced to five years of probation and 1,000 hours of community service. *Id.* ¶ 159. From October through November 2012, University administrators, including Hunt and Oldham, exchanged several emails with John Doe 2's attorney, who offered to provide and ultimately provided evidence to Hunt and Oldham to support John Doe 2's defense in the University's investigation. *Id.* ¶ 160. In addition, John Doe 2 provided letters and recommendations from several individuals to support his defense. *Id.* Commins was never allowed to present any evidence in the University's investigation and was not allowed to view or comment on John Doe 2's evidence. *Id.* ¶ 161.

At some point in late fall or early winter 2012, a University administrator called Commins and represented to her that she would have an opportunity to present evidence at a formal hearing. *Id.* ¶ 162. Commins states that the administrator did not inform her that the University was in fact engaging in an "early resolution process" in which Commins would not be able to participate. *Id.*

On January 21, 2013, Oldham notified John Doe 2 that she had completed the investigation of Commins's assault, that she had found that he had violated the University's Policy on Sexual Harassment, and that this finding would be forwarded to the Center for Student Conduct for evaluation of whether he had also violated the Code of Student Conduct. *Id.* ¶ 163. Commins was notified as well. *Id.* Commins alleges that the University's investigation was limited to: (1) interviewing Commins; (2) reviewing the police report regarding Commins's assault; (3) reviewing Commins's hospital records from the night of the assault; and (4) reviewing transcripts of online chat conversations between Commins and John Doe 2. *Id.* ¶ 164. On January 30, 2013, John Doe 2 and his attorney were given a copy of the Title IX Investigation Report. *Id.* ¶ 165. Commins was not given a copy of the report. *Id.* ¶ 166.

On February 4, 2013, Hunt met with John Doe 2 and his attorney "to discuss his side of

15

both the physical assault and [the] sexual assault he [had] committed." *Id.* ¶ 168.  On February 7, 2013, Hunt contacted Commins to ask if Commins would be comfortable with John Doe 2 being suspended until Commins finished her studies. *Id.* ¶ 169.  Commins responded that she "would be most comfortable with John Doe 2 being permanently expelled." *Id.*  After being told "expulsion was not an option," Commins "was forced to accept a suspension of her assailant… ." *Id.*

On February 27, 2013, Hunt sent John Doe 2 an Administrative Disposition Letter ("ADL") thanking him for meeting with her and informing him that he had been found to have violated the Code of Student Conduct based on his physical assault of the other students on January 16, 2012 and his sexual assault of Commins. *Id.* ¶ 170.  The ADL proposed an informal resolution of the matter. *Id.*  The ADL set out the following sanctions for both the physical assault and the sexual assault: (1) suspension through August 31, 2015; (2) total exclusion from campus and University functions through August 31, 2015; (3) disciplinary probation for the remainder of John Doe 2's studies; (4) no contact with Commins; and (5) a reflective writing assignment. *Id.* ¶ 173.  On March 5, 2013, John Doe 2 accepted the sanctions, and the University "officially resolved its grievance procedure against John Doe 2 using an early resolution process." *Id.* ¶ 174.

At some point in March 2013, Hunt sent an email to Commins informing her of the outcome of the early resolution process. *Id.* ¶ 175.  However, because the email was sent to an address that Commins had never used to communicate with the University and never checked, she did not learn of the outcome until she contacted the University in July 2013 to request an update. *Id.* ¶¶ 175-76.  Commins states that, when she finally learned of the sanctions imposed on John Doe 2, she was not informed that the sanctions were imposed for both the physical assault on the other students and the sexual assault on her, and that she was led to believe that the sanctions were imposed only as a result of John Doe 2's conduct against her. *Id.* ¶ 177.

In April 2014, Commins notified Hunt that she had been accepted to several graduate schools, including the University's School of Public Health, and that "although the University's program was her first choice, she was concerned that John Doe 2's suspension would be lifted," allowing him to return to campus in the fall 2015 semester. *Id.* ¶ 178.  Hunt informed Commins that she believed that John Doe 2 intended to recommence his studies at the University following

16

the termination of his suspension.  *Id.*  On April 17, 2014, Commins notified Hunt by email that

she had decided to enroll at the University's School of Public Health.  *Id.* ¶ 179.  Commins wrote,

"I have made the choice to pursue my graduate studies at Berkeley in spite of the fact that I feel it

is a risk to my physical safety and emotional well-being, and so my excitement about starting the

next chapter of my education is cheapened by feelings of anger, helplessness, and fear."  *Id.*  In

addition, in September 2014, Commins's father wrote a letter to the Chancellor of the University

requesting that John Doe 2 not be allowed to return to the University.  *Id.* ¶ 180.  Commins alleges

that her father "received boilerplate responses from low-level University employees."  *Id.*

John Doe 2 was allowed to recommence his studies at the University in fall 2015.  *Id.* ¶

181.  In a letter dated August 24, 2015, Hunt informed John Doe 2 that the Center for Student

Conduct had imposed a "No Contact Directive" prohibiting him from any contact, "direc[t] or

indirec[t]," with Commins.  Hunt Decl. Ex. E (Dkt. No. 89).  The letter explains the specific terms

of the No Contact Directive as follows:

> • Your presence on campus is restricted only to the areas of campus
> and the specific buildings in which the classes that you are currently
> registered for are being held . . . Your presence in these areas is
> further restricted to a maximum of 30 minutes before class starts and
> 30 minutes after it ends. Meetings with faculty should be scheduled
> immediately before or after class whenever possible. You may not
> go to any other area of campus, enter any other campus building, or
> attend any extracurricular campus events without first requesting
> and receiving permission to do so from the Center for Student
> Conduct. This permission must be requested five business days in
> advance by emailing the office . . . Requests sent less than five
> business days in advance will not be considered.
>
> • Regardless of any requests that you may initiate, you will not be
> granted permission to enter or be within 500 feet of the following
> buildings: the new MLK student center (including the bookstore,
> pub, and eateries), upper and lower Sproul Plaza, . . . the Rec Sports
> Facility (RSF), the RSF Fieldhouse, all campus pools, all other
> campus athletic facilities, Li Ka Shing, the Valley Life Sciences
> building, Dwinelle Hall, Haviland Hall, Evans Hall, Lewis Hall,
> University Hall, Sproul Hall, and the Golden Bear Cafe.
>
> • You may not attend campus events, enter campus buildings, or
> frequent areas of campus that Ms. Commins might frequent. If you
> find yourself in an area in which she is also present, it will be your
> responsibility to leave the area immediately without causing a scene
> regardless of who got there first.
>
> • You may not contact or communicate with Ms. Commins through

any means or media including, but not limited to contact in-person, via phone, messaging, social media or through other people, including counsel.

• It is expected that you will have met all graduation requirements by the end of the fall 2015 semester. As such, you will not be permitted to enroll in classes for spring 2016. We will discuss your ability to participate in campus graduation ceremonies at a later date.

• This directive will remain in place until you are otherwise notified by the Center for Student Conduct. The Center for Student Conduct is the only campus entity authorized to lift or modify this directive. Failure to comply with this directive will constitute a violation of university policy and will be grounds for further disciplinary action, likely in the form of an interim suspension and a recommendation for dismissal from the entire University of California system.

*Id.*

Commins accuses the University of improperly relying on an "informal, early resolution process" to resolve her complaint, despite its previous representation to her that she would be able to present evidence at a formal hearing. *Id.* ¶ 185. Commins alleges that at no time did the University contact her to inform her of the status of the investigation, or that it would not be completed within 60 days. *Id.* ¶ 167. Nor did anyone obtain her consent for informal resolution of her sexual assault. *Id.* ¶ 171. Nor was she given an opportunity to appeal any of the sanctions, provider her own evidence, or see the evidence provided by John Doe 2. *Id.* ¶ 183–84.

Commins alleges that as a result of the University's conduct, she "has suffered psychological and emotional damages, and has experienced a loss of educational opportunities and/or benefits, including but not limited to: [b]eing forced to drop a class because it let out at night and she was fearful of encountering John Doe 2 on campus after dark; [a]voiding enrollment in any classes that let out after dark, unless she knew someone in the class that could walk her home, because she was fearful she would encounter John Doe 2 on campus; [b]eing forced to take a reduced course load for the semester after her report, and having to stay in school for an extra summer to make up for her reduced course load; [w]ithdrawing [from] the Tae Kwon Doe Club;" and incurring "[s]ignificantly higher amounts of absences from classes;" and "a significant reduction in the enjoyment of her academic experience at the University. *Id.* ¶ 186.

Commins similarly alleges that the University violated its own policies in responding to her report of sexual assault. *Id.* ¶ 187. It violated the Sexual Harassment Policy by: failing to

United States District Court
Northern District of California

inform Commins about the options for resolving her report and possible outcomes; failing to encourage Commins to file a formal, written report; failing to inform Commins of her right to have a representative present when she was interviewed; and failing to complete the investigation within 60 days. *Id.* ¶ 188. It violated the Interim Sexual Misconduct Policy by: failing to complete its investigation within 60 days; failing to inform Commins about the status of the investigation; failing to commence or resume its investigation after law enforcement's evidence collection concluded; failing to obtain Commins's consent to an informal resolution; ignoring Commins's request for a formal hearing; failing to provide Commins with the ADL; failing to provide Commins with an opportunity to appeal CSC's decision to engage in informal resolution; and failing to provide Commins with the Final Decision to Impose Sanctions on the same day the document was provided to John Doe 2. *Id.* ¶ 189. It violated its Sexual Assault Policy by failing to disclose the outcome of Commins's complaint to Commins in a reasonable time, and it violated the Code of Student Conduct by failing to determine within seven days of Commins's complaint whether sufficient information existed to proceed with a conduct process. *Id.* ¶¶ 190-91.[7]

## II.        PROCEDURAL BACKGROUND

Plaintiffs initiated this action in the Superior Court of California for the County of Alameda on July 2, 2015. Dkt. No. 1-1. On July 17, 2015, they served the University with their first amended complaint, and on August 14, 2015, the University removed the case to federal court. Dkt. No. 1 (Notice of Removal). On September 10, 2015, after the University moved to dismiss the first amended complaint, plaintiffs filed the SAC. Dkt. Nos. 6, 14.

The SAC brought four causes of action against the University: (1) gender discrimination in violation of Title IX, 20 U.S.C. § 1681, SAC ¶¶ 77–79;[8] (2) negligent failure to warn, train, and/or educate plaintiffs, SAC ¶¶ 80–82; (3) gender discrimination in violation of California Education Code section 220, SAC ¶¶ 83–85; and (4) fraud, SAC ¶¶ 86–92. The SAC sought damages but

---

[7] Because I have already held that Butler's allegations state a claim under Title IX and the University does not move to dismiss her claim, I do not include her allegations here.

[8] The SAC referred to the Title IX cause of action as, "Discrimination on the Basis of Gender in Violation of 20 U.S.C. § 1681." SAC ¶ 77.

did not include a request for injunctive or other equitable relief.

On September 24, 2015, the University moved to dismiss the SAC.  Dkt. No. 18.  On December 11, 2015, I issued the Prior Order, denying the motion with respect to Butler's Title IX claim, but granting the motion with respect to Karasek and Commins's Title IX claims, and with respect to plaintiffs' state law causes of action.  Prior Order at 22-36.  I gave plaintiffs leave to amend, and allowed them to pursue discovery so that they could learn more about how the University had handled their complaints, and evaluate whether their Title IX claims were plausible.  *Id.* at 36; Dkt. No. 40.

On April 13, 2016, plaintiffs filed their TAC, asserting a single cause of action under Title IX.  Dkt. No. 55 ("TAC"), ¶¶ 130–32.  The University moved to dismiss the TAC on May 9, 2016 (Dkt. No. 57), which I granted on July 28, 2016.  Dkt. No. 77 ("TAC Order").  On September 1, 2016, plaintiffs filed their fourth amended complaint ("FAC"), again asserting a single cause of action under Title IX.  Dkt. No. 83.  The University moved to dismiss on October 3, 2016.  Motion to Dismiss Fourth Am. Compl. ("Mot."), Dkt. No. 87.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted).  A claim is facially plausible when it

"allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). The court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

## DISCUSSION

Title IX states in relevant part that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The statute provides victims of sex discrimination with a private right of action against recipients of federal education funding. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). Under *Davis*, however, a school may be held liable in money damages under Title IX "only for its own misconduct," i.e., only when it "subjects its students to harassment." 526 U.S. at 640, 644 (internal quotation marks and alterations omitted). Under this standard, a plaintiff bringing a Title IX claim arising from student-on-student sexual harassment must establish the following elements:

First, the school must have "exercise[d] substantial control over both the harasser and the context in which the . . . harassment occur[ed]." *Id.* at 645.

Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Third, the school must have had "actual knowledge of the harassment," meaning that a school official "who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf ha[d] actual knowledge of [the] discrimination." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (internal

United States District Court
Northern District of California

quotation marks omitted); *see also Davis*, 526 U.S. at 650.

Fourth, the school must have acted with "deliberate indifference" to the harassment, meaning that the school's "response to the harassment [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648. This is an "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (internal quotation marks omitted), that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless," *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Rather, a plaintiff must plead facts that support a plausible inference that the school made what amounts to "an official decision not to remedy the violation." *Id.* (internal quotation marks and alterations omitted); *accord Doe v. Willits Unified Sch. Dist.*, 473 F. Appx. 775, 776 (9th Cir. 2012). Deliberate indifference is a fact intensive inquiry that often must be resolved by the trier of fact. *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860-MEJ, 2011 WL 2976805, at *5 (N.D. Cal. July 22, 2011). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Fifth, the school's deliberate indifference must have "subject[ed] [the plaintiff] to harassment," i.e., "cause[d] [the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it." *Id.* at 645 (internal quotation marks omitted).

In the Prior Order, I held that plaintiffs in this case were not precluded from satisfying this requirement merely because they had not alleged that they suffered further affirmative acts of harassment by their assailants after reporting their assaults to the University, so long as they adequately alleged in some other way that the University's deliberate indifference had subjected them to harassment "'that is so severe, pervasive, and objectively offensive that it can be said to deprive [them] of access to the educational opportunities or benefits provided by the school.'" Prior Order at 24 (quoting *Davis*, 526 U.S. at 650); *see also id.* at 15-20, 22-24, 27-28.

The University argues for dismissal of plaintiffs' Title IX claims "because they have again failed to adequately plead either that UC responded to their reports with deliberate indifference or that UC's conduct caused them to undergo harassment or made them vulnerable to it." Mot. at 12.

This is plaintiffs' fifth time (third before me) attempting to state a claim under Title IX. In the FAC, the plaintiffs include very few new allegations, and instead focus on the manner in which the University's response to each of their complaints violated its own policy. *See* FAC ¶¶ 100–105; 187–191. They allege that the University generally failed to adequately respond to complaints of sexual harassment and/or assault, and specifically pertaining to Karasek and Commins, as evidenced by deviations from the standard of care articulated in the DOE's DCL and violations of their own policy. *Id*. ¶¶ 193–195. Plaintiffs include a new allegation that "Defendant University intentionally uses the informal process to avoid the reporting requirements of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act")… ." *Id*. ¶ 28.

## I.   PRE-ASSAULT OR "GENERAL POLICY OF INDIFFERENCE" THEORY

Plaintiffs request that I reconsider whether the University "is liable under Title IX for its general policy of indifference to sexual misconduct on campus." Opp'n at 1 (Dkt. No. 90). Their FAC includes several general allegations pertaining to "[t]he [u]niversity's [h]istory of and [d]eliberate [i]ndifference to [s]exual [m]isconduct [c]omplaints." FAC at ¶10; *id*. ¶¶ 19–28;[9] *id*. ¶

---

[9] The plaintiffs allege:

> (1) that an audit of the University's handling of sexual misconduct from 2009 to 2013 revealed several ways in which the University violated Title IX (FAC ¶ 18), (2) Thirty-one women filed an administrative Title IX complaint with the Department of Education ("DOE") claiming that the University acted unreasonably in response to their reports of sexual violence dating back to 1979 (FAC ¶ 24), (3) that despite Oldham's public representations that informal resolution processes are never appropriate in response to reports of sexual violence, only 2 out of 500 cases of sexual misconduct were resolved using a formal process in 2012 (FAC ¶¶ 26-27), (4) that the University deliberately chooses to engage in early resolution processes in order to avoid its obligation to publicly report incidents of sexual misconduct pursuant to the Clery Act (FAC ¶ 28), (5) the University ignored reports for years that Geoff Marcy, a tenured astronomy professor, serially sexually harassed female students, and (6) University officials ignored, and even retaliated against a female employee who reported that she was sexually harassed by Mr. Sujit Choudhry, the then Dean of the University's law school.

Opp'n at 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

30.[10]  I previously rejected plaintiffs' "pre-assault" conduct theory of liability because they "cite[d] no authority indicating that this level of awareness or deficiency of response with respect to the general problem of sexual violence is enough to establish either actual knowledge or deliberate indifference for the purposes of a Title IX claim."  Prior Order at 14–15.  They once again cite no cases supporting this theory.  Because no cases directly support their position, plaintiffs ask the court to consider "other civil rights contexts such as Sec. 1983 cases … as analogous to the Title IX claims herein."  Opp'n at 2.  In effect, plaintiffs entreat the Court to overlook precedent establishing the strict requirement of deliberate indifference to create the space for "a reasonable jury [to] conclude that Berkeley maintained a policy of indifference to sexual misconduct on campus that intentionally violated Title IX… ."  Opp'n 2.  I lack authority to do so. I cannot analogize these circumstances to the context of section 1983 law, thereby extending the protections of Title IX, when there is binding precedent to the contrary.  The "deliberate indifference" standard is difficult to meet, but it is the law under Title IX, and plaintiffs must meet it to proceed past the motion to dismiss stage.

## II.  THE DCL, UNIVERSITY POLICIES & THE DELIBERATE INDIFFERENCE STANDARD

In the TAC Order, I emphasized the Prior Order's holding that "the DCL does not define what amounts to deliberate indifference for the purposes of this case."  TAC Order at 18 (quoting Prior Order at 2).  I made it clear that I would focus on *Davis* and its progeny "[i]n determining whether plaintiffs have adequately alleged deliberate indifference… ."  *Id.* (quoting Prior Order at 22).  Nonetheless, plaintiffs—for the third time—rely heavily on the DCL and urge the Court to

---

[10] Karasek also cites a 2008 incident in which the then Club president sexually assaulted another member of the Club.  FAC ¶ 30.  But when that individual reported it, "[s]he was provided no services, no Title IX investigation was started nor completed, and the assailant remained in his position… ."  *Id.*  On that basis, she alleges "that multiple other female members of the Club were victims of sexual assault and that the Club has a history of sexual assault problems known to the University."  *Id.*  She includes these allegations in an attempt to bolster her argument that the University "acted with deliberate indifference in its response to a known issue of sexual misconduct within the Club."  Opp'n at 16 n.7 (citing *Simpson v. U. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007) (holding that an educational institution acts with deliberate indifference when it fails to adequately respond to a known problem of sexual violence within a specific program).  Plaintiffs unsupported allegations do not rise to the level of the evidence in *Simpson*, and so *Simpson* does not help her case.

United States District Court
Northern District of California

1   reconsider its position.  Opp'n at 11 n.5.  But this time they also cite four of the University's own

2   policies (the 2013 Interim Sexual Misconduct Policy,[11] the Code of Student Conduct, Rape and

3   Sexual Assault, the Sexual Harassment Policy, and the Sexual Assault Policy).  FAC ¶¶ 6–18.

4   They first allege that the policies are contradictory and confusing.  *Id*. ¶ 6.  They then contend that

5   the University's response contravened the DOE DCL and several of its own policies, and therefore

6   amounted to deliberate indifference.  *Id*. ¶¶ 100 – 105; 187–191; 193–195; *see also* Opp'n at 13.

7        Under *Davis*, liability for student-on-student harassment lies "only where the recipient's

8   response to the harassment or lack thereof is clearly unreasonable in light of the known

9   circumstances."  *Davis*, 526 U.S. at 648.  Knowing that I am bound by *Davis*, plaintiffs creatively

10  argue that the DCL—and the Universities own policies adopting the DCL—comprise part of the

11  "known circumstances" that explicitly outline a "reasonable" response to a report of sexual

12  harassment.  Opp'n at 13.  They contend that "[a] reasonable inference can be drawn from this fact

13  [that the Interim Sexual Misconduct Policy specifically incorporated provisions of the DCL] that

14  by doing so, Berkeley was sufficiently convinced that the DCL represented the reasonable

15  response to a report of sexual misconduct."  *Id*.  Thus, any response that did not align with the

16  University's established guidelines was "clearly unreasonable in light of the known

17  circumstances," and, therefore, amounts to deliberate indifference.  *Id*. at 13–14.

18       The University takes issue with plaintiffs' characterization of the policies as contradictory,

19  notes that the Code of Student Conduct allowed for the informal resolution of complaints, and

20  cites *Oden* and persuasive authority from other circuits to argue that a school's "failure to comply

21  with [its] regulations ... does not establish the requisite ... deliberate indifference."  *Sanches v.*

22  *Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011) (quoting *Gebser*,

23  524 U.S. at 291–92); *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d

24  1114, 1122 (10th Cir. 2008) (finding that the school's violation of its own policy "sound[ed] in

25

26  ─────────────────

27  [11] The University implemented the Interim Sexual Misconduct Policy in September 2013, after
    UC had concluded its investigation of Karasek's and Commins's complaints.  *See* FAC ¶¶ 7, 69,
    74, 136, 163.  But, plaintiffs contend that the University "began employing practices detailed in
28  the Interim Misconduct Policy soon after receiving new federal guidance on the subject in 2011…
    ."  FAC ¶ 7.

negligence, not deliberate indifference.").

Plaintiffs have rectified a prior deficiency by identifying the University's own policy warning against engaging in informal resolution without first consulting with the victim. *See* Goldblatt Decl. Ex. A (Interim Sexual Misconduct Policy); *see also* TAC Order at 22 ("Further, even assuming that a school's violation of its own sexual harassment policy is relevant to the deliberate indifference analysis, Karasek identifies no way in which the University's use of an early resolution process to address her complaint was in violation of University policy.") But, as Judge Seeborg recently noted, "a school's violation of its own policy does not alone establish deliberate indifference for purposes of Title IX." *Moore v. Regents of the Univ. of California*, No. 15-CV-05779-RS, 2016 WL 7048991, at *2 (N.D. Cal. Dec. 5, 2016).

Plaintiffs' attempt to liken the Title IX standard "to a determination of the reasonableness of a defendant's conduct in a negligence case," Opp'n at 13, is not helpful to them; "[e]ven a showing of heightened negligence is insufficient to prove deliberate indifference." *Doe v. Willits Unified Sch. Dist.*, 473 F. App'x 775, 776 (9th Cir. 2012); *see also Oden*, 440 F.3d 1085, 1089 (finding "negligent, lazy, or careless" response insufficient to establish deliberate indifference). Notably, the *Oden* court "[did] not decide that a delay never can constitute deliberate indifference," nor did it "hold that a response that is inadequate never can amount to deliberate indifference." *Oden*, 440, F.3d at 1089. With this understanding, I address plaintiff's specific allegations of deliberate indifference.

### III. RESPONSE TO KARASEK

Karasek again stresses many of the same alleged failures of the University in responding to her complaint. I previously included an in depth analysis of both causation (Prior Order at 22–24), and deliberate indifference (TAC Order at 18–24). I found Karasek's allegations regarding the use of an early resolution process, unjustifiable delay, inadequate discipline, and the University's decision to unjustly favor TH, specifically by failing to communicate with her, involve her in the decisionmaking process, or provide her with an opportunity to appeal the disciplinary decision, insufficient to establish deliberate indifference. TAC Order at 23 ("The University's use of an early resolution process to address Karasek's assault does not meaningfully contribute to her

26

1   showing of deliberate indifference because Title IX liability turns on the content of the school's

2   response, not the label affixed to it."); *id.* ("Karasek's unjustifiable delay argument is unpersuasive

3   in light of *Oden v. Northern Marianas College*… ."); *id.* ("Karasek's inadequate discipline

4   argument runs into the basic Title IX precept that 'victims of peer harassment [do not] have a Title

5   IX right to make particular remedial demands.'")(citation omitted); *id.* at 23 ("Like that failure to

6   communicate, the University's failure to involve Karasek in the disciplinary decisionmaking

7   process or to provide her with an opportunity to appeal does not support Title IX liability in light

8   of the University's overall response to the reported harassment.").  Given that many of the

9   allegations are the same, I will only briefly address any new allegations.

10          Unlike her previous complaints, Karasek now alleges that during the February 14, 2012

11  meeting between the Club president and Boyce[12] in which the president reported the sexual assault

12  by TH, the president mentioned Karasek by name.  FAC ¶ 36; *see* TAC Order 21 n.7.  She

13  contends that this meeting put the University on actual notice as of February 14, and renders the

14  University's decision to delay interviewing TH until May clearly unreasonable.  Opp'n at 15.

15  Ambrosio's email to Oldham does not name the victim or the assailant,[13] which might suggest that

16  no names were mentioned, although the absence of names does not foreclose the possibility that

17  names were reported.  But the email does state Ambrosio's recommendation "to encourage

18  survivor to seek emotional support" and "to tell survivor about how I can explain about options

19  (police, student conduct)."  Hunt Decl. Ex. A.  The contents seem to suggest that no names were

20  mentioned, but at this stage, I will accept Karasek's allegation that the University was put on

21  notice of her identity at this time.

22          Regardless, responses from both Oldham and Hunt the next day include offers to meet with

23  "the student."  *See* Hunt Decl. Ex. A (Dkt. No. 89).  Inferring that "the student" refers to the

---

[12] I name Boyce because Karasek alleges the meeting took place with Boyce, even though the University's records indicate the meeting took place with Ambrosio, and Ambrosio is the one who sent an email to Oldham the same day.

[13] Nor does it identify the Club.  *See* Hunt Decl. Ex. A.  It merely states "one of the student organizations."  *Id.*

United States District Court
Northern District of California

1   president also seems to suggest that those particular administrators were not put on notice of

2   Karasek's identity.   Karasek alleges that the University, after receiving actual notice of a

3   complaint of sexual assault, took no remedial actions to protect the members of the Club.  FAC ¶

4   43.  But later she alleges, "Oldham, Hunt and Ambrosio were also continually in contact with

5   board members of the Club." *Id.* ¶ 62.  The allegations establish that they were put on notice of *an*

6   incident, and offered their assistance in response.  *See Lopez v. Regents of Univ. of California*, 5 F.

7   Supp. 3d 1106, 1122 (N.D. Cal. 2013) ("The actual notice requirement under Title IX is satisfied

8   where an appropriate official possessed enough knowledge of the harassment that it reasonably

9   could have responded with remedial measures to address the kind of harassment upon which

10  plaintiff's legal claim is based.") (internal quotation marks omitted).  No doubt that the officials

11  could have done more, but  their response cannot be considered "clearly unreasonable."

12      Once Karasek and others came forward to formally report their assaults, DeGuzman met

13  with TH less than a month later.  FAC ¶ 47, 59.  Accepting Karasek's allegation that the

14  University was put on actual notice in February, a three-month delay prior to meeting with the

15  alleged assailant when considered in the context of the University's numerous communications

16  with the Club president is not clearly unreasonable.  *See* TAC Order at 23 (citing *Oden*, 440 F.3d

17  at 1089, where the Ninth Circuit held a nine-month delay was insufficient to amount to deliberate

18  indifference).

19      Karasek also points to the University's decision to allow TH to participate in the Cal in the

20  Capital program during the summer of 2012, despite Karasek and several others expressing their

21  concern over TH's participation.  FAC ¶¶ 48, 53, 61.  As the University points out, however, TH's

22  participation was not without restriction.  Mot. at 16 (citing Goldblatt Decl. Ex. E, F).  Moreover,

23  Karasek does not allege that she participated in the program or was made vulnerable to harassment

24  by the University's decision to allow TH to participate.  Again, if it was my decision to make,

25  based on the allegations I would have acted differently.  But, as I have said before, "I am not

26  allowed to substitute my opinion for that of the University."  TAC Order at 28.

27      To support her position, Karasek cites several out of circuit cases, some of which I have

28  distinguished before and will briefly do so again.  In *Williams v. Board of Regents of University*

28

*System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), the University of Georgia (UGA) delayed

investigating a gang rape orchestrated by a member of the basketball team with a known history of

sexual harassment. *Id.* at 1288–89.  The school's decision to wait for eleven months before taking

any corrective action was unreasonable in part because the police provided UGA with a

preliminary report within forty-eight hours and a full report within three months. *Id.* at 1296.  The

court noted that UGA could not "explain why [it] waited  almost eleven months to take corrective

action, especially considering the fact that UGA Police's report provided substantial evidence

corroborating [the victim's] version of the January 14 incident." *Id.*  As I said in the TAC Order,

"[t]he crucial difference between this case and *Williams* is that the University here did 'institute its

own procedures' and 'take … precautions[.]'" TAC Order at 27.  At most, the University waited

three months before interviewing TH, it completed its investigation within seven months and

imposed its disciplinary decision within eight months, including the summer months.  In *Doe v.

East Haven Board of Education*, 200 F. App'x 46 (2d Cir. 2006), the court found that "a

reasonable fact-finder could conclude that East Haven school authorities acted in a clearly

unreasonable fashion, where the alleged victim of a rape complained of verbal harassment based

on her sex and related to the rape for five weeks before authorities took concrete action to get the

perpetrators of the harassment to stop." *Id.* at 49.  Karasek does not allege that she was subjected

to "persistent[] … verbal abuse" following the report of her assault.  In *Vance v. Spencer County

Public School District*, 231 F.3d 253 (6th Cir. 2000), the victim was repeatedly harassed over the

course of three years, beginning when she was in sixth grade. *Id.* at 256.  On one occasion, she

had been stabbed in the hand, and on another, "two male students held [her] back while another

took off his pants and others pulled her hair and attempted to rip her clothes off." *Id.* at 262.  The

school was aware of the harassment since the first incident, but did nothing other than talk to the

offenders, and "the harassing conduct not only continued but also increased as a result." *Id.*  In

finding deliberate indifference, the court noted that "[t]here is no evidence before this Court that

[the school] ever disciplined the offending students *nor* informed law enforcement as a result of

any of these incidents." *Id.* (emphasis added).  Here, there was no on-going harassment and there

is evidence that the University disciplined TH.  Finally, *Doe v. Oyster River Co-op. School*

*District*, 992 F. Supp. 467 (D.N.H. 1997) preceded the Supreme Court's decision in *Davis*, so it is of marginal relevance.  But as in *Doe v. East Haven* and *Vance,* the two young (seventh grade) plaintiffs were sexually harassed by a male classmate continually for a sustained period (more than a year) after the school had notice and did nothing of substance to remediate the situation.  *Id*. at 480.

Assuming the truth of Karasek's allegations, as I stated in the TAC Order, "the University began investigating her assault within one month of when *she* reported it, found that TH had violated the Student Code of Conduct, and imposed disciplinary measures against TH, placing him on disciplinary probation for the remainder of his studies at the University and requiring him to consult with a mental health practitioner and a drug and alcohol counselor."  TAC Order at 20 (emphasis added).  She has not "allege[d] that she requested any accommodations from the University that were not granted, or that she sought additional information from the University that was not given."  *Id*.  I agree with plaintiffs that, at some point, a decision to act contrary to established policy incorporating administrative guidelines on Title IX compliance seems clearly unreasonable.  But in the absence of precedent establishing this principle, and in light of the response the University elected to take, I still do not see how the University's response could be found "an official decision ... not to remedy the violation."  *Oden*, 440 F.3d at 1089 (quoting *Gebser,* 524 U.S. at 290).

## IV.  RESPONSE TO COMMINS

Commins alleges the same facts as the SAC and TAC, but in the context of a purported policy of indifference.  Further, she clarifies her allegation that her initial report was to the University police, not the Berkeley police department, so the University was put on actual notice on January 20, 2012.  FAC ¶ 132.  Still, the University placed John Doe 2 on interim suspension on January 31, 2012.  This is not the length of delay or unreasonable action that amounts to deliberate indifference.  As previously stated, the University "institute[d] its own procedures and [took] precautions to prevent future attacks."  *See* TAC Order at 27 (internal quotation marks omitted).

In the Prior Order, I found that Commins's accusations that the University failed to provide

United States District Court
Northern District of California

her with updates, allow her an opportunity to present evidence, or inform her of her right to appeal, were insufficient to establish liability.  *See* Prior Order 25.  To hold otherwise, I reasoned, "would amount to either imposing Title IX liability for conduct that was merely 'negligent, lazy, or careless,' *Oden*, 440 F.3d at 1089, or 'second-guessing the disciplinary decisions made by school administrators,' *Davis*, 526 U.S. at 648."  *Id.*  Accepting Commins's allegations as true, the University's actions clearly violated its established policies.  But, as discussed above, this alone is not enough to render its actions deliberately indifferent.

## CONCLUSION

I granted limited discovery to Karasek and Commins so that they could learn what the University had done in their cases and to see if the University's conduct was deliberately indifferent.  The FAC is their second attempt after receiving that discovery, and it falls short of stating a plausible Title IX claim.  Accordingly, the University's motion to dismiss is GRANTED, and Karasek and Commins's Title IX claims are DISMISSED WITHOUT LEAVE TO AMEND. The University shall file its answer in response to Butler's allegations within twenty days.

**IT IS SO ORDERED**.

Dated: December 22, 2016



WILLIAM H. ORRICK
United States District Judge