UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SOFIE KARASEK, et al.,

             Plaintiffs,

     v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE,

          Defendant.

Case No. 3:15-cv-03717-WHO

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 114

**INTRODUCTION**

Defendant The Regents of the University of California ("UC") moves for summary judgment on plaintiff Aryle Butler's Title IX complaint over its response to her report that she had been sexually assaulted in the summer of 2012 in Alaska while she was still a student at UC. A recipient of federal funds, such as the UC, can only be liable in damages under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. 1681 *et seq.* for its own misconduct. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). UC did not have control over the assailant or program in Alaska, and no reasonable jury would determine that UC is liable under the "exacting standard" of "deliberate indifference" that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless." *See Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). For the reasons described below, UC's motion for summary judgment is GRANTED.

**BACKGROUND**[1]

## I.   FACTUAL BACKGROUND

### A.   Butler's Experience in Alaska

Butler, an undergraduate student at UC Berkeley from 2012 to 2015, was employed as a research assistant to UC Berkeley graduate student Margot Higgins during the summer of 2012. Butler Dep. at 18:5–10, 34:5–21 (Everitt Decl. ¶ 2, Ex. 1). The research, funded by the George Melendez Wright fellowship, took place in a remote part of Alaska. *Id*. at 38, 41. Higgins paid Butler directly, neither of them received money from UC, and Butler did not receive academic credit for her work that summer.[2] Butler Dep. at 38, 41, 47:2–4; Higgins Dep. at 42:1–8 (Everitt Decl. ¶ 5, Ex. 4); Doyle Dep. at 38:10–40:10, 85:5-87:25 ("30b6 Dep.")(Everitt Decl. ¶ 4, Ex. 3).

While in Alaska, Butler lived at the Wrangell Mountains Center ("WMC"), which is "a small nonprofit entity located in the remote Wrangell Mountains" that "offers local programs focusing on the understanding, appreciation, and stewardship of wildlands and mountain culture in Alaska through research and the arts, none of which have any relationship to the University of California." WMC Response (Everitt Decl. ¶ 7, Ex. 6, Dkt. No. 120-1 at 332). WMC explained that "there has never been a formal relationship i[n] between the University of California and [it]." *Id*. WMC also housed programming for the Alaska Wildlands Studies Program, where Butler's assailant, identified as "John Doe" in the complaint, was a part-time instructor. Doe Dep. at 38:2–13 (Everitt Decl. ¶ 3, Ex. 2, Dkt. No. 120-1 at 213); Butler Dep. at 47:5–14. Butler was not

---

[1] Butler requests judicial notice of the following documents: (1) United States Department of Education's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, January 2001 ("DOE 2001 Guidance")(RJN, Ex. A); (2) United States Department of Education's Dear Colleague Letter of April 4, 2011 ("DCL")(RJN, Ex. B); (3) California State Auditor Report 2013-124: Sexual Harassment and Sexual Violence (RJN, Ex. C); (4) University of California, Berkeley's Interim Sexual Misconduct Policy (RJN, Ex. D); and several newspaper articles concerning complaints of sexual violence at UC Berkeley (RJN, Exs. E–K). Dkt. No. 119. UC opposes Butler's request. Dkt. No. 120-3. I will take judicial notice of the policies because they are not subject to reasonable dispute, Fed. R. Evid. 201, and they provide some context to Butler's claims, *see* Fed. R. Evid. 401, 402. Butler's request to take judicial notice of exhibits A – F is GRANTED. But the various newspaper articles are not the proper subject of judicial notice, and are not relevant to her claims. The request to notice exhibits E through K is DENIED.

[2] But the employment agreement was placed on UC Berkeley letterhead, in violation of UC policy. *See* Contract (Ex. 7); Doyle Dep. at 32–37 ("30b6 Dep.").

enrolled in the program.  Butler Dep. at 47:20–22.  She lived in WMC's main building, along with faculty and staff, including Doe.  Butler Dep. at 47:20–22; Doe Dep. at 23:21–23.  Students typically lived at a campground near WMC.  Butler Dep. at 47:16–22; Doe Dep. at 23:13–14.

According to Higgins, Doe "had a reputation for giving hugs prior to the summer of 2012." Higgins Dep. at 46:4–5.  In retrospect, Higgins reflected that "[m]aybe [the hugs] were longer than what felt comfortable."  *Id*. at 46:19–20; *see also id*. at 49:2–14.

One night in June or July 2012, Butler was tidying up in the common area of WMC when Doe came up behind her, trapped her against a table, put his hands down her pants, into her underwear, and grabbed her buttocks and genitals.  Butler Dep. at 174:6–175:5.  He attempted to penetrate her with his fingers, but he did not.  *Id*. at 175:5–6.  He stopped, and left without saying anything.  *Id*. at 175:6–7.

A few days later, he approached her from behind, ran his fingers through her hair, and rubbed and patted her shoulders.  Butler Dep. at 176:6–11.  As he turned to leave, he said "It's so nice to have such a beautiful woman around."  *Id*. at 176:12–13.  A few days after that, he approached her from behind as she was singing while preparing dinner in the kitchen.  *Id*. at 177:3–13.  He trapped her against the kitchen island, put his hands under her shirt, and started touching her bare breasts.  *Id*. at 177:13–16.  He stopped, and as he was walking away, he said, "You have such a beautiful voice."  *Id*. at 177:18–20.

According to Butler, she called Higgins after each of these incidents.  Butler Dep. at 178:25.  After the first time, she called her "[m]aybe a day" later.  *Id*. at 179:13–15.  She told Higgins that "someone had done something inappropriate, had touched [her] inappropriately, but that [she] handled it or [] dealt with it."  *Id*. at 179:17–20.  Higgins asked if it was Doe, Butler confirmed that it was, and Higgins indicated that she would not say anything as long as Butler felt like she had dealt with it.  Butler Dep. at 179:21–25. Butler did not share the specific details of the first incident.  *Id*. at 181:2–6; Higgins Dep. at 67:18–20; *id*. at 68:22–25.

After the second time, Butler told Higgins "exactly what he did[,]" and "that it really bothered [her] and it made [her] uncomfortable and that [she] didn't like it."  Butler Dep. at 180:6–12.  Higgins responded that they would do "whatever [Butler] want[ed] to do."  *Id*. at

3

180:13–15.

Directly after the third incident, Butler called Higgins "crying," "hyperventilating," and "very, very, very upset." Butler Dep. at 181:22–24. Butler told Higgins what had happened. *Id.* at 181:24–182:1. Higgins tried to calm her down, and told Butler that she could stay at Higgins's cabin until Higgins returned and Doe left. *Id.* at 182:1–8.

Higgins has a different recollection. She understood that Doe had hugged Butler more than once, but Higgins did not consider it to be inappropriate sexual misconduct at the time. Higgins Dep. at 53:3–5; *id.* at 55:12–24 (reiterating that Butler reported Doe had hugged her, but no further details of the first incident); *id.* at 58:15–24 (recalling that Butler used the word "hug," but not recalling the particular phrase "inappropriately touched"). Higgins testified that she notified WMC's executive director as soon as possible after the first call. Higgins Dep. at 60:10–61:19. And she offered that Butler could stay in Higgins's cabin, but Butler declined. *Id.* at 62:5–18. After the last incident, though, Butler accepted the offer.

After the final incident, Butler saw Doe around, but never had another personal encounter with him. *Id.* at 177:21–178:4. She has not seen him since she left Alaska. Response to Interrogatory No. 14 (Ex. 27).

### B.     Doe's Connection to Berkeley Campus

Doe visits UC Berkeley campus "perhaps once or twice a year[,]" for entertainment or enrichment events, and "every now and again" as a guest lecturer or speaker, some of which "are not CAL programs per se[.]" Doe Dep. at 15:8–15, 16:6–9. He estimated visiting campus to speak "every year or two at least for the past 10 or 15 years" in "either landscape architectures or the college of environmental design." Doe Dep. at 15:21–22, 17:18–19. Since the summer of 2012, he estimated that he has been on campus approximately five or six times. Doe Dep. at 22:13–20.

### C.     Butler's Report and UC's Response

#### 1.     Gender Equity Resource Center

On November 5, 2012, Butler went to UC's Gender Equity Resource Center to discuss the police response to the sexual assault of her roommate. Butler Dep. at 59–65. Butler spoke to

4

Marisa Boyce and CiCi Ambrosio, the director of Women's Studies at the Gender Equity Resource Center. *Id*. at 61–67. Ambrosio provided some information about Social Services, but Butler does not recall discussing her own assault. *Id*. at 68–70. Five days later, Butler emailed Boyce to express concerns about her academic performance and inquire about converting a class to pass/no pass. *Id*. at 76:5–19. Boyce provided Butler with a link and explanation about the process for converting a class to pass/no pass after the deadline. *Id*. at 78:11–15.

On November 20, 2012, Butler first shared the story of her assault with UC staff, specifically Ambrosio. Butler Dep. at 74:25–75:17, 81:15–83:2. She said that she needed help dealing with her situation because she was struggling academically, not sleeping, not going to classes like normal, and not turning in assignments on time. *Id*. at 84:3–11. She indicated that these struggles were caused by a combination of her own assault and the incident with her roommate. *Id*. at 84:12–23. Butler does not recall what details she provided about her own assaults, although she is certain that she did not disclose the name of her assailant. *Id*. at 85:17–86:7. Ambrosio listened to Butler, talked to her about counseling and help with academic support, and offered to email her professors.[3] *Id*. at 83:10–21, 86:8–15. Ambrosio subsequently emailed Butler's professors and provided Butler with a copy of the email. *Id*. at 86:16 – 87:4. Butler's professors granted her accommodations, but in at least one instance, it was not the specific form of accommodation Butler had sought.[4] *Id*. at 87:10–88:13, 89:16–92:4. On November 27, 2012, Butler emailed Ambrosio to thank her for all of her help and support. Butler Dep. at 88:16–89:10.

On February 27, 2013, Butler emailed Ambrosio to discuss a meeting scheduled for the next day with Denise Oldham, UC Berkeley's Title IX Officer and Director of the Office for the Prevention of Harassment & Discrimination. Butler Dep. at 93:13–25. Butler had decided to meet with Oldham because she wanted to see if there was something that could be done to prevent another student from having a similar experience in Alaska. *Id*. at 94:12–17, 96:10–16. Ambrosio offered Butler the option of having a friend present at the meeting, but Butler declined.

---

[3] Butler began counseling with a UC counselor in November 2012.

[4] She wanted an "incomplete" in her math course, but instead the professor offered to tutor her for the final exam. Butler Dep. at 89:19–92:4. She received an "A" in the class. *Id*.

*Id.* at 100:4–101:2.

Butler met with Ambrosio at least twice more in March, and again in April. Butler Dep. at 302:4–22; *see also* Gender Equity Resource Notes dated 11/5/12 (Ex. 22). She interned with the Center during spring semester 2013, so she was in the office six to ten hours per week and interacted with Boyce and Ambrosio regularly. Butler Dep. at 319:4–17, 320:23; *see also* Gender Equity Resource Center BEAM Peer Educators Hours Log (Ex. 23).

### 2. Title IX Office

On February 28, 2013, Butler met with Oldham and Ambrosio. Butler Dep. at 101:3–7. They discussed Butler's wish to keep her report anonymous because she was concerned about retaliation, and specifically whether reporting would impact her ability to get a thesis advisor. *Id.* at 101:16–24; 11/27/13 Email String (Ex. 11); Oldham's Notes from 2/28/13 Meeting with Butler (Ex. 24). After thinking about it, she decided that she was comfortable telling Oldham the name of the program, even if that might lead to the disclosure of her identity. *Id.* at 114:6–14, 115:3–116:22; 3/7/13 Email String (Ex. 12).

On April 22, 2013, Ambrosio emailed Butler to set up another meeting with Oldham. Butler Dep. 117–118. Butler had researched federal and state laws concerning what was required when a University learned of sexual assault or harassment, and found some "discrepancies" and "misinformation" in the University's policies and how it handled her own case that she felt needed to be addressed. *Id.* at 119:1–121:12. Around the same time, she was working with other students on campus to pass a Bill of No Confidence in Berkeley's Title IX office. *Id.* at 118:16–25. Ambrosio made sure that Butler was comfortable going forward with the meeting with the Title IX office, given her work on the bill. *Id.* at 125:9–23.

On April 26, 2013, Butler brought her friend and student advocate Anais LaVoie to her meeting with Ambrosio and Oldham. Butler Dep. at 125:24–126:25. At this meeting, Butler's main goal was to protect against future harassment against students in the Wildlands Studies Program. *Id.* at 127:7–13. She also wanted to know if the program had a sexual assault policy. *Id.* at 127:11–13. Oldham explained that UC's sexual harassment policy would only cover her

situation if her assailant was a UC Berkeley employee,[5] but Butler "felt that that was not correct." *Id*. at 127:18–23. She also disagreed with Oldham's assessment that Berkeley's policies would not apply since her situation occurred off campus. *Id*. at 129:11–23. But she never directly asked her to apply Berkeley's policies to her own situation. *Id*. at 129:24–130:12.

Butler testified that "[a]t the time [she] wasn't sure that [she] wanted [Oldham] investigating her specific claim[,]" but she was "not as concerned" with remaining anonymous because she had already talked to the student paper about being a survivor. *Id*. at 127:24–128:8. She believes that she told Oldham the name of the program, the name of WMC, Higgins's name and Higgins's advisor's name (Professor Lynn Huntsinger), but she did not disclose the name of her assailant at this meeting. *Id*. at 128:14–129:3. Oldham's notes indicate that she provided Butler with options, and Butler indicated that she was most comfortable with Oldham researching the program, letting Butler know whether Berkeley's policies would apply, and following up with next steps. Oldham's Notes from 4/26/13 Meeting with Butler (Everitt Decl. ¶ 9, Ex. 25).

On May 21, 2013, Oldham called and emailed Huntsinger in search of information regarding Berkeley students' participation in the Wildland Studies Program. 5/21/13 Email String (Ex. 9, Dkt. No. 120-1 at 349). Huntsinger initially responded that she was "not aware of the Wildlands Studies Program, or anything close." *Id*. After a quick internet search, she followed up with, "[i]t seems to be a Cal state Monterey program[,]" and she included a brief description of the program that appears to be extracted from a website. *Id*.

On May 22, 2013, Oldham emailed Butler to inform her that gathering the necessary information proved difficult without compromising Butler's identity. 5/30/13 Email String (Ex. 14); *see also* Butler Dep. at 133:4–15. She informed Butler that it appeared to be a "private activity[,]" but needed more details to determine Butler's "status[.]" 5/30/13 Email String (Dkt. No. 120-1 at 366). She specifically asked Butler if she could access the contract she signed, whether she paid to attend the Program, whether they hired her directly, and if she had any

---

[5] Oldham's notes of the meeting provide a slightly different account. Oldham's Notes from 4/26/13 Meeting (Ex. 25). She indicated that if Butler's assailant was not an employee, staff, or student, there "may be a limit to what univ[ersity] can determine in terms of outcome to [the] individual." *Id*.

enrollment information. *Id.* She requested a follow-up meeting to discuss these issues with Butler. *Id.* On May 28, 2013, Oldham received an email from Leslie Arutunian with the Wildlands Studies Program who provided her with materials establishing that the program had no connection with UC Berkeley, and its own code of conduct that "strictly prohibited" "[s]exual harassment or unwelcome sexual conduct of any kind." 5/28/13 Email String (Ex. 15), Wildlands Studies LLC Scope of Work Lead Instructor (Ex. 17, Dkt. No. 120-1 at 411). At some point, Oldham connected "voice to voice" with Arutunian. 5/30/13 Email String (Ex. 14, Dkt. No. 120-1 at 366).

On May 30, 2013, Oldham notified Butler that she had received new information and asked that they set up a meeting. 5/30/13 Email String (Ex. 14, Dkt. No. 120-1 at 366); *see also* Butler Dep. at 134:4–14. The parties were finally able to schedule a meeting for August 7, 2013. Butler Dep. at 136:6–12, 137–138; *see* Oldham's Notes from 8/7/13 Meeting with Butler (Ex. 26). At this meeting, Butler contends that she revealed the name of her assailant for the first time and told Oldham that he was a guest lecturer. *Id.* at 137:4–10; *id.* at 143:18–21; *id.* at 158:4–19. But Oldham testified that she did not learn the name of Butler's assailant, his status as a guest lecturer, or the details about the assault, until after the litigation commenced.[6] Oldham Dep. at 138:5–19 (Ex. 5); *see also* Oldham Notes from 8/7/13 Meeting with Butler (no mention of learning assailant's name or status as guest lecturer)(Ex. 26).

At the meeting on August 7th, Oldham provided Butler with the documents that Arutunian had sent to her. *Id.* at 139:6–141:6. She also told Butler that Arutunian expressed concern that a Berkeley student had a negative experience in the program and wished to speak with her directly. *Id.* at 142:2–8. Oldham provided Arutunian's contact information, but Butler never contacted her. *Id.* at 142:6–13. She testified that she did not contact Arutunian "[b]ecause [she] knew that there would be more weight if the university did the contacting than if a single individual did." *Id.* at 142:15–17. But Butler never "specifically" told Oldham to follow up with Arutunian; Butler

---

[6] Butler testified that, on a scale from 0 to 100, she was "100" percent sure that she disclosed the name of her assailant. Butler Dep. at 162:16–20.

"told her [Oldham] that [Butler] wanted her to contact them under the auspices of her position as a Title IX coordinator at UC Berkeley." *Id*. at 142:18–23. After the August meeting, Butler had no more questions for Oldham or Ambrosio. *Id*. at 149:2–5.

### D. After Actions

According to Butler, she initially wanted to participate in the Wildland Studies Program again, "[b]ut after everything that happened," she decided not to go back because "the university wasn't going to do anything to make sure [Doe] wasn't there[.]" Butler Dep. at 159:5–24. But she never told anyone in the Administration that she wanted to participate in the program again. *Id*. at 160:3–22. She testified that she dropped a class in April or May 2013 because she felt stress stemming from her sense that the University's response had betrayed her. *Id*. at 165–168. She had to retake it the following semester. *Id*.

Butler never requested that UC issue a stay away order against Doe. Butler Dep. at 163:19–21. During her last semester, she attended one class only three or four times because she felt that she had to avoid the area of campus where the class was held because of the risk that she might run into her assailant. *Id*. at 228:2–12. But she had no "personal knowledge that he was actually giving lectures or ever physically present in that area." *Id*. at 254:1–4. She went to graduate-led sessions that met in a different area, did all of the course reading, and received an "A-" in the class. *Id*. at 252:18–20, 255:21–256:12. She never told anyone in the Administration that she was avoiding parts of campus or skipping class. *Id*. at 254–256.

She testified about other times that she received accommodations from professors related to her work with survivors of sexual assault and violence. Butler Dep. at 171:6–23; *id*. at 172:8–19. She testified that she was able to take all of the classes she was interested in taking at UC Berkeley. *Id*. at 22:14–23:13. She graduated on time, and at the top of her class. *Id*. at 23:17–24:4. She felt like she received a "good education" and enjoyed her time there. *Id*. at 25: 3–7.

## II. PROCEDURAL HISTORY

Plaintiffs Sofie Karasek, Nicoletta Commins, and Aryle Butler initiated this action in the Superior Court of California for the County of Alameda on July 2, 2015. Dkt. No. 1-1. They filed a first amended complaint just over two weeks later. UC removed the case on August 14, 2015,

and plaintiffs filed their second amended complaint ("SAC") on September 10, 2015. Dkt. Nos. 1, 14. The SAC brought four causes of action against UC: (1) gender discrimination in violation of Title IX, 20 U.S.C. § 1681, SAC ¶¶ 77–79; (2) negligent failure to warn, train, and/or educate plaintiffs, SAC ¶¶ 80–82; (3) gender discrimination in violation of California Education Code section 220, SAC ¶¶ 83–85; and (4) fraud, SAC ¶¶ 86–92.

UC moved to dismiss the SAC two weeks later. Dkt. No. 6. On December 11, 2015, I denied the motion with respect to Butler's Title IX claim, but granted the motion with respect to Karasek's and Commins's Title IX claims, and with respect to plaintiffs' state law causes of action. Order on Mot. to Dismiss Second Am. Compl. at 22–36 ("SAC Order")(Dkt. No. 38). I gave plaintiffs leave to amend, and allowed them to pursue discovery so that they could learn more about how UC had handled their complaints to evaluate whether their Title IX claims were plausible. *Id.* at 36; 12/15/15 CMC Minute Entry (Dkt. No. 40).

On April 13, 2016, plaintiffs filed their third amended complaint ("TAC"), asserting a single cause of action under Title IX. TAC ¶¶ 130–32 (Dkt. No. 55). UC moved to dismiss the TAC on May 9, 2016 (Dkt. No. 57), which I granted on July 28, 2016. Order on Mot. to Dismiss Third Am. Compl. ("TAC Order")(Dkt. No. 77). On September 1, 2016, plaintiffs filed their fourth amended complaint ("FAC"), again asserting a single cause of action under Title IX. FAC (Dkt. No. 83). For the final time, I granted UC's motion to dismiss Karasek's and Commins's claims because they had not adequately alleged deliberate indifference. Order on Mot. to Dismiss Fourth Am. Complaint ("FAC Order")(Dkt. No. 96). I noted that "the University could have treated [plaintiffs] better." FAC Order at 2. "But the deliberate indifference standard under *Davis* [*v. Monroe County Board of Education*, 526 U.S. 629 (1999)] protects school administrations that do investigate and remedy complaints, and judges are not permitted to substitute their views for those of not clearly unreasonable administrators." *Id.* Only Butler's title IX claim proceeded past the motion to dismiss stage.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I.    TITLE IX LAW

Title IX states in relevant part that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The statute provides victims of sex discrimination with a private right of action against recipients of federal education funding. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). Under *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), however, a school may be held liable in money damages under Title IX "only for its own misconduct," i.e., only when it "subjects its students to harassment." *Id.* at 644-45 (internal quotation marks and alterations omitted). Under this standard, a plaintiff bringing a Title IX claim arising from student-on-student or faculty-on-student[7] sexual harassment must establish the following elements:

---

[7] *See Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) (applying the *Davis* "deliberate indifference" framework to a Title IX claim based on faculty-to-student

11

First, the school must have "exercise[d] substantial control over both the harasser and the context in which the . . . harassment occur[ed]." *Id.* at 645.

Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Third, the school must have had "actual knowledge of the harassment," meaning that a school official "who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf ha[d] actual knowledge of [the] discrimination." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (internal quotation marks omitted); *see also Davis*, 526 U.S. at 650.

Fourth, the school must have acted with "deliberate indifference" to the harassment, meaning that the school's "response to the harassment [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648. This is an "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (internal quotation marks omitted), that requires a showing of a response that was more deficient than merely "negligent, lazy, or careless," *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Rather, a plaintiff must plead facts that support a reasonable inference that the school made what amounts to "an official decision . . . not to remedy" the discrimination. *Id.* (internal quotation marks omitted). Deliberate indifference is a fact intensive inquiry that often must be resolved by the trier of fact. *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860-MEJ, 2011 WL 2976805, at *5 (N.D. Cal. July 22, 2011). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Fifth, the school's deliberate indifference must have "subject[ed] [the plaintiff] to harassment," i.e., "cause[d] [the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it." *Id.* at 645 (internal quotation marks omitted).

sexual harassment); *Takla v. Regents of the Univ. of California*, No. 15-cv-04418, 2015 WL 6755190, at *3 (C.D. Cal. Nov. 2, 2015) (same).

## II.    BUTLER CANNOT ESTABLISH HER TITLE IX CLAIM[8]

I previously denied UC's motion to dismiss Butler's Title IX claim because her allegations plausibly pleaded UC's "actual knowledge of the harassment" and substantial control, at least over the alleged harassment Butler was "likely" to experience given the "pervasive possibility that [she] would encounter her assailant on campus." SAC Order at 25–28 (quoting plaintiffs' opposition to UC's motion to dismiss).[9] The parties dispute when UC learned the identity of Butler's assailant, which is relevant to establishing UC's actual knowledge of the harassment. But regardless of when UC learned the identity of Butler's assailant, Butler cannot prove that UC "act[ed] with deliberate indifference to known acts of harassment in its programs or activities." *Davis*, 526 U.S. at 633. With respect to Butler's complaint, UC arguably *never* learned of harassment *in its programs or activities*. She aims to hold UC liable for its lack of action with respect to a third party. But "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Id*. at 640.

The Supreme Court has not expressly extended a recipient's liability to cover a student's harassment by an independent third-party. *See Davis*, 526 U.S. at 645 ("These factors [inherent in the language of the statute] combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs."). Butler has not identified any lower court cases assigning liability under similar circumstances. Although this ultimately dooms her claim, I will walk through each element to show the absence of disputed facts that would entitle her to relief.

---

[8] UC contends that Butler's Title IX claim is time barred under California's two-year statute of limitations for personal injury actions. Cal. Code Civ. P. § 335.1 (setting two year limitations period for personal injury actions); *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1135–36 (9th Cir. 2006)(applying personal injury statute of limitations to Title IX claim). A plaintiff must identify an "act" of sexual harassment within the limitations period. *Stanley*, 433 F.3d at 1137. UC likens this case to *Stanley*, where the court found that Stanley "ha[d] not alleged that the University caused her to undergo, or be vulnerable to, any harassment during the limitations period, a time when she was not present at the University." *Id*. But the same cannot be said here, where Butler was at least *vulnerable* to continued harassment while she was still present at UC.

[9] Also in the SAC Order, I specifically noted that UC's arguments did not directly target Butler's showing of deliberate indifference. SAC Order at 25 n.12.

## A. There is a Genuine Issue as to Whether UC Had Actual Knowledge of Discrimination in its Programs

"[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Butler testified that she reported her assaults to Higgins soon after each incident. She then told Ambrosio in November 2012, and Oldham in February 2013.

UC argues that none of these reports satisfy the actual knowledge requirement because (1) Butler never notified Oldham of any discrimination *in UC's programs*, (2) her disclosure to Oldham was "too vague and inconclusive to put [UC] on notice of a substantial risk of ongoing harm[,]" and (3) Higgins did not have the authority to institute corrective measures on UC's behalf.[10] Mot. for Summ. J. at 22–23 ("MSJ")(Dkt. No. 114). Butler does not contest the latter point, but she contends that there is a question of fact regarding when UC had actual knowledge of Doe's identity, which impacts UC's first two arguments. She testified that she told Oldham at the August meeting, whereas Oldham testified that she did not learn his identity until after this action commenced. The question I must answer is whether this specific fact creates a "genuine issue" over whether UC had actual knowledge of harassment in its programs. *See Celotex*, 477 U.S. at 323.

"[T]he scope of liability in private damages actions under Title IX is circumscribed by *Pennhurst*'s requirement that funding recipients have notice of their potential liability." *Davis*, 526 U.S. at 642 (citing *Gebser*, 524 U.S. at 287–88). According to Butler, she initially told Oldham that her assailant gave guest lectures, and "was a part of campus in some way or another[.]" Butler Dep. at 108:4–8. But she also testified that she "wasn't sure that [she] wanted [ Oldham] to investigate [her] specific claim." *Id.* at 128:4–8. At the August meeting when she says she disclosed her assailant's identity, she also "repeat[ed], as [she] did in the first meeting,

---

[10] UC focuses on the reports to Oldham and Higgins because, in its analysis, actual knowledge entails the name of Butler's assailant, and Ambrosio never learned his identity.

United States District Court
Northern District of California

that he did guest lectures and was around campus[.]"[11] *Id.* at 143:13–15. But she also "didn't ask [Oldham] to do anything specifically[.]" *Id*. at 143:16–17.

Butler insists that UC must have been on notice because she "(1) explicitly identified John Doe, (2) experienced multiple sexual assaults by John Doe, and (3) she feared retaliation and backlash." Opp'n to MSJ at 22 ("Opp'n")(Dkt. No. 118). And, "even if Berkeley could not infer that John Doe was an ongoing threat, which is a disingenuous argument at best, it still had actual knowledge of Aryle's report that she was sexually assaulted multiple times by John Doe, that he frequented campus, and that she feared backlash and retaliation." *Id*. These characterizations appear to unjustifiably link Butler's fear of retaliation and backlash to Doe's potential presence on campus. Butler testified that she "c[ouldn't] be sure" whether she told Oldham that she feared coming into contact with Doe. Butler Dep. at 147:13–18. Rather, Butler testified that she feared *academic* backlash from reporting her sexual assaults without maintaining anonymity. *See, e.g.*, Butler Dep. at 190:17–24 ("I was so afraid of somebody knowing that it had been me and not getting a thesis advisor and not being able to major in what I wanted to major in."). But ignoring the unwarranted connection between Butler's report and her fear, it is still reasonable to infer that UC had actual knowledge that Butler's assailant may have had a presence on its campus. A genuine issue exists, therefore, about whether UC knew of its potential liability with respect to Butler's report.[12]

**B.    UC Was Not Deliberately Indifferent**

Butler tries to underscore the fact-intensive nature of the inquiry into whether UC acted with deliberate indifference. Opp'n at 11–12. But this approach cannot save her claim because her arguments purporting to establish disputed facts demonstrating UC's deliberate indifference all fall short. *See Davis*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a

_____

[11] Although she admitted that she did not know of any particular lectures that he gave, but only "knew generally that he would give guest lectures." Butler Dep. at 146:20–147:2.

[12] I acknowledge that this is a bit of a stretch considering the undisputed vagueness of Butler's report. Since the Supreme Court has not explicitly articulated the "contours" defining "what kind of notice is sufficient[,]" *see Tesoriero v. Syosset Central School District*, 382 F. Supp. 2d 387, 397 (E.D.N.Y. 2005), it is more prudent to infer a genuine issue as to "actual knowledge" and assess the reasonableness of UC's response in light of the knowledge that it possessed.

motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law.").

Butler first insists that UC failed to investigate her report of sexual assault. This misrepresents the record. Oldham took steps to investigate Butler's report: she contacted a representative with the Alaska Wildlands Studies Program, Higgins, and Higgins's advisor, all while maintaining Butler's desire for confidentiality. Butler correctly contends that "once Defendant had actual knowledge of [Butler's] sexual assault, it was obligated to respond in a manner that was not clearly unreasonable, regardless of whether [Butler] asked it to or not." Opp'n at 1. But she fails to identify any actions that were clearly unreasonable. Contrary to her representation, UC does not insist that "Title IX only applies when a plaintiff affirmatively requests that an educational institution investigate sexual misconduct." Opp'n at 13. It took investigatory steps and reasonably determined that its policies did not cover Butler's time in Alaska because she was not working as a UC employee, she was not getting academic credit, and she was not affiliated with a UC program. Under these circumstances, UC's response to the initial report was not "clearly unreasonable." *See Davis*, 526 U.S. at 648.

As for circumstances following Butler's return to campus, she relies on *Kelly v. Yale University*, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) to argue that UC's failure to implement any interim protective measures to ensure that she did not subsequently encounter John Doe on campus supports her claim for deliberate indifference. Opp'n at 13. But this is a much different case than *Kelly*. After Kelly was sexually assaulted by a fellow student who lived in the same dormitory, she filed a formal written complaint and specifically requested that the committee take immediate remedial action against her assailant. 2003 WL 1563424, at *1. She also made repeated requests for academic accommodations, which she insisted went unanswered. *Id.* at *2. The court concluded that, "a reasonable jury could find that Yale's response, or lack thereof, rendered Kelly 'liable or vulnerable' to [her assailant's] harassment [citation] and that Yale's failure to provide Kelly with accommodations, either academic or residential, immediately following [her assailant's] assault of her, was clearly unreasonable given all the circumstances of which it was aware." *Id.* at *4.

United States District Court
Northern District of California

1    Here, Butler was not sexually assaulted by a fellow classmate who lived in the same

2    dormitory, she did not file a formal complaint, and she did not request immediate remedial action

3    against her assailant.  Rather, her assailant was a third-party working in Alaska with no official

4    relationship to UC.  UC's liability for his actions, therefore, is significantly limited.  *See infra*

5    section C (control).  Next, assuming Butler gave the identity of Butler's assailant to Oldham at the

6    August 7, 2013 meeting, Butler admitted that she never asked for a stay away order.  It was not

7    unreasonable for UC to fail to take preventative measures against Doe solely based on Butler's

8    report of what happened in Alaska.  Butler argues that UC could have required Doe to notify the

9    Title IX office any time he came to campus so that the Title IX office could advise Butler of his

10   presence.  But she never informed UC that she avoided certain parts of campus out of fear that she

11   would encounter Doe.  Given the lack of information, it is a stretch to label UC's response "clearly

12   unreasonable."

13       Further, in all but one circumstance, UC granted Butler the specific academic

14   accommodations she requested.  In that one circumstance, she received a different

15   accommodation, which resulted in her getting an "A" in a class when she had requested an

16   "incomplete." Under these circumstances, she cannot legitimately contend that UC's decision not

17   to take additional actions was clearly unreasonable given all the circumstances.  *Cf. Kelly*, 2003

18   WL 1563424, at *4.

19       Butler next urges that UC's failure to comply with its own policies and federal

20   requirements contributes to a finding of deliberate indifference.  Opp'n at 14 (citing *Takla v.*

21   *Regents of the U. of California,* 2015 WL 6755190 (C.D. Cal. Nov. 2, 2015)).  She insists that UC

22   "failed to comply with its own policies, and [Department of Education] guidance documents, by

23   failing to: (1) respond to [Butler's] complaint, (2) respond to [Butler's] complaint to the best of its

24   ability when she wanted to remain anonymous, (3) respond to [Butler's] complaint of sexual

25   misconduct that occurred off-campus and by a third-party, and (4) implement any interim

26   measures to remediate her hostile environment on campus."  Opp'n at 15.  As UC underscores, I

27   have repeatedly indicated that agency guidance "does not define what amounts to deliberate

28   indifference for the purposes of this case."  SAC Order at 22; TAC Order at 18; FAC Order at 24.

And UC highlights that the guidance documents expressly state that they do not address the standard for a private right of action under Title IX. Reply at 2; *see* DOE 2001 Guidance (Pl.'s RJN, Ex. A), at ii-iii (explaining that federal agencies have power to promulgate and enforce Title IX's discrimination mandate even in circumstances that would not give rise to a claim for money damages); 2011 DCL (RJN, Ex. B), at 4 n.12 (noting that the guidance provides the standard for administrative enforcement of Title IX, and that a different standard applies to private lawsuits for money damages).

But even beyond the rule that the policies do not define the law, Butler's first three assertions are inaccurate. UC did respond to Butler's complaint when it took investigatory steps, and it arguably did so to the best of its ability considering Butler's desire to remain anonymous. As for the third contention, Butler does not identify the UC policies or DOE guidance documents that required UC to respond to "sexual misconduct that occurred off-campus and by a third-party." She cites to DOE 2001 Guidance that provides,

> ... Title IX protects students in connection with all of the academic, educational, extracurricular, athletic, and other *programs of the school*, whether they take place in the facilities of the school, on a bus, at a class or training program sponsored by the school at another location, or elsewhere.

2001 Guidance at 2 (RJN, Ex. A). The flaw in her claim is the undisputed fact that her time in Alaska was not "in connection with ... [any] programs of the school... ."

Once she returned to campus, UC may have had an obligation to take steps with respect to third parties. *See id.* at 12 ("sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program"). But it cannot legitimately be expected to take preventative measures to "eliminate [a] hostile environment" if it has no reason to know that a hostile environment exists. *See id.* ("the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence."). Butler testified that UC "could have done more to assure that [she] didn't encounter [her] assailant on campus." Butler Dep. at 155:22–23. But she never told anyone that she had encountered him after returning from

18

Alaska (she never did) and never told anyone of any specific guest lecture that she was worried he would attend. *Id.* at 156:4–11. And, in fact, she never knew of any time that he was on campus. *Id.* at 162:5–11; *see also id.* at 162:25–163:21.

Under these circumstances, it is unreasonable to infer a violation of UC's policies. Even if I accepted Butler's representation that UC's failure to implement any interim measures violated its policies, such a "violation" is only one consideration in the assessment of whether UC acted with deliberate indifference. *See Takla v. Regents of the Univ. of California*, 2015 WL 6755190, at *7 (C.D. Cal. Nov. 2, 2015)(denying motion to dismiss Title IX claim given numerous deficiencies in UCLA's response, including various violations of its own policies); *Doe v. Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015)("Although failure to comply with Title IX guidance does not, *on its own,* constitute deliberate indifference, it is one consideration.") (emphasis in original). *But see Gebser*, 524 U.S. at 291 ("[School's] alleged failure to comply with the [DOE] regulations, however, does not establish the requisite actual notice and deliberate indifference."); *Oden*, 440 F.3d at 1089 (affirming district court's decision that college was not deliberately indifferent as a matter of law, even though it had violated its own policies). In short, a school's failure to comply with DOE guidance or its own policies informs, but does not dictate, the reasonableness of its response.

Here, UC's alleged failure to comply with DOE guidance and its own policies does not render its response "clearly unreasonable." It determined that its policies did not apply to the initial assaults, and it lacked specific information that Butler's assailant presented a risk of harassment on its campus. When Butler was asked how she wished UC had responded, she testified that she "wanted there to be more emphasis on protecting students from my assailant as opposed to figuring out what the liability was of the university." Butler Dep. 152:25-53:3. I heartily agree, but this does not establish that UC acted with deliberate indifference. *See Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."); *Oden*, 440 F.3d at 1089 (concluding that a "negligent, lazy, or careless" response did not support a finding of deliberate indifference).

Butler has not identified any disputed facts establishing that UC's "response to the

United States District Court
Northern District of California

harassment [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. In other words, she cannot prove that UC's actions or omissions amount to "an official decision . . . not to remedy" known discrimination. *See Oden*, 440 F.3d at 1089.

### C. UC Did Not Have the Requisite Control

Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. It is undisputed that Doe was not a teacher or student at UC, but rather was an independent third-party with no official relationship to UC. As the *Davis* court held, "[d]eliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment." *Id.* "A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.*

Butler never truly addresses whether UC had any control over her harasser; rather, she attempts to rest on her allegations that he was a "guest lecturer" who occasionally visited campus. *See* Opp'n at 17–18. UC Berkeley's Vice-Provost for Graduate Studies and Dean of the Graduate Division, identified as the person most qualified, 30(b)(6) Dep. at 38:12–17, 51:8–11, explained that "[a]ny instructor of record teaching a class ... ha[s] the academic freedom to invite members of the general public who have relevant expertise to share their expertise with the students in their class." *Id.* at 51:18–24. She indicated that there is no oversight, official vetting process, or records of when guest lecturers come on campus. *Id.* at 51:25–53:4. When asked whether a guest lecturer who had been the subject of a complaint could be excluded from campus she responded that the instructional faculty would generally be unaware of complaints in most cases because complaints are treated confidentially. *Id.* at 53:5–54:9. But she provided an example of a person being prohibited from campus if the individual has a restraining order actually prohibiting him from being on campus. *Id.* at 54:10–16.

Butler fails to offer any "specific facts" establishing UC's control over Doe. *See Celotex*, 477 U.S. at 323. Rather than directly address whether UC had control over Doe, Butler focuses her argument on UC's purported control over Berkeley's campus. She attempts to work around the "limited circumstances[,]" *Davis*, 526 U.S. at 643, under which an institution can be held

20

1    liable for violating Title IX by arguing that UC's inaction created a hostile environment for her.

2    Opp'n at 16.

3        Butler cites *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438 (D. Conn. 2006) to

4    illustrate the "concept." In *Derby*, a middle school girl and her father alleged that the school

5    district violated Title IX when it failed to adequately respond to Doe's report that a high school

6    student sexually assaulted her off-campus during summer recess. *Id*. at 440. The middle school

7    and high school students attended classes in the same building, and Doe claimed that she

8    frequently saw her assailant, suffered off-campus harassment and teasing from his friends, and

9    was forced to transfer schools to escape harassment and contact with her assailant. *Id*. at 441–42.

10   Contrary to Butler's characterization, the court, in analyzing the severity of the harassment,[13] held

11   that the harassment by the assailant's friends "off school grounds [was] not actionable because

12   *Davis* mandates that the Board cannot be liable for any deliberate indifference to harassment in a

13   context over which the Board [did] not have control." *Id*. at 445. But it found that this evidence

14   "bolster[ed] plaintiff's claim concerning the severity and offensiveness of having to go to school

15   in the same building as [her assailant]." *Id*. And it ultimately decided that "there [was] minimally

16   sufficient evidence from which a reasonable jury could conclude that going to the same school as

17   [her assailant] played a role in Sally Doe's decision to transfer out of Derby High School, thus

18   depriving her of its educational opportunities or benefits." *Id*.

19       *Derby* does not help Butler. The court did not address the "control" factor because it was

20   assessing a Title IX violation in the context of a student-on-student sexual assault. *See supra* note

21   13. Butler's argument ignores that UC can only be held liable "in circumstances wherein [it]

22   exercises substantial control over both the harasser and the context in which the *known* harassment

23   occurs." *Davis*, 526 U.S. at 645. UC was never apprised of any harassment by Doe occurring on

24   Berkeley's campus. To the contrary, the only *known* harassment occurred in Alaska, where UC

25   indisputably did not exercise any control. Butler has not shown disputed facts establishing UC's

26

27   ───────────────
     [13] The court did not directly address the "substantial control" factor, likely because it was tasked
     with assessing a Title IX claim in the wake of a student-on-student sexual assault, which the
28   Supreme Court had already decided can support a Title IX claim. *Derby*, 451 F. Supp. 2d 438; *see
     Davis*, 526 U.S. at 645.

control over Doe, nor the context of any known harassment.

**D.** **Butler Did Not Suffer Severe and Pervasive Harassment Rising to the Level of Discrimination**

The *Davis* court decided that only sexual harassment that is "so severe, pervasive, and objectively offensive[,]" *Davis*, 526 U.S. at 650, "rise[s] to the level of discrimination actionable under [Title IX]." *Id*. Only evidence of harassment occurring after a recipient first receives a report of harassment factors into this analysis. *See Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations."). Otherwise, a recipient "cannot be deemed to have 'subjected' the plaintiff[] to the harassment." *Id*.

Butler admits that she never saw her assailant after leaving Alaska and was never harassed by him on campus. Rather, she underscores the severity of the assaults in Alaska and cites to numerous cases concluding that precipitating sexual misconduct may satisfy this element. Opp'n at 18–20. But she overlooks the fact that each of those cases involved sexual misconduct that occurred in a context over which the school had control. *See Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (concluding that the harassment, sexual molestation, and rape of female special education student by three of her classmates at school and on the bus satisfied the "severe, pervaisive, and objectively offensive" prong); *Lopez v. Metro. Gov't of Nashville & Davidson Cty.*, 646 F. Supp. 2d 891, 897–915 (M.D. Tenn. 2009) (finding questions of fact as to whether student was raped on school bus, and whether that lead to difficulties in school); *Kelly*, 2003 WL 1563424, at *3 (finding rape of student by another student "severe and objectively offensive sexual harassment"); *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 2002 WL 1592694, at *6 (N.D. Tex. July 16, 2002) (determining that a single instance of rape occurring on school property was sufficiently sever to support claim); *J.K. v. Ariz. Bd. of Regents*, 2008 WL 4446712, at *2 (D. Ariz. Sept. 30, 2008) (holding that the rape of a student by another student in a dorm room constituted "severe, pervasive, and objectively offensive" sexual harassment).

In the context of a motion to dismiss in this case, I discussed at length UC's argument that the "plaintiffs ha[d] not made the requisite showing of causation – i.e., that the University's

deliberate indifference 'cause[d] [them] to undergo harassment or ma[d]e them liable of vulnerable to it,' *Davis* 526 U.S. at 645 – because they ha[d] not alleged that they suffered 'further harassment' after reporting their assaults to an appropriate school official." SAC Order at 15. I disagreed with "a number of Title IX decision that appear to endorse this view of a 'further harassment' requirement." *Id*. at 16 (listing cases). And I agreed with the reasoning behind decisions recognizing that a plaintiff could "bring a Title IX claim against an educational institution even in the absence of further acts of harassment by the alleged harasser or other students or faculty." *Id*. at 20. Butler insists that I have already decided the issue [further harassment] and urges me to reject UC's argument. Opp'n at 23.

It is true that a plaintiff need not demonstrate that she experienced *actual* harassment after reporting sexual misconduct. *See Davis*, 526 U.S. at 644–45. But both parties ignore the reasoning behind the "severe, pervasive, and objectively offensive" requirement—it must "be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Accepting Butler's contention that she was vulnerable to additional harassment, she did not attempt to argue that her vulnerability deprived her of access to UC's educational opportunities or benefits. Butler's overly formulaic approach ignores the language of Title IX itself, which necessarily "cabins the range of misconduct that the statute proscribes." *Id*. at 644; *see* 20 U.S.C. §1681(a)("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activities receiving Federal financial assistance... .").

### E. Causation

Given the preceding analysis, it is not necessary to separately analyze the element of causation. The parties blurred the line between whether "further harassment" is necessary and whether UC's alleged deliberate indifference "cause[d]" Butler to undergo sexual harassment or made her vulnerable to it. In the preceding section, I addressed and rejected Butler's assertion that I had previously "decided this issue," and she offers no additional arguments. She has not established how UC's inaction "subjected" her to harassment that rises to the level of discrimination.

23

**CONCLUSION**

Butler fails to demonstrate a genuine issue on four of the five elements necessary for her Title IX claim. The insufficient showing on any one element is enough to support judgment in UC's favor. Its motion is GRANTED.

**IT IS SO ORDERED.**

Dated: April 12, 2018

William H. Orrick
United States District Judge