IRWIN M. ZALKIN, ESQ. (#89957)
DEVIN M. STOREY, ESQ. (#234271)
ALEXANDER S. ZALKIN, ESQ. (#280813)
RYAN M. COHEN, ESQ, (#261313)
The Zalkin Law Firm, P.C.
10590 W. Ocean Air Drive, Suite 125
San Diego, CA 92130
Tel:  858-259-3011
Fax: 858-259-3015
Email:  Irwin@zalkin.com
        dms@zalkin.com
        alex@zalkin.com
        ryan@zalkin.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| SOFIE KARASEK, individually;<br>NICOLLETTA COMMINS, individually;<br>ARYLE BUTLER, individually;<br><br>Plaintiffs,<br><br>vs.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a public entity, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No: 3:15-cv-03717-WHO<br><br>**FIFTH AMENDED COMPLAINT FOR DAMAGES:**<br><br>    1.  **DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. §1681 (TITLE IX)**<br><br>**[DEMAND FOR JURY TRIAL]**<br><br>Dept:  Courtroom 4, 3rd Floor<br>Judge: Hon. William H. Orrick |

## <u>TABLE OF CONTENTS</u>

**PAGE**

A. PARTIES…………………………………………….........................1

B. BACKGROUND FACTS RELEVANT TO ALL COUNTS…………..........................1

   1. The Department of Education's Office for
     Civil Rights Significant Guidance Documents ……………………..… 1

   2. Defendant University's Multiple and Confusing Policies
     Relating to Sexual Misconduct…………………………………………4

     a. Interim Sexual Misconduct Policy……………………………………4

     b. Code of Student Conduct, Rape and Sexual Assault………………....6

     c. Sexual Harassment Policy…………………………………………7

     d. Sexual Assault Policy……………………………………………....8

   3. The California State Audit and Findings re University's
     Policies and Practices Relating to Its Response to
     Sexual Misconduct Complaints……………………………………......9

   4. The University's History of And Deliberate Indifference
     to Sexual Misconduct Complaints…………………………………....12

C. BACKGROUND FACTS RELATED TO SOFIE
   KARASEK'S COMPLAINT……………………………………………14

D. BACKGROUND FACTS RELATED TO
   ARYLE BUTLER'S COMPLAINT……………………………………25

E. BACKGROUND FACTS RELATED TO
   NICOLETTA COMMINS' COMPLAINT…………………………………29

COUNT ONE DISCRIMINATION ON THE BASIS OF
   GENDER IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX)…………………....40

JURY DEMAND………………………………………………………43

               i

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

Based upon information and belief available to Plaintiffs, Sofie Karasek, Individually, Nicoletta Commins, Individually, Aryle Butler, Individually at the time of the filing of the Complaint for Damages, Plaintiffs make the following allegations:

## A. PARTIES

1.  Defendant The Regents of the University of California ("Regents") owns and operates the University of California, Berkeley ("University").

2.  Plaintiff Sofie Karasek ("Karasek") was, at all times relevant, a student at the University.

3.  Plaintiff Aryle Butler ("Butler") was, at all times relevant, a student at the University.

4.  Plaintiff Nicoletta Commins ("Commins") was, at all times relevant, a student at the University.

## B. BACKGROUND FACTS RELEVANT TO ALL COUNTS

### 1. The Department of Education's Office for Civil Rights Significant Guidance Documents

5.  In 2001, The Department of Education ("DOE"), published the Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties ("2001 Guidance").

6.  The 2001 Guidance, "…focuses on a school's fundamental compliance responsibilities under Title IX…"

7.  The 2001 Guidance acknowledges that, "Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination."

8.  It goes on to state, "These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

problems, as required by the Title IX regulations. *By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences."*

9.    The 2001 Guidance recognizes that, "training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond."

10.    The 2001 Guidance requires that a school's sexual misconduct policies be widely disseminated. To that end, "Distributing the procedures to administrators, or including them in the school's administrative or policy manual may not by itself be an effective way of providing notice…"

11.    On April 4, 2011, the DOE issued a supplement to the 2001 Guidance known as a Dear Colleague Letter ("DCL").  The DCL addressed how an educational institution should respond to sexual misconduct on campus. The DCL required:

- All persons involved in a complaint resolution process must be trained in handling complaints of sexual harassment or sexual violence;

- A school's grievance procedures must be prominently displayed on the school website, and widely distributed throughout campus in both print and electronic formats;

- A school must take immediate action to address a complaint of sexual harassment/assault, prevent its reoccurrence and address its effects;

- A school should notify the complainant of his or her options to avoid contact with the alleged perpetrator;

- When taking steps to separate a complainant and alleged perpetrator, a school

FIFTH AMENDED COMPLAINT FOR DAMAGES

should minimize the burden on the complainant;

- A school must inform a complainant of their right to file a criminal report and not discourage the complainant from doing so;

- A school must conduct their own investigation, and take immediate steps to protect the complainant and the school community at large;

- Although a school may need to delay the fact-finding portion of an investigation while the police are gathering evidence, the school must promptly resume and complete its fact-finding once the police department has completed its gathering of evidence, not after the ultimate outcome or the filing of any charges (usually three to ten calendar days);

- Grievance procedures may include voluntary informal mechanisms. However, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In cases involving allegations of sexual assault, mediation is not appropriate;

- A school must treat both parties equally throughout the investigative process;

- A school must give the parties to a complaint periodic status updates;

- Throughout the school's investigation the parties must have an equal opportunity to present relevant witnesses and other evidence;

- A resolution should be achieved no longer than 60 days after the complainant makes a report of sexual harassment/assault;

- A school must notify the parties in writing about the outcome of the complaint;

- A school should take proactive measures to prevent sexual harassment and violence, including implementing sexual misconduct prevention education and providing such education to its employees and students multiple times;

- "These programs should include a discussion of what constitutes sexual

FIFTH AMENDED COMPLAINT FOR DAMAGES

harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies;"

- A school's sexual misconduct policies should include instruction for students who are victims of sexual misconduct on where, and to whom, they should report. The policies should also instruct students and employees what to do if they learn of an incident of sexual misconduct;

- "Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence."

## 2. Defendant University's Multiple and Confusing Policies
## Relating to Sexual Misconduct

12.   In 2012 the University had in place multiple and contradictory policies for responding to allegations of student on student sexual assault, including the Berkeley Campus Code of Student Conduct ("Code of Student Conduct"), the Berkeley Campus Procedures for Responding to Reports of Sexual Harassment ("Sexual Harassment Policy"), and the Berkeley Campus Student Policy and Procedures Regarding Sexual Assault and Rape ("Sexual Assault Policy").

### a. Interim Sexual Misconduct Policy

13.   In September of 2013, the University implemented the Interim Sexual Misconduct Policy.  According to Hallie Hunt ("Hunt"), the Director of the Center for Student Conduct ("CSC") and Assistant Dean of Students, the CSC and the Office for the Prevention of Harassment and Discrimination ("OPHD") began employing the practices detailed in the Interim Sexual Misconduct Policy soon after receiving new federal guidance on the subject in 2011, referring to the Dear Colleague Letter.  *The Interim Sexual Misconduct Policy adopted the guidelines within the Dear Colleague*

*Letter ("DCL")*.

14. The University's Interim Sexual Misconduct Policy included and required the following:

- Complaints against students that allege sexual misconduct may be made directly to the UC Berkeley Police Department, the CSC, the OPHD or any other campus office authorized to receive such complaints;

- Sexual misconduct complaints, after receipt by the CSC, shall be referred to OPHD for investigation;

- OPHD will take responsibility for investigating complaints of sexual misconduct;

- OPHD may temporarily delay the fact-finding portion of its investigation while law enforcement officers collect evidence for a criminal investigation, but will promptly resume its investigation at such time as there will be no interference with law enforcement evidence collection;

- A sexual misconduct investigation shall be completed promptly.  If the investigation is not completed within 60 days, OPHD shall inform the complainant and the CSC of the status of the investigation and provide the complainant and the CSC with an estimated date for the completion of the investigation;

- *Prior to agreeing to an informal resolution of a sexual misconduct complaint, the CSC shall consult with the complainant regarding any proposed informal resolution*;

- If the CSC decides to agree with the responding student to enter into an informal resolution, then the CSC shall provide the complainant with the resulting signed Administrative Disposition.  *Upon receipt of the signed Administrative Disposition, the complainant may appeal the CSC's decision to enter into the informal resolution*;

- *Notices or communications given to the responding student by the CSC or the*

FIFTH AMENDED COMPLAINT FOR DAMAGES

*Independent Hearing Officer concerning the following shall be provided to complainant on the same day*:

- Administrative Disposition;

- Notice of the outcome of a hearing;

- Final decision to impose sanctions issued by the Dean of Students; and any decision regarding an appeal.

**b. Code of Student Conduct, Rape and Sexual Assault**

15. The University's Code of Student Conduct included and required the following:

- In cases involving a complaint of rape or sexual assault, the investigation of specific allegations will be directed by the Title IX Compliance Officer and conducted by the CSC. The Title IX Compliance Officer will decide whether sexual assault cases should be pursued by the CSC;

- Within 7 days of the receipt of a complaint, the CSC will determine whether sufficient information exists to proceed with a conduct process. If the CSC determines that there is sufficient information to support the allegation(s), an Alleged Violation Letter will be sent to the respondent;

- Most often complaints are resolved informally (as opposed to the mandatory formal process required by the DCL in cases of sexual assault) through discussions with CSC staff. The CSC may conduct an investigation and/or gather further information relevant to the complaint. If the investigation yields evidence of a Code violation, the CSC will propose a resolution and the student may be given the opportunity to resolve the case informally;

- When, as a result of a violation of the Code of Student Conduct, a student is suspended, the fact that suspension was imposed must be posted on the academic transcript for the duration of the suspension. When a student is dismissed, the fact

that dismissal was imposed must be posted on the academic transcript permanently.

16.   The Code of Student Conduct details the due process rights of the accused student, the notifications required, and timelines for the process.  It contains no policies with respect to rights of the complainant, notifications to the complainant, or opportunities for the complainant to meet with staff or discuss possible outcomes of the complaint.

### c. Sexual Harassment Policy

17.   The University's Sexual Harassment Policy included and required the following:

- Individuals making reports of sexual harassment shall be informed about options for resolving potential violations of the Sexual Harassment Policy, including procedures for early resolution and procedures for a formal investigation;

- Individuals bringing reports of sexual harassment shall be informed about the range of possible outcomes of the report, including interim protections, remedies for the individual harmed by the harassment, and disciplinary actions that might be taken against the accused as a result of the report, including information about the procedures leading to such outcomes;

- The campus shall respond, to the greatest extent possible, to reports of sexual harassment brought anonymously or brought by third parties not directly involved in the harassment;

- The goal of early resolution is to resolve concerns at the earliest stage possible, with the cooperation of all parties involved.  The University encourages early resolution options when the parties desire to resolve the situation cooperatively and/or when a formal investigation is not likely to lead to a satisfactory outcome;

- Steps taken to encourage early resolution and agreements reached through early resolution efforts should be documented;

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

- Some reports of sexual harassment may not be appropriate for early resolution, but may require a formal investigation at the discretion of the Title IX Officer;

- In response to reports of sexual harassment in cases where early resolution is inappropriate (such as when the facts are in dispute in reports of serious misconduct, or reports involve individuals with a pattern of inappropriate behavior or allege criminal acts such as stalking, sexual assault or physical assault), the campus may conduct a formal investigation.  In such cases, the individual making the report shall be encouraged to file written documentation regarding the behaviors complained of.  The wishes of the individual making the request shall be considered, but are not determinative, in the decision to initiate a formal investigation of a report of sexual harassment;

- Formal investigation of reports of sexual harassment shall incorporate the following standards:

  - Upon request the complainant and the accused may each have a representative present when he or she is interviewed;

  - The investigation shall be completed as promptly as possible and in most cases within 60 working days of the date the request for formal investigation was filed;

  - The complainant and the accused may request a copy of the investigative report pursuant to University policy governing privacy and access to personal information.

### d. Sexual Assault Policy

18.    The University's Sexual Assault Policy additionally included and required the following:

- The University has a legal obligation to disclose the outcome of the discipline

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

proceedings to the student who reports being sexually assaulted;

- When a student reports an allegation of sexual assault, appropriate administrators will work to try to ensure a safe environment for a complainant;

- When an incident is reported to any unit providing sexual assault resources on campus, the unit that receives the information shall report the incident to the Director and Title IX Officer at earliest awareness;

- At the direction of the Director and Title IX Officer, the CSC will conduct an investigation of the allegations in the case.  The procedures described in the Code of Student Conduct will be followed in resolving allegations of sexual assault.

19.   The Code of Student Conduct and the Sexual Assault Policies both state that the CDC would conduct the investigations into sexual assault allegations at the direction of the Title IX Complaint Officer.  However, in direct contradiction to the Code of Student Conduct, the Interim Sexual Misconduct Policy, which had adopted the requirements of the DCL, states that the OPHD will investigate complaints of sexual misconduct, including sexual assault and harassment.

### 3. The California State Audit and Findings re University's

### Policies and Practices Relating to Its Response to Sexual Misconduct Complaints

20.   In June of 2014, the California State Auditor published a report entitled "Sexual Harassment and Sexual Violence: California Universities Must Better Protect Students by Doing More to Prevent, Respond to, and Resolve Incidents" (the "Audit") (https://www.auditor.ca.gov/pdfs/reports/2013-124.pdf).

21.   The Audit studied the handling of sexual violence incidents at four California universities, including the University.  The Audit analyzed 20 case files at each university for the period 2009 through 2013.  One of the examples used in the Audit is Karasek's complaint.

22.     Among other conclusions, the Audit concluded the following:

- The universities do not ensure that all faculty and staff are sufficiently trained on responding to and reporting these incidents to appropriate officials;

- Certain university employees who are likely to be the first point of contact are not sufficiently trained on responding to and reporting these incidents;

- The universities must do more to properly educate students on sexual harassment and sexual violence;

- The universities did not always comply with requirements in state law for distribution of relevant policies;

- The universities need to better inform students who file a complaint of the status of the investigation and notify them of the eventual outcome.  When universities do not provide regular updates on their investigation, they are not meeting the needs of their students.  Students who experience sexual harassment or sexual violence may experience residual feelings of stress or fear, even if the danger is no longer imminent, and periodic status updates may help reduce this anxiety by assuring complainants that their concerns are being taken seriously and that the process is proceeding to a definitive outcome.

23.     With respect to the University, the Audit found the following:

- The University's Title IX officer handled 120 student complaints of sexual harassment or sexual violence against faculty, staff, and students between 2009 and 2013;

- Some concerns were identified regarding whether the University notified complainants and respondents of case outcomes;

- Some concerns were identified regarding whether the University investigated complaints in a timely manner;

FIFTH AMENDED COMPLAINT FOR DAMAGES

- The discretion within the UC policy to not initiate a formal investigation when requested to do so by the complainant, as opposed to requiring a formal investigation when requested, does not align with instructions in the 2011 DCL, which indicate that the complainant must be notified of the right to end the informal process at any time;

- *If a UC Title IX coordinator decides to use early resolution, the coordinator needs to engage complainants in ongoing communication to attempt to achieve a mutually agreeable resolution.  Using an informal approach that involves no substantive communication with complainants is not consistent with federal guidance;*

- Between 2009 and 2013, the University resolved 76 percent of Title IX complaints from students using the early resolution process, meaning no formal investigation was conducted;

- With respect to Karasek's complaint, there was no indication in the case file that university officials provided any updates to the complainants, including that the complaint would be handled using the early resolution process.  The Title IX officer acknowledged that her office did not maintain routine communication with the complainants throughout the process;

- Of the 20 case files reviewed, the University completed 11 investigations within 60 working days (or 90 working days if the university officials approved an extension).  An investigation is completed when a determination is made by the Title IX coordinator in an investigative report, prior to referral to the Center for Student Conduct.

24.   With respect to the University, the Audit made the following recommendations:

- The University should create and use a document to share with students that

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

explains what students should expect from the complaint process;

- The University should ensure that the differences between an informal or early resolution process and a formal investigation process are clearly explained to ensure that students know what to expect from each process. Further, they should explain that students whose cases are being handled under an informal or early resolution process have the right to move to a formal process at any time;

- The University should provide regular updates on the status of their investigations to students filing or responding to complaints. Additionally, the universities should notify the students of the resolution of the complaints;

- The University should regularly evaluate the timeliness of investigations and ensure that they complete investigations within established timelines.

### 4. The University's History of And Deliberate Indifference to Sexual Misconduct Complaints

25. Plaintiffs are informed, believe, and on that basis allege, that the University underreported the amount of sexually violent incidents that occurred on campus during the years prior to Plaintiffs' enrollment at the University.

26. For the year 2013, 14 cases of student-on-student sexual misconduct were reported to the University's CSC. Of the 14 reported cases, no formal hearings were held. In other words, all 14 cases were resolved through the University's informal resolution process.

27. In April of 2013 the Associated Students of the University passed a "bill of no confidence" in the University's sexual assault policies and disciplinary procedures.

28. In several publicly available investigation reports, including reports generated prior to the sexual assaults alleged by Plaintiffs herein, the University has admitted that "Sexual harassment may include incidents between any members of the University community, including faculty and other academic appointees, staff, coaches, housestaff, students,

FIFTH AMENDED COMPLAINT FOR DAMAGES

and non-student or <u>non-employee participants in University programs</u>, such as vendors, contractors, visitors, and patients."

29.   In 2014, thirty-one people filed an administrative Title IX claim with the Office of Civil Rights, alleging that as far back as 1979, the University failed to adequately respond to their reports that they had been sexually assaulted.

30.   Based on information and belief, as early as 1999, if a student reported that they had been sexually assaulted, the University's policy dictated that the student be notified of their rights under the law, as well as their ability to report their assault to law enforcement.

31.   Based on information and belief, Denise Oldham ("Oldham), the University's interim Title IX officer, indicated to the Los Angeles Times in February 2014 that the University does not use early resolution for sexual assault cases, stating, "I can't imagine a situation where that would be appropriate."

32.   By contrast, at least three witnesses were told by Oldham that the OPHD handles approximately 500 cases per year and that of the 500 cases handled in 2012 only two were resolved through a formal process.

33.   Plaintiffs are informed and believe and thereon allege that Defendant University consciously and intentionally opts to engage in an informal process upon receipt of a complaint of sexual violence against a female student without informing the student of her right to participate in the informal process or to reject the informal process in favor of a formal investigation and hearing.  Plaintiffs are further informed and believe and thereon allege that Defendant University intentionally uses the informal process to avoid the reporting requirements of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f), because it takes the position that if the matter is resolved informally, it is not required to report

the offense as mandated by the Clery Act.

## C. BACKGROUND FACTS RELATED TO SOFIE KARASEK'S COMPLAINT

34.   Karasek enrolled at the University in the Fall of 2011. Karasek never received any education regarding the University's sexual misconduct policies during her orientation, or at any time subsequent.

35.   During her freshman year at the University, Karasek was involved in the Cal Berkeley Democrats Club ("Club"), a student organization affiliated with the University.

36.   Karasek is informed, believes, and on that basis alleges, that at the bi-annual Club retreat in 2008 the then Club president sexually assaulted another member of the Club. When this Club member reported her assault to the University's Police Department she was told the University could do nothing because the assault occurred off campus, despite it being at a Club event.  She was provided no services, no Title IX investigation was started nor completed, and the assailant remained in his position of authority in the Club.

37.   In 2011, a female member of the club was sexually assaulted by a male student member of the club during a Club retreat in Lake Tahoe.  Karasek is further informed, believes, and on that basis alleges that the University knew of this sexual assault, but did nothing in response.

38.   During this same Club retreat in Lake Tahoe in 2011, TH, the male student who would eventually sexually assault Karasek, sexually assaulted a female member of the Club. Karasek is informed, believes, and on that basis alleges, that the University knew about this sexual assault but failed to respond to it.

39.   On the weekend of February 10 through February 12, 2012, the Club organized a trip to the California Democratic Party Convention being held in San Diego, CA.

40.   Karasek attended this event with the Club.

FIFTH AMENDED COMPLAINT FOR DAMAGES

41.   On the night of February 10, 2012, Karasek slept in the same bed with three other students, including a student named TH.

42.   At around 3:00 am, Karasek awoke to TH massaging her legs, back and buttocks. Karasek froze in the moment, and TH continued to inappropriately rub her for approximately 30 minutes.

43.   Karasek is informed, believes, and on that basis alleges, that TH never received any education from the University on prohibited sexual misconduct or the University's policies related to sexual misconduct.

44.   On February 14, 2012, the president of the Club met with Marisa Boyce ("Boyce") from the Gender Equity Resource Center. The Club president informed Boyce that that Sofie Karasek, and two other unidentified women, had reported being sexually assaulted by TH. This amounted to actual knowledge of three sexual assaults committed by TH.

45.   Also at this meeting, the president of the Club asked Boyce the Club's responsibilities surrounding the issue of sexual misconduct. The Club president told Boyce that she was thinking about removing TH from the Club altogether. In response, Boyce consciously and intentionally discouraged this approach and suggested that the Club use more informal, restorative justice models to deal with TH. Boyce went on to reason that pushing TH too far out of his social circle would not be ideal because he probably would assault other women and would not have any support around him if he engaged in this type of conduct again.

46.   Documents provided by Defendant suggest that Christine Ambrosio ("Ambrosio"), Director of Women's Resources at the Gender Equity Resource Center attended the February 14, 2012 meeting. However, Karasek is informed, believes and on that basis alleges, that the aforementioned meeting actually occurred between the Club president

and Boyce, not Ambrosio.  The February 14, 2012 document memorializing the meeting specifically identifies Sofie Karasek as having been assaulted and describes the details of her assault.  It also indicates that this information was provided to numerous departments of Defendant University including OPHD and CSC.

47.    On February 14, 2012 Ambrosio sent an email to Oldham, the Interim Title IX Officer and Director, Hallie Hunt ("Hunt"), the Director of the CSC, and Paula Flamm, explaining that two students had been sexually assaulted by one of the officers of the Club.  She additionally asked about informal models for dealing with sexual assault that she could present to the Club president.

48.    On February 15, 2012 Oldham responded to Ambrosio's email.  Oldham did not address the sexual assault allegation specifically.  With respect to the use of informal procedures to respond to claims of sexual harassment and/or assault, Oldham cautioned that she was "…very wary of the use of these models for any kind of sexual harassment, let alone and [sic] extreme form like sexual assault."  Oldham further acknowledged the significance of the DCL and informed that, "…recent federal guidelines are indicating that any kind of mediation is not appropriate for these kinds of cases at educational institutions."  Oldham also admitted that the University's suggestion of informal procedures for responding to sexual misconduct "…might implicitly suggest that the campus condones that approach."

49.    Based on the advice of staff at the Gender Equity Resource Center, the Club president, who is just another student and not a member of the faculty or administration, invited TH to a private meeting.  During that meeting TH admitted assaulting Karasek.  The Club president asked TH to resign from his board position but allowed him to continue to attend "non-social" club events, such as meetings, professional events, and guest lectures.  TH resigned from his board position in the Club.

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

50.   Though no longer a board member, TH continued to participate in Club events and activities.  As a result, Karasek avoided Club meetings and activities for fear of further harassment by, or encounters with, TH.

51.   On April 6, 2012, after Defendant University administrators consciously and intentionally took no remedial action to protect Karasek or other female students after they had actual knowledge of TH's propensities over two months earlier, TH assaulted another female member of the Club, Jane Doe.  The Club president received a phone call early the next morning from a club member who was aware of Karasek's assault by TH and expressed concern about TH's behavior with Jane Doe.  The Club president then telephoned Jane Doe and learned of her assault by TH.

52.   Not only did the University take no remedial measures to protect University students from TH following its actual notice of the sexual assault of Karasek, instead, the University intentionally prevented remedial measures from being taken by the Club by instructing the Club president to keep TH in the Club.  On April 9, 2012 the Club president contacted the University to follow-up on the previously reported sexual assaults by TH and informed the University that two other female students had come forward stating they had been assaulted by TH.

53.   After discovery of the April 6, 2012 assault by TH the Club president took it upon herself to ask him to leave the organization, against the University's earlier instruction to allow him to remain.

54.   On April 12, 2012 Ambrosio sent an email to Oldham and Hunt informing them that two additional victims of TH had come forward.

55.   On April 20, 2012, Karasek, along with the three other female students who had been sexually assaulted by TH, met with Oldham and Hunt to formally report their assaults.

56.   During the April 20, 2012 meeting the four women expressed their concerns regarding

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

TH's planned attendance in the upcoming Cal in the Capitol program over the summer.

57. At no time during this meeting, or after, was Karasek informed of potential options for resolving the allegation, including procedures for early resolution or a formal investigation.  This was contrary to the University's Sexual Harassment Policy.

58. At no time during this meeting, or after, was Karasek informed about the range of possible outcomes of her report, including any interim protections such as a no contact order, or disciplinary actions that may be taken against the accused.  This was contrary to the University's Sexual Harassment Policy.

59. Karasek was never informed, at the meeting or otherwise, that according to the University's policies, in order to initiate a formal complaint against TH to trigger a University investigation, she would need to submit a written statement detailing her assault.  This was contrary to the University's Sexual Harassment Policy.

60. Just out of luck, one of TH's victims told Karasek that she had submitted a written statement to the University detailing her assault.  Still unaware that a written report was required to initiate a formal investigation, Karasek thought it was a good idea and also submitted a written report to Hunt on May 15, 2012.

61. In her email and statement of May 15, 2012 Karasek again expressed concern over allowing TH to attend the Cal in the Capital program and the possibility that he may assault another.  Karasek also indicated that she could take a screenshot of the friend request she had received from TH if that would help in the investigation.

62. Karasek received no response to her complaint.

63. Later, Karasek learned from the president of the Club, that the administration had advised against removing TH from the Club because they were concerned that if he went to another student group, he may assault someone and there would not be the same support structure for a survivor in that group.  The University was also concerned

that TH would not have the support of his friends in processing that what he did was wrong.

64. The administration did advise the president of the Club that they could make TH sufficiently "uncomfortable" to leave on his own accord.

65. For the next eight months, Karasek was never contacted about her complaint.

66. Meanwhile, the University was taking virtually no action to investigate Karasek's complaint.

67. Three months after receiving notice of TH's assaults of several women, and one month after these women's meeting with several administrators, on May 14, 2012, Glenn DeGuzman ("DeGuzman"), the Assistant Director of the CSC, met with TH. At this meeting, TH admitted that he had problems and acted foolishly, especially when he had consumed alcohol. TH also admitted to engaging in the troublesome conduct even after being removed from office with the Club.

68. In his notes of the meeting, DeGuzman admitted that the nature of his meeting was not to investigate, but rather was "…focused on getting help so [TH] could move forward." After this meeting, DeGuzman followed up several times with TH to check on TH's progress with dealing with his admitted problems and to continue to offer his assistance to TH in that regard.

69. Although TH had admitted to having "some problems" when questioned about sexually assaulting four separate women, TH was allowed to attend the Cal in the Capitol program over the 2012 summer months with no restrictions in place. DeGuzman sent an email to TH on May 15, 2012 asking him to "please stay away from alcohol" but immediately thereafter stating: "If you do drink, do so responsibly. Make the decision now to not put yourself in situations to be alone with other women specifically if you are drinking. Until you can better understand what you are experiencing, it is in your

best interest to not put yourself in that situation."

70.   Oldham, Hunt and Ambrosio were also continually in contact with board members of the Club.  At one point, on September 11, 2012, Oldham provided both the outgoing and incoming Club president with an update regarding Karasek's complaint.

71.   At no time did Oldham, or any other University administrator provide Karasek with an update prior to the resolution of the complaint.

72.   On September 17, 2012 Oldham met with TH for the first time.

73.   On October 1, 2012, Oldham sent an email to the CSC summarizing the response to the complaints of sexual assault by TH.  Despite having learned of the assaults on February 14, 2012, Oldham wrote that concerns of "unwelcome physical contact" were brought to the attention of her office in "late April 2012."   Additionally, despite her prior acknowledgment that informal resolution procedures such as mediations are never appropriate in instances of sexual assault, Oldham stated that, "After examining the information submitted by the two women students and consulting DeGuzman about his positive impressions of the developmental discussion he'd had with [TH], I determined that this situation could be resolved without a formal investigation by my office." According to this e-mail, it was only *after* this determination was made that Oldham met with TH.  Finally, Oldham acknowledged that from her perspective, she considered the sexual harassment issue with TH to be resolved.

74.   Oldham did not conduct a formal investigation of Karasek's, or the three other victims', sexual assault complaints against TH.  Oldham engaged in an early resolution of the complaints without obtaining the cooperation of all involved parties. The intentional decision by Oldham to engage in early resolution was contrary to the University's Sexual Harassment Policy.

75.   At no time was Karasek consulted to determine if she desired to engage in an early

FIFTH AMENDED COMPLAINT FOR DAMAGES

resolution of her complaint, despite her having submitted a written statement.

76. Despite the early resolution determination taking more than 60 days, Karasek was never contacted regarding the status of the investigation, or lack thereof, nor was she provided an estimated date for the completion of any potential investigation.

77. On October 10, 2012, 9 months after having actual knowledge of the sexual assault complaint, DeGuzman sent an Administrative Disposition Letter to TH.  In this letter, DeGuzman informed TH that he had been found to have violated the University's Student Code of Conduct for engaging in disorderly or lewd conduct.  DeGuzman offered TH a choice to either meet with DeGuzman to tell his side of the story and participate in the resolution of his case, or, to simply accept responsibility.  If TH chose to accept responsibility, he would have been subject to the following sanctions:

- Disciplinary probation effective October 12, 2012 through December 12, 2012 when TH was set to graduate;

- One consultation with a licensed mental health practitioner of TH's choice;

- One appointment with an Alcohol and Other Drugs Counselor in Social Services at the Tang Center;

- One meeting with Alan Creighton, Health Educator, to check-in regarding gender issues and sexual misconduct as it related to TH's case.

78. At some point TH was assigned a Student Advocate caseworker.

79. Unlike TH, Karasek was never assigned a Student Advocate caseworker.

80. On October 18, 2012, TH sent an e-mail to an Independent Hearing Officer along with a timeline of events that had occurred with respect to the allegations against him.  In this e-mail TH asked the Officer to review the timeline to see if there were any procedural problems with respect to how the University addressed the women's complaints against TH, specifically since he first met with DeGuzman in May and did

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

not receive his Alleged Violation Letter until October 10, 2012.

81.  Unlike TH, Karasek was never offered an opportunity to discuss the appropriateness of the University's untimely response to her complaint of sexual assault against TH. TH chose to meet with DeGuzman and participate in the resolution of his case, and in fact did meet with DeGuzman on October 19, 2012.

82.  On October 24, 2012, DeGuzman sent another Administrative Disposition Letter to TH that ostensibly incorporated their agreement at their prior meeting.  This letter similarly gave TH the choice to accept responsibility.  However, this letter removed the sanction requiring TH to meet with Alan Creighton to discuss gender issues and sexual misconduct – which were the very issues that led to his discipline in the first place.

83.  On October 26, 2012 TH returned his signed Administrative Disposition Letter to DeGuzman, indicating he wished to accept the sanctions within the October 24, 2012 Administrative Disposition Letter, and thus accepted the informal resolution procedure.

84.  At no time was Karasek consulted regarding the proposed informal resolution of her complaint, including any of the proposed sanctions.  The intentional decision by the University to engage in an informal resolution of Karasek's complaint without consulting her regarding the proposed informal resolution was contrary to the University's Interim Sexual Misconduct Policy.

85.  At no time was Karasek provided a copy of the signed Administrative Disposition nor was she provided a copy of any of the evidence submitted by TH in support of his version of the events.

86.  At no time was Karasek informed of her rights to appeal the decision of the CSC to enter into an informal resolution.

87.  Karasek learned from a board member of the Club that TH was set to graduate in December of 2012.  Up to this time, Karasek had yet to be contacted by the University

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

regarding her formal complaint.

88.     On November 2, 2012, Karasek went to Ambrosio's office and expressed her frustration and concern that she was not being treated fairly, and that she had not heard from anyone at the University regarding her complaint. She also expressed concern at the length of time that had passed, given that she knew TH was graduating in December of 2012.

89.     On November 6, 2012 Ambrosio e-mailed Karasek and informed her that Ambrosio was waiting to hear back from the CSC regarding an update on the investigation.

90.     On November 15, 2012, Karasek e-mailed Ambrosio in follow up, requesting an update on the investigation. Karasek received no response.

91.     On December 2, 2012, Karasek again e-mailed Ambrosio requesting an update on the investigation. Karasek again received no response.

92.     Finally, on December 12, 2012, Karasek received her first communication from the University since her initial meeting took place in April of 2012. This three sentence e-mail from the Title IX office informed Karasek that "this matter had been explored and resolved using an early resolution process outlined in our campus procedures for responding to sexual harassment complaints" and that the Title IX officer had "communicated the outcome of the resolution process to the Center for Student Conduct." Nowhere in this brief communication was the outcome of the resolution process ever revealed to Karasek.

93.     At no time during the early resolution process was Karasek ever contacted by any administrator involved in the investigation and/or resolution process.

94.     On December 17, 2012, three days after TH graduated, a representative from the CSC informed Karasek by e-mail that TH had been charged with violating, and had been found to be in violation of, the Campus Code of Student Conduct. However, Karasek

was still not apprised of any disciplinary action that may have been taken against TH. Failing to disclose the outcome of the discipline proceedings violated the University's Sexual Assault Policy.

95.   Unsatisfied with the entire resolution process, Karasek filed a Federal Clery Act complaint against the University in May of 2013.

96.   On September 2, 2013 Karasek contacted Oldham to again attempt to ascertain what, if any, disciplinary action had been taken against TH.

97.   Hunt responded on September 20, 2013 that TH had been placed on a disciplinary probation and engaged in some counseling measures, but did not give any specific detail as to what counseling measures had been taken.

98.   Hunt informed Karasek that the CSC characterized her case as "sexual misconduct."

99.   At no time was Karasek given the opportunity to appeal the University's disciplinary decision.  Further, any appeal would have been futile as Karasek was not even notified of TH's sanctions until nine months after TH had graduated.

100.  At no time was Karasek given updates about the investigation or the potential resolution.

101.  At no time was Karasek ever encouraged, or even informed, that she could report her assault to law enforcement.

102.  Karasek was never afforded the opportunity to present her claim at a disciplinary hearing or meaningfully participate in any part of the complaint process.

103.  During the entire pendency of the resolution process, TH was allowed to remain on campus, unrestricted, creating a sexually hostile environment for Karasek.  Th was also allowed to remain in his position as a campus tour guide.

104.  Throughout the pendency of the process, and even after, Karasek was constantly operating with a heightened sense of fear, anxiety and stress knowing that her assailant

remained unrestricted on campus, and that there were other possible perpetrators in her classes that had not been removed, or otherwise disciplined, by the University.

105.  On one occasion, Karasek saw TH from afar as she was walking to class.  Because the University had taken no steps to ensure that TH would not continue to harass, or otherwise harm Karasek, Karasek took her safety and wellbeing into her own hands, and in an effort to avoid her assailant, she was forced to change her usual path to class and take a longer route.

106.  Karasek also encountered TH while she was participating Club events held off campus. Karasek is informed and believes and on that basis alleges that if a no contact order had been issued, TH would not have been allowed to be present at these events at the same time as Karasek was in attendance.

107.  As a result of the University's conduct, and lack of conduct Karasek has suffered psychological and emotional damages, and has experienced a loss of educational opportunities and/or benefits, including but not limited to:

- Being forced to change her major from Economics to the less academically rigorous Political Economy;

- Suffering a noticeable drop in her GPA subsequent to the University's inadequate response to her report;

- Being forced to drop at least one class;

- Being forced to miss assignments and ask for extensions on assignments.

**D. BACKGROUND FACTS RELATED TO ARYLE BUTLER'S COMPLAINT**

108.   While a student at the University, at no time did Butler receive any formal education from the University regarding prohibited sexual misconduct, or the University's sexual misconduct policies.

109.  During the 2011-2012 academic schoolyear, Margot Higgins ("Higgins") was a PhD

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

candidate and Graduate Student Instructor ("GSI") at the University. In her role as a GSI, Higgins instructed undergraduate students at the University.

110.    Also in her role as a GSI, Higgins received training from the University. Specifically, GSI's were required to attend a day to day-and-a-half long training on issues such as how to lead discussions, or how to organize labs.  GSI's were also required to take a semester-long graduate student training course.   Higgins attended both of these trainings.

111.    Despite attending the GSI training and completing the semester-long graduate student training course, Higgins has no recollection of receiving any training on sexual misconduct, including how to detect, prevent, or respond to sexual misconduct.

112.    As a GSI, Higgins was an agent of the University.

113.    During the summer of 2012, Butler signed a work contract ("Contract") with the University to serve as an assistant to Higgins who was going to be conducting research in Alaska that summer. The Contract was printed on official University letterhead.  The Contract also indicated that "Data gathered through this study is the property of Margot Higgins under the auspices of UC Berkeley." Moreover, the Contract provided a release of liability clause seeking to hold harmless both Higgins and the University.

114.    Butler understood that she was being employed by the University.

115.    Butler is informed, believes and on that basis alleges, that the University authorized Higgins to hire and supervise an undergraduate assistant while Higgins conducted her research in Alaska.

116.    Higgins was on the board of The Wrangell Mountain Center ("The Center") which housed the Alaska Wildlands Studies Program ("The Program").

117.    The University advertises for University students to enroll in the Program, and University students receive academic credit for completing the Program.

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

118. John Doe is on the board of The Center and is a guest lecturer for the Program.

119. John Doe was, at all relevant times, a guest lecturer at the University and was frequently on campus in this capacity while Butler was a student at the University.

120. Higgins met John Doe through their mutual work at The Center. Prior to the Summer of 2012, Higgins personally experienced John Doe engage in inappropriate conduct with her that made her feel uncomfortable. What's more, prior to the Summer of 2012, John Doe's inappropriate behavior was generally discussed among women at the Center, and Higgins knew of several other women who had experienced his inappropriate behavior.

121. Prior to the Summer of 2012, Higgins was aware that John Doe would be living at The Center. Notwithstanding the fact that she had experienced inappropriate behavior by John Doe, and was aware that several other women had also experienced inappropriate behavior by John Doe, Higgins arranged for Butler to live at the Center.

122. Toward the end of June 2012, Butler was in the dining hall at The Center. John Doe approached Butler from behind, pressed Butler up against a table, and proceeded to insert his hands in to Butler's underwear and massage Butler's genitals. Butler could feel John Doe's breath on her right shoulder as he continued to assault her. After a short time, John Doe stopped, removed his hands from Butler's underwear, and left without saying anything.

123. The next day, Butler contacted Higgins to report what had happened. Butler did not reveal the name of her assailant to Higgins. However, unprompted, Higgins specifically asked Butler if it was John Doe who had touched her inappropriately. Butler confirmed to Higgins that it was John Doe who had assaulted her, but asked that Higgins not say anything at that time.

124. A few days later, Butler was in the library at the Center. John Doe entered the room

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

and maneuvered behind Butler's chair. He swept her hair to one side and whispered "it's so nice to have such a beautiful woman around" into Butler's ear. John Doe then patted Butler's shoulder and left the room. Butler again reported this incident to Higgins.

125. Later that summer, Butler was again in the kitchen at the Center preparing her dinner when John Doe entered the room. He again maneuvered behind her, pressed her up against the kitchen counter, reached around her body and rubbed Butler's breasts underneath her clothing. John Doe quickly retracted his hands after there was an audible noise outside the room. He then whispered "you have such a beautiful voice" to Butler and left the room.

126. Butler immediately reported this assault to Higgins. Higgins was away for a few days and she advised Butler to pack her belongings and go to Higgins cabin, which was offsite from the Center and away from John Doe.

127. Upon Higgins' return, Butler asked Higgins if she had reported John Doe to anybody, or spoken to John Doe about the assaults. Higgins responded that she had done neither.

128. Upon completion of Butler's employment with Higgins, Higgins mentioned to Butler that she had spoken to John Doe and that she believed that John Doe "really gets it this time."

129. Upon returning to the University, Butler reported her assaults to Ms. Ambrosio. Ms. Ambrosio set up a meeting between Butler and Ms. Oldham, the Title IX Coordinator. Ambrosio informed Butler that the meeting was to assess Butler's credibility.

130. During the meeting, Butler identified John Doe as her assailant. Oldham repeatedly asked Butler if she ever affirmatively rebuffed any of John Doe's advances. She then asked how John Doe was supposed to know his conduct was not welcomed if Butler never affirmatively denied consent.

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

131.   At the end of the meeting, Oldham admonished Butler regarding the consequences of falsely reporting sexual assaults.

132.   Butler is informed, believes, and on that basis alleges that to date, there has been no investigation by the University into John Doe, nor has any disciplinary action been taken against John Doe.

133.   As a result of the University's conduct, and lack of conduct Butler has suffered psychological and emotional damages, and has experienced a loss of educational opportunities and/or benefits, including but not limited to:

- Being forced to withdraw from an internship she had secured with the Gender Equity Resource Center because she was deemed "too political" for speaking out against the way the University handles reports of sexual assault;

- Being forced to drop a class, required for her major, during finals week in the Fall of 2013;

- Being forced to avoid classes altogether for fear that she would encounter John Doe on campus.

## E. BACKGROUND FACTS RELATED TO NICOLETTA COMMINS' COMPLAINT

134.   Commins was sexually assaulted in January 2012 in her apartment by John Doe 2, a student at the University.

135.   At no time did Commins receive any formal education from the University regarding prohibited sexual misconduct, or the University's sexual misconduct policies.

136.   Commins is informed, believes, and on that basis alleges that at no time did John Doe 2 receive any formal education from the University regarding prohibited sexual misconduct, or the University's sexual misconduct policies.

137.   Commins and John Doe 2 were acquainted through their mutual involvement with the Tae Kwon Do team at the University.

FIFTH AMENDED COMPLAINT FOR DAMAGES

138.   One night, Commins invited John Doe 2 over to her apartment.  The night quickly turned from flirtatious to John Doe 2 performing non-consensual sexual acts on Commins.

139.   Without Commins' consent, John Doe 2 performed oral sex on Commins, tried to coerce Commins to perform oral sex on him by forcibly pushing her head towards his genitals and getting on top of Commins and rubbing his penis on Commins face as she turned away, and digitally penetrated Commins.

140.   The next day, Commins reported her assault to the Tang Student Health Center at the University.

141.   The Tang center performed a cursory exam, but did not perform a rape kit.

142.   On January 20, 2012, Commins reported her assault to the University Police Department who in turn told her to go to the Berkeley Police Department.  Her report to the University Police Department constituted actual knowledge by the University of her assault according to the University's Sexual Assault Policy.

143.   She then went to Highland Hospital wherein a rape kit was performed.  The rape kit revealed evidence of trauma.

144.   Four days prior to John Doe 2's sexual assault of Commins, on January 16, 2012, John Doe 2 had physically assaulted two other students at a party at a University fraternity house.  These students reported this assault to the University, and John Doe 2 received notice of being charged with a violation of the Code of Student Conduct related to this incident on February 10, 2012.

145.   In January of 2012 the Alameda District Attorney's Office filed a criminal complaint against John Doe 2 alleging multiple felony sexual assault charges based on the sexual assault of Commins on January 20, 2012.

146.   On or about January 31, 2012, the University sent a letter to John Doe 2 informing him

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

that he was placed on an interim suspension which prohibited him from entering any part of the University campus and all University property.  The letter additionally informed John Doe 2 that a hearing would be held on February 3, 2012 to determine if the prohibition would remain in place.  This interim suspension notice alleged violations for both the January 16, 2012 physical assault and the sexual assault of Commins on January 20, 2012.

147.  Commins was never informed of the interim suspension prohibition or that a hearing would take place.  Additionally, the prohibition did not include a "no contact" order with Commins. On February 3, 2012, the University held a hearing to determine if John Doe 2 should remain on an interim suspension.  Commins is informed and believes that John Doe 2 was represented by counsel at that hearing.  As a result of that hearing, the suspension was modified to allow John Doe 2 on campus to attend classes and given a window of time within which to get to and from his classes.  This prohibition did not include a "no contact" order with Commins.

148.  Commins was not present at the hearing and no University official had yet spoken with Commins to get her input as to whether John Doe 2 should remain on campus.

149.  Commins was never informed that John Doe 2 was on any type of prohibition, or that he was allowed to be on campus to attend his classes.

150.  Commins was never informed about any possible interim measures for her protection, including the ability to request a "no-contact" order.

151.  On February 22, 2012, Commins submitted an Incident Report Form, officially reporting her assault, to the University's Center for Student Conduct.

152.  On or about March 5, 2012 Commins spoke with Julio Oyola ("Oyola"), Student Conduct Specialist with the CSC.  Oyola asked questions regarding the sexual assault.  Oyola told Commins that the University would perform an investigation, however,

Commins was made to believe that the investigation could not commence until after the Berkeley Police Department finished with their investigation.  Commins was asked if she was comfortable with the University delaying its investigation until after the criminal proceedings had concluded.   Commins responded that she was not comfortable with any delay in the commencement of the University's investigation.

153.   Commins is informed and believes that Oyola met with John Doe 2 on March 6, 2012.

154.   On March 22, 2012 Oyola sent John Doe 2 the official notice of charges relating to his sexual assault of Commins.

155.   On March 23, 2012 Oyola sent John Doe 2 copies of his student conduct record.

156.   On April 2, 2012, an investigator working for John Doe 2's attorney called Commins. This investigator caught Commins off guard and attempted to pressure her into consenting to allow John Doe 2 to continue his studies at the University, and Commins conceded that she could comfortably complete her studies if John Doe 2 was on campus.  She also asked if Commins would be comfortable with the University staying their investigation until John Doe 2's criminal proceedings were completed.  Commins responded that she needed more time to think about the last request.

157.   This contact by John Doe 2's agent amounted to additional intimidation and harassment of Commins subsequent to her report of sexual assault.

158.   Later that same day, Commins e-mailed Oyola regarding her contact by John Doe 2's investigator as well as the contents of their conversation.  Commins informed Oyola that she was not comfortable with the University waiting to initiate their investigation until after John Doe 2's criminal proceedings had concluded.  In explaining this to Oyola, Commins wrote that she did not think she had any say in whether the school's disciplinary action could be stayed.  She also informed Oyola that she was not sure she was comfortable with John Doe 2 being allowed to remain on campus at all.  In

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

conclusion, Commins wrote: "I just want to be sure that if my opinions become a consideration in any of these issues, I will be able to express them firsthand."

159. On April 4, 2012 Oyola spoke with John Doe 2. Oyola's notes indicate that John Doe 2 made a request to "stay the process until criminal proceedings have been resolved."

160. On April 19, 2012 Oyola met with John Doe 2 and his attorney. Oyola's notes from this meeting indicate that they engaged in discussions regarding an informal resolution of the matters and discussed the criminal proceedings.

161. University administrators continued to meet, or otherwise communicate with John Doe 2 and his attorney on several occasions to discuss the commencement of the investigation, request that John Doe 2's complaints be resolved using the University's informal early resolution process, and provide information as to the measures John Doe 2 was taking to ensure that he would not continue to engage in criminal misconduct in the future.

162. On April 30, 2012 Commins met with Oldham. At this meeting, Oldham asked Commins to tell her what happened on the night of her assault. Oldham also asked Commins to gather some documents when she went home and send them to Oldham. Oldham did not explain to Commins about any investigation that would be taking place. Nor did Oldham ask Commins whether she would agree to an informal resolution process. On April 30, 2012 John Doe 2's attorney sent a letter to the Dean of Students requesting that any formal hearing process be stayed pending the outcome of John Doe 2's criminal charges and that the University engage in an informal resolution of the complaints.

163. On May 4, 2012, the Dean of Students wrote a letter to John Doe 2 which again modified John Doe 2's interim suspension. Effective May 11, 2012 John Doe 2 was once again to be prohibited from entering upon the University campus or any

University property.

164. On May 11, 2012, the Dean of Students sent a modified letter to John Doe 2 describing the same prohibition with additional caveats.  The May 11, 2012 letter indicates that an agreement has been made between John Doe 2 and the University.  In part, the letter states: "This interim suspension has been imposed in part to accommodate your request to postpone the hearing upon your charges until such time as criminal charges pending against you have been resolved.  You and the [CSC] have agreed that charges pending against you will not be heard without your consent prior to the earlier of the date set forth in the paragraph above."   This letter was then signed by John Doe 2 in acknowledgement of that agreement.

165. Commins were never informed of the agreement between John Doe 2 and the University, and was never given an opportunity to provide input as to the agreement.

166. Despite having knowledge of Commins' sexual assault for approximately three months, and despite Commins' clear wishes that a University investigation ensue independent of John Doe 2's criminal proceedings, the University honored John Doe 2's request and stayed the investigation.   This decision by the University was contrary to the University's Interim Sexual Misconduct Policy.

167. Plaintiff is informed, believes and on that basis alleges that the University delayed in placing John Doe 2 on a full interim suspension to allow him to complete his classes for the Spring 2012 semester.

168. Commins was never notified about this interim suspension by anybody at the University.  Instead, Commins learned by the end of spring of 2012 that John Doe 2 had been placed on some sort of suspension and had moved back to Southern California to live with his parents.  Commins learned this information from the deputy district attorney who was prosecuting John Doe 2 in criminal court for his sexual assault of

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

Commins.

169.   On October 5, 2012, John Doe 2 was convicted of felony assault for his attack on Commins and was sentenced to five years probation and 1,000 hours of community service.

170.   In October through November of 2012, University administrators, including Hunt and Oldham, engaged in several e-mail communications with John Doe 2's attorney.  John Doe 2's attorney received several updates regarding John Doe 2's case, and offered to provide evidence to support John Doe 2's defense in the University investigation. Ultimately, John Doe 2's attorney did provide evidence to Hunt and Oldham.  John Doe 2 also provided letters and recommendations from several witnesses to support the defense of his University claim.

171.   Meanwhile, Commins was never allowed to provide any evidence to support her claims, and she was not allowed to view and comment on John Doe 2's evidence.

172.   At some point in the late Fall or early Winter of 2012, Commins received a call from either Hunt or Erin Niebylski, another University administrator.  On this call, it was represented to Commins that she would be able to engage in a formal hearing process, which would include her ability to present evidence and witnesses, prior to any sanctioning of John Doe 2.  She was never told that the University was engaging in an informal resolution process instead.

173.   On January 21, 2013, approximately one year after the University received actual knowledge of Commins' sexual assault, and three and a half months after the resolution of John Doe 2's criminal proceedings, Oldham informed Commins and John Doe 2 that she had completed the investigation and found that he had violated the University of California Policy on Sexual Harassment.  This finding would then be forwarded to the Center for Student Conduct to evaluate whether John Doe 2 violated the Code of

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

Student Conduct.

174.  In order to come to this conclusion, the University's entire year-long investigation entailed: (1) an interview of Commins, (2) review of the Berkeley Police Department report regarding the assault of Commins, (3) review of Commins' hospital records from the night of the assault, and (4) transcripts of online chat conversations between Commins and John Doe 2.  According to the Investigation Report John Doe 2 declined to participate in an interview or otherwise respond directly to the allegations made against him on advice of his attorney.

175.  On January 30, 2013, John Doe 2 and his attorney were provided with a copy of the Title IX Investigation Report.

176.  Commins was never provided a copy of the Title IX Investigation Report.

177.  At no time did anyone contact Commins to inform her of the status of the investigation, that it would not be completed within 60 days, or provide an estimate date for the completion of the investigation.  The intentional decision by the University to delay the investigation pending the outcome of John Doe's criminal case, and its failure to timely complete the formal investigation was against the University's Sexual Harassment Policy.

178.  On February 4, 2013, prior to issuing any sanction, or even suggested sanctions against John Doe 2, John Doe 2 and his attorney met with Hunt to discuss his side of both the physical assault and sexual assault he committed.

179.  On February 7, 2013 Hallie Hunt contacted Commins to ask if Commins would be comfortable with John Doe 2 being suspended until Commins finished her studies at the University.  This is the first time a suspension of any kind of John Doe 2 was mentioned to Commins. Commins responded that she would be most comfortable with John Doe 2 being permanently expelled. Hunt told Commins that expulsion was not an

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

option.  Commins took Hunt's statement to mean that she had no choice and was forced to accept a suspension of her assailant at best.

180.  On February 27, 2013, Hunt sent John Doe 2 an Administrative Disposition Letter ("ADL"), thanking John Doe 2 for meeting with her.  This letter also informed John Doe 2 that he had been found to have engaged in "Physical Abuse" as it was defined in the University's Code of Student Conduct for both his physical assault of another student, and his sexual assault of Commins. The ADL proposed an informal resolution of his case if he were to accept the sanctions therein.

181.  At no time did anyone from the University speak with Commins to determine if she agreed to an informal resolution.

182.  At no time did anyone from the University advise Commins that she had a right to appeal the CSC's decision to enter into an informal resolution.

183.  As a sanction for both his physical assault of another student, and his sexual assault of Commins, John Doe 2 negotiated and agreed to (1) a suspension through August 31, 2015, (2) Exclusion from campus and official University functions through August 31, 2015, (3) Disciplinary probation for the remainder of his studies, (4) No contact with Commins, and (5) a reflective writing assignment.

184.  On March 5, 2013, the University officially resolved its grievance procedure against John Doe 2 using an informal resolution process when John Doe 2 accepted the sanctions laid out in Administrative Disposition Letter of February 27, 2013.

185.  Also in March 2013, Hunt sent an e-mail to Commins informing her of the outcome of the informal resolution process.  However, Hunt sent the e-mail to an e-mail address that Commins had never used to communicate with the University regarding her report of sexual assault, and one that Commins never checked.  Accordingly, Commins did not learn of the outcome of the resolution process at that time.

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

186.   The Administrative Disposition Letter was never provided to Commins.

187.   In July 2013 Commins e-mailed Hunt and Niebylski to request an update on the investigation.   The next day, Hunt responded and outlined John Doe 2's sanctions. Hunt did not inform Commins that John Doe 2's sanctions were the result of both his physical assault of another student, and his sexual assault of Commins.   Instead, Commins was led to believe that the sanctions were only a result of John Doe 2's conduct against her.

188.   In early April 2014 Commins contacted Hunt to inform her that Commins had been accepted to several graduate schools, including the University's graduate school of Public Health.   Commins expressed to Hunt that although the University's program was her first choice, she was concerned that John Doe 2's suspension would be lifted and he would be allowed to return to campus during the fall of 2015.   Hunt informed Commins that she believed John Doe 2 intended to return to his studies at the University following his suspension.

189.   On April 17, 2014, Commins e-mailed Hunt to inform her that she had decided to enroll at the University's Public Health graduate school.   Commins also told Hunt: "I have made the choice to pursue my graduate studies at Berkeley in spite of the fact that I feel it is a risk to my physical safety and emotional well-being, and so my excitement about starting the next chapter of my education is cheapened by feelings of anger, helplessness and fear."

190.   On September 15, 2014, Commins' father sent a letter to Nicholas B. Dirks, Chancellor of the University.   Mr. Commins outlined all of the details of both the criminal and University investigation of John Doe 2 for sexually assaulting his daughter, including that John Doe 2 was convicted of felony assault, and suspended by the University.   Mr. Commins also informed Chancellor Dirks that Commins was going to be enrolling in

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

the University's graduate program of Public Health and would therefore be on campus when John Doe 2 was allowed to return.  Mr. Commins requested, on behalf of his daughter, that John Doe 2 not be allowed to return to the University.  In response to his request, Commins' father received boilerplate responses from low level University employees.

191. Despite both Commins' and her father's protestations, John Doe 2 was allowed to recommence his studies at the University in late August of 2015 and graduated from the University.

192. Despite the University putting in place a No Contact Order with Commins, John Doe 2 was still allowed back on campus, even though he had demonstrated violent propensities and a disregard of the law and school policies.  Notwithstanding the restrictions placed on John Doe 2, a convicted felon at the time, Commins was still forced to maintain a heightened vigilance knowing that her assailant could not be trusted to control his conduct or adhere to such restrictions.

193. At no time following the informal resolution process was Commins ever given an opportunity to appeal any of the sanctions.

194. At no time during the informal resolution process was Commins allowed to provide evidence and/or witnesses to support her allegations.  Nor was Commins ever allowed to see the evidence John Doe 2 provided, let alone comment or provide rebuttal evidence.

195. Despite Oldham's concession that informal resolution procedures are never appropriate to respond to complaints of sexual assault, and despite the University's representation to Commins that there would be a formal hearing process in which she would be allowed to participate, the University used an informal resolution process to resolve Commins' complaint.

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

196.   As a result of the University's conduct, and lack of conduct, Commins has suffered psychological and emotional damages, and has experienced a loss of educational opportunities and/or benefits, including but not limited to:

- Being forced to drop a class because it let out at night, and she was fearful of encountering John Doe 2 on campus after dark;

- Avoiding enrollment in any classes that let out after dark, unless she knew someone in the class that could walk her home, because she was fearful she would encounter John Doe 2 on campus;

- Being forced to take a reduced course load for the semester after her report, and having to stay in school for an extra summer to make up for her reduced course load;

- Withdrawing her participation in the Tae Kwon Doe Club; and

- Significantly higher amounts of absences from classes;

- A significant reduction in the enjoyment of her academic experience at the University.

**COUNT ONE**

**DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681**

**(TITLE IX)**

**(ALL PLAINTIFFS AGAINST DEFENDANT REGENTS)**

197.   Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

198.   Defendant maintained a policy of indifference to sexual misconduct on campus.

199.   Defendant's policy of indifference created a heightened risk of sexual harassment on campus that was known and/or obvious to Defendant.

200.   Defendant knowingly and deliberately concealed the breadth of the problem of sexual misconduct on its campus, maintained multiple, contradictory and confusing policies,

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

and failed to enforce its policies creating an environment in which sexual misconduct was tacitly approved, and sexual predators could operate with impunity without fear of consequence. By maintaining multiple and contradictory policies, Defendant violated 34 C.F.R. § 106.9 which requires an educational institution to notify students, and others, of their rights and protections under Title IX.

201.  Defendant knowingly and deliberately failed to publicly report, as required by law, instances of sexual misconduct committed by its students and employees. Such failure created a false sense of security for female students on campus, and deprived them of the information necessary to protect themselves from sexual predators on campus.

202.  Defendant knowingly and deliberately failed to adhere to the guidelines and recommendations promulgated by the DOE in both its 2001 Guidance and DCL.

203.  Defendant failed to properly train its employees, including its GSIs, with respect to detecting, preventing, and responding to sexual misconduct. Defendant also failed to train its students with respect to identifying sexual misconduct, preventing its occurrence, and reporting its occurrence.

204.  Defendant's policy of indifference to sexual misconduct on campus created a heightened risk for sexual misconduct to occur which was a substantial factor in causing the sexual assaults alleged by Plaintiffs herein.

205.  It was obvious, or Defendant knew of the serious risk of sexual misconduct on campus. Defendant knew that hundreds of instances of sexual misconduct occur on campus every year. Defendant nevertheless deliberately concealed the amount of sexual misconduct on campus in violation of federal law, maintained multiple, contradictory policies for addressing sexual misconduct, failed to enforce its policies, failed to train its employees, agents, and students, failed to adhere to federal guidelines, and maintained a general policy of indifference to sexual misconduct on campus. The need

FIFTH AMENDED COMPLAINT FOR DAMAGES

for more effective policies, and a more effective response to sexual misconduct was so obvious, and the aforementioned inadequacies so likely to result in Title IX violations, that Defendant's actions and inactions were a substantial factor in causing the sexual assaults alleged by Plaintiffs herein.

206.   In addition to its general policy of indifference to sexual misconduct, Defendant exhibited a policy of indifference to sexual misconduct committed by members of the Club. Defendant had knowledge of no less than three instances of sexual misconduct committed by male Club members against female Club members prior to Karasek's assault during a Club retreat. Defendant also had knowledge that one of those instances involved TH sexually assaulting a female student during a Club event prior to sexually assaulting Karasek. Nevertheless, Defendant did not take any action to remedy the issue of sexual misconduct in the Club or prevent future occurrences of sexual misconduct committed by TH, or other members of the Club prior to Karasek's assault.

207.   Defendant's failure to train GSIs, including Higgins, in sexual assault detection, prevention, and response was a substantial factor in causing Butler's sexual assaults. Higgins was aware of Butler's first incident of sexual assault and aware of who assaulted Butler, yet failed to do anything in response. Had the University trained Higgins with respect to sexual misconduct, Higgins could have prevented Butler's additional sexual harassment and sexual assault once she learned of Butler's first instance of sexual misconduct.

208.    As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of

life; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**WHEREFORE**, Plaintiffs pray for damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

### <u>JURY DEMAND</u>

Plaintiffs demand a jury trial on all issues so triable.

Date: June 5, 2020                    THE ZALKIN LAW FIRM, P.C.
                                      IRWIN M. ZALKIN
                                      DEVIN M. STOREY
                                      ALEXANDER S. ZALKIN
                                      RYAN M. COHEN


                              By:    /s/ Alexander S. Zalkin
                                      Alexander S. Zalkin
                                      Attorneys for Plaintiffs

**FIFTH AMENDED COMPLAINT FOR DAMAGES**

## PROOF OF SERVICE

<u>Sofie Karasek, et al., v The Regents of the University of California, a public entity, et al.,</u>
United States District Court, Northern District of California, San Francisco Division,
Case No: 3:15-cv-03717-WHO

I, **Stephanie M. Paleo**, am employed in the city and county of San Diego, State of California. I am over the age of 18 and not a party to the action; my business address is 10590 W. Ocean Air Drive, Suite 125, San Diego, CA 92130.

On June 5, 2020, I caused to be served:

**FIFTH AMENDED COMPLAINT FOR DAMAGES:**

   **1.  DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. §1681 (TITLE IX)**

in this action by placing a true and correct copy of said documents(s) in sealed envelopes addressed as follows:

**SEE ATTACHED SERVICE LIST**

(BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Diego, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

(BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s) on the date listed above.

(BY OVERNIGHT DELIVERY – FEDERAL EXPRESS) I enclosed the documents in an envelope or package provided by an Federal Express and addressed to the persons at the addresses listed below. I placed the envelope or package for collection and overnight delivery at an office of a regularly utilized drop box for Federal Express.

XX   (BY E-MAIL OR ELECTRONIC TRANSMISSION) Using the CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing to the persons at the emails listed below. I did not receive, within a reasonable time after the transmission, any electronic messages or other indication that the transmissions were unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on: June 5, 2020

                                                     */s/ Stephanie M. Paleo*
                                                     Stephanie M. Paleo
                                                     stephanie@zalkin.com

## SERVICE LIST

HAILYN J. CHEN (SBN 237436)
hailyn.chen@mto.com
JOHN B. MAJOR (SBN 306416)
 john.major@mto.com
MUNGER, TOLLES & OLSON, LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone:(213) 683-9100
Facsimile:(213) 687-3702


JEROME MAYER-CANTÚ (SBN 291623)
jerome.mayer-cantu@ucop.edu
UNIVERSITY OF CALIFORNIA
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607
Telephone:(510) 987-9800
Facsimile:(510) 987-9757

Attorneys for Defendant
The Regents of the University of California