United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOFIE KARASEK, et al., | Case No. 3:15-cv-03717-WHO |
| Plaintiffs, | |
| v. | **ORDER ON MOTION TO DISMISS** |
| | Re: Dkt. No. 140 |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, THE, | |
| Defendant. | |

## INTRODUCTION

The plaintiffs in this case were sexually assaulted while enrolled at the University of California, Berkeley ("the University"). As relevant here, they brought two types of claims against the University under Title IX: "post-assault" and "pre-assault." A post-assault claim alleges that a school's response to a complaint of sexual misconduct violated Title IX; a pre-assault claim alleges that the school maintained a policy of deliberate indifference to sexual harassment that created a heightened risk of it and, ultimately, led to a plaintiff's particular harassment. After a long series of motions and orders, I eventually dismissed two of the plaintiffs' post-assault claims and granted summary judgment to the University on the third. Those rulings were upheld on appeal. I also dismissed the pre-assault claims on the ground that the plaintiffs had not shown their theory of Title IX liability was viable. The Ninth Circuit vacated that decision and held that a pre-assault claim based on a school's alleged general policy of deliberate indifference was cognizable under Title IX. It remanded the case to me to determine, in the first instance, whether the plaintiffs' pre-assault claims met the standard it laid out.

I GRANT IN PART and DENY IN PART the University's motion to dismiss for failure to state a claim. The plaintiffs have plausibly alleged that the University maintained a de facto

United States District Court
Northern District of California

policy of deliberate indifference toward sexual misconduct that created a heightened risk of harassment that was obvious.  Plaintiff Sofie Karasek has also shown such a policy in the particular context—a school club—in which she was assaulted and she has plausibly alleged that this policy is causally linked to her assault.  Her claim is adequately pleaded.  Plaintiff Nicoletta Commins has not stated a claim because, on this record, there is no causal connection between the University's alleged policy—troubling as it allegedly is—and her assault.  Plaintiff Aryle Butler has not stated a claim because a previous order in this case found that her assaults and harassment did not occur in a context subject to the University's control.  I give Commins leave to amend the complaint, if she believes she can adequately allege causality.

**BACKGROUND**

**I.     FACTUAL BACKGROUND**

Because this case is before me on a motion to dismiss, the facts here are drawn from the Fifth Amended Complaint ("FAC") [Dkt. No. 138].  Like the Court of Appeals, I remind the parties and others that these facts have not been established.

**A.  The Plaintiffs' Assaults**

Karasek, Commins, and Butler were sexually assaulted while enrolled at the University.[1]  I have discussed the details of those assaults in several prior orders and will not repeat them here except as necessary to resolve the current motion.  *See, e.g.*, *Karasek v. Regents of Univ. of Cal.*, 226 F. Supp. 3d 1009, 1015–24 (N.D. Cal. 2016), *aff'd in part, vacated in part, remanded*, 948 F.3d 1150 (9th Cir. 2020), *opinion amended and superseded on denial of reh'g*, 956 F.3d 1093 (9th Cir. 2020) ("Prior MTD Order").  The FAC and this motion concern only the University's alleged pre-assault liability, not its post-assault response.  The University's response to the plaintiffs' assaults in particular is, accordingly, not relevant to the plaintiffs' current claims.

**i.     Karasek**

Karasek was assaulted in February 2012 on a biannual trip with the Cal Berkeley Democrats Club (the "Club") while in her bed.  FAC ¶¶ 39–42.  She alleges that, on the same trip

---

[1] The suit is against the Regents of the University of California.  For simplicity, I refer to them as "the University" as well.

1  in 2008, the then-president of the Club assaulted another member; when that student reported the

2  assault to the University's Police Department, she was told the University "could do nothing

3  because the assault occurred off campus." *Id.* ¶ 36.  In 2011, one member assaulted another at a

4  different Club retreat; Karasek alleges that the University knew about the assault but did not

5  respond in any way. *Id.* ¶ 37.  Finally, Karasek alleges that "TH," the same student who sexually

6  assaulted her, assaulted another student at this same retreat in 2011 and that the University knew

7  and did not respond. *Id.* ¶ 38.  Karasek claims that TH "never received any education from the

8  University on prohibited sexual misconduct or the University's policies related to sexual

9  misconduct." *Id.* ¶ 43.

10                    **ii.    Butler**

11          Butler was assaulted or harassed three times while serving as a research assistant to

12  University PhD candidate and graduate student instructor ("GSI") Margot Higgins in summer

13  2012, beginning in June. *Id.* ¶¶ 109, 113, 119–125.  The FAC alleges that Higgins was an agent of

14  the University because she was a GSI but that she "has no recollection of receiving any training on

15  sexual misconduct, including how to detect, prevent, or respond to sexual misconduct." *Id.* ¶ 111.

16  Butler signed a work contract on University letterhead to serve as an assistant to Higgins at a

17  facility in Alaska during that summer. *Id.* ¶ 113.  Butler's assaulter, "John Doe," was a guest

18  lecturer for the program Butler was a part of and sat on the board of the center where she worked.

19  *Id.* ¶ 118–19.  The plaintiffs allege that Higgins had "experienced John Doe engage in

20  inappropriate conduct" and that his "inappropriate behavior was generally discussed among

21  women at the" research facility. *Id.* ¶ 120.  Higgins arranged for Butler to live at the facility. *Id.* ¶

22  121.  Doe assaulted Butler in the facility's dining hall in June 2012. *Id.* ¶ 122.  Butler reported the

23  assault to Higgins. *Id.* ¶ 123.  Over the summer, Doe harassed and/or assaulted Butler twice more.

24  *Id.* ¶ 124–25.  Butler reported both incidents to Higgins. *Id.* ¶ 124, 126.  When she returned to

25  campus, Butler reported the incidents to the University. *Id.* ¶ 129.

26                    **iii.    Commins**

27          Commins was sexually assaulted in her apartment in January 2012 by another student,

28  "John Doe 2." *Id.* ¶ 134.  She alleges that Doe 2 did not "receive any formal education from the

United States District Court
Northern District of California

United States District Court
Northern District of California

University regarding prohibited sexual misconduct, or the University's sexual misconduct policies." *Id.* ¶ 136.  Commins reported the assault to the University Police Department, where she was told to report to the Berkeley Police Department.  *Id.* ¶ 142.  "Four days prior to John Doe 2's sexual assault of Commins, on January 16, 2012, John Doe 2 had physically assaulted two other students at a party at a University fraternity house"; the University charged him with violating the Code of Student Conduct.  *Id.* ¶ 144.  Alameda County filed a criminal complaint against him for the assault of Commins and he was eventually suspended through August 2015 and barred from campus.  *Id.* ¶ 145, 183.  After a series of proceedings discussed in prior orders, *see* Prior MTD Order at 1019–1024, Doe 2 was permitted to resume his studies in August 2015, by which time Commins had enrolled in graduate school at the University, FAC ¶¶ 188–91.

### B.  The University's Sexual Assault Policies

The plaintiffs allege that, in the relevant timeframe, "the University had in place multiple and contradictory policies for responding to allegations of student on student sexual assault."  *Id.* ¶ 12.

### i.   Department of Education Guidance

In 2001, the Department of Education ("DOE") issued its Revised Sexual Harassment Guidance ("2001 Guidance"), laying out what it believed schools must do to comply with Title IX. *Id.* ¶ 5.  On April 4, 2011, DOE published a Dear Colleague Letter ("DCL") that supplemented the 2001 Guidance.  *Id.* ¶ 11.[2]  The plaintiffs highlight several of the DCL's requirements:

- All persons involved in a complaint resolution process must be trained in handling complaints of sexual harassment or sexual violence;

- A school's grievance procedures must be prominently displayed on the school website, and widely distributed throughout campus in both print and electronic formats;

- A school must take immediate action to address a complaint of sexual harassment/assault, prevent its reoccurrence and address its effects;

- A school should notify the complainant of his or her options to avoid contact with the alleged perpetrator;

---

[2] As in previous orders in this case, I take judicial notice of all federal guidance documents referenced in the FAC, including the DCL.  *See* FED. R. EVID. 201(b)(2).  As in those orders, this does not mean that I accept as binding the plaintiffs' interpretation of those documents.

4

- When taking steps to separate a complainant and alleged perpetrator, a school should minimize the burden on the complainant;

- A school must inform a complainant of their right to file a criminal report and not discourage the complainant from doing so;

- A school must conduct their own investigation, and take immediate steps to protect the complainant and the school community at large;

- Although a school may need to delay the fact-finding portion of an investigation while the police are gathering evidence, the school must promptly resume and complete its fact-finding once the police department has completed its gathering of evidence, not after the ultimate outcome or the filing of any charges (usually three to ten calendar days);

- Grievance procedures may include voluntary informal mechanisms. However, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. In cases involving allegations of sexual assault, mediation is not appropriate;

- A school must treat both parties equally throughout the investigative process;

- A school must give the parties to a complaint periodic status updates;

- Throughout the school's investigation the parties must have an equal opportunity to present relevant witnesses and other evidence;

- A resolution should be achieved no longer than 60 days after the complainant makes a report of sexual harassment/assault;

- A school must notify the parties in writing about the outcome of the complaint;

- A school should take proactive measures to prevent sexual harassment and violence, including implementing sexual misconduct prevention education and providing such education to its employees and students multiple times;

- "These programs should include a discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies;"

- A school's sexual misconduct policies should include instruction for students who are victims of sexual misconduct on where, and to whom, they should report. The policies should also instruct students and employees what to do if they learn of an incident of sexual misconduct;

- "Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence."

*Id.* ¶ 11.

### ii.      Interim Sexual Misconduct Policy

In September 2013, the University implemented an "Interim Sexual Misconduct Policy"

("Interim Policy"). *Id.* ¶ 13.  The plaintiffs claim, however, that the University "began employing the practices detailed" in the Interim Policy in 2011. *Id.*  They also allege that the Interim Policy adopted the guidelines set out in the DCL. *Id.*  The Interim Policy required that sexual misconduct complaints against students be made to the University's Police Department, Center for Student Conduct ("CSC"), or Office for the Prevention of Harassment and Discrimination ("OPHD"). *Id.* ¶ 14.  The OPHD was given responsibility for investigating complaints brought to it and the CSC. *Id.*  It would delay its investigation if law enforcement officers collected evidence for a criminal investigation, but was required to "promptly resume" investigating once it would no longer interfere. *Id.*  OPHD was required to complete its investigation within 60 days or inform the complainant that it could not and provide an estimated completion date. *Id.*

Under the Interim Policy, if there was an "informal resolution" of a complaint, the CSC was required to consult with the complainant regarding that resolution. *Id.*  The CSC and responding student could enter into an informal resolution but the complainant had the ability to appeal the CSC's decision to do so. *Id.*  Notices of dispositions and outcomes of the process had to be given to the complainant on the same day they were provided to the responding student. *Id.*

### iii.    Other Policies

The plaintiffs raise three other policies: the University's Code of Student Conduct, Sexual Harassment Policy, and Sexual Assault Policy. *Id.* ¶¶ 15–19.  Each contains various reporting and investigatory requirements. *See id.*  Among other features, the plaintiffs allege that the Code of Student Conduct "contains no policies with respect to rights of the complainant, notifications to the complainant, or opportunities for the complainant to meet with staff or discuss possible outcomes of the complaint." *Id.* ¶ 16.  They also allege that both the Code of Student Conduct and the Sexual Assault Policy state that the CSC would conduct sexual assault investigations, which contradicts the Interim Policy's requirement that the OPHD will do so. *Id.* ¶ 19.

### C.    The California State Audit

In June 2014, the California State Auditor released a report called "Sexual Harassment and Sexual Violence: California Universities Must Better Protect Students by Doing More to Prevent, Respond to, and Resolve Incidents" (the "Audit"). *Id.* ¶ 20; *see* CALIFORNIA STATE AUDITOR,

REP. NO. 2013-124 SEXUAL HARASSMENT AND SEXUAL VIOLENCE (2014),

https://www.auditor.ca.gov/pdfs/reports/2013-124.pdf.  The Audit analyzed 20 case files

(including Karasek's complaint) at four California universities, including the University.  FAC ¶

21.  It found, among other things, that universities had not adequately ensured that faculty and

staff were trained in responding to and reporting sexual misconduct, sufficiently educated students

about sexual misconduct, always followed state law requirements for distributing policies, or

adequately informed complainants of the status and outcome of investigations.  *Id.* ¶ 22.

The Audit also addressed the University specifically.  For instance, the Audit found that

the University did "not have processes to ensure that all incoming students receive" education in

sexual violence.  Audit at 29.  The University was also in the "some concerns identified" category

(as opposed to "no concerns identified" or "did not perform the stated activity") for employee

training in identifying and reporting incidents and distributing copies of its policies to students at

orientation.  *Id.* at 16–17.  These educational failings, the Audit found, led to "mishandle[ing]" of

complaints and placed students' safety "at risk."  *Id.* at 15, 30.

The Audit found that the University "resolved 76 percent of Title IX complaints from

students using the [informal] early resolution process."  *Id.* at 53.  Given "significant procedural

differences between the formal and informal processes," the Audit found that universities should

have, but did not, always clearly communicate to complainants about those differences.  *Id.*

Indeed, the Audit used a case from the University as an example of how the informal process

could lead to improper handling of complaints.  *Id.* 53.  The University was, for example, "unable

to demonstrate that [it] consistently informed students of what to expect as the university

investigated their complaints and how to report retaliatory harassment."  *Id.* at 55.  It also failed to

"provide regular updates" to complainants and "consistently complete investigations in a timely

manner."  *Id.* at 57, 61.

**D.  Alleged History of Deliberate Indifference**

The plaintiffs also allege that the University systemically "underreported the amount of

sexually violent incidents that occurred on campus" prior to their enrollment.  FAC ¶ 25.

Additionally, they allege that, in all of the cases reported to the CSC in 2013, "no formal hearings

were held," meaning that all were resolved informally. *Id.* ¶ 26. Despite this, in February 2014, Denise Oldham, the University's interim Title IX officer, stated to the *Los Angeles Times* that she could not "imagine a situation where" using the informal resolution process for sexual assault cases "would be appropriate." *Id.* ¶ 31. The plaintiffs allege that "at least three witnesses were told by Oldham that the OPHD handles approximately 500 cases per year and that of the 500 cases handled in 2012 only two were resolved through a formal process." *Id.* ¶ 32.

The University, the plaintiffs assert, "consciously and intentionally" used the informal process to "avoid the reporting requirements" under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f)(1)(F)(i). *Id.* ¶¶ 32–33. They claim that the University "takes the position that if the matter is resolved informally, it is not required to report the offense as mandated by the Clery Act." *Id.* ¶ 33.

## II.   PROCEDURAL BACKGROUND

The plaintiffs filed this action in California state court and the University removed the case to this Court in August 2015. Dkt. Nos. 1, 1-1. After the University moved to dismiss the First Amended Complaint, the plaintiffs filed a Second Amended Complaint that alleged violations of Title IX and related state law claims. Prior MTD Order at 1024; *see* Dkt. Nos. 6, 14. The University moved to dismiss and I granted that motion with respect to Karasek and Commins's Title IX claims and with respect to all plaintiffs' state law claims, but denied it with respect to Butler's Title IX claim. Prior MTD Order at 1024; *see* Dkt. Nos. 18, 38. I granted the plaintiffs leave to amend and permitted discovery into how the University handled their complaints, so that they could evaluate the plausibility of their claims. Prior MTD Order at 1024; *see* Dkt. No. 40. The plaintiffs then filed a Third Amended Complaint—containing only the Title IX claim—and I again granted the University's motion to dismiss without prejudice. Prior MTD Order at 1024; *see* Dkt. Nos. 55, 77.

The plaintiffs filed a Fourth Amended Complaint, realleging their Title IX claim. Dkt. No. 83. I granted the University's motion to dismiss that complaint with respect to Karasek and Commins. Prior MTD Order at 1032. Because the plaintiffs had been permitted discovery into the University's handling of their reports and because they had not plausibly alleged Title IX

8

1   claims twice after that discovery, the dismissal was without leave to amend.  *Id.*  The University

2   answered Butler's complaint and, after discovery, I granted the University's motion for summary

3   judgment against Butler.  Dkt. No. 123.

4          The plaintiffs appealed.  Dkt. Nos. 98, 125.  On appeal, the Ninth Circuit affirmed

5   dismissal of Karasek's and Commins's post-assault claims and affirmed summary judgment on

6   Butler's post-assault claim.  *Karasek v. Regents of Univ. of California*, 956 F.3d 1093 (9th Cir.

7   2020).  But the court reversed dismissal of the plaintiffs' *pre-assault* claims.  *Id.* at 1111–14.  I

8   had determined that the plaintiffs cited no authority for a theory of pre-assault liability based on

9   general university policies.  Prior MTD Order at 1026–27.  The Ninth Circuit explained that it had

10  "never directly addressed pre-assault Title IX claims."  *Karasek*, 956 F.3d at 1112.  It held,

11  however, that "such a claim is a cognizable theory of Title IX liability."  *Id.*  After laying out the

12  legal standard to plead a successful pre-assault Title IX claim, the court remanded the case to me

13  to determine, in the first instance, whether the plaintiffs had adequately alleged a pre-assault

14  claim.  *Id.* at 1114.  I granted the parties' stipulation permitting the plaintiffs to file their FAC.

15  Dkt. No. 137.  They have now done so and the University has again moved to dismiss.  Motion to

16  Dismiss Plaintiffs' FAC ("Mot") [Dkt. No. 140].  I held a hearing on the motion on October 21,

17  2020, and asked the parties to submit supplemental briefs on the application of the statute of

18  limitations, which the University raised for the first time in this motion.

19                              **LEGAL STANDARD**

20          Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

21  if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

22  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

23  face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

24  when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the

25  defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

26  (citation omitted).  There must be "more than a sheer possibility that a defendant has acted

27  unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff

28  must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*,

United States District Court
Northern District of California

9

1    550 U.S. at 555, 570.

2        In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

3    Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

4    plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

5    is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

6    fact, or unreasonable inferences."  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

7    2008).

8        If the court dismisses the complaint, it "should grant leave to amend even if no request to

9    amend the pleading was made, unless it determines that the pleading could not possibly be cured

10   by the allegation of other facts."  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In

11   making this determination, the court should consider factors such as "the presence or absence of

12   undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous

13   amendments, undue prejudice to the opposing party and futility of the proposed amendment."  *See*

14   *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

15                              **DISCUSSION**

16   **I.      THE PRE-ASSAULT STANDARD**

17       Title IX provides, "No person in the United States shall, on the basis of sex, be excluded

18   from participation in, be denied the benefits of, or be subjected to discrimination under any

19   education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  A

20   victim of sex discrimination has a private right of action against those recipients of federal funds

21   for their alleged Title IX violations.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979).

22       On the appeal of this matter, the Ninth Circuit made clear that, when a plaintiff is sexually

23   assaulted, he or she has a cause of action against a university for its policy of deliberate

24   indifference to reports of sexual misconduct that created a "sexually hostile environment" for and

25   heightened risk of sexual assault or harassment to the plaintiff.  *Karasek*, 956 F.3d at 1111–12.

26   Such a policy, the court explained, is an "intentional[] violat[ion of] the statute."  *Id.* at 1112

27   (quoting *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

28   Therefore, a "school need not have had actual knowledge of a specific instance of sexual

United States District Court
Northern District of California

1  misconduct or responded with deliberate indifference to that misconduct before damages liability

2  may attach." *Id.*

3          There are four elements that must be plausibly alleged for a pre-assault claim to survive a

4  motion to dismiss: "(1) a school maintained a policy of deliberate indifference to reports of sexual

5  misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious

6  (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment

7  that was so severe, pervasive, and objectively offensive that it can be said to have deprived the

8  plaintiff of access to the educational opportunities or benefits provided by the school." *Id.*

9  (internal quotation marks and alterations omitted).

10         The risk of sexual harassment need not "be a specific problem in a specific program." *Id.*

11  at 1113 (internal quotation marks omitted).  Title IX liability can instead be imposed "when a

12  school's official policy is one of deliberate indifference to sexual harassment in any context

13  subject to the school's control." *Id.*  Although "it may be easier to establish a causal link between

14  a school's policy of deliberate indifference and the plaintiff's harassment when the heightened risk

15  of harassment exists in a specific program," the Ninth Circuit did "not foreclose the possibility

16  that a plaintiff could adequately allege causation even when a school's policy of deliberate

17  indifference extends to sexual misconduct occurring across campus." *Id.*

18  **II.     STATUTE OF LIMITATIONS**

19         As an initial matter, the University argues that the statute of limitations bars the plaintiffs'

20  pre-assault claims.  Mot. 7–10; *see Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir.

21  1980) ("If the running of the statute [of limitations] is apparent on the face of the complaint, the

22  defense may be raised by a motion to dismiss.").  The issue is whether the claims accrued when

23  the assaults occurred or when the plaintiffs learned of the University's alleged policy of deliberate

24  indifference.

25              **A.  The Proper Accrual Standard**

26         "Title IX claims are subject to the applicable state statute of limitations for personal injury

27  actions."  *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006).

28  California's personal injury statute of limitations is—and has been at all times relevant to this

United States District Court
Northern District of California

11

suit—two years. CAL. CIV. P. CODE § 335.1. While state law governs the length of the limitations period, federal law "governs the determination of the point at which the limitations period *begins* to run." *Id.* (emphasis added). The "standard" federal rule is that this "accrual occurs when the plaintiff has a complete and present cause of action." *Wallace v. Kato*, 549 U.S. 384, 288 (2007) (internal alterations and quotation marks omitted). Accordingly, the "touchstone for determining the commencement of the limitations period is notice: a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action." *Stanley*, 433 F.3d at 1136 (internal quotation marks omitted).

The parties disagree about what knowledge is required under this standard. The University contends that the plaintiffs' claims accrued when they were assaulted—that is, when they had knowledge of that concrete injury. Mot. 6. If that were true, the plaintiffs' claims would be barred by the statute of limitations because the original complaint was filed more than two years after the assaults in January, February, and summer 2012. *See* Dkt. No. 1-1. The plaintiffs argue that the relevant knowledge is of the alleged policy of deliberate indifference that created a heightened risk of harassment. Oppo. 3. They assert that their claims accrued when the Audit that revealed the University's policy deficiencies was released.

The Ninth Circuit has never squarely addressed this issue. District courts in this Circuit are as divided as the parties. Some have held that the limitations period begins at the time of a plaintiff's assault. *Doe v. Univ. of S. Cal.*, No. s:18-cv-09530, 2019 WL 4229750 (C.D. Cal. July 9, 2019); *A.T. v. Everett Sch. Dist.*, 300 F. Supp. 3d 1243, 1258–59 (W.D. Wash. 2018), *aff'd on different grounds*, 794 F. App'x 601 (9th Cir. 2019). Others have held that a claim accrues when the plaintiff knew or should have known of the alleged policy of deliberate indifference. *Jameson v. Univ. of Idaho*, No. 3:18-CV-00451, 2019 WL 5606828 (D. Idaho Oct. 30, 2019); *Dutchuk v. Yesner*, No. 3:19-CV-0136, 2020 WL 5752848 (D. Alaska Sept. 25, 2020).[3]

For the reasons that follow, I conclude that a plaintiff's Title IX pre-assault claim accrues

---

[3] District courts in other circuits have also come out on both sides. *Compare, e.g.*, *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 663 (W.D. Tex. 2017), *with Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 438–39 (S.D.N.Y.).

United States District Court
Northern District of California

when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment.

"The general common law principle is that a cause of action accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action and the cause of that injury." *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017).  Knowledge of the "injury," the Ninth Circuit has explained, means knowledge of the "actual injury," not when the plaintiff "suspects a legal wrong." *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1049–51 (9th Cir. 2008).  The court has often reiterated that a plaintiff does not need to know that she possesses a legal cause of action, she must simply be aware of the actual injury and its cause. *See id.*

The division among courts appears to arise from the tension between two principles.  One principle, epitomized in this Circuit by *Bibeau v. Pacific Northwest Research Foundation Inc.*, holds that "the statute only begins to run once a plaintiff has knowledge of the 'critical facts' of his injury, which are 'that he has been hurt and *who has inflicted the injury*.'"  188 F.3d 1105, 1108 (9th Cir. 1999), *opinion amended on denial of reh'g*, 208 F.3d 831 (9th Cir. 2000) (emphasis added).  The other principle, articulated in *Dyniewicz v. United States*, holds that "[d]iscovery of the cause of one's injury . . . does not mean knowing who is responsible for it."  742 F.2d 484, 486 (9th Cir. 1984).  Under that principle, the plaintiffs' claims would accrue when the assaults occurred.

The cases cited above, and all the others I, the parties, and other courts rely on in this context, come from disparate areas of law.  Accrual is based on "general" federal common law. *See, e.g.*, *Wallace*, 549 U.S. at 388.  Courts accordingly use common-law tort principles from distinct but related areas of law to inform their uniform accrual analysis.  *See, e.g.*, *id.* (relying on an Employee Retirement Income Security Act case to inform a Section 1983 case); *Lukovsky*, 535 F.3d at 1048 (relying on Section 1983 cases to inform a Title VII case).  Although this tension in the Ninth Circuit's cases means that there are reasonable arguments on both sides, several considerations lead me to conclude that, under the law as it stands, the plaintiffs' claims did not accrue when they were assaulted.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

To start, first principles of accrual support the plaintiffs' position.  The "touchstone" of accrual is notice of the "injury which is the basis of [the plaintiff's] action."  *Stanley*, 433 F.3d at 1136 (internal quotation marks omitted).  In a pre-assault case such as this, the injury that is the basis of the plaintiff's action is not the assault.  A school is not liable because it assaulted a plaintiff.  A school is instead liable for its policy of deliberate indifference that created a heightened risk of harassment, which is ultimately causally connected with the assault.  As the Ninth Circuit explained, when a school maintains a policy of deliberate indifference to sexual harassment, it "intentionally violate[s]" Title IX.  *Karasek*, 956 F.3d at 1112.

A plaintiff, moreover, must be put on notice not just of the concrete injury but of its "cause."  *Gregg*, 870 F.3d at 887.  Even some Ninth Circuit cases that do not explicitly announce that principle apply it.  In *TwoRivers v. Lewis*, for instance, the court held that the plaintiff's Section 1983 claim accrued when he "knew or had reason to know of the . . . employees' deliberate indifference to his medical needs."  174 F.3d 987, 992 (9th Cir. 1999).  In other words, the plaintiff did not need to only be aware of his concrete injury, but of the employees' deliberate indifference that caused it.  The "cause" for purposes of a pre-assault action against a university is the school's alleged policy, not just the assault itself.  To be sure, the Ninth Circuit has been clear that knowledge of the "cause" or "injury" does not mean knowledge of the "legal wrong" and I do not so hold:  It is perfectly possible, for example, for a plaintiff to be put on adequate notice of the university's unlawful policy without being aware the university has violated his or her Title IX rights.

Additionally, *Bibeau* was explicit that, at least in some circumstances, knowledge of who committed the injury is required to have a complete cause of action.  *See* 188 F.3d at 1108.  That approach makes particular sense for a pre-assault claim because the actor committing the assault is different than the one who would be liable under Title IX.  The University attacks *Bibeau* as having been "repeatedly discounted."  Defendant's Response to Plaintiffs' Supplemental Brief ("University Supp.") [Dkt. No. 148] 2.  But the fundamental case it cites for that proposition simply said that *Bibeau*'s statement about knowing the identity of the party that inflicted the injury is dictum.  *See Ritchie v. U.S.*, 210 F. Supp. 2d 1120, 1129 n.9 (N.D. Cal. 2002).  Even assuming

that *Bibeau*'s statement is dictum, it was a direct quote from the Supreme Court's decision in *U.S. v. Kubrick*, which held that "who has inflicted the injury" could at least be relevant to the accrual inquiry. *See* 444 U.S. 111, 122 (1979). *Bibeau* draws its rationale from a foundational Supreme Court precedent that many other cases, including *Lukovsky*, rely on. *See Lukovsky*, 535 F.3d at 1050.

The interpretation of *Dyniewicz* advanced by the University contradicts this last point. The plaintiffs fail to address *Dyniewicz*, even in their supplemental briefing. But I conclude that *Dyniewicz* does not require the sweeping and categorical approach to accrual that the University urges. First, some of the Ninth Circuit's more recent cases have discussed *Dyniewicz* as applying specifically to ignorance of the involvement of government employees in tort claims against the federal government. *See, e.g.*, *Hensley v. U.S.*, 531 F.3d 1052, 1056–57 (9th Cir. 2008). In those negligence cases, courts have routinely held that the wrongdoer's identity as a federal agent can readily be discovered within the statute of limitations period, and accrual therefore does not depend on that knowledge. *See id.* In a pre-assault case, however, there is a singular risk that the assault will not alert a reasonable person to *the school's* involvement. Second, the Ninth Circuit case that *Dyniewicz* relied on for its holding simply held that accrual did not wait for the plaintiff to discover the defendant's *negligence*. *See Davis v. U.S.*, 642 F.2d 328, 331 (9th Cir. 1981). That, as I have explained, is the standard rule—the statute is not triggered by knowledge of the legal wrong. Consequently, despite *Dyniewicz*'s language, I find it does not apply here.

The University also relies on *Lukovsky* to show that knowledge of the deliberate policy is best classified as knowledge of the "legal wrong." There, the plaintiffs were not hired for a job; they later learned it was allegedly due to their race and sued under Title VII. *Lukovsky*, 535 F.3d at 1046–47. The court held that their claim accrued at the time of the adverse employment action, not when they learned of the alleged discriminatory motive. *Id.* at 1049. The crucial difference between a case like *Lukovsky* and a case such as this is that it is evident from an employment decision who the potential wrongdoer was; at the point they were not hired, the plaintiffs were on notice of their injury and who caused it. In a case like this, the assault would not necessarily cause

15

any reasonable person to suspect that their university's policies were involved.[4]

When Karasik was assaulted, she did not know of the University's alleged policy of deliberate indifference to reports of sexual misconduct that created a heightened risk of sexual harassment. I join those courts that have held that a pre-assault claim under Title IX does not accrue until a plaintiff knows or has reason to know of such a policy of deliberate indifference.

### B. Application of the Statute of Limitations

The University argues that, even under this accrual standard, the plaintiffs' claims are barred by the statute of limitations. *See* Reply 2–3; University Supp. 3–4. A Rule 12(b)(6) motion can be granted based on a statute of limitations "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove" her claims were timely. *Jablon*, 614 F.2d at 682. Drawing all reasonable inferences in the plaintiffs' favor, I reject the University's argument. The University does not contend—nor could it, on the basis of the FAC— that the plaintiffs had actual knowledge of the alleged policy of deliberate indifference prior to the Audit. Instead, the University argues that other facts put the plaintiffs on adequate constructive notice; that is, it argues that they had reason to know of the policy. *See Lukovsky*, 535 F.3d at 1048.

The University first argues that Karasek was on sufficient notice when she knew of the University's "allegedly inadequate responses to other assaults at Club events." Reply 3; University Supp. 3–4. I cannot say as a matter of law that a reasonably prudent person would have been put on notice of the University's overarching policy of deliberate indifference merely by being aware of specific past assaults in the same club. As the University emphasizes over and over, a policy of deliberate indifference is far from a university responding inadequately, lazily, or even negligently. *See Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). A reasonably prudent person, looking at the facts as Karasek alleges them, would not necessarily be

---

[4] The plaintiffs argue that *Lukovsky* itself turned on this distinction; they make much of the statement that the plaintiffs' claims were untimely because at the time of their non-hiring, they "knew they had been injured and by whom." *Lukovsky*, 535 F.3d at 1051. That lone statement is, however, tacked on at the end of the relevant section of *Lukovsky* and that reasoning is not part of *Lukovsky*'s analysis.

United States District Court
Northern District of California

put on notice that the University had a policy of deliberate indifference.  The deeply unfortunate reality, as the Audit makes plain, is that sexual harassment and assault are all too common on college campuses.  It is entirely possible for assaults to occur and for a school not to have created a heightened risk through a policy of deliberate indifference.  Indeed, that is the University's argument here.  The University, therefore, essentially argues in its motion that it did not, *as a matter of law*, have a policy of deliberate indifference but that a student looking at its actions should nonetheless be on adequate notice to believe that it might have.

The University also argues that the plaintiffs were on notice when the University allegedly mishandled their complaints and, in Karasek's case, when she filed a Clery Act complaint against it.  University Supp. 4; FAC ¶¶ 94–95, 123–26, 135.  It is unreasonable to conclude—and the University cites no authority in support of its argument—that a plaintiff's knowledge that her *individual* complaint was mishandled would reveal that the University has a broad de facto policy of deliberate indifference generally.

The University's argument that Butler should be aware is more strained.  It asserts that she should have been aware of an alleged policy of deliberate indifference when Higgins failed to respond adequately to her assaults and harassment.  Reply 3.  That argument is somewhat at odds with the University's insistence that it has no adequate connection to the Alaska facility to impose liability on it.  Moreover, I have already explained that a reasonable person would not, as a matter of law, automatically become aware of a systemic policy of deliberate indifference on the basis of his or her individual complaint.  The University's argument is even weaker when it comes to Butler's complaint to Higgins because that complaint was made to a single employee whom the University represents was not its agent.

Last, the University argues that the plaintiffs should have become aware of the policy when the University's student government passed a "bill of no confidence" in its sexual assault policies.  Reply 3; *see* FAC ¶ 27.  Again, at the pleadings stage, I must draw all reasonable inferences in the plaintiffs' favor.  A reasonably diligent person would not, as a matter of law, investigate whether a University had a broad, unlawful policy of *deliberate* indifference based on a student government's position that its response to sexual misconduct was inadequate.

My conclusion is reinforced by the University's public statements about its process, which would lead many reasonable observers to believe its policies were adequate. As explained, the University is alleged to have publicly represented one thing but carried out its process differently in reality. *See supra* Background I.D. While I do not hold that the University fraudulently concealed its policy, the University's own behavior contradicts its position today that its students were on adequate notice to inquire further about a policy of deliberate indifference.

Accordingly, it is not apparent from the face of the complaint that the plaintiffs' claims are untimely.

## III.   CONTEXT SUBJECT TO THE SCHOOL'S CONTROL

A plaintiff must adequately allege that the heightened risk of harassment was "in a context subject to the school's control." *Karasek*, 956 F.3d at 1112. The University does not dispute that Karasek and Commins satisfy this element. But it argues that my previous decision on Butler's claim means that she cannot satisfy it. I agree.

As a preliminary matter, the parties disagree about what level of "control" is required under the Ninth Circuit's decision. The University relies on the Supreme Court's statement in *Davis* that Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Consequently, *Davis* held that a university's liability is limited "to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 646. The plaintiffs contend that *Karasek* rendered this standard inapplicable in the pre-assault context and altered it in three ways: (1) The control need not be "substantial"; (2) the heightened *risk* of misconduct must be in a context subject to the school's control, not the "harassment itself"; and (3) the school does not need to have "any control whatsoever *over the harasser*." Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Oppo.") [Dkt. No. 142] 7 (emphases added). Butler's claim cannot survive either standard, including the plaintiffs' laxer one, so there is therefore no need to resolve this issue for purposes of this motion.

I previously granted and the Ninth Circuit affirmed summary judgment to the University

on Butler's post-assault claim.  *Karasek v. Regents of Univ. of Cal.*, No. 3:15-CV-03717-WHO,

2018 WL 1763289 (N.D. Cal. Apr. 12, 2018), *aff'd* 948 F.3d 1150 (9th Cir. 2020), *amended and*

*superseded on denial of reh'g* 956 F.3d 1093 (9th Cir. 2020) ("Prior MSJ Order").  In my Prior

MSJ Order, I described in detail the context in which Butler's harassment occurred.  Prior MSJ

Order, at *1–*3.  In brief, that harassment occurred at a research facility in Alaska, where Butler

was a research assistant to Higgins, one of the University's GSIs.  FAC ¶¶ 109–113; *see* Prior MSJ

Order, at *1–*3.  I found, among other things, that "the only known harassment occurred in

Alaska, where [the University] indisputably did not exercise any control."  Prior MSJ Order, at

*13 (emphasis removed).  The Ninth Circuit upheld summary judgment on the ground that the

University's response to Butler's reports was not deliberately indifferent; it therefore did not

address my finding about control.  *See Karasek*, 956 F.3d at 1111 n.4.

"Under the law of the case doctrine, a court is generally precluded from reconsidering an

issue previously decided by the same court, or a higher court in the identical case."  *Ingle v.*

*Circuit City*, 408 F.3d 592, 595 (9th Cir. 2005).  Application of the doctrine is "discretionary" and

motived by the need to "maintain consistency and avoid reconsideration of matters once decided."

*Id.*  Here, Butler offers no exception showing that the law of the case doctrine should not apply;

instead, she argues that this issue was not resolved previously, so the doctrine is not relevant in the

first place.

Butler contends that the pre-assault standard for control differs from the post-assault

standard, which renders my previous conclusion irrelevant to this issue.  I held, however, that the

University "indisputably did not exercise *any* control" over the Alaska facility.  Prior MSJ Order,

at *13 (emphasis added).  As a result, "Butler ha[d] not shown disputed facts establishing UC's

control over . . . the context of any known harassment."  *Id.*  That finding does not depend on any

purported difference in the pre- or post-assault standards.  Even under the plaintiffs' proposed

control standard—exercising control over the context in which the heightened risk of harassment

emerged—this issue was settled in summary judgment.[5]

---

[5] Most of my control analysis focused on the University's lack of control over Butler's harasser.
*See* Prior MSJ Order, at *13.  If this were the only basis for my decision, it would be necessary to

1    Butler's only new argument regarding control is that Higgins was an agent of the

2    University and the University therefore had control of the context.  Oppo. 7–9.  Despite making

3    arguments that the University exercised control of the context of her harassment, Butler did not

4    make that argument during summary judgment briefing.  *See* Dkt. No. 118.  If she were correct

5    that the standard were different, and she presented allegations that satisfied the new standard but

6    not the old one, the law of the case doctrine would not stand in her way.  But here, Butler seeks to

7    do something very different:  She seeks to relitigate a settled issue based on an argument that was

8    not raised at the time.

9    Given my prior determination, I conclude that Butler cannot plausibly allege that the

10   University exercised control over the context in which she was exposed to a heightened risk of

11   harassment.  Dismissal of this claim is accordingly with prejudice.

## IV.   POLICY OF DELIBERATE INDIFFERENCE

13   The first element that a plaintiff must adequately allege for a pre-assault claim is that a

14   school have "maintained a policy of deliberate indifference to reports of sexual misconduct."  *Id.*

15   at 1112.  As cases drawn from the post-assault context make clear, deliberate indifference requires

16   more culpable conduct than simply that the school was "negligent, lazy, or careless."  *Oden v. N.*

17   *Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006).  The school's actions must amount to "an

18   official decision . . . not to remedy [a] violation."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

19   274, 291 (1998).

20   The plaintiffs argue that "deliberate indifference" in pre-assault cases is a lower standard

21   than I have articulated.  Oppo. 10–11.  They contend that the reason the Supreme Court adopted

22   the deliberate-indifference standard is to ensure that schools were not held liable for their

23   employees' independent actions, rather than the universities' own.  *Id.*; *see Gebser*, 524 U.S. at

24   290–91.  In a pre-assault case, they point out, there is no threat of that because liability is based on

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   determine today whether a university must exercise substantial control over the harasser even in a
     pre-assault context.  But, as I have explained, I also determined that, as the FAC alleges, the
     harassment occurred entirely in the Alaska facility; and I concluded that the University did not

28   exercise "any" control there.  *Id.*

United States District Court
Northern District of California

a school's own official policy. The plaintiffs appear to argue that "general allegations of indifference to sexual misconduct on campus" satisfy *Karasek*'s pre-assault deliberate-indifference standard. Oppo. 11.

There is no reason to think that the Ninth Circuit meant something different by "deliberate indifference" in the pre- and post-assault Title IX contexts. First, most of the court's opinion in this case on appeal deals with post-assault claims and repeatedly discusses deliberate indifference. The court would not have, without saying so, begun using that phrase in a different way partway through the opinion. Second, the plaintiffs take out of context the Ninth Circuit's statement that "the calculus shifts when a plaintiff alleges that a school's official policy violates Title IX." *Karasek*, 956 F.3d at 1112 (internal quotation marks omitted). The court immediately went on to say that what is different from post-assault liability is that a "school need not have had actual knowledge *of a specific instance of sexual misconduct* or responded with deliberate indifference *to that misconduct* before damages liability may attach." *Id.* (emphasis added). In other words, because the school's official policy—and not its response to a particular incident—is at issue, the plaintiff does not have to point to past specific instances of misconduct. Finally, *Karasek* relied, in part, on the Tenth Circuit's decision in *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), which had previously established that pre-assault liability was actionable. *Simpson* regularly employs *Gebser*'s deliberate-indifference standard in analyzing a pre-assault claim. *See, e.g.*, 500 F.3d at 1178.

The plaintiffs offer two types of policies of deliberate indifference: a general, campus-wide policy and policies related to the context of Karasek's and Butler's assaults. Oppo. 10–16. Commins's claims rest entirely on the general policies. *See id.* Because I have concluded that Butler's claim is not adequately pleaded on other grounds, I do not address it.

### A. General Policy of Deliberate Indifference

The plaintiffs have plausibly alleged that the University maintained a de facto policy of deliberate indifference to reports of sexual misconduct.[6] Oldham, the Title IX coordinator, told

---

[6] Neither my prior decisions nor the Ninth Circuit's decision regarding the University's alleged deliberate indifference to Karasek's, Butler's, and Commins's individual reports forecloses a

the *Los Angeles Times* in 2014 that she could not "imagine a situation where" using the early resolution process for sexual assault cases "would be appropriate." FAC ¶ 31. Yet, the Audit lays bare that 76 percent of Title IX complaints used this process. *Id.* ¶ 53. As alleged, all but two of approximately 500 cases of sexual misconduct reported to OPHD in one year used the informal process. *Id.* ¶ 32. As the Ninth Circuit put it, if "Oldham's premise is correct," the extensive use of this process is "inexplicable." *Karasek*, 956 F.3d at 1114. Nor is Oldham's word the only one on the matter. The Audit found that there are "significant procedural differences between the formal and informal processes." FAC ¶ 53. One key difference is that, when the University employed the informal process, it could not demonstrate to the Auditor that it "consistently informed students of what to expect as the university investigated their complaints and how to report retaliatory harassment." *Id.* at 55. And it failed to "provide regular updates" to complainants and "consistently complete investigations in a timely manner." *Id.* at 57, 61.

The FAC's allegations—supported by the Audit—also show that the University failed to adequately educate students about sexual misconduct on campus, which plausibly indicates University officials' deliberate indifference. The Audit found that there was no process in place to ensure that *all* students received education in sexual violence. Audit at 29. The plaintiffs have also alleged that faculty and staff—including those who are the points of contact for sexual misconduct reports—were inadequately trained in how to respond to complaints of sexual assault. *Id.* at 16–17. As a result, the Audit found that complaints had been mishandled and students' safety had been placed at risk. *Id.* at 15, 30.

The use of the informal process, according to the FAC, is no accident: The University allegedly believes that it does not have to report complaints dealt with in that process under the Clery Act. FAC ¶ 32. As the Ninth Circuit said, that belief, if true, would be a "powerful incentive" to use the allegedly faulty informal process. *Karasek*, 956 F.3d at 1114.

Taking all of these allegations as true, they are sufficient to show that the University

finding of a pre-assault policy of deliberate indifference. All of those conclusions related to how the University handled the individual reports after they were made, not to the University's policies that allegedly contributed to the misconduct in the first place.

22

United States District Court
Northern District of California

maintained a de facto policy of deliberate indifference toward sexual misconduct on campus. This is not to say, of course, that the University did maintain such a policy; I conclude only that the plaintiffs have plausibly claimed that it did. The alleged Clery Act motive, taken as true, elevates this behavior from mere "carelessness" or "negligent" to behavior that is intentional. *Oden*, 440 F.3d at 1089 (9th Cir. 2006). If, as the University's own Title IX officer publicly claimed, the informal process is inappropriate to resolve sexual assault cases, the University's use of that process can easily be described as indifferent to at least some reports of sexual assault. This conclusion is bolstered by the University's alleged systemic failures to adequately inform incoming students about sexual misconduct and adequately educate staff who must handle the complaints.

The University responds that the allegations are too "broad" to sustain Title IX liability. Mot. 17. None of the cases it relies on for that argument support its conclusion. In *Doe v. California Inst. of Tech.*, No. 2:19-cv-01005, 2019 WL 8645652 (C.D. Cal. Aug. 13, 2019), the court held that "a university typically is not liable for purported deliberate indifference to a general problem of sexual violence absent knowledge of a specific threat." *Id.*, at *4. It relied on, among other things, my Prior MTD Order. *Id.* The court, citing *Simpson*, held that the plaintiff must "allege[] facts demonstrating a known risk of sexual assault either by [the plaintiff's assaulter] . . . or the [sic] particular context in which the assault occurred." *Id.* Both of these conclusions are contrary to *Karasek*, which was decided later. The first conclusion is from the post-assault context; *Karasek* made clear that, in the pre-assault context, "[a] school need not have had actual knowledge of a specific instance of sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach." *Karasek*, 956 F.3d at 1112. Instead, the plaintiff must allege that "a school maintained a policy of deliberate indifference *to reports of sexual misconduct*." *Id.* (emphasis added). The second conclusion—that a plaintiff must demonstrate a risk in the "particular context in which the assault occurred"—comes from *Simpson*. As the Ninth Circuit made clear, however, "*Simpson's* reasoning, and the reasoning of *Gebser* and *Davis*, supports imposing Title IX liability when a school's official policy is one of deliberate indifference to sexual harassment *in any context subject to the school's control*." *Id.* (emphasis

added).  As a result, the court would "not foreclose the possibility that a plaintiff could adequately

allege causation even when a school's policy of deliberate indifference extends to sexual

misconduct occurring across campus."  *Id.*

The University's other cases do not support dismissal.  *Doherty v. Emerson College* was a

post-assault case, even if the plaintiff referenced the school's pre-assault policies as deficient.  No.

1:14-cv-13281, 2017 WL 4364406, at *7–*8 (D. Mass. Sept. 29, 2017).  Additionally, the court

there found that the school's educational programs were sufficient to show it was not deliberately

indifferent.  *Id.*, at *8.  The University makes no attempt to compare those educational programs

with its own and, in any case, the plaintiffs here do not rely solely on educational deficiencies, as I

explain above.  The University also relies on *Raihan v. George Washington University* for the

proposition that a pre-assault claim should be dismissed if it contains "no credible allegation that

the University *intended* to create impunity for sexual harassment or assault."  324 F. Supp. 3d 102,

110 (D.D.C. 2018) (emphasis in original).  In context, it is clear that *Raihan*'s statements about

intent are contrasting a negligence standard with the deliberate-indifference standard.  *See id.* at

109–10.  That court found that that the plaintiff had not presented "specific evidence beyond the

University's failure to implement fully its own policy, and its conduct in Ms. Raihan's case."  *Id.*

at 111.  Here, as explained, the plaintiffs have presented sufficient evidence of deliberate

indifference that goes far beyond this.

### B.  Karasek's Allegations

In addition to properly pleading a general policy of deliberate indifference, Karasek has

adequately alleged that the University maintained a de facto policy of deliberate indifference to

reports of sexual misconduct within the Club.  According to Karasek's allegations, there were

three prior assaults in just four years in the Club; all took place in the same circumstance, when

the Club went on trips and retreats.  FAC ¶¶ 36–38.  The University was allegedly aware of these

assaults but took no action—including with respect to the student who would eventually assault

Karasek.  *Id.*  For there to be no response despite knowing of three assaults to occur in four years

in one Club in such similar circumstances likely satisfies even the stringent "specific problem in a

specific program" test that the University unsuccessfully advocated before the Ninth Circuit.

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The University has three responses.  First, it contends that Karasek has not adequately pleaded her allegations because she does not allege "*who* at the University knew of these assaults." Mot. 14.  Generally, informing low-level school employees of assaults is insufficient to establish deliberate indifference because those employees do not have the authority to alter official policy. *See Oden*, 440 F.3d at 1088–89.  Karasek alleges that one assault was reported to the University's Police Department and that, on information and belief, "the University" knew of the other assaults. FAC ¶¶ 36–38.  The University argues that reporting an assault to a non-managerial campus police officer is not a report to an official who is empowered to change university policy.  *See Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1352 n.43 (M.D. Ga. 2007) (stating this conclusion in dictum). While that may be true in some circumstances, here Karasek alleges that the victim "was told the University could do nothing because the assault occurred off campus, despite it being at a Club event." *Id.* ¶ 36.  That categorical statement, in the light most favorable to Karasek, evidences a *policy* of deliberate indifference toward sexual misconduct that occurred on these trips and others.[7]

Some other courts have found that allegations that "the school" or unnamed "school officials" were aware of the assaults are insufficient to demonstrate an official policy of deliberate indifference.  The cases that the University relies on for this conclusion are of little value because they concerned alleged post-assault failures to remedy specific instances of harassment.  *See* Mot. 14–15; *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d 1106 (N.D. Cal. 2013); *Joyce v. Wright State Univ.*, No. 3:17-cv-387, 2018 WL 3009105 (S.D. Ohio June 15, 2018).  In those post-assault cases, an appropriate school official would need to know of the harassment, or the failure to respond to it could not fairly be attributed to the school but instead to its employees.  *Oden*, 440 F.3d at 1088–89.  But in this pre-assault case, Karasek does not have to demonstrate that any particular official was aware of any particular past instance of conduct; she must simply present enough evidence to plausibly demonstrate that there was a policy of deliberate indifference to reports generally.  *Karasek*, 956 F.3d at 1112.  To the extent that these courts' conclusions *are*

---

[7] Notably, the University does not argue that the trip was beyond the control of the University for pre-assault purposes.

United States District Court
Northern District of California

relevant in the pre-assault context, I do not agree that these type of allegations are insufficient. Courts must draw all reasonably inferences in the plaintiff's favor at this stage.  When a plaintiff alleges that the university was informed of an assault, one reasonable inference is that a sufficiently senior official was aware.  To infer otherwise would be to impose too high a burden on a plaintiff at the pleadings stage.  The identity of the University officials who were (or were not) aware of the previous complaints are likely within the University's knowledge, not Karasek's. Her allegation on information and belief is, at this point, appropriate.

At the hearing, the University relied heavily on *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136 (9th Cir. 2020), to support its argument.  There, the plaintiff was hit with a bullet that a Honolulu police officer accidentally fired while drunkenly attempting to load an already loaded gun.  *Park*, 952 F.3d at 1139.  The plaintiff sued Honolulu, arguing that its police department had a policy of deliberate indifference with respect to police officers' intoxicated carrying and use of firearms.  *See id.*  The Ninth Circuit held that there was no adequate allegation showing that a sufficiently senior official was aware of similar past misconduct such that it amounted to deliberate indifference.  *Id.* at 1142–43.

The portion of that case the University relies on is quite different from the facts here. There, the plaintiff "acknowledge[d] . . . [that] the Chief of Police did not learn of [the prior] incidents before her injury, and she alleges no other prior incidents that would have alerted the Chief of Police" to the allegedly deficient policy.  *Id.*  Here, in contrast, the plaintiffs offer no concession that the pertinent decisionmakers were unaware of the three assaults—nor reasonably could they, because the relevant discovery has not taken place.  On this record, unlike the record there, there is no "acknowledge[ment]" of senior officials' ignorance.  Instead, Karasek alleges the most that a plaintiff without access to the University's internal information reasonably could: That the University was made aware of prior assaults.

Second, the University argues that the FAC does not allege that the University's response to these past assaults was improper.  Mot. 15.  The University contends, for example, that it is possible that its "fail[ure] to respond [was] for reasons that were entirely proper or merely negligent."  *Id.*  That is a striking argument:  Karasek alleges that the University did not respond *in*

26

*any way* to three assaults taking place over four years in one of its clubs.  That evidence creates more than a "sheer possibility" of deliberate indifference, it makes it plausible.  *See Ashcroft*, 556 U.S. at 678.  Moreover, if I were to hold for the University on this issue, it would flip the burden at the motion-to-dismiss stage; it would require me to draw the inference in the University's favor that its response was proper or, at worst for it, negligent.

Third, the University contends that Karasek "has not shown that the prior assaults were sufficiently similar to the one she later suffered."  Mot. 16.  Given that this is a case about the University's systemic past failure to adequately respond to reports of sexual misconduct, the University's assertion of this argument in the present is troubling.  Karasek alleges that three other female students were assaulted by three male students over the course of four years when this same Club went on retreats.  FAC ¶¶ 36–38.  One of those three assaulters *was the same person* who assaulted Karasek.  *Id.* ¶ 38.  The University leans on *Gebser* for support on this point but that case is nothing like this one.  In *Gebser*, the Court held that a teacher's "inappropriate comments during class . . . was plainly insufficient to alert the principal to the possibility that [he] was involved in a sexual relationship with a student."  *Gebser*, 524 U.S. at 291.  Here, in contrast, the events that would put the University on notice were assaults strikingly similar to what happened to Karasek.

### C.  Conclusion

The plaintiffs have adequately alleged that the University maintained a general policy of deliberate indifference toward reports of sexual misconduct.  Karasek has also plausibly alleged that the University maintained a policy of deliberate indifference toward reports of sexual misconduct in the Club.

## V.   HEIGHTENED RISK THAT WAS KNOWN OR OBVIOUS

The second element a plaintiff must adequately allege is that the school's policy of deliberate indifference "created a heightened risk of sexual harassment that was known or obvious."  *Karasek*, 956 F.3d at 1112.  Karasek and Commins both rely on the University's alleged general policy and Karasek also relies on the alleged policy related to the Club.

United States District Court
Northern District of California

1

### A.   General Policy

2      Here, the plaintiffs have adequately pleaded that the University's alleged general policy of

3   deliberate indifference created at least some heightened risk of sexual harassment.  The Audit

4   found that the University's policy led to mishandling of complaints and placed student safety at

5   risk.  *See, e.g.*, Audit at 15, 30.  While the University attempts to characterize this argument as

6   being simply that its "general policies were less than adequate," Mot. 17, it is plainly not; it is a

7   finding that student safety was potentially impacted.  It is also more than a conclusory allegation;

8   it is supported by the in-depth, professional Audit incorporated into the plaintiffs' complaint.

9   Beyond this, the University has no direct reply.  It does not, anywhere, indicate why the Audit's

10  finding would be insufficient.  Nor does it point to a case in which a similar finding has been held

11  insufficient.[8]

12      The University also argues that any risk created by the policies was not "known or

13  obvious."  Reply 9–10.  At this stage, however, all reasonable inferences must be drawn in the

14  plaintiffs' favor.  The plaintiffs have alleged that the University's own Title IX officer stated that

15  the policies the University was surreptitiously using were not adequate and she could not imagine

16  situations in which they would be used to respond to assault.  FAC ¶ 31.  One reason this might be

17  so is that the inadequate policy—the informal resolution process—did not keep students

18  sufficiently safe.  It is easy to see how that could be so:  Among other findings, the Audit found

19  that use of the informal process led to inadequate communication with victims about their

20  harassers' status.  The risk created is, accordingly, plausibly obvious.

21

### B.   Karasek's Allegations

22      As I have explained, in addition to arguing that the University's general policies showed

23  deliberate indifference to reports of sexual assault, Karasek argues that the University's de facto

24  policies related to the Club also created a heightened risk of harassment that was known or

25  obvious.  Karasek has plausibly alleged that this is true.  The fact that the University allegedly

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [8] The University argues that allegations in two of the cases the plaintiffs cite are more serious than
28  those here.  Reply 8.  That may or may not be true, but it is not in itself a reason to dismiss the
    plaintiffs' claims if those claims are otherwise adequate.

repeatedly failed to respond in any way to sexual assaults that occurred under such similar circumstances would naturally create an "obvious" risk. Tragically, that obvious risk played out in Karasek's case: She was assaulted by one of the students who had previously allegedly committed a similar assault. Because the University combines its arguments about this element and the previous one, I already addressed its responses above. *See* Mot. 14–16; Reply 10–11.

### C. Conclusion

The plaintiffs have plausibly alleged that that the University's general policy of deliberate indifference created at least some heightened risk of sexual misconduct that was known or obvious. Karasek has properly alleged that the University's policy of deliberate indifference regarding the Club created such a heightened risk.

## VI. CAUSATION

The last element a plaintiff must adequately allege is that "as a result" of the heightened risk created by the school's policy of deliberate indifference, "the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school." *Karasek*, 956 F.3d at 1112 (internal quotation marks and alterations omitted). This last element therefore consists of two parts: (1) causation and (2) sufficiently serious harassment. I address causation first.

The parties again disagree over the proper standard. *Karasek* did not explicitly state what level of causation would be required in a pre-assault case. The University urges but-for and proximate causation—that is, typical tort causation standards. *See, e.g.*, Restatement (Second) of Torts § 430. The plaintiffs argue that a university's offending actions need only be "a substantial factor" in the plaintiff's harm—also a principle borrowed from tort law.

The Supreme Court recently held that that "[i]t is textbook tort law that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (internal quotation marks omitted). Accordingly, the "'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating

29

its own new causes of action." *Id.* The Court has used but-for causation as the standard in various antidiscrimination causes of action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 246–47 (2013) (Title VII); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) (Age Discrimination in Employment Act).

I do not need to determine today whether a plaintiff need only show that the policy of deliberate indifference was a substantial factor in his or her assault because I conclude that, even under that standard, Commins has not adequately alleged causation. And I conclude that, even under the but-for standard, Karasek has alleged causation.

Generally, "[c]ausation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores*, 730 F.3d at 1168. But "adequately *alleging* a causal link between a plaintiff's harassment and a school's deliberate indifference to sexual misconduct across campus is difficult," *Karasek*, 956 F.3d at 1114 (emphasis added), and "it may be easier to establish a causal link between a school's policy of deliberate indifference and the plaintiff's harassment when the heightened risk of harassment exists in a specific program," *id.* at 1113.

### A. Karasek

The University's arguments that Karasek has not adequately alleged causation are largely a restatement of its arguments about the policy of deliberate indifference. It argues, for instance that "[t]o evaluate whether [there is causation], the Court (and the University) would need information regarding what the University knew about the prior assaults, when it knew about them, whether the prior assaults were similar to the one Karasek suffered, and what the University should have done in response." Mot. 20. As I have explained, however, the risk that the University's alleged policies created was obvious. Additionally, Karasek's causal connection is unusually strong: The same person who assaulted her had previously assaulted another female student on a similar Club trip and the University did nothing to remedy it and two other similar assaults happened in highly related contexts. Karasek has adequately alleged that, but for the heightened risk created by the University's pre-assault deliberate indifference, she would not have been assaulted.

### B. Commins

Unlike Karasek, Commins was not assaulted in the context of a "specific program." As

United States District Court
Northern District of California

1    such, it is more difficult to establish the necessary causal link between the University's general

2    policy of deliberate indifference and Commins's assault.  *See Karasek*, 956 F.3d at 1113.

3          The plaintiffs' Opposition makes few causation arguments specific to Commins.  It argues

4    that had the University "properly trained Commins and John Doe 2 on how to detect and prevent

5    sexual misconduct, a reasonable factfinder could conclude that Commins' assault would not have

6    occurred."  Oppo. 18.  That allegation, however, is "conclusory."  *See In re Gilead Scis. Sec.*

7    *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  While I have explained that the University's

8    deliberately indifferent policy created some general heightened risk, Commins has alleged no facts

9    that show that policy would have made *her* assault more likely.  She has not indicated, for

10   instance, what about the training would have affected her particular situation.  *Cf. Flores v. Cty. of*

11   *Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) ("If the threat of prison time does not

12   sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to

13   commit sexual assault will provide such deterrence.").  Nor does she point to any authority that

14   such a general allegation can suffice to show causality.

15         The plaintiffs argue more generally that the University's "systemic failures in responding

16   to sexual misconduct on campus" contributed to the assaults, including of Commins.  Oppo. 17.

17   But again, they offer no more than this conclusory, high-level assertion.  As I explained above, the

18   plaintiffs plausibly alleged that the risk to students generally was increased, as the Audit indicates.

19   But "[t]he element of causation ensures that Title IX liability remains within proper bounds.  To

20   that end, adequately alleging a causal link between a plaintiff's harassment and a school's

21   deliberate indifference to sexual misconduct across campus is difficult."  *Karasek*, 956 F.3d at

22   1114.  To see why the Ninth Circuit held that it is difficult to draw this causal link, consider

23   hypothetical situations in which such a causal link might plausibly be drawn.  For instance, if a

24   university systemically failed to discipline employees for harassment and an employee who had

25   not been disciplined for past harassment committed further harassment, it is plausible that the

26   university's policy failure contributed to that.  Here, however, there is no non-conclusory causal

27   link alleged between the University's general policy of deliberate indifference—or the heightened

28   risk it created—and what happened to Commins in particular.

Because this is Commins's first attempt now that the case has been remanded and it seems possible she could adequately plead a causal connection, dismissal of her claim is with leave to amend.

## VII.    SEVERITY OF HARASSMENT

The second part of the final element that a plaintiff must adequately allege is that he or she "suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school." *Karasek*, 956 F.3d at 1112.

Unsurprisingly, the parties disagree about what this language means.  The University argues that it means the plaintiffs must demonstrate a distinct deprivation of educational opportunities or benefits as a result of the harassment, *see* Mot. 23–24, while the plaintiffs argue that *Karasek*'s "plain language . . . requires a plaintiff to allege only a single injury: a sufficiently severe incident of sexual misconduct," Oppo. 24.

The language at issue was taken directly from *Davis.  Karasek*, 956 F.3d at 1112.  It was not, however, in the Ninth Circuit's original draft of the opinion.  *See Karasek v. Regents of the Univ. of California*, 948 F.3d 1150, 1169 (9th Cir. 2020).  That opinion's fourth element simply read: "the plaintiff was harassed as a result." *Id.*  After the panel issued its opinion, the University requested a rehearing or rehearing en banc.  *See* Request for Judicial Notice Ex. A ("Pet. for Reh'g") [Dkt. No. 142-1].[9]  One of its contentions was that the panel's language "implie[d] that the type of harassment needed to support a 'pre-assault' claim might be less than that required to support a 'post-assault' claim." *Id.* at 14.  The University argued that the language, "perhaps inadvertently," omitted the requirement that the harassment be "so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Id.* (quoting *Davis*, 526 U.S. at 650).  The panel

---

[9] The plaintiffs' request for judicial notice of the University's Petition is GRANTED because I may "take judicial notice of court filings." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  Citations to the Petition for Rehearing are to that document's original page numbers.

United States District Court
Northern District of California

then amended its decision to include the language that exists now.  *See Karasek*, 956 F.3d at 1098, 1112.

The plaintiffs have the better reading of *Karasek*.  The Ninth Circuit instructed that the plaintiff must have "suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school."  *Id.* at 1112 (internal quotation marks and alterations omitted). To break down the sentence, the Ninth Circuit stated that the *harassment* must be so serious "that *it* can be said to have deprived the plaintiff..."  *Id.* (emphasis added).

This reading also makes sense given the structure of a pre-assault claim.  The University's violation of Title IX *is* the policy of deliberate indifference and the resulting injury is the harassment.  I do not read the Ninth Circuit to impose a different requirement that the harassment then cause *other* injuries.  Instead, the harassment itself must be of sufficient severity, pervasiveness, and offensiveness that it can be said to have deprived the plaintiff of access to educational opportunities.[10]

Although the Ninth Circuit's opinion speaks for itself, I note that the University's Petition for Rehearing belies its argument.  That Petition stated that the problem with the Ninth Circuit's original formulation—that "the plaintiff was harassed as a result"—is that it omitted "any mention of the 'severe, pervasive, and objectively offensive' requirement."  Pet. for Reh'g at 15.  The University objected to that omission because it "implie[d], perhaps inadvertently, that some lesser form *of harassment* can support a pre-assault claim."  *Id.* (emphasis added).  The Petition went on to say that "the Supreme Court and this Court have made clear that *severe and pervasive harassment* is required for all Title IX harassment claims."  *Id* (emphasis added).  The focus of the Petition was entirely on the level of severity of the harassment, not on some independent deprivation of educational benefits or opportunities.  *See also id.* at 1–2 (summarizing this

---

[10] My Prior MSJ Order is not to the contrary.  That Order explained that "the reasoning behind the 'severe, pervasive, and objectively offensive' requirement [is that] it must 'be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school."  Prior MSJ Order, at *14 (internal alteration omitted).  In the pre-assault context, the school has already intentionally acted by having an official policy of deliberate indifference.  *Karasek*, 956 F.3d at 1112.

1   argument).  To the extent the panel was responding to this Petition—both of the changes it made

2   were those requested—it did so against the backdrop of a very different argument than the

3   University now advances.

4       Because I conclude that the University's new interpretation is incorrect, I must reject its

5   argument.  The University does not dispute that the plaintiffs have adequately alleged

6   "harassment" that is "severe, pervasive, and objectively offensive."  Instead, it argues that Karasek

7   was not deprived of educational benefits or opportunities beyond that harassment.  Mot. 24.  As I

8   have explained, the Ninth Circuit's opinion requires that the harassment Karasek was subjected to

9   be sufficiently "severe, pervasive, and objectively offensive."  Here, she has adequately alleged

10  that it was.  She awoke around 3:00 am on the retreat to find TH "massaging her legs, back and

11  buttocks."  FAC ¶ 42.  He continued to do so for approximately 30 minutes.  *Id.*  The University

12  has pointed to no case in which such egregious behavior was found to not be severe sexual

13  harassment.

### CONCLUSION

15      The motion to dismiss is GRANTED IN PART and DENIED IN PART.  Butler and

16  Commins's claims are dismissed.  Commins has leave to amend the complaint to address

17  causality; any amended complaint shall be filed within 20 days of the date this order issues.

18  Karasek has adequately alleged a claim, which is not dismissed.

19      A Case Management Conference is set for December 15, 2020 at 2 p.m.  The Joint Case

20  Management Statement shall be filed by December 8, 2020, and shall include a proposed schedule

21  for trial and the remainder of the case.

22  **IT IS SO ORDERED.** Dated:

23          November 13, 2020



William H. Orrick
United States District Judge

*(left margin)* United States District Court
Northern District of California

34