1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    SOFIE KARASEK, et al.,                    Case No.  3:15-cv-03717-WHO

8                    Plaintiffs,
                                               **ORDER ON MOTION TO DISMISS**
9            v.
                                               Re: Dkt. No. 156
10   REGENTS OF THE UNIVERSITY OF
     CALIFORNIA, THE,
11
                    Defendant.
12

13          While she was enrolled at the University of California, Berkeley ("the University"),

14   plaintiff Nicoletta Commins was sexually assaulted by a person who had previously been sexually

15   inappropriate and aggressive.  Commins alleges that the University systemically failed to educate

16   its students about sexual assault and appropriate sexual interactions.  This failure, she argues,

17   violated Title IX because it constituted a policy of deliberate indifference to sexual harassment

18   that created an obvious risk of it and led to her assault.  If the University had provided sexual

19   misconduct education, she asserts that she would not have engaged in the later interaction during

20   which he assaulted her.

21          The University moves to dismiss.  Although the law on this issue is new, evolving, and not

22   yet firmly settled, Commins has plausibly pleaded a claim to overcome a motion to dismiss.  The

23   motion is denied.

24                                    **BACKGROUND**

25   I.     **FACTUAL BACKGROUND**

26          I have discussed the factual background of this case in many previous orders.  Here, I

27   include only those facts relevant to the current motion.

28

United States District Court
Northern District of California

### A.  The University's Alleged Sexual Misconduct Failures

Commins alleges that the University took or failed to take a number of actions that amount to or relate to policies of deliberate indifference to sexual misconduct.  Many of Commins's claims about the University's broad policies are based on an audit performed by the California State Auditor that was published in June 2014.  *See* Sixth Amended Complaint ("SAC") [Dkt. No. 151] ¶ 19; California State Auditor, Rep. No. 2013-124 Sexual Harassment and Sexual Violence (2014), https://www.auditor.ca.gov/pdfs/reports/2013-124.pdf (the "Audit").  That Audit examined four California universities' sexual misconduct policies and responses, including the University's.

This is the second motion to dismiss this claim after appeal.  *See Karasek v. Regents of Univ. of California*, No. 3:15-CV-03717-WHO, 2020 WL 6684869, at *5 (N.D. Cal. Nov. 12, 2020) ("Prior Order").  Most relevant to the first motion on her claims is the University's alleged policy of resolving sexual assault claims.  That alleged policy was the primary focus of the Prior Order.  As I described it there,

> The Audit found that the University "resolved 76 percent of Title IX complaints from students using the [informal] early resolution process." [Audit] 53.  Given "significant procedural differences between the formal and informal processes," the Audit found that universities should have, but did not, always clearly communicate to complainants about those differences.  *Id.*  Indeed, the Audit used a case from the University as an example of how the informal process could lead to improper handling of complaints.  *Id.* 53.  The University was, for example, "unable to demonstrate that [it] consistently informed students of what to expect as the university investigated their complaints and how to report retaliatory harassment."  *Id.* at 55.  It also failed to "provide regular updates" to complainants and "consistently complete investigations in a timely manner."  *Id.* at 57, 61.
>
> . . .
>
> The plaintiffs also allege that the University systemically "underreported the amount of sexually violent incidents that occurred on campus" prior to their enrollment.  [Fifth Amended Complaint] ¶ 25.  Additionally, they allege that, in all of the cases reported to the [Center for Student Conduct] in 2013, "no formal hearings were held," meaning that all were resolved informally.  *Id.*  ¶ 26. Despite this, in February 2014, Denise Oldham, the University's interim Title IX officer, stated to the Los Angeles Times that she could not "imagine a situation where" using the informal resolution process for sexual assault cases "would be appropriate."  *Id.* ¶ 31.  The plaintiffs allege that "at least three witnesses were told by Oldham that the [Office for Prevention of Harassment and Discrimination] handles approximately 500 cases per year and that of the 500 cases handled in 2012 only two were resolved through a formal process."  *Id.* ¶ 32.

2

The University, the plaintiffs assert, "consciously and intentionally" used the informal process to "avoid the reporting requirements" under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f)(1)(F)(i).  *Id.* ¶¶ 32–33. They claim that the University "takes the position that if the matter is resolved informally, it is not required to report the offense as mandated by the Clery Act."  *Id.* ¶ 33.

Prior Order, at *4–*5.

The University's alleged deficiencies in *educating students* about sexual misconduct are most relevant to Commins's current theory.  The Audit's high-level finding was that the universities "must do more to appropriately educate students on sexual harassment and sexual violence.  Specifically, universities should ensure that incoming students receive this education as close as possible to when they first arrive on campus, as well as provide refresher training to all continuing students at the university on a periodic basis."  Audit 15; *see also id.* 27.  It also found that the content of that education "could be improved," but did not single out the University as it did for San Diego State University.  *Id.*  The Audit developed five categories by which it would assess "training and informing students"; the University received "no concerns identified" in four and received "some concerns identified" for distributing copies of its sexual harassment policy to all students at orientation.  Audit 16–17.  It further found that the University did not "consistently provide[] [sexual harassment and violence] education to freshmen at their summer orientations during the five years we reviewed," but did provide it at "various times" throughout the school year.  *Id.* 27.

This failure to consistently provide timely education, the Audit found, was particularly significant to student safety because the first six weeks of the fall semester are a "red zone" in which students are at increased risk of sexual assault, potentially because they are thrust into a social situation that is unfamiliar.  *Id.*  The Audit faulted the University for failing to have "processes to ensure that all incoming students receive the education."  *Id.* 29.  The University does not have consequences for students who fail to attend these trainings, and its own data showed that "only 52 percent of incoming students attended the education it provided for the 2013 – 2014 academic year."  *Id.*  The Audit concluded that the University's educational failings "put[] the safety of their students at risk."  *Id.* 30.

United States District Court
Northern District of California

Commins also alleges that the University is deficient in other ways that are not causally linked to the assault. One is in adequately training faculty and staff, including those who are primary contacts for complaints of sexual misconduct. *See id.* 17–26. These failures create a risk of "mishandling" students' reports of sexual misconduct. *See, e.g.*, *id.* 15. In addition, Commins asserts that the University maintained multiple, contradictory policies for reporting sexual misconduct, including which office had investigatory responsibility. *See* SAC ¶¶ 11–18, 178. She claims that the University failed to adhere to federal Title IX guidelines. *Id.* ¶ 180.

### B. John Doe 2's Assault of Commins

Commins was sexually assaulted in January 2012 while enrolled at the University. SAC ¶ 107. The assaulter, "John Doe 2," was another student at the University. *Id.* Commons alleges that, "[p]rior to the sexual assault, [she] was very inexperienced with intimate, sexual relationships." *Id.* ¶ 109. After Commins invited Doe 2 to her apartment, he "began aggressively forcing Commins to engage in sexual behavior that she did not consent to." *Id.* ¶¶ 113–14. As she describes it, "[w]ithout Commins' consent, John Doe 2 performed oral sex on Commins, tried to coerce Commins to perform oral sex on him by forcibly pushing her head towards his genitals and getting on top of Commins and rubbing his penis on Commins [sic] face as she turned away, and digitally penetrated Commins." *Id.* ¶ 114.

At some point before Doe 2 assaulted Commins, they "encountered" each other at a party at his fraternity and "engage[d] in light sexual activity." *Id.* ¶ 112. Doe 2 "was very aggressive with Commins." *Id.* She "was able to end the encounter, claiming that her friends were looking for her." *Id.* She alleges that "[b]ecause the University provided her with no training or education, at the time, Commins did not understand that this behavior was not appropriate, and could be indicative of a dangerous individual." *Id.* According to her, "[h]ad she been given appropriate training and education related to sexual misconduct, Commins would have recognized John Doe 2 as a dangerous individual and would not have continued any sexual relationship with him following their initial sexual encounter." *Id.* ¶ 184. The University's alleged failure to educate "prevented Commins from understanding the nature of acceptable sexual conduct, as well as the nature and extent of consent." *Id.* ¶ 183. She further alleges that she "would have been

empowered to stop" the assault if she had been educated.  *Id.* ¶ 185.

She alleges (on information and belief) that "at no time prior to her sexual assault did the University provide Commins with any training or education related to safe, sexual conduct, including but not limited to, what type of sexual conduct is appropriate, the nature and extent of consent, and how to identify warning signs related to potentially dangerous circumstances or individuals."  *Id.* ¶ 110.  She similarly alleges that Doe 2 was not given any such education either.  *Id.* ¶ 111.  Although Commins was "not comfortable with John Doe 2's conduct," she states that "she did not fully appreciate the wrongfulness of his conduct in the moment" because of the University's alleged "fail[ure] to provide her with any training related to appropriate sexual conduct."  *Id.* ¶ 115.  She also alleges that Doe 2 "did not understand that what he did was wrong" in the immediate aftermath of the assault and that his behavior "was consistent with someone who believed that he had just engaged in a normal, appropriate sexual encounter rather than someone who had just sexually assaulted a friendly acquaintance."  *Id.* ¶ 116.  Commins further contends that Doe 2's fraternity had a reputation as the "date rape" fraternity, but that she was unaware of that reputation and would not have gone there or invited Doe 2 over had she known.  *Id.* ¶ 122.[1]

The focus of the current claim is on the University's pre-assault conduct, not its post-assault response as in earlier phases of litigation.  In brief, Commins reported the assault to the University's police department who referred her to the Berkeley Police Department.  *See id.* ¶ 119.  Doe 2 was later charged with felony sexual assault.  *Id.* ¶ 123.  The University placed him on interim suspension but allegedly failed to inform Commins about it or the hearing on it.  *Id.* ¶¶ 124–25.  After that hearing, Doe 2 was allowed to be on campus to attend classes and get to and from them, which Commins alleges she was not informed about.  *Id.* ¶ 126.  Commins reported the assault to the University in February 2012 and a series of post-reporting events occurred that were the subject of earlier orders.

---

[1] Doe 2 is alleged to have physically assaulted two other students four days prior to his sexual assault of Commins, which the University is alleged to have known about and charged him with conduct violations for.  *See* SAC ¶ 121.  Commins's theory of pre-assault Title IX liability does not turn on those actions.

## II.        PROCEDURAL BACKGROUND

Three plaintiffs, Sofie Karasek, Aryle Butler, and Commins, filed this action in California state court and the University removed it in August 2015.  Dkt. Nos. 1, 1-1.  After a lengthy series of motions and orders that I have discussed in previous orders, I eventually granted the University's motion to dismiss Karasek and Commins's claims and motion for summary judgment on Butler's.  On appeal, the Ninth Circuit affirmed my rulings on the plaintiffs' post-assault claims.  *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105–12 (9th Cir. 2020) ("*Karasek*").  That court reversed my ruling on the pre-assault claims, holding for the first time that "such a claim is a cognizable theory of Title IX liability."  *Id.* at 1112.  It remanded the case to me to determine whether the plaintiffs had adequately pleaded pre-assault claims.

The plaintiffs amended the complaint, narrowed to the pre-assault claim.  In the Prior Order, I granted in part and denied in part the University's motion to dismiss the plaintiffs' claims. I denied the motion to dismiss Karasek's claim, finding it adequately pleaded.  Prior Order, at *21. I dismissed Butler's claim with prejudice because it was foreclosed by my summary judgment order.  *Id.*, at *12. And I dismissed Commins's claim with leave to amend because, while she adequately alleged many elements of a pre-assault claim, she had not plausibly pleaded causation. *Id.*, at *19.  Commins amended her claim in the SAC and the University again moves to dismiss.[2]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff

---

[2] Karasek's claims were not dismissed, are unaltered in the SAC, and are not challenged here.

United States District Court
Northern District of California

1   must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*,

2   550 U.S. at 555, 570.

3       In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

4   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

5   plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court

6   is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

7   fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

8   2008).

9       If the court dismisses the complaint, it "should grant leave to amend even if no request to

10   amend the pleading was made, unless it determines that the pleading could not possibly be cured

11   by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In

12   making this determination, the court should consider factors such as "the presence or absence of

13   undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous

14   amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See*

15   *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

16                               **DISCUSSION**

17       Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

18   excluded from participation in, be denied the benefits of, or be subjected to discrimination under

19   any education program or activity receiving Federal financial assistance." 28 U.S.C. § 1681(a).

20   Under Title IX, victims of sex discrimination have a private right of action against those recipients

21   of federal funds for their alleged Title IX violations. *Cannon v. Univ. of Chicago*, 441 U.S. 677,

22   709 (1979).

23       In *Karasek*, the Ninth Circuit held that a pre-assault claim can lie against a recipient of

24   federal funds. Such a claim alleges an "intentional[] violat[ion of] the statute." *Karasek*, 956

25   F.3d at 1112 (quoting *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629,

26   650 (1999)). The court laid out four elements to plead a successful pre-assault claim: "(1) a school

27   maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a

28   heightened risk of sexual harassment that was known or obvious (3) in a context subject to the

school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school." *Id.*

# I.    THE POLICY AT ISSUE

As an initial matter, the parties disagree about what policy is at issue. The answer to this question governs analysis of the merits and the statute of limitations. I address it first.

## A.  The Policy Analyzed in the Prior Order

The Prior Order found that the plaintiffs had adequately alleged a "de facto policy of deliberate indifference to reports of sexual misconduct." *See* Prior Order, at *12–*14.[3]  In particular, the plaintiffs alleged—supported by the Audit—that the University often used the "informal" sexual misconduct resolution process that its own Title IX official said would not "be appropriate" for resolving sexual assault claims. *Id.*, at *13.  Despite this, the University was alleged (and found in the Audit) to have used that process in the vast majority of cases. *Id.*  There are, according to the Audit, "significant procedural differences between the formal and informal processes." *Id.* (quoting Fifth Amended Complaint [Dkt. No. 138] ¶ 53).  As I explained,

> One key difference is that, when the University employed the informal process, it could not demonstrate to the Auditor that it "consistently informed students of what to expect as the university investigated their complaints and how to report retaliatory harassment." And it failed to "provide regular updates" to complainants and "consistently complete investigations in a timely manner."

*Id.* (internal citations omitted).  These problems and others, the Audit found, "led to mishandling of complaints and placed student safety at risk." *Id.*, at *17.  Because of this allegation and others, the Prior Order went on to find that the policy "created a heightened risk of sexual harassment that was known or obvious." *Id.*

I also explained that this alleged de facto policy was, as pleaded, not mere negligence or laziness.  Instead, the University is alleged to utilize the informal process to avoid reporting

---

[3] The Prior Order also found that the University was adequately alleged to maintain such a policy with respect to "reports of sexual misconduct within the [Cal Berkeley Democrats] Club," the context in which Karasek was assaulted. *See* Prior Order, at *15–*16.  That alleged policy is unrelated to Commins's claims.

United States District Court
Northern District of California

requirements under the Clery Act.  *Id.*, at *5, *14.  This "alleged Clery Act motive, taken as true, elevates [the systemic use of the informal process] from mere 'carelessness or 'negligen[ce]' to behavior that is intentional."  *Id.*, at *14.  As I explained, "[i]f, as the University's own Title IX officer publicly claimed, the informal process is inappropriate to resolve sexual assault cases, the University's [alleged] use of that process can easily be described as indifferent to at least some reports of sexual assault."  *Id.*

Finally, I found that several other actions and inactions by the University "plausibly indicate[] University officials' deliberate indifference."  *Id.*, at *13.  The plaintiffs alleged that "the University failed to adequately educate students about sexual misconduct on campus."  *Id.* They alleged that "faculty and staff—including those who are the points of contact for sexual misconduct reports—were inadequately trained in how to respond to complaints of sexual assault."  *Id.*  "[T]he University's alleged systemic failures to adequately inform incoming students about sexual misconduct and adequately educate staff who must handle the complaints," I explained, "bolstered" the allegation that University officials' indifference was deliberate.  *Id.*, at *14.

### B.  The Policy Commins Alleges

In the present motion, the University argues that Commins's amended allegations now rely on a different policy than the one previously found to be adequately pleaded.  It interprets Commins to allege a "policy of deliberate indifference based on the University's failure to provide a specific type of 'safe, sexual conduct' training."  Motion to Dismiss ("Mot.") [Dkt. No. 156] 2. Commins resists this characterization, arguing that "[i]n the SAC, Ms. Commins did not alter or add to any of the allegations that this Court found plausibly alleged a timely claim that UC maintained a policy of indifference to sexual misconduct that was known or obvious."  Opposition to the Mot. ("Oppo.") [Dkt. No. 160] 2.  Far from alleging a new policy, Commins argues that she "has consistently alleged that UC, in addition to its other systemic deficiencies, broadly failed to train or educate its students with respect to sexual misconduct."  *Id.*  She asserts that the only meaningfully changed allegations relate to causality, in line with the Prior Order that permitted her to allege facts demonstrating a causal link between the challenged policy and the assault.

It is true, as Commins says, that the deficiencies in student education that she alleges are not all that different from the educational deficiencies that the plaintiffs previously alleged. They are also supported by the same Audit findings. But I agree with the University on the broader point that the Prior Order did not find that these deficiencies in student education and training about sexual misconduct were, *on their own*, policies that met *Karasek*'s pre-assault standard. As explained above, the crux of the Prior Order's findings was the alleged policy of using the informal resolution process. Prior Order, at *13–*14. That policy, not any others, was allegedly motivated by Clery Act reporting requirements, plausibly rendering it deliberately indifferent. *Id.* That policy was what I found to have plausibly created a heightened risk of sexual harassment that was known or obvious. *Id.*, at *17. And that policy was the primary focus of the Ninth Circuit's concern. *Karasek*, 956 F.3d at 1113.

It makes sense that that policy was the subject of previous analysis, because it is the policy that the plaintiffs proffered in their previous motions as satisfying the pre-assault standard. For instance, in discussing the timeliness of their claims, the plaintiffs argued, "Plaintiffs here had no reason to investigate whether UC had a policy of discrimination against women who *reported* sexual misconduct…" Dkt. No. 142 at 4 (emphasis added). In asserting that the statute of limitations was tolled because of fraudulent concealment, they represented that,

> Plaintiffs allege that (1) the University underreported the amount of sexual misconduct committed on campus prior to their enrollment; (2) UC publicly stated that it would always use a formal resolution process for reports of sexual assault, when in practice, it resolved the vast majority of sexual assault complaints using an informal resolution process; and (3) UC resolved sexual assaults using an informal resolution process in order to avoid its obligation to publicly report incidents of sexual misconduct pursuant to the [Clery Act].

*Id.* at 5 (internal citations omitted). In defining the policy at issue, the plaintiffs quoted the Ninth Circuit, whose description largely centered on the policy addressed in the Prior Order. *Id.* at 12. The plaintiffs' brief then went on to describe the alleged policy of using the informal resolution process. *Id.* at 12–13.

To be sure, the Prior Order, the Ninth Circuit, and the plaintiffs also referenced the alleged failures to educate students, but to varying degrees and for different purposes. At several points in their brief, the plaintiffs referenced failures to educate. *See, e.g.*, *id.* at 18. But they almost always

10

did so packaged with the other policy deficiencies. *See, e.g.*, *id.* at 19 ("It is foreseeable that maintaining deficient sexual misconduct policies, failing to train students and faculty, failing to meaningfully punish perpetrators of sexual misconduct, actively concealing the breadth of sexual misconduct on campus, failing to meaningfully enforce policies, and lying to the public about enforcement of policies would lead to sexual assaults to be committed on campus."). The plaintiffs never attempted to show that failures to educate students, standing alone, would constitute a policy of deliberate indifference. The only allegation they argued in briefing that was indicative of deliberate indifference was the Clery Act motive. *Id.* at 13.

The Prior Order also referenced deficiencies in education and training. But it did so to support a finding of an adequate inference of *deliberate indifference*, not that an alleged failure to educate students was alone a policy of deliberate indifference that created a heightened risk of sexual harassment. *See* Prior Order, at *13 ("The FAC's allegations—supported by the Audit— also show that the University failed to adequately educate students about sexual misconduct on campus, *which plausibly indicates University officials' deliberate indifference*.") (emphasis added); *id.*, at *14 ("*This conclusion* [about an inference of indifference] is bolstered by the University's alleged systemic failures to adequately inform incoming students about sexual misconduct and adequately educate staff who must handle the complaints.") (emphasis added); *id.* ("[T]he plaintiffs here do not rely solely on educational deficiencies, as I explain above [in contrast to a cited case].")  The Ninth Circuit only referenced educating students once, in passing; the bulk of its discussion focused on the investigatory deficiencies and, to a lesser extent, *staff training* for handling misconduct complaints. *See Karasek*, 856 F.3d at 1113–14.

Finding that a pre-assault claim can be predicated solely on a failure to educate students would be an expansion of *Karasek*. As the court explained,

> We do not hold that deliberate indifference to reports of past sexual misconduct is the only form of pre-assault conduct that could result in an institution's Title IX liability. Rather, we focus on the sufficiency of such allegations *because they are what the FAC articulates*. We do not have occasion to consider whether other forms of pre-assault conduct could amount to an official policy of deliberate indifference that is actionable under Title IX.

*Id.* at 1112 n.5 (emphasis added). Some failures to educate students about sexual assault will lead

1   to viable Title IX claims, as I discuss later.  But I did not reach that conclusion in the Prior Order;

2   its discussion of student education was for a much more limited purpose.  The policy at issue there

3   was one of deliberate indifference "to reports of sexual misconduct."  Prior Order, at *12;

4   *Karasek*, 856 F.3d 956 at 1113.

5          Commins's theory has now narrowed.  She does not argue that there is causality between

6   her assault and the alleged policy of using the informal resolution process.  Nor does she allege

7   that there is a link between *staff* mishandling of complaints (which the Audit found to create a

8   heightened risk) and her assault.  Instead, her theory of causation is: (1) the University failed to

9   adequately educate her about sexual misconduct and (2) the University failed to maintain a policy

10  that "could have led Doe 2 to recognize that his behavior during their first sexual encounter was

11  wrong."  Oppo. 16–17.

12          **C.  "Mix-and-Match" Approach to Title IX Claims**

13          Commins appears to argue that she can show one policy is deliberately indifferent but

14  another caused the assault.  *See, e.g.*, Oppo. 7–8 ("Her SAC not only alleges that UC failed to train

15  its students on sexual misconduct (although that would be enough under the Ninth Circuit's

16  standard), but also realleges all the allegations contained in her FAC related to UC's broad

17  systemic failure to respond reasonably to sexual misconduct on campus.").  The University aptly

18  describes this as a "mix-and-match" approach to a Title IX claim.  Reply 5.  I previously rejected a

19  similar argument that she could illustrate causality from what she termed the University's general

20  "systemic failures in responding to sexual misconduct on campus."  Dkt. No. 142 at 17; *see also*

21  Prior Order, at *19 (addressing this argument).

22          This is not a viable theory of causation.  A Title IX pre-assault plaintiff must show that her

23  harassment occurred "*as a result*" of the policy of deliberate indifference that created a heightened

24  risk of harassment that was known or obvious.  *Karasek*, 956 F.3d at 1112.  A plaintiff cannot

25  allege that a school had such a policy but that a *different* policy caused the assault.  Commins must

26  show that the only policy she contends is causally connected to the assault—the alleged failure to

27  educate students about sexual misconduct—was deliberately indifferent and created a heightened

28  risk of sexual harassment that was known or obvious.

United States District Court
Northern District of California

## II.      STATUTE OF LIMITATIONS

The University argues that Commins's amended claim is untimely.  It is not persuasive.

A motion to dismiss based on a statute of limitations can only be granted when its running "is apparent on the face of the complaint."  *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (internal quotation marks and citation omitted).  "Title IX claims are subject to the applicable state statute of limitations for personal injury actions."  *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006).  California's relevant personal injury statute of limitations is, and was at all relevant times, two years.  CAL. CIV. P. CODE. § 335.1; *see Stanley*, 433 F.3d at 1136.

In the Prior Order, I explained that there was a split among district courts in this Circuit (and elsewhere) about when a Title IX pre-assault claim accrues and, therefore, when the statute of limitations is triggered.  That issue is governed by federal law and "[t]he standard federal rule is that this accrual occurs when the plaintiff has a complete and present cause of action."  Prior Order, at *7 (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)) (internal quotation marks omitted).  The "touchstone for determining the commencement of the limitations period is notice: a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action."  *Stanley*, 433 F.3d at 1136 (internal quotation marks omitted).  I joined those courts that have held that a pre-assault claim accrues "when the plaintiff knows or has reason to know of the school's policy of deliberate indifference that created a heightened risk of harassment."  Prior Order, at *8.  I rejected the University's position that the claim automatically accrues when a plaintiff is assaulted.  *Id.*  I incorporate that portion of the Prior Order here.  The University accepts that this dispute is now governed by the accrual standard I previously laid out. *See* Mot. 9 n.3.

Commins first argues that this debate is foreclosed by the Prior Order.  Oppo. 21.  Not so. The Prior Order held that the plaintiffs' claims were not barred by the statute of limitations (at the motion-to-dismiss stage) because plaintiffs plausibly would not have known of the alleged policy of deliberate indifference until the Audit was published, but Commins now alleges that the policy of deliberate indifference is in student education alone.  The University contends that Commins

must have known or reasonably should have known of the educational deficiencies when she was assaulted "because she necessarily knew at that time what training she had or had not received prior to the assault."  Mot. 9.

The University's statute of limitations argument fails.  While Commins would know what education she did and did not receive at the time of the assault, the relevant inquiry is into when she did learn or should have learned of the alleged *policy* of the University.  Prior Order, at *8.  At this stage, I cannot determine that she *necessarily* would reasonably have known about the University's alleged *systemic* failures to educate its students about sexual misconduct until the Audit was published.  The University's argument is premature and cannot be granted on a motion to dismiss.

## III.    PRE-ASSAULT CLAIM

The University does not dispute that Commins has adequately alleged that the heightened risk (and assault) occurred in a context subject to its control or that the assault was sufficiently severe harassment.  It argues that Commins's claim must be dismissed because it does not allege a policy of deliberate indifference that created a known or obvious heightened risk of sexual misconduct and because she again does not adequately allege causation.

Commins first argues that all inquiries except causation are barred by the law of the case doctrine.  Oppo. 6–7.  "Under the law of the case doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case."  *Ingle v. Circuit City*, 408 F.3d 592, 595 (9th Cir. 2005).  That doctrine does not foreclose the University's arguments.  As explained, Commins now alleges that the assault was caused by a separate policy than the one that the Prior Order held adequate.  As a result, the Prior Order did not decide the issue.  I proceed to why Commins' claim satisfies the pre-assault standard.

### A.  Policy of Deliberate Indifference that Created a Heightened Risk

*Karasek* held that a cause of action existed when "a school maintained a policy of deliberate indifference to *reports* of sexual misconduct."  *Karasek*, 956 F.3d at 1112 (emphasis added).  But the court was also clear that "[w]e do not hold that deliberate indifference to reports of past sexual misconduct is the only form of pre-assault conduct that could result in an

United States District Court
Northern District of California

1   institution's Title IX liability. . . . We do not have occasion to consider whether other forms of

2   pre-assault conduct could amount to an official policy of deliberate indifference that is actionable

3   under Title IX." *Id.* & n.5.  As the court explained, a school's "official policy" can violate Title

4   IX.  *Id.*  Such a policy is an "intentional[] violat[ion of] the statute."  *Id.* (quoting *Davis*, 526 U.S.

5   at 642).  If a school intentionally (or with deliberate indifference) adopts a policy of systemically

6   failing to adequately educate students about sexual misconduct, that would seem to be just as

7   much an "intentional" act as a policy of ignoring reports of sexual misconduct.[4]

8        Deliberate indifference is a relatively high standard.  It requires that conduct be "more than

9   negligent, lazy, or careless."  *Oden v. N. Marianas Coll.,* 440 F.3d 1085, 1089 (9th Cir. 2006).

10  Cases from the post-assault context teach that the policy must be "an official decision by the

11  recipient not to remedy the violation."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290

12  (1998).  In the pre-assault context, "[a] school need not have had actual knowledge of a specific

13  instance of sexual misconduct or responded with deliberate indifference to that misconduct before

14  damages liability may attach."  *Karasek*, 956 F.3d at 1112.

15       Commins has adequately alleged a policy of deliberate indifference to sexual harassment

16  that created an obvious heightened risk.  She asserts that the University adopted a de facto policy

17  by which a significant number of students were never educated on sexual harassment and

18  violence.  As the Audit found, approximately half of the University's students had no record of

19  such training in one academic year (though not the precise academic year in question).  Audit 29–

20  30.  The failure to educate such a large percentage of the student body about any of the

21  fundamentals of sexual misconduct would plausibly create an obvious risk: an increase in sexual

22  misconduct.  *See id.*  That obvious risk plausibly shows deliberate indifference, provided that

23  Commins can ultimately show that University officials were or should have been aware of it.

24       In the last round of briefing, the University relied on *Doherty v. Emerson Coll.*, No. 1:14-

25  CV-13281-LTS, 2017 WL 4364406 (D. Mass. Sept. 29, 2017), to attempt to show that the

26  plaintiffs' allegations were insufficient.  That was not a pre-assault case even though there was

27

28  [4] The University does not argue that alleged failures to educate about sexual misconduct are categorically not actionable under *Karasek*.

reference to pre-assault conduct.  Prior Order, at *14.  But, as I explained, "the court there found that the school's educational programs were sufficient to show it was not deliberately indifferent. The University makes no attempt to compare those educational programs with its own and, in any case, the plaintiffs here do not rely solely on educational deficiencies."  *Id.* (internal citation omitted).

*Doherty* is a more useful comparator for education-based allegations standing alone. There, the plaintiff argued that "the alcohol-and-sexual-assault-related education and training Emerson provided to its students were so inadequate as to demonstrate a deliberate indifference to her sexual assault."  *Doherty*, 2017 WL 4364406, at *8.  The court found, however, that "[t]he undisputed evidence establishes that Emerson provided all students with information about sexual assault risks, alcohol risks, and resources available related to such risks," so the deficiency was at most in failing to expressly link alcohol use and sexual assault.  *Id.*  That is different from this case*:* Commins alleges that not all students—far from it—were given education and training about sexually appropriate behavior and consent.  The Audit supports that allegation.

The University has not pointed to any case in which allegations about an educational institution under Title IX as substantial as those here merited dismissal on the pleadings.  It turns to a group of cases from the Section 1983 context against entities that were not educational institutions.  Commins responds that those cases are entirely irrelevant.  *See* Oppo. 8.  I disagree. In formulating the Title IX deliberate indifference standard, the Supreme Court noted that "[c]omparable considerations" undergirded its adoption of the standard in the Section 1983 and Title IX contexts.  *Gebser*, 524 U.S. at 291.  It later described itself as having "employ[ed] the 'deliberate indifference' theory already used to establish municipal liability under [Section] 1983." *Davis*, 526 U.S. at 642.

The plaintiffs cite *Stilwell v. City of Williams*, 831 F.3d 1234 (9th Cir. 2016), and several non-binding cases to argue that Title IX and Section 1983 are distinct.  *Stilwell* highlights many of the differences between those causes of action, such as who can be sued and the substantive rights and protections of the statute.  But in terms of *the deliberate indifference element*, the Supreme Court was clear in *Gebser* and *Davis* that Title IX deliberate indifference is drawn from the

16

United States District Court
Northern District of California

Section 1983 cases. *Stilwell* also discussed the differences in liability: "a Title IX plaintiff can establish school district's liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference, whereas a plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice." *Stilwell*, 831 F.3d at 1243–44. In a Title IX *pre-assault* case, though, it is the school's policy that is at issue, in a way reminiscent of Section 1983.

While Section 1983 cases *can* be helpful, there is no principled reason for simply grafting them onto this context. A municipality's alleged failure to *train its employees* leading to alleged constitutional violations is distinct from a university's alleged failure to *educate its students* leading to alleged sexual harassment. The dynamics, duties, and risks are distinct. Although the institution's level of blameworthiness must, under both standards, be the same, there is no principled reason that precise *factual* requirements of the one should be imported wholesale into the other.

Moreover, the University's Section 1983 cases are quite different from this one and do not compel dismissal. *Flores v. County of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014), and related district court cases, dealt with what is required to hold a municipality liable for its failure to train police officers. In such cases, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores*, 758 F.3d at 1158 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (internal quotation marks omitted)). Accordingly, the municipality must have "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Id.* (internal quotation marks and alteration omitted). Here, the risk of sexual assault from failing to give any sexual misconduct education to such a large portion of the student body makes the harm plausibly "obvious" and makes it plausible that University officials disregarded that risk.

In *Flores*, the plaintiff alleged that she was sexually assaulted by a sheriff's deputy (while he was on the job) and sued the County on a theory that the assault was caused by its failure to

train deputies. *Id.* at 1156–57.  The court gave a number of reasons to dismiss that claim.  First, it held there was no pattern of similar violations in the past.  *Id.* at 1159.  Second, it held that the risks from the failure to train would not be "patently obvious" even without proof of a past pattern.  *Id.* at 1159–60.  The court explained that "[t]here is . . . every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law." *Id.* at 1160.  Third, *Flores* held that the claim was not plausible on its face for largely the same reason.  *Id.*  I previously cited this portion of *Flores* in discussing Commins's allegations because they were conclusory under the pleading standard.  Prior Order, at *19.  Now that Commins has fleshed out her theory, *Flores* does not require dismissal.  The situation as alleged at the University is different from the one in *Flores*.  While any incoming student will likely know that sexual assault is illegal, the entire reason that University sexual assault education is necessary is that the students will not necessarily know when certain behavior crosses the line or how to respond to it.  That is precisely what Commins alleges here: that she reasonably did not recognize that Doe 2's initial behavior was a threat.  SAC ¶¶ 110, 115.  That is unlike the police academy cadet who carries out the assault being assumed to be aware of the law surrounding sexual misconduct.

Nor does *Connick v. Thompson*, 563 U.S. 51 (2011), require dismissal.  *Connick* involved a failure of a government to train its own employees (there, prosecutors) in the law.  The situation of a University adequately educating students is fundamentally different.  As Commins has plausibly argued, and the Audit supports, a failure to educate students about sexual misconduct can put their safety at risk.  *Connick* held that the municipality must be on notice that the harm that would result is "highly predictable" absent the training.  *Connick*, 563 U.S. at 64.  At the motion-to-dismiss stage, I agree with Commins that it is *plausibly* "highly predictable" that students will be harassed on campus if a large proportion of them are not given education in sexual misconduct.

The University counters that its behavior was, at worst for it, negligent or careless and that there is no allegation showing deliberate indifference.  But as its own cases make clear, deliberate indifference can exist when a defendant "recognize[s] an unreasonable risk" and acts anyway, intentionally exposing the plaintiffs to that risk.  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th

Cir. 2011) (internal quotation marks and alteration omitted).  It is likely that if a university fails to ensure that a large percentage of its students receive adequate sexual harassment education, sexual harassment will predictably occur.  The reason such trainings are necessary is that many students will not be aware, as Commins alleges she was not, of the warning signs of inappropriate sexual behavior.  As the Audit found, the University's failures to educate students—separate and apart from any other alleged failures—put student safety at risk.

The University also argues that Commins insists on one specific type of training, training in "safe, sexual conduct."  *See* Mot. 10–15.  Commins's theory is broader.  She argues that the University did not train many students (including her) in even the fundamentals of sexual violence, appropriate sexual behaviors, and consent.  And the University contended at oral argument that there is no allegation that it was aware that so many students were not being educated.  But the Audit shows that its *own collected data* reflected this; at this stage, Commins is entitled to the reasonable inference that the University plausibly was aware of this.

### B.  Causation

The parties disagree over the unsettled question of what standard applies for causation in a Title IX pre-assault case.  The University argues it should be but-for and proximate cause; Commins argues that the policy need only be a substantial factor in the harassment.  This is a distinction with little difference.[5]

The parties treat the substantial factor test as being a lower standard than proximate cause—the plaintiffs even say it is lower than but-for causation.  That misunderstands their relationship.  "Under [the but-for] standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred."  *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  "Proximate cause"

---

[5] In the Prior Order, I declined to reach this question because I found that Karasek's claim was adequately pleaded under both standards and Commins's was not adequately pleaded under either (though I reminded the parties of the Supreme Court's recent decision that but-for causation is generally the "default" form for federal statutes).  Prior Order, at *18; *see also Barnett v. Kapla*, No. 20-CV-03748-JCS, 2020 WL 7428321, at *17 & n.16 (N.D. Cal. Dec. 18, 2020) (declining to reach the question on similar grounds).

United States District Court
Northern District of California

or "legal cause" ensures that there is some causal link between the act and the harm that is not "so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014).  "The doctrine of proximate cause serves merely to protect defendants from unforeseeable results of their" actions.  *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).

As the Ninth Circuit and Restatement of Torts make clear, the substantial factor inquiry is just an aspect of the proximate cause test.  In *Pacific Shores*, the Ninth Circuit laid out the standard for proximate cause and, while doing so, explained that "plaintiffs can demonstrate causation by proving that the defendant's wrongful conduct was a 'substantial factor' in bringing about the harm in question."  *Id.*  The Restatement (Second) of Torts explains that an actor's conduct is the "legal cause"—*i.e.*, the proximate cause—"of harm to another if . . . his conduct is a substantial factor in bringing about the harm."  Restatement (Second) of Torts § 431; *accord id.* § 435 (intertwining the standards).

Commins is incorrect in asserting that she must show something less than but-for causation.  And the University is wrong that the substantial factor test displaces usual tort principles of causation; it is part and parcel of them.  Although the University seeks to present proximate cause as a high bar, the reality is that proximate cause is "often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."  *Paroline*, 572 U.S. at 445.  At this stage, the question is (1) whether Doe 2's assault of Commins *plausibly* would not have occurred if the University had properly educated her (but-for causation) and (2) whether the risk to Commins was a *plausibly* foreseeable risk of the University's policy (legal causation).[6]

The Ninth Circuit has cautioned that "[c]ausation is an intensely factual question that should typically be resolved by a jury."  *Pac. Shores*, 730 F.3d at 1168.  Commins alleges that, had she received education from the University in what constitutes sexual assault or misconduct, she would have been able to "understand" that Doe 2's behavior at the fraternity party (prior to the assault) was "not appropriate."  SAC ¶ 112.  She would not have invited Doe 2 over later had she

---

[6] Different jurisdictions might adopt different causation principles; here, I discuss only the general common-law understanding because that is what the parties focus on.

been properly educated and the assault would not have occurred.  *Id.* ¶¶ 183–84.  These allegations are sufficient at this stage;  it is plausible that the assault would not have occurred "but for" the failure to educate.  And the "foreseeable" risk, *see Reynaga Hernandez v. Skinner*, 969 F.3d 930, 942 (9th Cir. 2020), of failing to train new students about sexual misconduct is that they will be less able to understand the dynamics of it when it occurs, and less knowledgeable about possible responses.[7]

The University responds that this link is "speculative" and "based on inference."  Mot. 17–20.  But what Commins alleges is precisely why universities conduct sexual harassment education in the first place.  The University claims that Commins advances the following attenuated causal chain:

> (1) she would have received and paid attention to "safe, sexual conduct" training at some earlier point; (2) she would have remembered that training months (or years) later when she met Doe 2; (3) she would have, based on that training, recognized Doe 2 as a potentially dangerous individual based on a single encounter; and (4) she would have made the decision to avoid a relationship with Doe 2 and therefore would have avoided her assault.

Mot. 17.  But many of these so-called "inferences" are reasonable and should be drawn in a plaintiff's favor at this early stage.  Commins is entitled to the reasonable assumption that she would have paid attention to sexual misconduct training if the University had given it and would have remembered it.  Doe 2's behavior was unacceptable, so it is plausible that Commins would recognize it for what it was if she had been educated in how to do so.  And the final alleged inference requires no speculation because Commins affirmatively pleads it. The University's arguments are premature; they do not show that allegations are not adequately pleaded at this early stage.  *See Pac. Shores*, 730 F.3d ("Juries are expected to rely on their common sense in resolving questions of causation.  Indeed, it is jurors' common experience of living on a populated planet that renders them at least as reliable, if not more so, than a single judge at assessing issues of causation.") (internal quotation marks and citation omitted).

---

[7] Because this theory of causation is viable, there is no need to address two other proposed theories of causation: (1) that *Doe 2's* behavior would have been different had the University properly educated *him* and (2) that Commins would have known how to prevent the assault in the moment if she had been educated.

The University invokes the "policy implications" of these causation arguments. It worries that "any individual assaulted on campus at the same time as Commins might have a potential pre-assault Title IX claim for money damages against the University, based on nothing more than the University's failure to provide a narrow and specific type of training." Mot. 20. Relatedly, it argues that,

> The same logic might render all manner of claims viable, because there is almost always some additional training that a plaintiff can claim would have prevented harm. For example, a plaintiff could claim that the University's failure to provide physical self-defense training led to an assault, or claim that the failure to provide training on healthy relationships led to an abusive relationship, in which context an assault later occurred (even without any specific allegation of how exactly such trainings would have prevented the assault).

*Id.*

The University attacks a straw man. I do not conclude that Commins's claim survives because of the failure to give "a narrow and specific type of training." Her claim survives based on the alleged (and, in the Audit, established) failure to provide *any* sexual misconduct training to a significant portion of students, which plausibly and obviously placed students at risk and caused her harm.

**CONCLUSION**

The motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: April 14, 2021

William H. Orrick
United States District Judge

United States District Court
Northern District of California